Gregory W. Gilliam
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York 10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

| | |
|---|---|
| MAGWITCH L.L.C., | : |
| | : **NOTICE OF REMOVAL** |
| Plaintiff, | : **(DIVERSITY)** |
| | : |
| -against- | : Case No.: 08cv2144 (LTS) |
| | : |
| PUSSER'S INC., PUSSER'S LTD., | : ECF Case |
| PUSSER'S WEST INDIES LTD., and | : |
| CHARLES S. TOBIAS | : (Removed from Supreme |
| | : Court, County of New York, |
| Defendants. | : Index No. 600238/08) |

-----------------------------------------------------------------------X

**TO THE CLERK OF COURT**:

   **PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446,

Defendants Pusser's Inc., Pusser's Ltd., Pusser's West Indies Ltd., and Charles S. Tobias

(collectively, "Defendants"), by and through their attorneys, remove to this Court the action

described below:

   1.    On January 25, 2008, plaintiff Magwitch L.L.C. ("Magwitch") filed a complaint

in the Supreme Court of New York, County of New York, entitled *Magwitch L.L.C. v. Pusser's*

*Inc., et al.*, Index No. 600238/08. Copies of all papers filed thus far in this action are attached

hereto at Exhibit A, and are provided to this Court pursuant to Local Rule 81.1(b).

2.      Plaintiff's complaint alleges eight causes of action sounding in contract and tort and arising out of an unpaid promissory note, and seeks damages in an amount in excess of $2,000,000.00, plus unspecified other compensatory damages and punitive damages.

3.      The removal statute, 28 U.S.C. § 1441, provides several bases for the removal of a state court action to federal court. Among other things, section 1441(a) states that "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

4.      28 U.S.C. § 1332(a) states in relevant part that "[t]he district courts shall have original jurisdiction of all civil actions where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different States...."

5.      Diversity jurisdiction exists over this action, as the matter in controversy exceeds $75,000 and complete diversity of citizenship exists between the parties. Plaintiff Magwitch seeks judgment in an amount exceeding $1.9 million, exclusive of interest and costs, a total in controversy far exceeding the minimum statutory requirement.

6.      Magwitch is a limited liability company organized under the laws of the State of New York. Its principal place of business is in Mountainside, New Jersey. Thus, Magwitch is a citizen of New York and New Jersey. Defendant Pusser's Inc. is a foreign corporation organized and existing under the laws of the State of Florida, with its principal place of business in Tortola, British Virgin Islands ("BVI"). Pusser's Inc. is, and was at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, a citizen of Florida and the

BVI. Defendant Pusser's Ltd. is a foreign corporation organized and existing under the laws of the BVI, with its principal place of business in the BVI. Defendant Pusser's West Indies Ltd. also is a foreign corporation organized and existing under the laws of the BVI, with its principal place of business in the BVI. Pusser's Ltd. and Pusser's West Indies, Ltd. are, and were at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, citizens of the BVI. Finally, Defendant Charles S. Tobias is, and was at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, a domiciliary and citizen of the BVI who resides at Road Town, Tortola, BVI. None of the Defendants are, or were at the time of the filing of the Complaint or at any time relevant to the matters in the Complaint, citizens of any state in which Magwitch is a citizen. This Court has jurisdiction under 28 U.S.C. § 1332 because both elements of diversity jurisdiction—diversity of citizenship and amount in controversy—are present.

7.      This Notice of Removal is timely filed. 28 U.S.C. § 1446(b) requires that a notice of removal be filed within 30 days after receipt of the initial pleading setting forth the claim. Defendant Pusser's Inc. received the summons and complaint on February 1, 2008. The remaining Defendants received the summons and complaint on February 13, 2008. This action is therefore timely removed under 28 U.S.C. § 1446 because the first of the Defendants to receive Magwitch's initial pleadings received them within 30 days of removal.

8.      Upon the filing of this Notice of Removal, Defendants will serve this Notice on Magwitch's counsel and will cause this Notice of Removal to be filed with the Supreme Court of the State of New York, County of New York, under Index No. 600238/08. A copy of the Notice of Filing of Notice of Removal to the Supreme Court is attached hereto as Exhibit B.

Dated: New York, New York
       March 3, 2008

Gregory W. Gilliam (GG 2857)
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Tel: (212) 307-5500
*Attorneys for Defendants Pusser's Inc.,*
*Pusser's Ltd., Pusser's West Indies Ltd., and*
*Charles S. Tobias*

TO:    Clerk of Court
       United States District Court
       Southern District of New York
       Daniel Patrick Moynihan
       United States Courthouse
       500 Pearl Street
       New York, New York  10007-1312

       Andrew W. Heymann, Esq.
       SOLOMON PEARL BLUM HEYMANN & STITCH LLP
       40 Wall Street, 35th Floor
       New York, New York  10004
       *Attorneys for Plaintiff Magwitch L.L.C.*

BA2/336484

4

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

MAGWITCH L.L.C.,                       :        Index No. 600233/08
                                                Date Purchased: 1-25-08
                    Plaintiff,          :
                                                System, INC
    -against-  c/o The Prentice Hall Corporation  Plaintiff Designates
                                                New York County as
PUSSER'S INC., a Florida corporation;   :        The Place of Trial
PUSSER'S LTD., a British Virgin Islands
corporation; PUSSER'S WEST INDIES       :        **SUMMONS**
LIMITED, a British Virgin Islands
Corporation; and CHARLES S. TOBIAS      :        The basis of venue
                                                is the residence of Plaintiff
                    Defendants.         :        Plaintiff resides in
                                                New York County

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO THE ABOVE NAMED DEFENDANTS:

            YOU ARE HEREBY SUMMONED, to answer the complaint in this

action and serve a copy of your answer, or, if the complaint is not served with this

summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within twenty

(20) days after the service of this summons, exclusive of the day of service (or within 30

days after service is complete if this summons is not personally delivered to you within

the State of New York); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

Thomas N. Vause
Certified Process Server ID#145
Second Judicial Circuit Florida
Date 2-1-08 Time 3:15pm

NEW YORK
COUNTY CLERK'S OFFICE
JAN 25 2008
NOT COMPARED
WITH COPY FILE

Dated: New York, New York
      January 22, 2008

SOLOMON PEARL BLUM HEYMANN & STICH LLP

By: _____
      Andrew W. Heymann
      Attorneys for Plaintiff
      40 Wall Street
      35th Floor
      New York, New York 10005
      (212) 267-7600

To:     Pusser's Inc.
       80 Compromise Street
       Annapolis, Maryland
             and
       c/o Secretary of State, Florida
       c/o Secretary of State, Maryland
       c/o Secretary of State, New York

       Pusser's Ltd.
       Lower Estate
       Road Town
       British Virgin Islands
             and
       c/o Secretary of State, New York

       Pusser's West Indies Limited
       Lower Estate
       Road Town
       British Virgin Islands

       Charles S. Tobias
       Kingston
       Tortola
       British Virgin Islands

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

MAGWITCH L.L.C.,

                Plaintiff,

    v.

PUSSER'S INC., a Florida corporation,
PUSSER'S LTD., a British Virgin Islands
corporation, PUSSER'S WEST INDIES
LIMITED, a British Virgin Islands corporation,
and CHARLES S. TOBIAS,

                Defendants.

Index No. 600233/08

VERIFIED COMPLAINT

---

Plaintiff, Magwitch L.L.C. ("Plaintiff" or "Magwitch"), by its undersigned attorneys, as and for its Complaint herein, alleges as follows:

## THE PARTIES

1.    Plaintiff is a limited liability company organized under the laws of the State of New York .

2.    Defendant Pusser's Inc. ("Pusser's USA") is a corporation organized under the laws of the State of Florida. At all relevant times, the principal place of business of Pusser's USA was at 80 Compromise Street, Annapolis, Maryland.

3.    Defendant Pusser's Ltd. ("Pusser's Ltd.") is a corporation organized under the laws of the British Virgin Islands.

4.    Defendant Pusser's West Indies Limited ("Pusser's West Indies") is a corporation organized under the laws of the British Virgin Islands.

NEW YORK
COUNTY CLERK'S OFFICE
JAN 25 2008
NOT COMPARED
WITH COPY FILE

5.    Defendant Charles S. Tobias ("Tobias") is an individual resident at "Kingston," Tortola, British Virgin Islands.

6.    At all relevant times, Tobias was the sole director and President of Pusser's USA.

7.    At all relevant times, Tobias was the controlling person of Pusser's USA.

8.    At all relevant times, Tobias was the sole director and controlling person of Pusser's Ltd.

9.    At all relevant times, Tobias was, and continues to be, the sole shareholder of Pusser's West Indies.

10.    At all relevant times, Tobias was a director and the controlling person of Pusser's West Indies.

## JURISDICTION

11.    Defendant Tobias regularly came to New York for the purpose of conducting the business of defendant Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

12.    Defendant Tobias regularly attended business meetings in New York at which the matters which are the subject of the complaint were discussed during the times relevant to the transactions described in this Complaint.

13.    Defendant Tobias came to New York to give deposition testimony in connection with the business of defendant Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

14.    Defendant Tobias maintained regular and continuous telephone, facsimile and electronic communications with representatives of the Plaintiff in New York during the times relevant to the transactions described in this Complaint.

15.    Defendant Tobias regularly employed legal counsel in New York personally and on behalf of defendants Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

16.    Defendant Tobias caused payments to be made under the promissory note that is the subject of this Complaint to the bank account of plaintiff in New York.

17.    Defendant committed tortious acts on behalf of defendant Pusser's USA outside of New York causing injury to the plaintiff within New York.

18.    Defendant Tobias committed tortious acts on behalf of defendant Pusser's Ltd. outside of New York causing injury to the plaintiff within New York.

19.    Defendant Tobias committed tortious acts on behalf of defendant Pusser's West Indies outside of New York causing injury to the plaintiff within New York.

20.    Defendant Tobias, acting on behalf of defendant Pusser's USA as more fully described in this Complaint, caused funds belonging to Pusser's USA to be transferred and diverted to defendants Pusser's Ltd. and Pusser's West Indies, causing injury to Plaintiff in New York when funds were unavailable to pay Plaintiff in New York amounts due on the promissory note that is the subject of this Complaint.

21.    Defendant Tobias, acting on behalf of defendants Pusser's USA, Pusser's Ltd., Pusser's West Indies and personally, expected and should have reasonably expected the acts complained of herein to have consequences in New York.

22.    Defendant Tobias, acting on behalf of defendants Pusser's USA, Pusser's Ltd., Pusser's West Indies and personally, derive substantial revenue from interstate or international commerce.

## FACTS

23.    At all relevant times, the Pusser's group of companies (collectively, "Pusser's") was engaged in the businesses of operating restaurants and retail stores in the United States, the U.S. Virgin Islands and the British Virgin Islands.

24.    At all relevant times, the restaurant and retail businesses of Pusser's in the United States was conducted by companies incorporated in Florida, Maryland and South Carolina (the "Predecessor Pusser's Companies"), all of which were subsequently amalgamated into Pusser's USA.

25.    The restaurant and retail business of Pusser's in the Caribbean historically was conducted by Pusser's Ltd.

26.    Pusser's was historically financed by loans from Barclays Bank PLC ("Barclays") through its office in Tortola, British Virgin Islands.

27.    By mid 2002, Pusser's had accumulated debt owing to Barclays in excess of ten million dollars.

28.    By mid 2001, Barclays had notified Pusser's that it no longer wished to be the bankers to Pusser's and would demand payment of the debt if arrangements were not made to compromise or sell the debt.

29.    During 2001 and early 2002, Pusser's attempted to arrange for financing from other sources to replace Barclays. Pusser's was unable to obtain financing.

30.    To avoid the placing of Pusser's into liquidation, Tobias, the Chairman and controlling shareholder of Pusser's, Lloyd De Vos ("De Vos") and James Jackson ("Jackson") agreed to lead a group of shareholders in a purchase of the debt owed by Pusser's to Barclays at a negotiated discount.

31.    The offer to purchase debt from Barclays was extended to all shareholders of Pusser's. No shareholders other than Tobias, De Vos and Jackson agreed to participate.

32.    On May 9, 2002, Pusser's (2001) Ltd., a company owned by Johanna Rowan Tobias, wife of Charles Tobias, and controlled by Charles Tobias ("Pusser's 2001"), Magwitch and Pusser's West Indies (at the time controlled by Jackson) entered into an agreement with Barclays (the "Barclays Agreement") under which Magwitch would purchase $3,300,000 in face amount of the debt owed by Pusser's to Barclays in exchange for a payment of $1,500,000 on May 9, 2002, Pusser's 2001 would purchase $2,200,000 in face amount of the debt owed by Pusser's to Barclays in exchange for a payment of $1,000,000 on May 31, 2002, and Pusser's West Indies would purchase approximately $4,400,000 in face amount of the debt remaining owed by Pusser's to Barclays in exchange for a payment of $2,000,000 on September 30, 2002.

33.    Under the Barclay Agreement, all security held by Barclays in assets of Pusser's USA was to be assigned to Magwitch.

34.    As a condition of entering into the Barclays Agreement, Magwitch required that either Barclays assign and deliver to it security agreements that created a first security interest in all of the assets of Pusser's USA and the Predecessor Pusser's Companies or that Pusser's USA and the Predecessor Pusser's Companies execute security agreements that created a first security interest in the assets of Pusser's USA and its predecessors. A copy of the Pusser's USA security agreement is attached to this complaint as Exhibit A.

35.    Under the provisions of the security agreements covering the assets of Pusser's USA and the Predecessor Pusser's Companies, the secured party had the right to require that proceeds from the sale of inventories and other assets be paid to the secured party, either before or after the occurrence of an event of default.

- 5 -

36.    On behalf of Pusser's Ltd., Pusser's West Indies, Pusser's USA and the Predecessor Pusser's Companies, Tobias represented to, warranted, covenanted and agreed with Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001, until such time as the debt owed to Magwitch had been repaid.

37.    Magwitch specifically required this representation, warranty and covenant because it knew that Tobias had been transferring funds from Pusser's USA and the Predecessor Pusser's Companies to support the loss-making operations of Pusser's Ltd.

38.    Magwitch specifically relied upon this representation, warranty and covenant in entering into the Barclays Agreement.

39.    Under the provisions of the security agreements covering Pusser's USA and the Predecessor Pusser's Companies, all proceeds of any insurance policies were assigned to the secured party and payable to the secured party.

40.    On May 9, 2002, Magwitch paid $1,500,000 to Barclays in exchange for the demand promissory note made by Pusser's USA and others in favor of Barclays, dated April 5, 2002, in the face amount of $3,300,000 (the "Promissory Note"). A copy of the promissory note, as assigned to Magwitch, is attached to this Complaint as Exhibit B.

41.    At the time he caused Pusser's 2001 to enter into the Barclays Agreement, Tobias had no intention to honor his representations, warranty and covenant not to transfer funds from Pusser's USA and the Predecessor Pusser's Companies to other Pusser's companies.

42.    Pusser's 2001 breached the Barclays Agreement by failing to pay the required $1,000,000 to Barclays on May 31, 2002.

43.    Pusser's West Indies breached the Barclays Agreement by failing to pay the required $2,000,000 to Barclays on September 30, 2002.

44.    Following the breaches of the Barclays Agreement by Pusser's 2001 and Pusser's West Indies, Barclays threatened to reclaim the security over the Pusser's USA assets and treat the $1,500,000 paid by Magwitch as payment of the outstanding Pusser's Ltd. loans, as it was entitled to do under the terms of the Barclays Agreement.

45.    On July 9, 2003, the Barclays Agreement was amended to provide that instead of $3,000,000 being paid to Barclays by Pusser's 2001 and Pusser's West Indies for the remaining debt of Pusser's Ltd., Pusser's West Indies would purchase the remaining $7,031,124.77 in debt for $2,000,000.

46.    Magwitch consented to the amendment in order to avoid loss of its investment and the security for the Promissory Note, as had been threatened by Barclays.

47.    Pusser's West Indies subsequently purchased the debt of $7,031,124.77 owed by Pusser's Ltd. to Barclays for $2,000,000.

48.    Pusser's West Indies subsequently acquired all of the Caribbean assets of Pusser's Ltd.

49.    Subsequent to the purchase by Magwitch of the Promissory Note, neither Pusser's Ltd. nor Pusser's West Indies were able to generate sufficient cash to meet their obligations.

50.    Starting as early as September 2002, Tobias caused Pusser's USA and the Predecessor Pusser's Companies to transfer funds from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies, in breach of his commitment on behalf of Pusser's Ltd. Pusser's West Indies, Pusser's USA and the Predecessor Pusser's Companies.

51.     By June 30, 2004, Tobias had caused Pusser's USA and the Predecessor Pusser's Companies to transfer $2,470,386 to Pusser's West Indies and Pusser's Ltd., in breach of his commitment.

52.     In October 2004, Tobias caused Pusser's USA to transfer $14,000 to Pusser's West Indies.

53.     On April 4, 2005, Pusser's USA received a payment in settlement of insurance claims from damages to premises at Annapolis, Maryland in the amount of $753,227 that had been assigned to Magwitch under the terms of the security agreement between Pusser's USA and Magwitch.

54.     Notwithstanding prior demand for direct payment of these funds to Magwitch, and immediate transfer of these funds to Magwitch should they have been received by Pusser's USA, Pusser's USA refused to notify the insurance company to pay the funds directly to Magwitch, refused to pay the insurance proceeds to Magwitch upon receipt and converted them for its own purposes.

55.     On April 4, 2005, Tobias caused Pusser's USA to transfer $374,227 to Pusser's West Indies.

56.     On April 5, 2005, Tobias caused Pusser's USA to pay $11,533 in bank charges on the wrongful transfers to Pusser's West Indies.

57.     On April 14, 2005, Tobias caused Pusser's USA to transfer $10,000 to Pusser's West Indies.

58.     Upon information and belief, after April 14, 2005, Tobias caused Pusser's USA to transfer approximately $219,000 to Pusser's West Indies.

59.    All of the transfers from Pusser's USA or the Predecessor Pusser's Companies to Pusser's Ltd. or Pusser's West Indies were in breach of the agreement between Tobias, Pusser's Ltd. and Magwitch that no such transfers would be made while amounts were outstanding under the Promissory Note.

60.    On September 14, 2006, Magwitch demanded payment from Pusser's USA of all amounts due and owing on the Promissory Note. A copy of the demand letter is attached as Exhibit C.

61.    Despite demand, the amount due on the Promissory Note has not been paid.

62.    The amount outstanding on the Promissory Note for principal and accrued interest at December 31, 2007 totals $2,123,140.

### FIRST COUNT
#### (Default Under Promissory Note by Pusser's USA)

63.    Plaintiff repeats and restates the allegations of Paragraphs 1-62 of the Complaint and incorporates the same herein as if set forth at length.

64.    The failure of Pusser's USA to respond to Plaintiff's demand for payment of all amounts due and owing on the Promissory Note constitutes an act of default under the terms of the Promissory Note.

65.    By reason of the default by Pusser's USA, the principal amount of the Promissory Note, together with all interest thereon, is immediately due and owing.

### SECOND COUNT
#### (Breach of Security Agreements by Pusser's USA)

66.    Plaintiff repeats and restates the allegations of Paragraphs 1-65 of the Complaint and incorporates the same herein as if set forth at length.

67.    The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies constitute breaches of the security agreements and assignments thereof that conferred upon Magwitch a first security interest in the assets of Pusser's USA and the Predecessor Pusser's Companies.

68.    By reason of the aforesaid breaches of contract, Pusser's USA is without assets sufficient to satisfy its obligations to Magwitch under the terms of the Promissory Note.

69.    As a direct and proximate result of the breaches of contract by Pusser's USA, Magwitch has sustained damage.

### THIRD COUNT
(Tortious Interference With Contract by Tobias,
Pusser's Ltd. and Pusser's West Indies)

70.    Plaintiff repeats and restates the allegations of Paragraphs 1-69 of the Complaint and incorporates the same herein as if set forth at length.

71.    Tobias, acting on behalf of Pusser's Ltd. and Pusser's West Indies as well as in his own self-interest, caused Pusser's USA to effect the aforesaid transfers of assets.

72.    In so doing, Tobias, Pusser's Ltd. and Pusser's West Indies intentionally and tortiously interfered with the security agreements pursuant to which Magwitch had a first security interest in all the assets of Pusser's USA and the Predecessor Pusser's Companies.

73.    As a direct and proximate result of the wrongful conduct of Tobias, Pusser's Ltd. and Pusser's West Indies, Magwitch has sustained damage.

### FOURTH COUNT
(Breach of Contract by Tobias, Pusser's Ltd.,
Pusser's West Indies and Pusser's USA)

74.    Plaintiff repeats and restates the allegations of Paragraphs 1-73 of the Complaint and incorporates the same herein as if set forth at length.

75.     The transfers of assets from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made without first obtaining the express written consent of Magwitch.

76.     By effecting the transfer of assets from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies, as set forth herein, Tobias, Pusser's USA, Pusser's West Indies and Pusser's Ltd. breached the warranties given by them to Magwitch and breached the covenants and agreements they made with Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001; until such time as the debt owed to Magwitch had been repaid.

77.     By reason of the aforesaid breaches of warranty and contract, Pusser's USA is without assets sufficient to satisfy its obligations to Magwitch under the terms of the Promissory Note.

78.     As a direct and proximate result of the breaches of warranty and contract by Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, Magwitch has sustained damage.

<u>FIFTH COUNT</u>
(Fraudulent Misrepresentation by All Defendants)

79.     Plaintiff repeats and restates the allegations of Paragraphs 1-78 of the Complaint and incorporates the same herein as if set forth at length.

80.     Tobias, acting on behalf of Pusser's USA, the Predecessor Pusser's Companies, Pusser's Ltd. and Pusser's West Indies, as well as in his own self-interest, induced Magwitch to enter into the Barclays Agreement by representing and warranting to Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not

- 11 -

transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001, until such time as the debt owed to Magwitch had been repaid.

81.     On the basis of these representations and warranties, and in good faith reliance thereon, Magwitch agreed to enter into the Barclays Agreement and, pursuant thereto, paid $1,500,000 to Barclays in exchange for the Promissory Note.

82.     The representations and warranties made by Tobias were false when made.

83.     Defendants made the foregoing representations and gave the foregoing warranties to Magwitch with the expectation that Magwitch would rely on them and Magwitch did, in fact, rely on them to its detriment.

SIXTH COUNT
(Fraudulent Transfers by All Defendants)

84.     Plaintiff repeats and restates the allegations of Paragraphs 1-83 of the Complaint and incorporates the same herein as if set forth at length.

85.     The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made with actual intent to hinder, delay or defraud Magwitch as a creditor of Pusser's USA and the Predecessor Pusser's Companies, in violation of the Maryland Uniform Fraudulent Conveyance Act, Md. Code, Commercial Law, §§15-201 et seq.

86.     The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made without fair consideration.

87.     The transfers of assets by Pusser's USA to Pusser's Ltd. and Pusser's West Indies caused Pusser's USA and to become insolvent at the time of the transfers or became insolvent as a result of the transfers.

88.    All defendants participated in and benefited from the fraudulent transfers of Pusser's USA's assets, as aforesaid.

89.    As a direct and proximate result of defendants' participation in the fraudulent transfers of assets, Magwitch has sustained damage.

SEVENTH COUNT
(Conversion by Pusser's USA, Tobias and Pusser's West Indies)

90.    Plaintiff repeats and restates the allegations of Paragraphs 1-89 of the Complaint and incorporates the same herein as if set forth at length.

91.    Pusser's USA, Tobias and Pusser's West Indies converted to their own use and purposes the funds received by Pusser's USA in settlement of insurance claims from damages to premises at Annapolis, Maryland, in contravention of Magwitch's right to the payment of all proceeds of any insurance policies held by Pusser's USA under the terms of the security agreement between Pusser's USA and Magwitch.

92.    As a direct and proximate result of the conversion of funds by Pusser's USA, Tobias and Pusser's West Indies, Magwitch has sustained damage.

EIGHTH COUNT
(Negligence and Breach of Fiduciary Duty by Tobias)

93.    Plaintiff repeats and restates the allegations of Paragraphs 1-92 of the Complaint and incorporates the same herein as if set forth at length.

94.    As a director, officer and controlling person of Pusser's USA and the Predecessor Pusser's Companies, Tobias at all relevant times owed a fiduciary duty to the creditors of Pusser's USA to treat and deal with them fairly and to act in good faith when making decisions and taking actions on behalf of Pusser's USA.

95.    Tobias breached the fiduciary duty that he owed to Magwitch as a secured creditor of Pusser's USA and the Predecessor Pusser's Companies by effecting the transfers of assets from Pusser's USA and the Predecessor Pusser's Companies to other Pusser's entities in which he held a beneficial interest to benefit himself.

96.    Tobias was negligent in failing to protect the interests of Magwitch as a secured creditor of Pusser's USA and the Predecessor Pusser's Companies in connection with the decisions he made and actions he took as a director, officer and controlling person of Pusser's USA and the Predecessor Pusser's Companies.

97.    As a direct and proximate result of the aforesaid negligence and breach of fiduciary duty on the part of Tobias, Magwitch has sustained damage.

WHEREFORE, Plaintiff demands judgment in its favor against Defendants, as follows:

- On the First Count against Pusser's USA for all amounts due and owing under the Promissory Note, including all principal and interest, together with attorneys' fees and costs incurred in connection with the enforcement of the Promissory Note.

- On the Second Count against Pusser's USA for breach of the Security Agreements in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution.

- On the Third Count against Tobias, Pusser's Ltd. and Pusser's West Indies, jointly and severally, for tortuous interference with contract in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and an award of attorneys' fees and costs.

- On the Fourth Count against Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, jointly and severally, for breach of contract in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution.

- On the Fifth Count against Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, jointly and severally, for fraudulent misrepresentation in an amount to be

determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and an award of attorneys' fees and costs;

- On the Sixth Count against all defendants, jointly and severally, for fraudulent transfers:

  (i)    An Order voiding the transfers of assets to the extent necessary to satisfy Magwitch's claims under the Promissory Note;

  (ii)   A Writ of Attachment with respect to the assets transferred or other property of Pusser's Ltd. and Pusser's West Indies having equivalent value;

  (iii)  Preliminary and permanent injunctions against all defendants, jointly and severally, prohibiting any further use or disposition of the assets transferred;

  (iv)   An Order appointing a receiver to take charge of the subject assets;

  (v)    An Order authorizing Magwitch to levy execution on the subject assets, their proceeds or property of an equivalent worth in the hands of any or all of the defendants;

  (vi)   Judgment against Pusser's Ltd. and Pusser's West Indies for the value of the subject assets transferred;

  (vii)  Judgment imposing a constructive trust on the proceeds received by Pusser's Ltd. and Pusser's West Indies; and

  (viii) Punitive damages, and attorneys' fees and costs.

- On the Seventh Count against Pusser's USA, Tobias and Pusser's West Indies for conversion in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and attorneys' fees and costs.

- On the Eighth Count against Tobias for breach of fiduciary duty in an amount to be determined to compensate Plaintiff and make it whole through an award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and attorneys' fees and costs.

- Awarding Plaintiff the reasonable costs of the action;

- Awarding Plaintiff reasonable attorneys' fees;

- 15 -

- Awarding Plaintiff punitive damages;

- Granting such other and further relief as this Court deems appropriate.

Dated: New York, New York
       January 22, 2008

Yours, etc.

Solomon Pearl Blum Heymann & Stich LLP.

By: _____
       Andrew W. Heymann, Esq.
       Attorneys for Plaintiff
       40 Wall Street, 35th Floor
       New York, New York 10004
       (212) 267-7600

<u>VERIFICATION</u>

STATE OF NEW YORK          )
                           )          ss.:
COUNTY OF NEW YORK  )

Lloyd De Vos, being duly sworn, deposes and says:

I am the Manager of plaintiff Magwitch LLC, a limited liability company created under, and by virtue of the laws of the State of New York. I have read the foregoing Verified Complaint and know the contents thereof and the same are true to my knowledge, except those matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

_____
LLOYD DE VOS

Sworn to before me this
22ⁿᵈ day of January, 2008

_____
Notary Public

ANDREW W. HEYMANN
Notary Public, State of New York
No. 31-4897745
Qualified in New York County
My Commission Expires May 11, 2011

# EXHIBIT  A

## SECURITY AGREEMENT

This **SECURITY AGREEMENT,** made on the dates set forth on the signature page hereof, between **MAGWITCH LLC.**, c/o Hill, Betts & Nash LLP, 99 Park Avenue, 20th Floor, New York, NY 10016 (herein called the "Secured Party") and the undersigned.

(1)(a)   As security for any and all of the Obligations (as defined in Paragraph 1(b)) the undersigned pledges to the Secured Party and creates a lien and security interest in favor of the Secured Party in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

(i)   all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

(ii)   all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

(iii)   all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

(iv)   all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

(v)   all claims of the undersigned against the Secured Party, and all moneys at any time in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

(vi)   all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but no limited to securities issued (as stock splits, stock dividends or otherwise) relative to any securities constituting Collateral.

{NY005101.2 }

(b) The term "Obligations" means all obligations an liabilities of the undersigned to the Secured Party, now existing or hereafter arising (including but not limited to obligations and liabilities of the undersigned arising under this Security Agreement), whether matured or not matured, whether absolute or contingent and whether directly created or acquired by assignment or otherwise (including but not limited to liabilities, contingent and otherwise, direct or indirect, of the undersigned to the Secured Party as indorser, guarantor, acceptor, surety or otherwise with respect to any obligation or liability of any third party to the Secured Party and liabilities, contingent or otherwise, of the undersigned by way of any express or implied contract with or for the benefit of the Secured Party, to purchase or provide funds for the payment of any obligation or liability of any third party to the Secured Party, or to supply funds to or to invest in such third party, or otherwise to insure the Secured Party against loss on any obligation or liability of such third party).

(2)    Until the occurrence of an Event of Default (as defined in Paragraph 9), the undersigned may use the Collateral in any lawful manner not inconsistent with this Security Agreement and with the terms of any insurance thereon; may sell its inventory and goods in the ordinary course of business; and may use or consume any raw materials or supplies, the use or consumption of which is necessary in order to carry on the undersigned's business. The undersigned will at all times keep the collateral separate and distinct from any of its other property and keep accurate and complete records of the same.

(3)    The Secured Party shall have no duty of care with respect to the Collateral, except to exercise reasonable care in the custody and preservation of Collateral in its actual possession. The Secured Party shall be deemed to have exercised reasonable care with respect to Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property or if the Secured Party takes such action with respect to such collateral as the undersigned shall request in writing, but the Secured Party's failure to comply with any such request or to take steps to preserve rights against any person or property shall not be deemed a failure to exercise reasonable care with respect to such Collateral. The Secured Party shall have no responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the collateral, nor for informing the undersigned with respect to any thereof (whether or not the Secured Party shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the Secured Party, whether or not an Event of Default shall have occurred, the undersigned will promptly: (i) deliver, transfer, assign or indorse to the Secured Party upon receipt by the undersigned, in the exact form in which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Secured Party, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Secured Party; (iii) deliver to the Secured Party, at the time and place and in the manner specified by the Secured Party, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Secured Party has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Secured Party detailed lists of and all

[NY003101.2]

2

writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Secured Party; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and make payment on account of any or all of the Obligations, in each case to the satisfaction of the Secured Party, if the security afforded by this Security Agreement shall be unsatisfactory to the Secured Party in its sole judgment; and (vi) pay or reimburse the Secured Party for all expenses, including attorney's fees and disbursements, incurred by the Secured Party pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Secured Party's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Secured Party may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Secured Party's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Secured Party may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b) The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c) The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Secured Party may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Secured Party. All policies of insurance shall provide that (i) such insurance shall be payable to the Secured Party and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Secured Party for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Secured Party by the insurer. At the request of the Secured Party all such policies shall be delivered to and held by it. The Secured Party may act as attorney for the undersigned in obtaining, adjusting, settling and cancelling such insurance and indorsing any drafts.

(5)    The Secured Party may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Secured Party in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of

{NY005101.2 }

3

insurance as required by Paragraph 4(a)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v) to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Secured Party, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the collateral; and (i) transfer to or register in the name of the Secured Party or of the Secured Party's nominee any or all of the Collateral which may be in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf.

(6)    At any time and from time to time, the Secured Party may at its  option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral. The undersigned agrees to join with the Secured Party at the Secured Party's request in executing any such statements and amendments. The undersigned represents to the Secured Party that no lien or security interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Secured Party, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item. The undersigned will not create or suffer to exist, without the prior written consent of the Secured Party, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)    This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Secured Party of the undersigned's signed notice to such effect, or upon the Secured Party's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.

(8)    In the event of the happening of any one or more of the following events (each being herein called an "Event of Default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to  perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing for or securing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the undersigned or of any indorser, guarantor, acceptor, surety or other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Secured

[NY003101.2 ]

4

Party, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Secured Party against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Secured Party in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Secured Party's option become immediately due and payable, without demand or notice, and any obligation of the Secured Party to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

(9)     Upon the occurrence of an Event of Default the Secured Party shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Secured Party may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees. legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Secured Party may sell at its

{NY005101.2 }

5

option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Secured Party may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Secured Party at a place to be designated by the Secured Party which is reasonable convenient to both parties and at a time designated by the Secured Party, all at the expense of the undersigned.

(10)    The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, indorsements and powers of attorney, which in the Secured Party's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(11)(a)   For purposes of perfection of the Secured Party's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Secured Party's possession if such Collateral is in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Secured Party or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Secured Party as collateral security or for safekeeping or for any other or different purpose.

(b) No failure or delay on the Secured Party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The Secured Party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance. None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Secured Party. No provision of any Agreement or other contract or writing between the undersigned and the Secured Party shall be construed as a waiver, modification or amendment of any of the Secured Party's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement. The Secured Party may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or invalidating its rights as to any other Collateral.

(c) In litigation in which the Secured Party and the undersigned may be adverse parties, the Secured Party and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Secured Party.

[NY005101.2]

(d) The undersigned assents to any contract the Secured Party may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e) This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Secured Party the Secured Party's successors, transferees and assigns. The Secured Party may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f) Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Florida. All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of Florida shall have the same meaning herein as in said Code. If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

(g) The undersigned represents to the Secured Party that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h) If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties. Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation. Neither this Security Agreement nor any of the Secured Party's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any Collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Secured Party as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor. Each party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

{NY005101.2 }

7

(12)    This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Secured Party shall not be required as a condition to the effectiveness of this Security Agreement. Any execution of this Security Agreement by the Secured Party is only for purposes of filing this Security Agreement as a financing statement, if the Secured Party deems the execution hereof by it to be necessary or desirable for purposes of such filing.

(13)    This Security Agreement is being executed as part of a sale of debt and associated security by Barclays Bank PLC to the Secured Party. Barclays Bank PLC cannot locate the original Security Agreement. Copies of an original Security Agreement were held by both the Barclays Bank PLC and the undersigned. The undersigned held its copy of the original Security Agreement at the office of its Secretary, which was located at 1 World Trade Center, 52nd Floor, New York, New York. As a result of terrorist attack that occurred on September 11, 2001, the original Security Agreement was destroyed. This Security Agreement is intended to supersede and assign the rights granted by the undersigned to Barclays Bank to the Secured Party.

Dated: May 8, 2002
      as of October 3, 1997

PUSSER'S INC.,
a Florida corporation

By: _Charles S. Tobias_ _____
     Charles S. Tobias, President

# EXHIBIT B

## PROMISSORY NOTE

$3,300,000                                               May 9, 2002

FOR VALUE RECEIVED, PUSSER'S LTD. (the "Borrower"), promises to pay to the order of BARCLAYS BANK PLC., (the "Lender"), **on demand**, at its offices at Road Town, Tortola, British Virgin Islands, or at such other place or to such other party or parties as Lender may from time to time designate, the principal sum of Three Million Three Hundred Thousand and no/100 ($3,300,000.00) Dollars together with interest thereon computed from the date hereof at the rate of one and one-half (1.5%) percent per annum over the Barclays Bank New York Prime Rate (as hereinafter defined). The amount payable hereunder shall be paid without any set-off or counterclaim whatsoever.

The interest rate hereunder shall adjust accordingly on each date the Prime Rate changes. The term "Prime Rate" shall mean the rate of interest quoted by Barclays Bank New York, or any successor thereto, as the prime rate (which rate may not be the rate charged by Lender to its preferred customers), as the same may be changed from time to time by it. If for any reason Barclays Bank New York shall at any time no longer quote a prime rate in the manner set forth above, Lender shall, in the exercise of its reasonable judgment, substitute another means of determining the annual lending rate of interest and the rate of interest as thus determined shall thereafter be the Prime Rate as that term is used herein. Interest shall be computed on the actual number of days elapsed divided by a 360-day year.

All installments of principal and all interest are payable in lawful money of the United States of America, which shall be legal tender in payment of all debts and dues, public and private, at the time of payment; and in the event of (a) failure to pay this Note in full on demand, or (b) default in the payment of any other installment of interest or principal or any other sum payable pursuant to the terms of this Note or any lien document securing this Note, not cured within thirty (30) days after written notice from Lender, or (c) an "Event of Default" as such term is defined in the Security Agreements, (as hereinafter defined) not cured within the cure period (if any) provided therein, then or at any time thereafter, at the option of Lender, the whole of the principal sum then remaining unpaid hereunder together with all interest accrued thereon, shall immediately become due and payable without further notice, and the lien given to secure the payment of this Note may be foreclosed. From and after the maturity of this Note either according to its terms or as the result of a declaration of maturity, the entire principal remaining unpaid hereunder shall bear interest at a rate of four (4%) percent per annum above the rate otherwise in effect hereunder (the "Default Rate"), or the highest applicable lawful rate, whichever is the lesser; provided that there shall be no automatic reduction to the highest lawful rate if Borrower or any endorser or guarantor is barred by law from availing itself in any action or proceeding of the defense of usury, or if Borrower or any endorser or guarantor barred or exempted from the operation of any law limiting the

amount of interest that may be paid for the loan or use of money, or in the event this transaction, because of its amount or purpose or for any other reason is exempt from the operation of any statute limiting the amount of interest that may be paid for the loan of use of money. Failure to exercise such option or any other rights Lender may in the event of any such default be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent default, whether of the same of different nature.

If this Note is placed in the hands of an attorney for collection or is collected through any legal proceedings, Borrower promises to pay all expenses of collection and reasonable attorney's fees incurred by Lender.

In the event the interest provisions hereof or any exactions provided for herein or in the lien documents or any other instruments securing Note shall result, because of the monthly reduction of principal or any other reason related or unrelated to the interest provisions, at any time during the life of the loan, in an effective rate of interest which, for any period of time, transcends the limit of the usury or any other law applicable to the loan evidenced hereby, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied to principal immediately upon receipt of such monies by Lender with the same force and effect as though the payer had specifically designated such and agreed to accept such extra payment(s) as a premium free payment. Notwithstanding the foregoing, however, Lender may at any time and from time to time elect, by notice in writing to the owners of the property affected by the lien document securing this Note, to reduce or limit the collection of any interest to such sums, which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirement of the preceding sentence. In no event shall any agreed to or actual exaction as consideration for this loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

This Note evidences amounts owed pursuant to a facility letter dated 29 February 1996, a facility letter dated 25th November 1996 and a facility letter dated 26 January 2000 (in each case as amended from time to time).

This Note is secured by the Security Agreements over assets located in the United States of America entered into by Barclays Bank PLC with each of the undersigned and mortgage documents entered into by Barclays Bank with Pusser's Inc., a Florida corporation, and such further security documents as may be requested from time to time by Lender ("Security Agreements"), to which reference is made from the terms thereof.

Lender may collect a late charge of five (5%) per cent of any installment of principal or interest which is not paid within fifteen (15) days of the due date thereof to cover the extra time and expense involved in handling delinquent payments. Such late charge shall apply to late payments prior to maturity or acceleration. Upon maturity or acceleration, no further late charges shall be assessed, but Borrower shall pay the Default

Rate of interest on all amounts due from the date of maturity or acceleration until the Note is paid in full. The collection of the late charge shall not be deemed a waiver by Lender of interest accruing after the due date of any installment or of any of Lender's other rights under this Note.

Borrower agrees that the late charge provided above is fair and reasonable compensation to Lender for the additional administrative time and effort incurred in collecting and processing delinquent payments. Borrower further agrees that the Default Rate is a fair and reasonable rate of interest to be charged after maturity or acceleration of this Note in light of the increased risks to Lender inherent in a past due loan and the administrative time and effort incurred in collecting a past due loan.

Borrower and all endorsers, guarantors and all persons liable or to become liable on this Note waive presentment, protest and demand, notice of protest; demand and dishonor and nonpayment of this Note, and consent to any and all renewals and extensions of the time of payment hereof, and agree, further, that at any time and from time to time without notice, the terms of payment herein may be modified or the security described in the lien document securing the Note released in whole or in part, or increased, change or exchange by agreement between Lender and any owner of premises affected by said lien document securing this Note without in anywise affecting the liability of any party to this instrument or any person liable with respect to any indebtedness evidenced hereby.

Lender is not required to rely on the collateral for the payment of the Note in the event of default by the maker, but may proceed directly against the maker, endorsers, or guarantors, if any, in such manner as it deems desirable. None of the rights and remedies of Lender hereunder are to be waived or affected by failure or delay to exercise them. All remedies conferred on Lender by this Note or any other instrument or agreement shall be cumulative, and none is exclusive. Such remedies may be exercised concurrently or consecutively at Lender's option.

This Note may be prepaid in whole or in part at any time without penalty.

This Note shall be governed as to validity, interpretation, construction, effect, and in all other respects by the laws and decisions of the British Virgin Islands.

Wherever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note or portion thereof shall be prohibited by or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

This note may be assigned by Lender with or without recourse.

BORROWER AND LENDER WAIVE, TO THE FULL EXTENT PERMITTED BY LAW, THE RIGHT TO A JURY TRIAL IN ANY LITIGATION CONCERNING THIS PROMISSORY NOTE OR ANY AGREEMENT SECURING THIS PROMISSORY NOTE AND IN ANY LITIGATION CONCERNING ANY DEFENSE, CLAIM, COUNTERCLAIM, CLAIM OF SET-OFF OR SIMILAR CLAIM OF ANY NATURE THAT BORROWER MAY ASSERT AGAINST LENDER.

PUSSER'S LTD., a British Virgin Islands Company

By: _____
Charles S. Tobias, Director

PUSSER'S INC., a South Carolina Corporation

By: _____
Charles S. Tobias, President

PUSSER'S INC., a Florida Corporation

By: _____
Charles S. Tobias, President

PUSSER'S INC., a Delaware Corporation

By: _____
Charles S. Tobias, President

PUSSER'S INC., a Maryland Corporation

By: _____
Charles S. Tobias, President

PUSSER'S RETAIL INC., a Delaware Corporation

By: _____
Charles S. Tobias, President

## ASSIGNMENT OF PROMISSORY NOTE

For value received, Barclays Bank PLC hereby sells, assigns, transfers and conveys the certain promissory note dated May 9 , 2002 made by Pusser's Ltd., Pusser's Inc. (a Delaware corporation), Pusser's Inc. (a Maryland corporation), Pusser's Inc. (a South Carolina corporation), Pusser's Retail Inc. (a South Carolina corporation) and Pusser's Inc. (a Florida corporation) to Magwitch LLC, a New York limited liability company without recourse.

Dated: May 9, 2002
    Road Town, Tortola
    British Virgin Islands

Barclays Bank PLC

By:    _____
        Mark Young
        Senior Manager and Authorized
        Signatory

{NY903328.1}

# EXHIBIT C

# MAGWITCH LLC

1445 Forest Court
Mountainside, New Jersey 07092

(908) 789-2400

E-mail: Ldevos@devos-law.com

September 13, 2006

**BY FEDERAL EXPRESS**

Mr. Charles S. Tobias
Chairman
Pusser's Ltd.
"Kingston"
Tortola, British Virgin Islands

Dear Charles:

We refer to the promissory note in the amount of $3,300,000 made by Pusser's Ltd. on May 9, 2002 and the other companies listed thereon to Barclays Bank PLC and assigned by Barclays Bank PLC to us on the same date.

We hereby demand payment in full of all amounts outstanding under this promissory note. The amount outstanding at present is **$1,905,679,** plus $264.68 for each additional day that the note remains unpaid.

Kindly make payment to our account at The United States Trust Company, N. A., ABA number 021001318 for credit to account 21-4605-3.

Yours sincerely,

Lloyd De Vos

LDV/ss

{D0006216.1 }

SUPREME COURT OF THE STATE OF
NEW YORK
COUNTY OF NEW YORK

Index No. 600233/08

MAGWITCH L.L.C.,

Plaintiff,

-against-

PUSSER'S INC., a Florida corporation;
PUSSER'S LTD., a British Virgin Islands
corporation; PUSSER'S WEST INDIES
LIMITED, a British Virgin Islands
Corporation; and CHARLES S. TOBIAS,

Defendants.

SUMMONS AND COMPLAINT

SOLOMON PEARL BLUM HEYMANN & STICH LLP
ATTORNEYS FOR    Plaintiff

40 WALL STREET, 35th FLOOR
NEW YORK, N.Y. 10005
(212) 267-7600

# EXHIBIT B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------X

MAGWITCH L.L.C.,                 :

                Plaintiff,     :

                           :

        -against-        :

                           :

PUSSER'S INC., PUSSER'S LTD.,     :
PUSSER'S WEST INDIES LTD., and     :
CHARLES S. TOBIAS           :

                           :

                Defendants.    :

-------------------------------------------------------------X

**NOTICE OF FILING**
**OF NOTICE OF REMOVAL**

Index No. 600238/08

**TO THE CLERK OF COURT:**

      **PLEASE TAKE NOTICE THAT,** pursuant to 28 U.S.C. §§ 1332(a) and 1441(a),

Defendants Pusser's Inc., Pusser's Ltd., Pusser's West Indies Ltd., and Charles S. Tobias filed

on this 3rd day of March 2008, a Notice of Removal of the above-captioned matter in the

United States District Court, Southern District of New York.  A true and correct copy of the

Notice of Removal is attached hereto as Exhibit A.  Pursuant to 28 U.S.C. § 1446(d), this

Court shall proceed no further unless and until the case is remanded.

Dated: New York, New York
        March 3, 2008

                            Gregory W. Gilliam
                            VENABLE LLP
                            Rockefeller Center
                            1270 Avenue of the Americas
                            25th Floor
                            New York, New York  10020
                            Tel: (212) 307-5500
                            *Attorneys for Defendants Pusser's Inc.,*
                            *Pusser's Ltd., Pusser's West Indies Ltd., and*
                            *Charles S. Tobias*

TO:   Clerk of Court
       United States District Court
       Southern District of New York
       Daniel Patrick Moynihan
       United States Courthouse
       500 Pearl Street
       New York, New York  10007-1312

       Andrew W. Heymann, Esq.
       SOLOMON PEARL BLUM HEYMANN & STITCH LLP
       40 Wall Street, 35th Floor
       New York, New York  10004
       *Attorneys for Plaintiff Magwitch L.L.C.*

BA2/336487