Gregory W. Gilliam (GG 2857)
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x
|  |  |
|---|---|
| MAGWITCH L.L.C., | : Case No. 08cv2144 (LTS)(GWG) |
| | : |
| | : |
| Plaintiff, | : ECF Case |
| | : |
| -against- | : |
| | : **DECLARATION OF** |
| PUSSER'S INC., PUSSER'S LTD., PUSSER'S WEST | : **<u>GREGORY W. GILLIAM</u>** |
| INDIES LTD and CHARLES S. TOBIAS, | : |
| | : |
| Defendants. | : |

-----------------------------------------------------------------------x

Gregory W. Gilliam makes this declaration pursuant to 28 U.S.C. § 1746 and in support of Defendant's Motion to Dismiss in the above-captioned action.

1.     My name is Gregory W. Gilliam and I am an attorney duly admitted to practice in this court, the State of New York, and an associate of the firm Venable LLP, which is counsel to the Defendants in the above-referenced action.

2.     Attached hereto as Exhibit A is a true and accurate copy of the December 20, 2007 Order from the United States District Court for the District of New Jersey in the matter of *Magwitch L.L.C. v. Pussers Inc., et al.*, D.N.J. Case No. 07-3040 (SRC).

3.     Attached hereto as Exhibit B is a true and accurate copy of the September 30, 2007 Declaration of Lloyd De Vos in Opposition to Defendants' Motion to Dismiss

Complaint that Plaintiff Magwitch L.L.C. filed in the United States District Court for the District of New Jersey in the matter of *Magwitch L.L.C. v. Pussers Inc., et al.*, D.N.J. Case No. 07-3040 (SRC).

4.      Attached hereto as Exhibit C is a true and accurate copy of the Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint that Plaintiff Magwitch L.L.C. filed in the United States District Court for the District of New Jersey in the matter of *Magwitch L.L.C. v. Pussers Inc., et al.*, D.N.J. Case No. 07-3040 (SRC).

5.      Attached hereto as Exhibit D is a true and accurate copy of the November 12, 2007 Second Declaration of Lloyd De Vos in Opposition to Defendants' Motion to Dismiss Complaint that Plaintiff Magwitch L.L.C. filed in the United States District Court for the District of New Jersey in the matter of *Magwitch L.L.C. v. Pussers Inc., et al.*, D.N.J. Case No. 07-3040 (SRC).

6.      Attached hereto as Exhibit E is a true and accurate copy of excerpts from the February 22, 2005 deposition of Lloyd De Vos in the matter of *State Treasurer of the State of Michigan, et al. v. Plantation Investors, Inc. f/k/a Pusser's, Inc.*, Circuit Court for Anne Arundel County, Maryland Case No. C-2003-90398-FJ.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
        March 10, 2008

                                    s/Gregory W. Gilliam
                                    Gregory W. Gilliam

# Exhibit A

CLOSED

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MAGWITCH L.L.C., | : | |
| Plaintiff, | : | Civil Action No. 07-3040 (SRC) |
| v. | : | **ORDER** |
| PUSSERS, INC., et al., | : | |
| Defendants. | : | |

**CHESLER, U.S.D.J.**

This matter having come before the Court upon the motion to dismiss the complaint by Defendants Pussers, Inc., Pussers, Ltd., Pusser's West Indies, Ltd., and Charles Tobias ("Defendants") [docket item # 9]; and objections having been filed by Plaintiff Magwitch L.L.C. [docket item # 13]; and the Court having considered the papers filed by the parties in support and in opposition of the motion; and the Court having held oral argument on this motion on December 10, 2007; therefore,

For the reasons set forth on the record of oral argument of December 10, 2007,

**IT IS** on this 20th day of December, 2007

**ORDERED** that Defendants' motion to dismiss the complaint [docket item # 9] is **GRANTED**; and it is further

**ORDERED** that this case is **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that this case be and hereby is **CLOSED**.

/s Stanley R. Chesler
STANLEY R. CHESLER, U.S.D.J.

# Exhibit B

Thomas R. Curtin
GRAHAM CURTIN
A Professional Association
4 Headquarters Plaza
P.O. Box 1991
Morristown, New Jersey 07962-1991
(973) 292-1700

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MAGWITCH L.L.C., | : | |
| Plaintiff, | : | Civil Action No. 07-3040 (SRC) |
| | : | |
| v. | : | |
| | : | **DECLARATION OF LLOYD DE VOS IN** |
| PUSSER'S INC., a Florida corporation, | : | **OPPOSITION TO DEFENDANTS'** |
| PUSSER'S LTD., a British Virgin Islands | : | **MOTION TO DISMISS COMPLAINT** |
| corporation, PUSSER'S WEST INDIES | : | |
| LIMITED, a British Virgin Islands | : | |
| corporation, and CHARLES S. TOBIAS, | : | Document Filed Electronically |
| | : | |
| Defendants. | : | |
| | : | |

I, Lloyd De Vos, make this declaration pursuant to 28 U.S.C. §1746 in opposition to the

motion of the defendants to dismiss this action for the lack of personal jurisdiction.

1.     I am the sole member of the plaintiff, Magwitch L.L.C. ("Magwitch"), the

plaintiff in this action, am authorized to act on behalf of Magwitch and am competent to testify

to the matters set forth in this Declaration.

2.     I am an attorney at law admitted to practice in New Jersey and before the bar of

this Honorable Court, having been admitted to practice in 1973.

3.     I grew up and went to elementary school and high school in Mountainside and

Berkeley Heights, New Jersey. After attending college and law school out of state and living in

New York for a short time, I returned to New Jersey to live. I have been a resident of New Jersey since 1976. Since 1985, I have resided at 1445 Forest Court, Mountainside, New Jersey.

4. Between 1985 and 2000, and between 2001 and the present time, I have registered with the New Jersey Lawyers Fund for Client Security as maintaining a part time office for the practice of law at my residence located at 1445 Forest Court, Mountainside, New Jersey.

5. Between 2000 and 2001, I was a partner in the law firm of Edwards & Angell LLP resident at their Short Hills, New Jersey office.

## BACKGROUND

6. I first met Charles Tobias ("Tobias"), the principal of Pusser's, and was introduced to Pusser's Ltd., at the time the only Pusser's company, in the mid 1980's. I have known Tobias for over fifteen years and, until the events that led up to the filing of this complaint, considered him a close friend as well as a client.

7. Tobias acted as the Chairman or President of each of the Pusser's companies. At all relevant times, he was the individual that made the decisions for each of the Pusser's companies.

8. I made a small investment in Pusser's Ltd. in the mid 1980's. At that time, Tobias asked me to serve on the board of Pusser's Ltd. I did so for a number of years. At the time, I was not representing Pusser's in any professional capacity.

9. I began to provide legal representation to Pusser's Ltd. in the early 1990's at the request of Charles Tobias when Pusser's was beginning to expand out of the Caribbean into the United States. I represented Pusser's through my firm, De Vos & Co., from the time I began the representation until I joined Edwards & Angell LLP as a partner in 2000. I represented Pusser's as a partner in Edwards & Angell LLP in New Jersey in 2000 and 2001. I represented Pusser's

- 2 -

as a partner in Hill, Betts & Nash LLP from 2001 through 2005, when I terminated the representation.

10.    In 1996, as part of the expansion of Pusser's into the United States, Tobias, acting through defendant Pusser's Inc., a Florida corporation, ("Pusser's USA") purchased a long term lease over real property located at 3000 East Oakland Park Boulevard in Ft. Lauderdale, Florida. At the time, this location was the site of a restaurant known as the "Down Under". This site became known as the "Down Under" and is referred to as such in this Declaration.

11.    After purchasing the Down Under lease for $2,100,000 and investing in excess of another $1,000,000 in improvements to this premises, Pusser's USA applied for a retail liquor license in Florida.

12.    After Pusser's applied for a Florida retail liquor license, Tobias learned that under the then applicable Florida law, no retail liquor license would be issued to a company that was owned in part by a manufacturer of distilled spirits.

13.    At the time, one of the shareholders of Pusser's was Glenmore Distillers, a subsidiary of Guinness Peat, a manufacturer of distilled spirits.

14.    Until such time as Glenmore Distillers was no longer a shareholder of Pusser's, Pusser's could not obtain a retail liquor license in Florida.  Without a retail liquor license, Pusser's could not open its new restaurant at the Down Under location and stood to lose millions of dollars.

15.    Tobias asked me if I individually would purchase the interest of Glenmore Distillers in Pusser's because he did not have the cash available to do so on short notice. He told me that he would arrange for other individuals to purchase the shares from me shortly after the purchase at the same price at which I would be purchasing the shares, but that my purchase of

- 3 -

the shares would enable Pusser's to obtain the Florida retail liquor license and allow the Down Under location to open as a Pusser's restaurant.

16.    I purchased the shares of Pusser's Ltd. owned by Glenmore Distillers for $550,000. These shares represented an interest of approximately eight percent (8%) of the then issued and outstanding shares of Pusser's Ltd. I purchased these shares to assist a friend, and not with a view to profiting from the purchase of the shares. I believed that I would be the owner of these shares only for a short period of time. I discussed with Tobias that the purchase of the shares was not in any way connected with the legal representation that my law firm was providing to Pusser's. Tobias agreed with me that there should not be any problem caused by my purchase of the shares because I would be the owner of the shares only for a short period of time.

17.    Shortly after the purchase of these shares, Tobias placed a portion of the shares with a third party purchaser who purchased a portion of the shares for $100,000. Tobias was unable to place the balance of the shares, with the result that I ended up with an investment in Pusser's Ltd. of $450,000 representing less than five percent (5%) of the then issued and outstanding shares of Pusser's Ltd.

18.    From at least 1994 onwards, the Pusser's companies were financed by Barclays Bank plc ("Barclays") through its branch office located in Tortola, British Virgin Islands.

19.    By early 2001, Pusser's was indebted to Barclays for amounts in excess of $11,000,000.

20.    In early 2001, Barclays informed Pusser's that Barclays was closing its business operations in the British Virgin Islands, that the bank formed to acquire the business operations

- 4 -

of Barclays had declined to purchase the Pusser's loans, and that Pusser's had to refinance its loans, failing which Barclays would place Pusser's into liquidation.

21. During 2001 and early 2002, Pusser's attempted to arrange for financing from other sources to replace Barclays. Pusser's was unable to obtain financing.

22. If Pusser's were unable to satisfy the Barclays demands and were placed into liquidation, it would have resulted in a loss to me of $450,000.

23. To prevent this loss, I agreed to join with Tobias and James Jackson ("Jackson") and any other shareholders of Pusser's who were willing to do so to purchase the debt owed by Pusser's to Barclays at a negotiated discount.

24. The offer to purchase the debt from Barclays was extended to all shareholders of Pusser's. No shareholders other than Tobias and Jackson and I agreed to participate.

25. Magwitch, the company that I control which undertook to purchase the debt, agreed to purchase only the portion of the debt of Pusser's to Barclays that was attributable to the United States operations of Pusser's. It specifically declined to purchase any of the debt related to the Caribbean operations of Pusser's.

26. The debt that Magwitch purchased was to be secured by all of the United States assets of Pusser's. The debt was to be repaid from United States sources.

27. At the time of this transaction, the Pusser's restaurant and retail store located at Annapolis, Maryland was generating positive cash flow of over $1,000,000 per year. It had a value of approximately $3,000,000.

28. At the time of this transaction, the long term lease of the Down Under site was valued at approximately $3,000,000.

- 5 -

29.     At the time of this transaction, the other assets and inventory of Pusser's in the United States had a value in excess of $500,000.

30.     At the time that I agreed to have Magwitch enter into this transaction, I did so for two reasons.

31.     My first reason was to avoid the loss of the $450,000 investment that I had ended up having in Pusser's. I believed that the $1,950,000 total exposure that Magwitch and I had would have was secure based upon the assets pledged as security within the United States having a value in excess of $6,500,000.

32.     My second reason was once again to help Tobias, whom I thought was my friend, not lose the company that he had spent more than twenty-five years building and developing.

33.     I expressly discussed with Tobias that Pusser's could no longer be operated as a single company with operations in the United States and the Caribbean, but that the United States operations and the Caribbean operations had to be kept separate financially because the assets and income from the United States operations were pledged to repay the debt being purchased by Magwitch. Tobias expressly told me that he understood this and that he agreed to operate this way in the future.

34.     I expressly told Tobias that his agreement with this method of operation was a condition without which Magwitch would not purchase the Barclays debt. Tobias expressly agreed to this method of operation.

35.     I expressly discussed with Tobias that the purchase of the debt by Magwitch from Barclays could create a conflict of interest between him, Pusser's and me in connection with the legal representation that I was providing to Pusser's. I described this potential for conflict of interest in a letter addressed to him as required by the rules of professional responsibility that

- 6 -

recommended that he have independent counsel advise him with respect to whether Pusser's should continue to seek legal representation from me and the law firm through which I practiced law. At the time, Tobias and Pusser's were being advised regularly by British Virgin Islands counsel independent of me. Tobias executed the letter acknowledging both that the purchase of the debt could create a conflict of interest, and that a conflict of interest could arise in the future as a result of the Magwitch purchase of the debt. He said that he did not believe any conflict of interest could arise given our friendship and tried and tested relationship.

36.     On May 9, 2002, Pusser's (2001) Ltd., a company owned by Johanna Rowan Tobias, the wife of Tobias, and controlled by Tobias ("Pusser's 2001"), Magwitch and Pusser's West Indies (at the time controlled by Jackson) entered into an agreement with Barclays (the "Barclays Agreement") under which Magwitch would purchase $3,300,000 in face amount of the debt owed by Pusser's to Barclays in exchange for a payment of $1,500,000 on May 9, 2002, Pusser's 2001 would purchase $2,200,000 in face amount of the debt owed by Pusser's to Barclays in exchange for a payment of $1,000,000 on May 31, 2002, and Pusser's West Indies would purchase approximately $4,400,000 in face amount of the debt remaining owed by Pusser's to Barclays in exchange for a payment of $2,000,000 on September 30, 2002.

37.     The promissory note in the face amount of $3,300,000 (the "Promissory Note") was made by Pusser's Ltd., Pusser's USA and and the other companies through which Pusser's did business in the United States (the "Predecessor Pusser's Companies") expressly in anticipation of this transaction.

38.     On the same day, May 9, 2002, Magwitch paid $1,500,000 to Barclays in exchange for the Promissory Note.

-7-

39.     Pusser's 2001 then breached the Barclays Agreement by failing to pay the required $1,000,000 to Barclays on May 31, 2002.

40.     Pusser's West Indies breached the Barclays Agreement by failing to pay the required $2,000,000 to Barclays on September 30, 2002.

41.     Following the breaches of the Barclays Agreement by Pusser's 2001 and Pusser's West Indies, Barclays threatened to reclaim the security over the Pusser's USA assets and treat the $1,500,000 paid by Magwitch as payment of the outstanding Pusser's Ltd. loans, as it was entitled to do under the terms of the Barclays Agreement.

42.     On July 9, 2003, the Barclays Agreement was amended to provide that instead of $3,000,000 being paid to Barclays by Pusser's 2001 and Pusser's West Indies for the remaining debt of Pusser's Ltd., Pusser's West Indies would purchase the remaining $7,031,124.77 in debt for $2,000,000.

43.     Magwitch consented to the amendment in order to avoid loss of its investment and the security for the Promissory Note, as had been threatened by Barclays.

44.     Pusser's West Indies subsequently purchased the debt of $7,031,124.77 owed by Pusser's Ltd. to Barclays for $2,000,000.

45.     Pusser's West Indies subsequently acquired all of the Caribbean assets of Pusser's Ltd.

46.     Subsequent to the purchase by Magwitch of the Promissory Note, neither Pusser's Ltd. nor Pusser's West Indies were able to generate sufficient cash to meet their obligations.

47.     Starting as early as September 2002, Tobias caused Pusser's USA and the Predecessor Pusser's Companies to transfer funds from Pusser's USA and the Predecessor

- 8 -

Pusser's Companies to Pusser's Ltd. and Pusser's West Indies, in breach of his commitment. The transferred funds left the United States and went into bank accounts in the British Virgin Islands.

48. By June 30, 2004, Tobias had caused Pusser's USA and the Predecessor Pusser's Companies to transfer $2,470,386 to Pusser's West Indies and Pusser's Ltd. in the British Virgin Islands, in breach of his commitment.

49. On each and every occasion that I became aware of and challenged these transfers, Tobias told me that these were short-term cash flow loans that would be repaid to Pusser's USA and the Predecessor Pusser's Companies.

50. In October 2004, Tobias caused Pusser's USA to transfer $14,000 to Pusser's West Indies in the British Virgin Islands.

51. On April 4, 2005, Pusser's USA received a payment in settlement of insurance claims from damages to a premises at Annapolis, Maryland in the amount of $753,227 that had been assigned to Magwitch under the terms of the security agreement between Pusser's USA and Magwitch.

52. Notwithstanding prior demand for direct payment of these funds to Magwitch, and immediate transfer of these funds to Magwitch should they have been received by Pusser's USA, Pusser's USA refused to notify the insurance company to pay the funds directly to Magwitch, refused to pay the insurance proceeds to Magwitch upon receipt and converted them for its own purposes.

53. On April 4, 2005, Tobias caused Pusser's USA to transfer $374,227 to Pusser's West Indies in the British Virgin Islands.

54. On April 5, 2005, Tobias caused Pusser's USA to pay $11,533 in bank charges on the wrongful transfers to Pusser's West Indies.

- 9 -

55.     On April 14, 2005, Tobias caused Pusser's USA to transfer $10,000 to Pusser's West Indies in the British Virgin Islands.

56.     Upon information and belief, after April 14, 2005, Tobias caused Pusser's USA to transfer approximately $219,000 to Pusser's West Indies in the British Virgin Islands.

57.     All of the transfers from Pusser's USA or the Predecessor Pusser's Companies to Pusser's Ltd. or Pusser's West Indies were in breach of the agreement I had with Tobias that no such transfers would be made while amounts were outstanding under the Promissory Note.

58.     On September 14, 2006, Magwitch demanded payment from Pusser's USA of all amounts due and owing on the Promissory Note.

59.     Despite demand, the amount due on the Promissory Note has not been paid.

60.     The amount outstanding on the Promissory Note for principal and accrued interest at May 15, 2007 totals $2,200,588.

## SPECIFIC CONNECTIONS WITH NEW JERSEY

61.     All of the key activities performed by Magwitch that related to the purchase of the Promissory Note took place in New Jersey:

a.      Between early 2000 and August, 2001, most of my time was spent in New Jersey, either professionally at the offices of Edwards & Angell LLP or at home. Pusser's and Tobias were in a situation where Barclays was threatening to liquidate Pusser's. Tobias and I spoke many times a week, if not daily. These telephone conferences took place with me being either at my law office in New Jersey or at home in New Jersey. During this period, I did not have a law office in New York.

b.      The offices of Hill, Betts & Nash, the law firm in which I became a partner in September, 2001 were located in the World Trade Center in New York. The offices

were destroyed on September 11, 2001. During the subsequent months, until well into December, 2001, I was working from home in New Jersey until a new office could be re-established. My telephone number with area code 212 was re-routed to ring in New Jersey by the telephone company. Given the events that led to this, Tobias knew that he was reaching me in New Jersey and that he and I were discussing matters from New Jersey. This is the time period when it became clear that Tobias could not raise or locate financing to replace Barclays and when we began to discuss the purchase of the Barclays debt by Magwitch, a company nominated by him and by other shareholders. These discussions took place with me being in New Jersey.

      c.      Tobias does not work regular business hours. During the time that I knew him, he would regularly work eighteen hour days. On Friday evening, he would go down to join customers at a Pusser's restaurant in the British Virgin Islands and go back to work until between 2:00 and 3:00 in the morning. He worked most weekends and holidays. While he was working, he would call me when he wanted to discuss something with me, whether it was in New Jersey at Edwards & Angell, at home, in New York or on my cellular telephone. Tobias regularly and consistently called me at my New Jersey office and at home to discuss matters, and I regularly called him from my home in New Jersey when I was working from that location to do something related to Pusser's that he needed as a matter of urgency, which happened regularly. The statement in Tobias' affidavit that he only called me at home as a matter of irregular happenstance is simply not true.

      d.      I signed the Barclays Agreement in New Jersey. The Barclays Agreement was sent to me in New Jersey by counsel to Barclays and I signed it in counterpart and sent it back to the British Virgin Islands by courier.

- 11 -

e.     I gave directions for the transfer of funds for the purchase of the Promissory Note to my bankers from New Jersey.

f.     I signed the July 9, 2003 agreement amending the Barclays Agreement in New Jersey. The Barclays Agreement was sent to me in New Jersey by counsel to Barclays and I signed it in counterpart and sent it back to the British Virgin Islands by courier.

g.     The Promissory Note was sent to me by counsel to Barclays Bank. The Promissory Note and all of the original security agreements have been kept in my safe at home in New Jersey since I received them.

h.     The Promissory Note sued upon here is expressly drafted to be payable in New Jersey. It provides that the makers "promises to pay to the order of BARCLAYS BANK PLC., (the "Lender"), **on demand**, at its offices at Road Town, Tortola, British Virgin Islands, or at such other place or to such other party or parties as Lender may from time to time designate" the amounts due under the note. The Promissory Note further provides that "This note may be assigned by Lender with or without recourse." The Promissory Note was a roll up of the portion of the debt owed to Barclays by Pusser's that related to the United States, as compared to the debt that was owed that related to the Caribbean. The intention of all the parties to the transaction, including Tobias and Pusser's, was that the note was going to be made by the Pusser's makers, immediately transferred by Barclays to Magwitch in exchange for $1,500,000, and would be payable in New Jersey to Magwitch. Magwitch indeed did make demand for payment of the Promissory Note in New Jersey.

i.     The Tobias Affidavit claims that the Barclays Agreement was the document that assigned the Promissory Note. Unfortunately, that is not the case. The document that assigned the Promissory Note is attached to this Declaration as Exhibit 1. I drafted the

- 12 -

478535_1

assignment. The Assignment specifically does not reference a jurisdiction in which the Promissory Note is to be enforceable because Magwitch wished to be able to enforce the Promissory Note in New Jersey, and against assets located in one of the United States.

        j.       On January 27, 2005, I sent two letters to Tobias, one concerning professional matters on letterhead from my New York law office, and one concerning Magwitch and personal matters from my home in New Jersey. The letter concerning professional matters bears a New York address on the letterhead. The letter concerning Magwitch and personal matters bears my New Jersey home address on the letterhead. The statement contained in the Tobias affidavit that he had never received communication from New Jersey before September, 2006 is simply wrong. Copies of these two letters are attached to this Declaration as Exhibits 2 and 3.

        k.       I handled matters relating to the Magwitch investment in the Pusser's debt from my home in New Jersey as a private matter separate and apart from matters relating to professional representation of clients. Mr. John McCauley, the attorney who succeeded to the representation of Pusser's and Tobias after my withdrawal, was informed of this directly by the partners of Hill, Betts & Nash LLP when he contacted them to try and link payment of legal fees due and owing to the law firm for professional services to my agreement to an unfavorable settlement of the amount owed on the Promissory Note following my withdrawal from providing legal services to Pusser's.

## GENERAL CONNECTIONS WITH NEW JERSEY

    62.     The Pusser's enterprise controlled by Tobias consist of four companies:

478535_1

a.      Pusser's USA is the company that was engaged in the operation of restaurants and retail stores in the United States that appears to have gone out of business leaving amounts due on the Promissory Note.

b.      Pusser's 2001 is a company that originally was to buy an interest in the Caribbean assets of Pusser's, but is now engaged in licensing Pusser's intellectual property. Instead of Pusser's USA earning profits directly from business operations, Tobias has caused Pusser's 2001 to receive royalties for use of Pusser's intellectual property in the United States from business operations operated by third parties.

c.      Pusser's West Indies is a company that is engaged in the operation of restaurants and retail stores in the British Virgin Islands. It also manufactures products that are used by Pusser's Rum Ltd. in connection with the sale of Pusser's Rum in the United States.

d.      Pusser's Rum Ltd. is the owner of the rights to the distilled spirit known as Pusser's Rum. Pusser's Rum Ltd. sells Pusser's Rum throughout the United States, including New Jersey.

63.    Tobias operates the Pusser's enterprise as if it were one company, and, as is stated in the complaint, moved funds back and forth between companies. All of the Pusser's operating companies are discussed in the Pusser's website, www.Pussers.com. The web pages recite that it is the property of Pusser's West Indies, contains promotional material for Pusser's Rum and references across to the licensed Pusser's restaurant in Annapolis, Maryland. Copies of the web pages are attached as Exhibit 4.

64.    As an example of how the business operates, in order to promote the sales of Pusser's Rum at Liberty Landing Marina located in Jersey City, New Jersey, Tobias had personalized Pusser's Rum mugs made by Pusser's West Indies that were given to Liberty

Landing Marina in Jersey City, New Jersey to promote Pusser's Rum. The mugs were sent to me at my home in New Jersey. I personally delivered them to the Liberty Landing Marina.

65. This business is targeted to New Jersey, as it is to the other places around the world where Pusser's sells its products. Attached as Exhibit 5 is a list from the Pusser's web site of the eighty-six (86) locations in New Jersey within a twenty-five mile radius of my home in Mountainside, New Jersey where Pusser's products are sold, and where visitors to the Pusser's web page are told they should go to find Pusser's products.

## MISSTATEMENTS AND HALF-TRUTHS

66. In its effort to create an impression that Tobias and Pusser's have nothing to do with New Jersey, Tobias has unfortunately omitted facts and misstated facts.

67. In paragraph 2 and 3 of his affidavit, Tobias states that he is a resident, citizen and domiciliary of the British Virgin Islands, that he has resided in the British Virgin Islands since 1979 and that he has not had a residence in the United States for over thirty years.

68. These paragraphs omit that Tobias is a naturalized citizen of the United States, that he served honorably in the Marine Corps of the United States as an aviator during the Viet Nam conflict (and speaks proudly about it) and that he obtained his citizenship in the British Virgin Islands only within the past few years.

69. During the period of time that I have known Tobias, he has resided not only in the British Virgin Islands, but also in Annapolis, Maryland and Charleston, South Carolina.

70. Tobias travels regularly between the British Virgin Islands and the United States, entering the United States using his United States passport. The medical and dental professionals with whom Mr. Tobias consults are located in the mainland United States, and not in the British Virgin Islands.

- 15 -

71.    I have met with Tobias in Miami, Fort Lauderdale, Atlanta, Charleston, Wilmington, Annapolis, Baltimore, Chicago and New York and have traveled with him between cities (including through New Jersey by train) on many occasions.

72.    The implication in paragraphs 2 and 3 of his affidavit that Tobias is an islander with no connection to the United States is a half-truth that is simply misleading. The statement that Tobias has not had a residence in the United States for the past thirty years is simply not true.

73.    In paragraphs 7 and 15 of his affidavit, Tobias recites that neither he nor any company with which he has been associated has ever been engaged in business activities directed at New Jersey. The statement is simply false for the reasons described earlier in this Declaration. Pusser's products are readily available in, and are advertised by Pusser's as being available in, New Jersey

74.    In paragraph 19 of his affidavit, Tobias recites that during 2002, I gave Pusser's Ltd. legal advice in the British Virgin Islands concerning the relationship between Barclays and Pusser's. Between September, 2001 and April, 2002, the time when the negotiations were taking place between Pusser's and Barclays Bank, I was not physically in the British Virgin Islands. Tobias and I talked regularly and constantly during this period, but it was with me being in New Jersey and elsewhere, not with me being in the British Virgin Islands.

75.    In paragraphs 21 and 23 of his affidavit, Tobias states that he signed the Promissory Note and related documents in the British Virgin Islands. The statements are carefully worded not to say that there was a physical closing in the British Virgin Islands at which all documents were executed, but only that he signed the documents in the British Virgin Islands. As stated above, there was no physical closing. I signed all of the documents on behalf

- 16 -

of Magwitch in New Jersey. I signed none of the documents on behalf of Magwitch in the British Virgin Islands.

76. In paragraph 22 of his affidavit, Tobias claims that the assignment of the Promissory Note took place under the terms of the Barclays Agreement. The statement is just wrong. As explained above in paragraph 65(i) and Exhibit 1, the assignment of the Promissory Note was made by an Assignment of Promissory Note attached physically to the Promissory Note.

77. In paragraph 24 of his affidavit, Tobias claims that representatives of Pusser's and Magwitch met often in the British Virgin Islands. Between April, 2002 and April, 2005, a period of three years, I was physically in the British Virgin Islands a total of seven times, averaging two days per visit. Even assuming that Tobias and I met seven times in the British Virgin Islands over a period of three years, the characterization of this as meeting "often" is designed to mislead. We did not meet "often" in the British Virgin Islands.

78. In paragraph 25 of his affidavit, Tobias states that whenever he met with me in the United States, it was almost always in my New York office. As explained above in paragraph 71, this statement is simply false. From September, 2000 through sometime towards the end of 2001, I had no New York office. During the course of my relationship with Tobias, I met with him throughout the eastern United States at locations where Pusser's had operations or was considering opening operations.

79. In paragraph 26 of his affidavit, Tobias indicates that the notice addresses contained in documents reference that correspondence with Magwitch should be sent to New York. The same documents reference that Magwitch designated an agent for service of process in the British Virgin Islands in respect of that transaction and that correspondence with Pusser's

- 17 -

West Indies should be sent to Durango, Colorado. If the argument advanced by Tobias is correct, this would mean that Magwitch was present in the British Virgin Islands, which it was not, and that Pusser's West Indies had its place of business in Colorado, which it did not. The addresses listed in the documents are notice addresses for certain legal correspondence, and do not and did not purport to indicate where the parties did business or were located.

\* \* \* \* \*

80.     At the time I entered into this transaction, I believed that Magwitch was purchasing a Promissory Note that would be enforceable in accordance with its terms in New Jersey and secured by assets located on other states in the United States. Had it not been for the actions of Tobias and the other defendants in removing assets from the United States, there would have been no connection between the British Virgin Islands and the realization on the Promissory Note.

Dated: September 30, 2007
       Mountainside, New Jersey        Lloyd De Vos

- 18 -

Exhibit C

# UNITED STATE DISTRICT COURT
## DISTRICT OF NEW JERSEY

MAGWITCH L.L.C.,

              Plaintiff,

    v.

PUSSER'S INC., a Florida corporation,
PUSSER'S LTD., a British Virgin
Islands corporation, PUSSER'S WEST
INDIES LIMITED, a British Virgin
Islands corporation, and CHARLES S.
TOBIAS,

              Defendants.

Civil Action No. 07-3040 (SRC)

Motion Returnable: October 22, 2007

Document Electronically Filed

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

GRAHAM CURTIN
A Professional Association
4 Headquarters Plaza
P.O. Box 1991
Morristown, New Jersey  07962-1991

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................ii

PRELIMINARY STATEMENT..............................................................................1

STATEMENT OF FACTS ......................................................................................2

LEGAL ARGUMENT

I. THIS COURT HAS PERSONAL JURISDICTION
OVER DEFENDANTS .................................................................................17

    A. This Court has Specific Jurisdiction
       Over the Defendants .........................................................................21

    B. This Court also has General Jurisdiction
       Over Defendants................................................................................25

    C. The Calder "Effects Test" Also Supports
       a Finding of Personal Jurisdiction ...................................................26

    D. Defendants Have Failed to Demonstrate that this Court's
       Exercise of Personal Jurisdiction Would be Unreasonable...............28

CONCLUSION .......................................................................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

*Asahi Metal Indus. Co., Ltd. v. Superior Court of California,*
    480 U.S. 102 (1987)..................................................................... 18
*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)............................................... 18, 19, 20, 28
*Calder v. Jones,*
    465 U.S. 783 (1984)..................................................................... 20
*Carteret Sav. Bank, F.A. v. Shushan,*
    954 F.2d 141 (3d Cir. 1992) .................................................. 17, 27, 28
*DeJames v. Magnificence Carriers, Inc*
    654 F.2d 280 (3d Cir. 1981), <u>cert. denied</u>, 45 4 U.S. 1085  (1981).............. 17
*George Young Co. v. Bury Bros., Inc.,*
    No. 03-3353. 2004 WL 1173129, at *
    (E.D. Pa. Apr. 2, 2004) ................................................................ 19
*Hanson v. Denckla,*
    357 U.S. 235 (1958) .................................................................... 19
*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984)............................................................. 18, 21, 25
*IMO Industries, Inc. v. Kiekert AG,*
    155 F.3d 254 (3d Cir. 1998) ......................................... 17, 19, 21, 27
*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945)................................................................. 17, 19
*Lebel v. Everglades Marina,*
    465 U.S. 770 (1984)........................................................... 20, 24, 28
*Milliken v. Meyer,*
    311 U.S. 457 (1940), <u>reh'g denied</u>, 312 U.S. 712 (1941) ............... 17
*N.J. Dept. of Treasury v. Qwest Comms. Int'l, Inc.*
    115 N.J. 317 (1989) (App. Div. 2006)......................................... 29
*Telcordia Tech. Inc. v. Telkom SA Ltd.,*
    458 F.3d 172 (3d Cir. 2006) ......................................................... 18
*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)................................................................. 18, 19

*Wright v. Xerox Corp.*
    882 F.Supp. 399 (D.N.J. 1995).......................................................... 17, 19, 20


**<u>Federal Rules</u>**
Fed. R. Civ. P. 4(e).................................................................................... 17

**<u>State Rules</u>**
N.J. Ct. R. 4:4-4(b)(1) .............................................................................. 17

## PRELIMINARY STATEMENT

Plaintiff Magwitch L.L.C. ("Magwitch") respectfully submits this Memorandum and Declaration of Lloyd DeVos ("DeVos Dec."), its sole member, in opposition to Defendants' Motion to Dismiss the Complaint.

Despite Defendants attempt to distance itself from New Jersey, the allegations set forth in the Complaint and the Mr. DeVos' declaration clearly demonstrate that this Court has personal jurisdiction over defendants.

Defendants' arguments that they are not subject to this Court's jurisdiction fall once the factual misstatements and half-truths upon which they are based are exposed.

At the time it entered into the transaction at issue, Magwitch believed that it was purchasing a Promissory Note that would be enforceable pursuant to its terms in New Jersey. DeVos negotiated the terms of the Promissory Note from New Jersey. DeVos signed the transactional documents on behalf of Magwitch in New Jersey. The original promissory note and related documents were held in DeVos' safe in New Jersey. Demand for payment of the Promissory Note was made by DeVos from New Jersey.

Given these undisputed facts, Plaintiff Magwitch L.L.C. respectfully submits that this Court has personal jurisdiction over defendants, and that defendants' Motion to Dismiss should be denied.

# STATEMENT OF FACTS

Plaintiff Magwitch L.L.C. ("Magwitch") is a limited liability company with one member – Lloyd DeVos ("DeVos").  As will be detailed below, Magwitch was expressly formed for the limited and exclusive purpose of purchasing the promissory note which is sued on in this Complaint.

DeVos has been a lifelong New Jersey resident, with the exception of attendance at college and law school, and a brief period following law school graduation.  DeVos has been admitted to the practice of law in New Jersey since 1973.  See Declaration of Lloyd DeVos ("DeVos Dec.") which is incorporated herein by reference, at ¶ 1 – 3.  Over the course of his legal career, he has practiced law in both New Jersey and New York.  Id., ¶4, 9  Even when DeVos' law office was in New York, he maintained a part time law office at his home in New Jersey.  At all times, DeVos has conducted his investment activities from his home in New Jersey.  This includes the investments that are it issue in this lawsuit.  Id., ¶61(k).

Defendant Charles Tobias ("Tobias") acted as Chairman or President, or controlled, each of the Pusser's companies named as a defendant in this matter.  He was, at all relevant times, the decision maker for the Pusser's companies.  Id., ¶7.  While it may be true that Tobias is a citizen of the British Virgin Islands (interestingly, he only obtained this citizenship within the last few years) Tobias is

a naturalized citizen of the United States, who served honorably in the United States Marine Corps. as an aviator during the Viet Nam conflict. Id., ¶67-68.

DeVos first met Tobias in the mid 1980's. During the time that DeVos has known Tobias, he has resided not only in the British Virgin Islands, but also in Annapolis, Maryland and Charleston, South Carolina. Tobias travels regularly between the United States and the British Virgin Islands using his United States passport. Id., ¶69-70. Until the events that led up to the filing of this complaint, DeVos considered Tobias a close friend as well as a client. Id., ¶6.

DeVos initially became involved with defendant Pusser's Ltd. as an investor. He made a small investment in Pusser's Ltd. in the mid 1980's. At Tobias' request, he also served on the board. Tobias asked DeVos to provide legal representation to Pusser's Ltd. in the early 1990's, when Pusser's was beginning to expand out of the Caribbean into the United States. He continued to represent the Pusser's companies until 2005. Id., ¶8-9.

**The First Bail Out**

In 1996, as part of Pusser's expansion into the United States, Tobias, acting through defendant Pusser's Inc., a Florida corporation, ("Pusser's USA") purchased a long term lease of real property located in Ft. Lauderdale, Florida for $2,100,000. At the time, this location was the site of a restaurant known as the "Down Under". After investing in excess of another $1,000,000 in improvements

3

to this premises, Pusser's USA applied for a retail liquor license in Florida. Id., ¶ 10 – 11.

Pusser's USA did not learn until after it applied for the liquor license that under Florida law, it could not own a liquor license because one of its shareholders – Glenmore Distillers, a subsidiary of Guinness Peat – manufactured distilled spirits. Without a retail liquor license, Pusser's could not open the restaurant at the Down Under location and stood to lose millions of dollars. Id., ¶11-14.

Tobias did not have cash available to purchase Glenmore Distillers' interest in Pusser's, so he went to his friend, DeVos. Tobias told DeVos that he would arrange for other individuals to purchase the shares from DeVos at the same price at which he purchased the shares, so he would not lose any money. DeVos purchased the Glenmore Distillers' shares for $550,000. He did this to assist a friend, and not with a view to profiting from the purchase of the shares, which he believed that he would only own for a short period of time. Id., ¶12-16.

Contrary to his representation, Tobias was only able to find a purchaser for $100,000 worth of the shares, leaving DeVos with a $450,000 investment in Pusser's Ltd. Id., ¶17.

**Barclay's Bank – The Second Bail Out**

From at least 1994 onward, the Pusser's companies were financed by Barclays Bank PLC ("Barclays") through its branch office located in Tortola,

4

British Virgin Islands. In early 2001, Barclays informed Pusser's that Barclays was closing its business operations in the British Virgin Islands, that the bank formed to acquire the business operations of Barclays had declined to purchase the Pusser's loans, and that Pusser's had to refinance its loans, or Barclays would place Pusser's into liquidation. If that happened, DeVos would have lost his $450,000 investment. During 2001 and early 2002, Pusser's unsuccessfully attempted to arrange for financing from outside sources. Id., ¶18-22. By early 2002, Pusser's was indebted to Barclays in excess of $11,000,000. Tobias Dec., ¶19.

Pusser's eventually turned to its shareholders for financing. To prevent the loss of his investment, DeVos agreed to join with Tobias and fellow shareholder James Jackson ("Jackson"), the only other interested shareholders of Pusser's, to purchase the debt owed by Pusser's to Barclays (the "Barclays Debt") at a negotiated discount. DeVos Dec., ¶23-24.

DeVos purchased his portion of the Barclays Debt through plaintiff Magwitch, a limited liability company that he formed for this sole purpose. Magwitch agreed to purchase only the portion of the Barclays Debt that was attributable to the United States operations of Pusser's. Magwitch specifically declined to purchase any of the debt related to the Caribbean operations of Pusser's. The debt that Magwitch purchased was to be secured by all of Pusser's United States assets and was to be repaid from United States sources. Id., ¶25-26.

5

DeVos agreed to have Magwitch enter into this transaction for two reasons. First, DeVos was protecting his investment in Pusser's Ltd. He believed that the value of the United States assets being pledged as security far exceeded the combined exposure of DeVos and Magwitch. DeVos' second reason was once again to help Tobias, whom he thought was a friend, not lose the company that he had spent more than twenty-five years building and developing. Id., ¶27-32.

DeVos told Tobias that as a condition of Magwitch agreeing to purchase a portion of the Barclay's Debt, Pusser's could no longer be operated as a single company with operations in the United States and the Caribbean because the assets and income from Pusser's United States' operations were pledged to repay the debt being purchased by Magwitch. Tobias told DeVos that he understood, and expressly agreed to separate the operations. Id., ¶33-34.

DeVos also advised Tobias that Magwitch's purchase of the Barclay's Debt could create a conflict of interest between Tobias, Pusser's and DeVos in connection with the legal representation that DeVos was providing to Pusser's. DeVos sent a conflict of interest letter to Tobias as required by the rules of professional responsibility recommending that Tobias obtain advice from independent counsel with respect to whether Pusser's should continue to seek legal representation from DeVos and the law firm through which he practiced law. Tobias executed the letter acknowledging both that the purchase of the Barclays

Debt could create a conflict of interest, and that a conflict of interest could arise in the future as a result of the Magwitch purchase of the debt. Tobias said that he did not believe any conflict of interest could arise given his friendship with DeVos and their tried and tested relationship. Id., ¶35.

**The Barclays Bank Refinance**

On May 9, 2002, Pusser's (2001) Ltd., a company owned by Johanna Rowan Tobias, the wife of Tobias, and controlled by Tobias ("Pusser's 2001"), Magwitch and Pusser's West Indies (at the time controlled by Jackson) entered into an agreement with Barclays (the "Barclays Agreement") under which Magwitch would purchase $3,300,000 in face amount of the Barclays Debt in exchange for a payment of $1,500,000 on May 9, 2002, Pusser's 2001 would purchase $2,200,000 in face amount of the Barclays Debt in exchange for a payment of $1,000,000 on May 31, 2002, and Pusser's West Indies would purchase approximately $4,400,000 in face amount of the remaining Barclays Debt in exchange for a payment of $2,000,000 on September 30, 2002. Id., ¶36. DeVos conducted most, if not all, of the negotiations regarding this deal from either his cell phone, home or office in New Jersey. Id., ¶61. This agreement was memorialized in the Assignment Agreement attached to the Tobias Dec. as Exhibit B.

7

A promissory note in the face amount of $3,300,000 (the "Promissory Note") was made by Pusser's Ltd., Pusser's USA and the Predecessor Pusser's Companies expressly in anticipation of this transaction. Tobias Dec., Ex. A.

On the same day, May 9, 2002, Magwitch paid $1,500,000 to Barclays in exchange for the Promissory Note. Barclays then executed an Assignment of Promissory Note (the "Magwitch Assignment"). DeVos Dec. Ex. 1. Contrary to the assertions in defendants' motion, it was the Magwitch Assignment, and not the Assignment Agreement, that assigned the Promissory Note to Magwitch. The Magwitch Assignment was negotiated and prepared by DeVos in New Jersey. DeVos intentionally excluded jurisdiction or venue clauses because it was his intention to enforce the agreement in New Jersey. Tobias knew this. Id., ¶61.

Unfortunately, the other parties breached the Barclays Agreement by failing to make the payments when due. Following the breaches of the Barclays Agreement by Pusser's 2001 and Pusser's West Indies, Barclays threatened to reclaim the security over the Pusser's USA assets and treat the $1,500,000 paid by Magwitch as payment of the outstanding Pusser's Ltd. loans, as it was entitled to do under the terms of the Barclays Agreement. On July 9, 2003, the Barclays Agreement was amended to provide that instead of $3,000,000 being paid to Barclays by Pusser's 2001 and Pusser's West Indies for the remaining debt of Pusser's Ltd., Pusser's West Indies would purchase the remaining $7,031,124.77 in

debt for $2,000,000. Magwitch consented to the amendment in order to avoid loss of its investment and the security for the Promissory Note, as had been threatened by Barclays. DeVos negotiated and signed the amendment to the Barclay's Agreement in New Jersey. Id., ¶39-43.

Pusser's West Indies subsequently purchased the debt of $7,031,124.77 owed by Pusser's Ltd. to Barclays for $2,000,000, and subsequently acquired all of the Caribbean assets of Pusser's Ltd. Id., ¶44-45.

## Tobias Diverts Assets from Pusser's United States Operations

After Magwitch purchased the Promissory Note, neither Pusser's Ltd. nor Pusser's West Indies were able to generate sufficient cash to meet their obligations. Starting as early as September 2002, at Tobias' direction, Pusser's USA and the other companies through which Pusser's did business in the United States (the "Predecessor Pusser's Companies") transferred funds from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies, in breach of his commitment to Magwitch and DeVos. By June 30, 2004, Tobias had authorized the transfer of almost $2,500,000 to Pusser's Ltd. and Pusser's West Indies. On each and every occasion that DeVos became aware of and challenged these transfers, Tobias told DeVos that these were short-term cash flow loans that would be repaid to Pusser's USA and the Predecessor Pusser's Companies. Id., ¶46-49.

The diversion of assets from the Predecessor Pusser's Companies continued.
In October 2004, Tobias caused Pusser's USA to transfer $14,000 to Pusser's West
Indies in the British Virgin Islands. On April 4, 2005, Pusser's USA received a
payment in settlement of insurance claims from damages to premises at Annapolis,
Maryland in the amount of $753,227 that had been assigned to Magwitch under the
terms of the security agreement between Pusser's USA and Magwitch. Id., ¶50-51.

On April 4, 2005, Tobias caused Pusser's USA to transfer $374,227 to
Pusser's West Indies in the British Virgin Islands. On April 5, 2005, Tobias caused
Pusser's USA to pay $11,533 in bank charges on the wrongful transfers to Pusser's
West Indies. On April 14, 2005, Tobias caused Pusser's USA to transfer $10,000
to Pusser's West Indies in the British Virgin Islands. Upon information and belief,
after April 14, 2005, Tobias caused Pusser's USA to transfer approximately
$219,000 to Pusser's West Indies in the British Virgin Islands. Id., ¶53-56.

All of the transfers from Pusser's USA or the Predecessor Pusser's
Companies to Pusser's Ltd. or Pusser's West Indies were in breach of the
agreement DeVos had with Tobias that no such transfers would be made while
amounts were outstanding under the Promissory Note. Id., ¶57.

On September 14, 2006, Magwitch demanded payment from Pusser's USA
of all amounts due and owing on the Promissory Note. This demand was prepared
by DeVos in New Jersey and sent by DeVos from New Jersey. Despite demand,

the amount due on the Promissory Note has not been paid. The amount outstanding on the Promissory Note for principal and accrued interest at May 15, 2007 totals $2,200,588. Id., ¶58-60. This lawsuit ensued.

**Defendants Contacts With New Jersey Supporting Specific Jurisdiction**

Contrary to the picture painted by Defendants in their motion, Defendants have substantial specific contacts with New Jersey, which more than support this Court's exercise of specific jurisdiction.

- **Tobias and DeVos had numerous telephone conversations in New Jersey.**

Between early 2000 and December, 2001, when Barclays was threatening to liquidate Pusser's, almost all of DeVos' time was spent in New Jersey, either in his law office at Edwards & Angell LLP or at home. Tobias and DeVos spoke on the telephone in New Jersey many times a week, if not daily. Many of these calls were initiated by Tobias. In September 2001, DeVos became a partner in the law firm of Hill, Betts & Nash ("HBN"). HBN's offices were located in the World Trade Center in New York, and were destroyed on September 11, 2001. During the subsequent months, until well into December, 2001, DeVos worked from his home in New Jersey. Given the events of September 11th, Tobias knew that he was reaching DeVos in New Jersey and that DeVos and Tobias were discussing matters from New Jersey. This is the time period when it became clear that Tobias could

11

not raise or locate financing to replace Barclays, and DeVos and Tobias began to discuss the purchase of the Barclays Debt by Magwitch.

Tobias does not work regular business hours; he would regularly work eighteen-hour days, and most weekends and holidays. While he was working, Tobias would call DeVos when he wanted to discuss something with him. Tobias regularly and consistently called DeVos on his cell phone, at his New Jersey office and at home to discuss Pusser's matters, and DeVos regularly called Tobias from his home in New Jersey when he was working from that location. Id., ¶61(a)-(c).

- **DeVos signed the Barclays Agreement in New Jersey.**

The Barclays Agreement was sent to DeVos in New Jersey by counsel to Barclays. DeVos signed it in New Jersey. DeVos gave directions for the transfer of funds for the purchase of the Promissory Note to his bankers from New Jersey. DeVos signed July 9, 2003 agreement amending the Barclays Agreement in New Jersey. The Promissory Note and all of the original security agreements have been kept in DeVos' safe at home in New Jersey since he received them. Id., ¶61(d)-(g).

- **The Promissory Note is Expressly Drafted to be Payable in New Jersey**

The Promissory Note that Magwitch is suing upon is expressly drafted to be payable in New Jersey. It provides that the makers "promises to pay to the order of BARCLAYS BANK PLC, (the "Lender"), **on demand**, at its offices at Road Town, Tortola, British Virgin Islands, or at such other place or to such other party or

parties as Lender may from time to time designate" the amounts due under the note. The Promissory Note further provides that "[t]his note may be assigned by Lender with or without recourse." The Promissory Note was a roll up of the portion of the debt owed to Barclays by Pusser's that related to the United States, as compared to the debt that was owed that related to the Caribbean. The intention of all the parties to the transaction, including Tobias and Pusser's, was that the note was going to be made by the Pusser's makers, immediately transferred by Barclays to Magwitch in exchange for $1,500,000, and would be payable in New Jersey to Magwitch. Magwitch demanded payment of the Promissory Note in New Jersey. Id., ¶61(h).

- **DeVos Sent Letters to Tobias from New Jersey**

On January 27, 2005, DeVos sent two letters to Tobias, one concerning professional matters on letterhead from his New York law office, and one concerning Magwitch and personal matters from his home in New Jersey. The letter concerning professional matters bears a New York address on the letterhead. The letter concerning Magwitch and personal matters bears his New Jersey home address on the letterhead. The statement contained in the Tobias affidavit that he had never received communication from New Jersey before September, 2006 is simply wrong. Id., ¶61(j).

- **DeVos handled all investment activity from his home in New Jersey**

DeVos handled matters relating to the Magwitch investment in the Pusser's debt from his home in New Jersey as a private matter, separate and apart from matters relating to professional representation of clients. Mr. John McCauley, the attorney who succeeded to the representation of Pusser's and Tobias after DeVos' withdrawal, was informed of this directly by the partners of HB&N when he contacted them to try and link payment of legal fees due and owing to the law firm for professional services to DeVos' agreement to an unfavorable settlement of the amount owed on the Promissory Note following his withdrawal from providing legal services to Pusser's. Id., ¶61(k).

## Defendants' Contacts With New Jersey Supporting General Jurisdiction

- **Pusser's Targets New Jersey**

The Pusser's enterprise controlled by Tobias consists of four companies:

a.  Pusser's USA, which appears to be out of business, operated retail stores and restaurants in the United States.

b.  Pusser's 2001 licenses Pusser's intellectual property.

c.  Pusser's West Indies operates restaurants and retail stores in the British Virgin Islands. It also manufactures products that are used by Pusser's Rum Ltd. in connection with the sale of Pusser's Rum in the United States, including New Jersey.

14

d.    Pusser's Rum Ltd. is the owner of the rights to the distilled spirit known as Pusser's Rum.  Pusser's Rum Ltd. sells Pusser's Rum throughout the United States, including New Jersey.  Id., ¶62.

Tobias operates the Pusser's enterprise as if it was one company and as is stated in the complaint, moved funds back and forth between companies.  All of the Pusser's operating companies are discussed on Pusser's website, www.Pussers.com.  The web page states that it is the property of Pusser's West Indies.  It contains promotional material for Pusser's Rum, and references the licensed Pusser's restaurant in Annapolis, Maryland.  See DeVos Dec., 4.

As one example of how the business operates, Tobias had personalized Pusser's Rum mugs made by Pusser's West Indies to give to Liberty Landing Marina in Jersey City, New Jersey to promote Pusser's Rum.  The mugs were sent to DeVos at his home in New Jersey.  DeVos personally delivered them to the Liberty Landing Marina.  Id., ¶4.

Pusser's targets its business to New Jersey, as it does to the other places around the world where Pusser's sells its products.  The Pusser's web site lists eighty-six (86) locations in New Jersey within a twenty-five mile radius of DeVos' home in Mountainside, New Jersey where Pusser's products are sold, and where visitors to the Pusser's web page are told they should go to find Pusser's products.  Id., ¶65.

15

Pusser's products are readily available in, and are advertised by Pusser's as being available in, New Jersey.

## LEGAL ARGUMENT

## I. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS.

In determining whether it may exercise personal jurisdiction over a defendant who is not a resident of the forum state, the Court must determine whether the exercise of personal jurisdiction comports with due process. IMO Industries, Inc., v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998)(citing DeJames v. Magnificence Carriers, Inc., 654 F.2d 280, 284 (3d Cir. 1981), cert. denied, 454 U.S. 1085 (1981)); see also Fed.R.Civ.P. 4(e)(1)(A), N.J. Ct. R. 4:4-4(b)(1)(permitting exercise of jurisdiction "consistent with due process of law"). In making such a determination on a motion to dismiss for lack of in personam jurisdiction, the Court must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff. Carteret Sav. Bank v. Sushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992)(citations omitted); see also Wright v. Xerox Corp., 882 F.Supp 399, 403 (D.N.J. 1995).

Under the Due Process clause, the exercise of personal jurisdiction over a non-resident defendant is appropriate when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l. Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)(quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940), reh'g denied, 312 U.S. 712 (1941)). A defendant establishes such

17

minimum contacts by "purposefully avail[ing] itself of the privilege of conducting activities within the forum State," thereby invoking "the benefits and protections of [the forum State's] laws." Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of California, 480 U.S. 102, 109 (1987)(quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). This "purposeful availment" requirement assures that the defendant is not haled into a forum as a result of "random," "fortuitous" or "attenuated" contacts with the forum state. See World-Wide Volksvagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); see also Burger King Corp., 471 U.S. at 472, 475 (internal citations omitted).

Whether sufficient minimum contacts exist to exert personal jurisdiction depends upon the "nature of the interactions and type of jurisdiction asserted." Telcordia Tech, Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006). A defendant may be subject to either the general or specific jurisdiction of the forum state. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984). The Court may exercise specific jurisdiction over a defendant where the cause of action is related to or arises out of the activities by the defendant that took place within the forum state. Id. at 414 n8. The Court may exercise general jurisdiction over a defendant if the defendant has conducted "continuous and systematic" business activities in the forum state. Id. at 414. This Court has both specific and general jurisdiction over defendants.

If the defendant has minimum contacts with the forum state, the assertion of personal jurisdiction over the defendant must also "comport with 'fair play and substantial justice'" to satisfy the due process test. Burger King Corp., 471 U.S. at 476 (quoting Int'l Shoe, 326 U.S. at 320). It must be reasonable to require the defendant to litigate the suit in the forum state. A court may consider the following factors to determine reasonableness: the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the interstate judicial system's interest in obtaining an efficient resolution of controversies. Id. at 477 (citing World-Wide Volkswagen, 444 U.S. at 292).

Regardless of whether a plaintiff asserts personal jurisdiction under the general or specific jurisdiction theory, a plaintiff must demonstrate that the defendant "has purposefully directed its activities toward the residents of the forum state . . . or otherwise 'purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" IMO Indus. Inc., 153 F3d at 259 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). Physical presence in the forum state is no longer a prerequisite for personal jurisdiction. George Young Co. v. Bury Bros., Inc., No. 03-3353, 2004 WL 1173129, at *4 (E.D. Pa. Apr. 2, 2004). See also Wright, 882 F.Supp. at 407.

As stated by the Supreme Court in <u>Burger King</u>,

> It is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward the residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

<u>Burger King Corp.</u>, 471 U.S. at 476.

Moreover, the New Jersey Supreme Court has held that "[w]here a defendant knowingly sends into a state a false statement, intending that it should be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state." <u>Lebel v. Everglades Marina</u>, 115 N.J. 317, 326 (1989). Where, as here, the defendants' acts are intentional, "the Court may assign a heightened level of foreseeability to their consequences. Courts have recognized the special importance of intentional, tortious acts in assessing whether personal jurisdiction over a non-resident defendant is reasonable." <u>Wright</u>, 882 F.Supp at 404-405.

Plaintiff also asserts that because the complaint alleges intentional torts, personal jurisdiction exists in this court by application of the "effects test" set forth in <u>Calder v. Jones</u>, 465 U.S. 783, 789 (1984). Under this test, "a court may exercise personal jurisdiction over a nonresident defendant who commits an intentional tort by certain acts outside the forum which have a particular type of

effect upon the plaintiff within the forum." IMO Indus., Inc., 155 F.3d at 261. Under the law of the Third Circuit, the effects test requires a plaintiff to demonstrate that:

1.   The defendant committed an intentional tort;

2.   The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and

3.   The defendant expressly aimed his tortuous conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

Id. at 265-266.

## A.  This Court has Specific Jurisdiction Over the Defendants.

In order for this court to exercise specific jurisdiction over the defendants, Magwitch must demonstrate that the causes of action pled in the Complaint are related to or arise out of activities of defendants that took place within New Jersey. Helicopteros, 466 U.S. at 414, n.8.  And they do.

As set forth below, all of the key activities related to Magwitch's purchase of the Promissory Note at issue in the Complaint, including the negotiation, execution and demand for payment, took place in New Jersey.

Magwitch's sole member, DeVos, is a New Jersey resident.  He conducted substantially all of his investment activities, including Magwitch's purchase of the Promissory Note, from his home.

21

Between early 2000 and December, 2001 – the time period when Barclay's was threatening to liquidate Pusser's, and Pusser's was trying to make alternate financing arrangements, DeVos spent most of his time in New Jersey, either at his law offices, which were located in New Jersey during that period, or at home. During this time, DeVos and Tobias had weekly, if not daily, telephone conferences, many of which were initiated by Tobias. DeVos was in New Jersey for these calls, and Tobias knew that. Tobias and DeVos had a long standing relationship – personally, as friends and professionally, because DeVos provided legal representation to Tobias and the Pusser's companies. As a result of their relationship, Tobias knew that DeVos lived in New Jersey. When he called DeVos at home, as he often did, he knew DeVos was in New Jersey.

Similarly, because of their relationship, Tobias knew where DeVos worked. Tobias knew that DeVos was a partner at Edwards & Angell LLP, in Short Hills, New Jersey, from 2000 to August, 2001. Tobias knew that DeVos became a partner in Hill Betts and Nash in September, 2001, and that Hill's World Trade Center office was destroyed on September 11, 2001. Tobias knew that DeVos worked out of his home until Hill could re-establish a new office. Tobias knew that when he called DeVos at work, he was calling him in New Jersey.

Barclay's counsel sent the Barclay's Agreement to DeVos in New Jersey. He signed the Agreement in New Jersey. He gave directions for the transfer of funds

for the purchase of the Promissory Note to his bankers in New Jersey, He signed the July 9, 2003 agreement amending the Barclay's Agreement in New Jersey. The Promissory Note was sent to DeVos by counsel for Barclay's Bank, and DeVos retained the Promissory Note and all of the original Security Agreements in his safe at his home in New Jersey.

The Promissory Note was expressly drafted to be payable in New Jersey. Magwitch made demand for payment of the Promissory Note in New Jersey.

Defendants' arguments against specific jurisdiction are based on inaccuracies, misstatements, and half-truths, and therefore fail. Defendants argue that Magwitch is a New York company because it used a New York address for notice purposes in some of the refinance documents. However, in the same documents, Pusser's West Indies provided a notice address in Colorado. Tobias recognizes in his declaration that Pusser's West Indies remains a British West Indies corporation despite the Colorado notice address. See Tobias Dec., ¶12. Magwitch's use of a New York notice for notice does not eliminate jurisdiction in New Jersey.

Defendants' argument that the Promissory Note and Assignment contain British West Indies choice of law provisions is equally unavailing because it is inaccurate. As detailed above, the Magwitch Assignment Agreement is the document that assigns the Barclay's Debt to Magwitch, and it contains no choice of law or venue provisions.

23

Defendants' arguments that the parties' negotiations and the terms of the agreements at issue have no bearing on New Jersey is just plain wrong. Magwitch, through DeVos, negotiated, signed, and held the Promissory Note, Security Agreements and Magwitch Assignment in New Jersey. Magwitch demanded payment of the Promissory Note from New Jersey.

Finally, contrary to the facts presented by defendants, defendants' misrepresentations and promises related to the transfer of funds from the Pusser's United States operations to its Caribbean operations were made to DeVos in New Jersey.

Defendants' attempts to distinguish the facts of this case from <u>Lebel</u> fail. At issue in <u>Lebel</u> was the purchase of a luxury speed boat purchased by a New Jersey plaintiff from a Florida defendant. Plaintiff met the defendant at a boat show in New York. Defendant called plaintiff in New Jersey to negotiate the terms of the deal. Plaintiff received and signed the sales agreement in New Jersey. After the sale was completed, plaintiff learned that he was defrauded by defendant. The <u>Lebel</u> court found that plaintiff alleged sufficient facts to support a finding of specific jurisdiction in New Jersey. <u>Lebel,</u> 115 N.J. at 324. The court noted that "[w]here a defendant knowingly sends into a state a false statement, intending that it should be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state. <u>Id.</u> at 317.

24

The Lebel court found that the defendant's telephone calls to plaintiff in New Jersey and the mailing of the sales agreement to plaintiff in New Jersey satisfied the minimum contacts requirement for specific jurisdiction. Here, as detailed above, defendants' contacts with New Jersey are even more extensive.

## B. This Court also has General Jurisdiction over Defendants.

A court exercises general jurisdiction over a defendant where the defendant has "continuous and systematic" contacts with the forum state sufficient to confer personal jurisdiction. Helicopteros, 466 U.S. at 414-15, n.9. Defendants contacts with New Jersey are substantial, and confer general jurisdiction.

Defendants' conclusory argument against general jurisdiction is set forth in a four-line footnote. See Defendants' Memorandum, at p. 19. Defendants argue that none of the Pusser's entities are incorporated in or have a principal place of business in New Jersey. That much may be true. They further argue that none of the Pusser's entities conduct business directed at New Jersey. This is not true. Accordingly, defendants' argument fails.

The Pusser's enterprise controlled by Tobias consists of four companies. Pusser's USA operated restaurants and retail stores in the United States. Defendant Pusser's 2001 licenses Pusser's intellectual property. Defendant Pusser's West Indies operates restaurants and retail stores in the British West Indies. And Pusser's Rum Ltd. owns the rights to the distilled spirit known as Pusser's Rum.

25

Pusser's Rum Ltd. sells Pusser's Rum in New Jersey and throughout the United States.

Tobias operates the Pusser's enterprise as if it was one company, and, as detailed in the Complaint, moved funds back and forth between the companies. All of the Pusser's operating companies are discussed on the Pusser's website, www.Pussers.com.

Pusser's targets its business to New Jersey residents. For example, in order to promote the sales of Pusser's Rum at Liberty Landing Marina, located in Jersey City, New Jersey, Tobias had Pusser's West Indies make personalized Pusser's Rum mugs that were given to the Liberty Landing Marina. Tobias had the mugs shipped to DeVos at his home in New Jersey, and DeVos personally delivered them to the Liberty Landing Marina.

Additionally, the Pusser's website lists 86 locations in New Jersey alone where Pusser's products are sold, and where visitors to the Pusser's website are directed to find Pusser's products. It belies logic to argue that Pusser's does not target its business to New Jersey when it sells Pusser's products in at least 86 locations in New Jersey.

## C. The Calder "Effects Test" Also Supports a Finding of Personal Jurisdiction.

The Third, Fifth, Seventh and Eighth Counts of the Complaint allege intentional torts arising out of defendants unauthorized diversion of assets from

Pusser's United States operations to Pusser's Caribbean operations in violation of the Promissory Note and Security Agreements, as well as defendants conversion of proceeds from the settlement of an insurance claim from damages to a Pusser's restaurant in Annapolis, Maryland. In order to determine whether these allegations confer personal jurisdiction, Magwitch must demonstrate that:

1. Defendants committed an intentional tort;

2. Magwitch felt the brunt of the harm in New Jersey such that New Jersey can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and

3. Defendants expressly aimed their tortuous conduct at New Jersey such that New Jersey can be said to be the focal point of the tortious activity.

IMO Indus. at 265-266.

The allegations in the Complaint, which must be accepted as true for the purpose of this motion, Carteret Savings Bank, 954 F.2d at 142, satisfy the first prong of the test. The second prong is equally satisfied – clearly Magwitch felt not only the brunt of the harm, but all of the harm, in New Jersey. The harm and effect of Defendants' tortious conduct is that the Promissory Note remains due and owing, and many of the assets originally pledged as security for the Note have been diverted outside of the United States by defendants contrary to the representations made by Tobias to DeVos in New Jersey. Magwitch has one member, DeVos. Given the long standing relationship between Tobias and DeVos, Tobias knows

that DeVos lives in New Jersey, and conducts his investment activities from New Jersey. DeVos negotiated and signed the Barclay's Agreement and the amendment thereso, the Promissory Note, the Security Agreements, and the Magwitch Assignment in New Jersey. The Promissory Note was held in DeVos' safe in New Jersey. Magwitch demanded payment of the Promissory Note from New Jersey. Where else could the brunt of the harm be felt except New Jersey?

The third prong of the effects test is satisfied. DeVos and Magwitch are the only focal points of Defendants' tortious activity.

## D. Defendants Have Failed to Demonstrate that this Court's Exercise of Personal Jurisdiction Would Be Unreasonable.

"Once the plaintiff has made out a prima facie case in favor of personal jurisdiction, the defendant 'must present a compelling case that the presence of some the of other considerations would render jurisdiction unreasonable.'" Carteret, 954 F.2d at 150, quoting Burger King, 471 U.S. at 477. The burden shifts to defendants to show that the "exercise of jurisdiction would offend 'traditional notions of fair play and substantial justice.'" N.J. Dept. of Treasury v. Qwest Comms. Int'l, Inc., 387 N.J. Super. 487, 499 (App. Div. 2006)(quoting Lebel, 115 N.J. at 327-29. Plaintiffs must establish "a compelling case that the presence of some other considerations would render jurisdiction . . . unreasonable." Qwest, 387 N.J. Super. at 505 (quoting Lebel, 115 N.J. at 328.)

Defendants do not argue that this Court's exercise of jurisdiction would cause any hardship or injustice. Therefore, the Complaint cannot be dismissed on the basis that the exercise of jurisdiction over defendants would be unreasonable.

## CONCLUSION

Based upon the foregoing, it is respectfully submitted that Defendants' Motion to Dismiss the Complaint should be denied.

Respectfully submitted,

GRAHAM CURTIN
A Professional Association
Attorneys for Plaintiff
Magwitch L.L.C.

By: s/ Thomas R. Curtin
Thomas R. Curtin

Dated: October 1, 2007

# Exhibit D

Thomas R. Curtin
GRAHAM CURTIN
A Professional Association
4 Headquarters Plaza
P.O. Box 1991
Morristown, New Jersey 07962-1991
(973) 292-1700

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MAGWITCH L.L.C., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 07-3040 (SRC) |
| | : | |
| v. | : | |
| | : | **SECOND DECLARATION OF LLOYD** |
| PUSSER'S INC., a Florida corporation, | : | **DE VOS IN OPPOSITION TO** |
| PUSSER'S LTD., a British Virgin Islands | : | **DEFENDANTS' MOTION TO DISMISS** |
| corporation, PUSSER'S WEST INDIES | : | **COMPLAINT** |
| LIMITED, a British Virgin Islands | : | |
| corporation, and CHARLES S. TOBIAS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

I, Lloyd De Vos, make this declaration pursuant to 28 U.S.C. §1746 in opposition to the

motion of the defendants to dismiss this action for the lack of personal jurisdiction.

1.     I am the sole member of the plaintiff, Magwitch L.L.C. ("Magwitch"), the

plaintiff in this action, am authorized to act on behalf of Magwitch and am competent to testify

to the matters set forth in this Declaration.

### Magwitch Public Records

2.     Attached hereto as Exhibit A are the Articles of Organization of Magwitch filed

with the Secretary of State of New York in 1999, prior to the transaction that gave rise to this

litigation. The public record states clearly that I am the sole member and manager of Magwitch LLC at my home address in New Jersey.

3.     Sometime thereafter, the address to which service should be sent was also changed to my home address in New Jersey. Attached hereto as Exhibit B is the most recent Limited Liability Biennial Statement filed with the New York Department of State. This pre-printed public filing shows the address for service of process to be my address in New Jersey.

<u>Investment Opportunities in the British Virgin Islands</u>

4.     At no time have I ever sought out investment opportunities in the British Virgin Islands.

5.     At no time have I ever sought out opportunities to invest in assets located in the British Virgin Islands.

6.     My travel to the British Virgin Islands over the past thirty years was principally in the course of performing legal services to the defendants in this action as well as other clients who have companies and other entities organized under the laws of the British Virgin Islands or, occasionally, for vacation. I never traveled to the British Virgin Islands for the purpose of seeking investment opportunities in the British Virgin Islands.

<u>Ownership of Pusser's Rum</u>

7.     On February 25, 2005, at the request of Mr. Charles S. Tobias ("Tobias"), a defendant in this action, I attended a deposition in Annapolis, Maryland as a designated representative of Pusser's Inc., a Delaware corporation that is related to the corporations involved in this matter. Tobias did not want to be deposed himself. The deposition was taken by counsel to Grotech Partners, IV, L. P. and the Retirement Funds of the State of Michigan after Grotech and the Retirement Funds obtained a judgment against Pusser's Inc. for moneys lent to

Pusser's Ltd. and not repaid by Pusser's Ltd. for the purpose of locating assets of Pusser's Inc. that could be used to satisfy the judgment.

     8.    At this deposition, I was asked whether Pusser's Rum was owned or controlled by Mr. James Jackson.

     9.    The question was asked in the disjunctive, not in the conjunctive. If Mr. James Jackson either owned Pusser's Rum or controlled Pusser's Rum, the answer to the question was "yes".

     10.    At that time, the majority of the shares of Pusser's Rum Ltd., the company referenced in the question, were owned by Mr. Jackson. Mr. Tobias controlled Pusser's Rum Ltd., being responsible for its management, publicity, production and marketing.

     11.    The affirmative answer to the question whether Pusser's Rum was a company owned or controlled by Mr. Jackson was correct because Mr. Jackson owned Pusser's Rum by virtue of his majority ownership.

     12.    The fact that the answer to the question was correct in no way contradicts the fact that at the time, Tobias controlled Pusser's Rum, as stated in my initial affidavit.

### Travel to the British Virgin Islands

     13.    I have no independent memory of when I was physically present in the British Virgin Islands many years ago. It is my practice to prepare expense reports to document my business travel. At the time I prepared my initial affidavit, I reviewed my expense report files and calendar records to determine when I had traveled to the British Virgin Islands. I found no expense report for travel to the British Virgin Islands between September, 2001 and April, 2002 for business matters. I also found no calendar entries indicating that I was in the British Virgin Islands during this time.

Second Affidavit opposing motion to dismiss (D0016185)

14.    I have seen that the supplemental affidavit submitted by Tobias exhibits a letter that references that I was present in the British Virgin Islands at some time in November, 2001.

15.    My records indicate that just prior to Thanksgiving in November, 2001, I was present in St. Thomas, United States Virgin Islands for hearings in a litigation unrelated to Pusser's in which I was appearing as counsel. St. Thomas is a forty minute ferry boat ride from Tortola, British Virgin Islands.  I have reviewed my records again and again have found no expense report or calendar entry for travel to the British Virgin Islands in November, 2001.

16.    The only explanation that I can think of is that when I was in St. Thomas, I took the ferry over to the British Virgin Islands on a day trip.  As indicated in my initial affidavit, at that time I regarded Tobias as my close friend.  It would have been entirely consistent for us to want to see each other if I were close by since we would not have seen each other subsequent to the horror of September 11, 2001.  This would account for the absence of an expense report or calendar entry on which I based my statement.

### Execution of the Barclays Agreement

17.    I agree with Tobias that I was physically present in the British Virgin Islands in April, 2002 at his request for discussions with Barclays Bank to resolve the issues involving Pusser's with them.  Indeed, Pusser's was billed for my travel as part of the legal fees that were charged to it by Hill, Betts & Nash, the law firm in which I was a partner.  There is nothing in my affidavit inconsistent with this statement.

18.    Likewise, there is nothing inconsistent in my statements in my affidavit that Barclays had told Pusser's in early 2001 that Pusser's had to refinance or be liquidated and the fact that Barclays had not formally placed Pusser's in default or made a formal demand for

ₗ
Second Affidavit opposing motion to dismiss  (D0016185)

payment of amounts loaned to it by April, 2002. Placing a borrower formally in default or making a formal demand for payment is usually a step taken by a bank as a last resort.

19.    Tobias, however, references a preliminary agreement with Barclays Bank that was dated April 17, 2002 as evidence that I signed the definitive legal agreements with Barclays Bank in the British Virgin Islands.

20.    The preliminary agreement with Barclays Bank, Exhibit G to the Supplemental Affidavit submitted by Tobias, recites in its second paragraph "The Bank and the Purchasers agree that they will proceed in good faith to document formally in a manner reasonably acceptable to both parties the agreement set forth in this letter, each understanding that a legally binding document will only come into force upon the execution of further, formal legal documents." This is a preliminary document that is not legally binding by its terms.

21.    I signed the legally binding agreement, the Barclays Agreement, as that term is defined in my affidavit, in New Jersey as I stated.

22.    Tobias then defaulted on the legally binding agreement, as I also stated in my initial affidavit.

23.    Tobias also then caused Pusser's USA to pay out the moneys alleged in the complaint to the other Pusser's defendants, leaving Pusser's USA unable to pay the balance of the Barclays Promissory Note.

Forbearance

24.    The reply brief of the Defendants makes much of a purported profit of $1.8 million that Magwitch supposedly would have made from its purchase of the Barclays Promissory Note. Perhaps obviously, this profit has yet to materialize.

25.    So that the record is clear, in 2005, at the request of Tobias, I had entered into a forbearance agreement on behalf of Magwitch. The forbearance agreement is contained in paragraph 6 of Exhibit I to the Tobias Supplemental Affidavit. Under the forbearance agreement:

a.    Magwitch agreed not to take action to enforce its rights under the Barclays Promissory Note for two years; and

b.    Tobias had the right to terminate all liability to Magwitch under the Promissory Note in exchange for a payment of $450,000, the amount of unrecovered money that Magwitch and I paid Pusser's.

26.    During this period, it was completely within the control and discretion of Tobias to simply return the money that I had placed at the use of my friend to Magwitch and me.

27.    The two year forbearance period terminated earlier this year. Tobias refused to pay the $450,000, or any part thereof, to Magwitch. This lawsuit followed.

Dated: November 12, 2007
       Mountainside, New Jersey        Lloyd De Vos

# Exhibit E

1

```
 1         IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY

 2    ------------------------------x            COPY

 3    STATE TREASURER OF THE STATE    :

 4    OF MICHIGAN, CUSTODIAN OF THE   :

 5    MICHIGAN PUBLIC SCHOOL          :

 6    EMPLOYEES' RETIREMENT SYSTEM,   :

 7    MICHIGAN STATE POLICE RETIRE-   :

 8    MENT SYSTEM, AND MICHIGAN       :

 9    JUDGES' RETIREMENT SYSTEM,      :

10         Plaintiff/Judgment         :

11         Creditor,                  :

12         -vs-                       :   Case No.

13    PLANTATION INVESTORS, INC., A   :   C-2003-90398-FJ

14    DELAWARE CORPORATION, f/k/a     :

15    PUSSER'S, INC.,                 :

16         Defendant/Judgment Debtor: :

17    ------------------------------:

18

19              Deposition of Lloyd De Vos

20

21

22
```



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW  •  Suite 850, Washington, D.C. 20036
Tel: 202.861.3410  •  800.292.4789  •  Fax: 202.861.3425
Web: ladreporting.com  •  E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD  •  Baltimore, MD  •  Greenbelt, MD  •  McLean, VA

DEPOSITION OF LLOYD DE VOS
CONDUCTED ON TUESDAY, FEBRUARY 22, 2005

2

```
1    ----------------------------:

2    GROTECH PARTNERS, IV., L.P.,  :

3    A DELAWARE LIMITED PARTNERSHIP:

4         Plaintiff/Judgment       :

5         Creditor,                :

6         -vs-                     : Case No.

7    PLANTATION INVESTORS, INC., A : C-2003-90400-FJ

8    DELAWARE CORPORATION, f/k/a   :

9    PUSSER'S, INC.,               :

10        Defendant/Judgment Debtor:

11   ----------------------------:

12

13

14             Deposition of Lloyd De Vos

15                Annapolis, Maryland

16             Tuesday, February 22, 2005

17                   9:46 a.m.

18

19   Job No.:  1-51449

20   Pages 1 - 161

21   Reported by:  Tammy S. Newton

22
```

DEPOSITION OF LLOYD DE VOS
CONDUCTED ON TUESDAY, FEBRUARY 22, 2005

3

1          Deposition of Lloyd De Vos held at the

2    offices of:

3          Council Baradel Kosmerl & Nolan, P.A.

4          125 West Street

5          Annapolis, Maryland 21404

6

7

8

9    Pursuant to agreement, before Tammy S. Newton, a

10   Notary Public in and for the State of Maryland.

11

12

13

14

15

16

17

18

19

20

21

22

DEPOSITION OF LLOYD DE VOS
CONDUCTED ON TUESDAY, FEBRUARY 22, 2005

80

1    of Pusser's Limited involving an interpretation

2    of British Virgin Island law.

3        Q      What I'm trying to figure out how we

4    got from the Jackson offer, that I appreciate you

5    don't remember, to the Magwitch offer.  How did

6    it evolve into the Magwitch offer?  Perhaps the

7    best way to approach this is to ask when did you

8    first have discussions with anyone about possibly

9    acquiring all or some portion of the Barclays

10   debt?

11       A      If my recollection is correct is March

12   or April of 2002.

13       Q      What precipitated those discussions?

14       A      It occurred during the negotiations

15   with Mr. Nobbs, the representative of Barclays

16   Bank.

17       Q      With whom did you have the

18   discussions?

19       A      Mr. Tobias and Mr. Jackson.

20       Q      What was Mr. Nobb's position at

21   Barclays?

22       A      I believe he was an associate director

DEPOSITION OF LLOYD DE VOS
CONDUCTED ON TUESDAY, FEBRUARY 22, 2005

81

1        in their work-out group out of London.

2            Q        Did you have face-to-face meetings

3        with him --

4            A        Yes.

5            Q        -- in the Virgin Islands?

6            A        In the British Virgin Islands, yes.

7            Q        Who first broached the subject of

8        Magwitch or some company controlled by you

9        acquiring some of the debt?

10           A        I don't recall who broached it first.

11           Q        How did it come about?  Somebody must

12       have had this idea.  It's your money.  So you

13       must have been in on the idea at some point.

14           A        There came a point in the discussions

15       with Barclays where Barclays made it clear

16       -- Barclays, in the person of Mr. Nobbs, made it

17       clear that they would step in and liquidate

18       Pusser's if an agreement was not reached to their

19       satisfaction.  At that time, Charles Tobias and

20       Jim Jackson and I met separately, and Mr. Jackson

21       offered to either purchase or finance the

22       Caribbean assets of Pusser's but did not want to

DEPOSITION OF LLOYD DE VOS
CONDUCTED ON TUESDAY, FEBRUARY 22, 2005

82

1    be involved with the United States assets of

2    Pusser's.

3                Mr. Tobias said he did not have the

4    funds in order to do this.  I thought about it

5    for a day and suggested that Mr. Tobias contact

6    all other shareholders of Pusser's or creditors

7    of Pusser's just to see if any of them who would

8    be interested in doing this, failing which I

9    would as a limited last resort.

10        Q     At the time, was Barclays facility in

11   default?

12        A     No, I don't believe so.

13        Q     Had Barclays made a formal demand for

14   payment?

15        A     No.

16        Q     What about this suggestion of a deal

17   with Jim Beam, was that deal not workable?  Did

18   you just go down another track?  Did it take too

19   long to handle the Jim Beam issues?

20        A     While I do know that there was a

21   purchase by a company called Pusser's Rum of the

22   Jim Beam rights, there was no connection with

DEPOSITION OF LLOYD DE VOS
CONDUCTED ON TUESDAY, FEBRUARY 22, 2005

83

1      Barclays that I'm aware of.

2           Q      Is Pusser's Rum a company owned or

3      controlled by Mr. Jackson?

4           A      Yes, it is.

5           Q      When did that purchase take place, the

6      purchase of the Pusser's Rum named from Jim Beam?

7           A      Sometime in 2002.  I don't recall

8      when.  It could be 2003.

9           Q      Did you have any involvement in that?

10          A      I acted as counsel of Pusser's Rum.

11          Q      Were you involved then in the

12     negotiations with Jim Beam?

13          A      No.

14          Q      Was Jim Beam represented?

15          A      I believe they had one of their

16     in-house counsel preparing documents.

17          Q      Where are they located?

18          A      I don't remember.  My memory says

19     Chicago, but I could be wrong.

20          Q      Which Pusser's entity or entities have

21     rights to receive funds from Hartmarx in

22     connection with the apparel trademarks?