Gregory W. Gilliam
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York 10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

| | | |
|---|---|---|
| MAGWITCH L.L.C., | : | |
| | : | Case No. 08-cv-2144 |
| Plaintiff, | : | |
| | : | ECF Case |
| -against- | : | |
| | : | |
| PUSSER'S INC., PUSSER'S LTD., | : | **DECLARATION OF** |
| PUSSER'S WEST INDIES LTD., and | : | **CHARLES S. TOBIAS** |
| CHARLES S. TOBIAS | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------------------X

**Charles S. Tobias** makes this declaration pursuant to 28 U.S.C. § 1746 and in

support of the Defendants' Motion to Dismiss the above-captioned action.

1.      My name is Charles S. Tobias, one of the defendants in the above-

referenced action.  I am 73 years of age.  I am competent to testify to the matters set forth

in this declaration.

2.      In 1979, I took up residence in the British Virgin Islands ("BVI") where I

founded Pusser's Ltd.  In 1999, I became a citizen, or "belonger," of the BVI.

3.      I have never been a citizen or domiciliary of the state of New York.

4.      I have never owned, leased or otherwise occupied any real property in the

state of New York.

5.      I have never maintained any tangible or intangible personal property, kept bank accounts, or made investments in the state of New York.

6.      I derive no income from the state of New York.

7.      I have not, in or on my own behalf, done business in, or otherwise engaged in business activities or transactions in or directed at, the state of New York.

8.      I have read the complaint filed by Magwitch, LLC ("Magwitch"), in the above-captioned action against Pusser's, Inc., ("Pusser's Florida"), Pusser's, Ltd ("Pusser's Ltd") Pusser's West Indies, Ltd. ("PWI"), and me individually.  Pusser's Florida, Pusser's Ltd, and PWI are hereafter sometimes referred to collectively as "the Pusser's entities."

9.      Pusser's Florida is a corporation organized under the laws of the state of Florida.  It has had no business activity since 2005.  In 2005, Pusser's Florida's assets were liquidated and all cash received as a result of the liquidation was used to pay Pusser's Florida's debts including a $1.5 million payment to Magwitch.  After all Pusser's Florida's debts were paid, there was no money left over.  At the time when Pusser's Florida was actively engaged in business, its activities, properties, and employees were in Florida, Maryland and South Carolina.  Pusser's Florida has never had any business activity, property, or employees in the state of New York.

10.      Pusser's Ltd is a corporation organized under the laws of the BVI.  It is currently inactive.  It is the sole shareholder of Pusser's Florida.  Its operations in the United States, when they were active, were in Maryland, South Carolina and Delaware, through subsidiaries of Pusser's Ltd, which were merged into Pusser's Florida in 2003. Pusser's Ltd does no business in New York and has no assets or employees there.

11.     PWI is a corporation organized under the laws of the BVI.  I am the sole shareholder of PWI.  Since 2002 PWI has owned and operated Pusser's branded restaurants, retail outlets, and other operations in the Caribbean, as distinguished from the Pusser's branded operations in the United States.  PWI has never done business, or otherwise engaged in business transactions in, or directed at the state of New York.  It has no property or employees in the state of New York.

12.     None of the Pusser's entities has ever owned, leased, or otherwise occupied any real property in the state of New York.

13.     None of the Pusser's entities has ever maintained any tangible or intangible personal property in the state of New York, none of them has employed persons in New York, and none of them has ever kept bank accounts, made investments, or employed persons in the state of New York.

14.     None of the Pusser's entities has ever been qualified or licensed to do business in New York, and none of them has ever, until the above-captioned action was filed, been involved in any court litigation, arbitration, mediation, or other legal proceedings in New York.

15.     Some time in the early 1980s I became acquainted with a lawyer named Lloyd De Vos.  I met him through a friend who headed a bank in the BVI that was using Mr. De Vos as a lawyer.  Mr. De Vos was a business and tax lawyer who provided legal advice to persons doing business in the Caribbean, including the BVI, and he had an office in the neighboring U.S. Virgin Islands.  Mr. De Vos became an investor in Pusser's Ltd in that time frame and then became a member of its board of directors.  Mr. De Vos's role eventually expanded to becoming legal advisor to Pusser's Ltd and its subsidiaries.

16.     Because Mr. De Vos was the lawyer for Pusser's companies, I had contact with him by letter, fax and email, and sometimes in person when I happened to be in the United States.  When I communicated by fax or email, I directed my correspondence to his law firm in New Jersey or New York depending on which law firm he happened to be affiliated with at the time.   When I called Mr. De Vos during business hours, I usually contacted him by calling his law office, which was for a period of time from 2000 until September 2001, in New Jersey, and for another period of time, after September 2001, in New York.  If I could not reach Mr. De Vos in his office, because of the hour at which I was calling or for some other reason, I typically called him on his cell phone, in which case I did not know precisely where he physically was located.  When I visited Mr. De Vos in New York, which was rare, I would typically see him at his New York office, or at a restaurant for dinner.  My records reflect that from 2000 to 2004 I was in New York less than five times.  The Complaint in this case alleges that I went to New York to give deposition testimony.  I have no recollection of such a deposition, and I do not believe I was ever in a deposition related to the matters asserted in the Complaint.

17.     When I spoke on the phone with Mr. De Vos, I did not keep track of where he was, and called him wherever he happened to be.  If I did discuss any of the matters described in the Complaint with Mr. De Vos on the phone while he was in New York (and I have no recollection of such discussion), it was only because he happened to be in New York at that time.  I have no recollection of discussing the Pusser's workout or Magwitch's becoming a Pusser's creditor while I was physically present in New York. To the contrary, my recollection, as set forth in more detail below, is that all significant discussions about the Barclays workout, and Magwitch's part in it, took place in the BVI

or, on at least one occasion, in Barbados.  Similarly, as also set forth in more detail below, any discussions about Pusser's intra-company fund transfers that I had with Mr. De Vos were typically in the BVI.

18.     During the period of time that Mr. De Vos was legal advisor to the Pusser's companies, he was affiliated with law firms based either in New York or New Jersey.  The fact that Mr. De Vos practiced law in New York as opposed to some other place was a matter of indifference to me.  I did not seek Mr. De Vos's legal advice with respect to any matter related to the state of New York.  I sought his advice on various tax and corporate governance issues, and on business issues, particularly relating to expansion of Pusser's Ltd's business into Florida, South Carolina, and Maryland.

19.     The Complaint in this case arose out of transactions in the BVI in 2002 pursuant to which Magwitch, the plaintiff in this case, became a secured creditor of Pusser's Ltd and Pusser's Florida by paying $1.5 million for a promissory note in the amount of $3.3 million Pusser's Ltd made to the BVI branch of the British bank, Barclays ("the Note").

20.     Mr. De Vos is the sole owner, member, and manager of Magwitch.  So far as I know, it has no employees or physical offices, and no assets other than the Note.

21.     Pusser's Ltd had business interests both in the Caribbean region and, through its wholly-owned subsidiaries, in the United States.  These interests included Pusser's branded restaurants and retail operations.  In the United States these operations were located in Florida, Maryland, and South Carolina.  There were no such operations in the state of New York.

22.    Pusser's Ltd financed its operations, including its United States operations, through loans provided by Barclays Bank's branch on Tortola, BVI.  To secure itself, Barclays took a security interest in Pusser's Ltd's assets in the Caribbean and the United States.  No bank in New York was involved.

23.    By 2001, Pusser's Ltd had accumulated indebtedness to Barclays in excess of $11 million.  Pusser's Ltd was incapable of paying this debt.  Rather than formally declare Pusser's Ltd in default, however, Barclays negotiated a workout.

24.    During the workout of Pusser's Ltd's debt, Mr. De Vos was a shareholder, officer, and director of Pusser's Ltd, as well as its closest legal advisor.  He was therefore fully engaged in the workout negotiations and actively participated in the workout process here in the BVI.   He came to the BVI for every key corporate meeting, and he participated in person in every important meeting with Barclays about Pusser's Ltd's attempted debt restructuring.  Most of these meetings were in the BVI, and all of them were held in the Caribbean.  None of them was in New York.

25.    For example, on June 25, 2001, Mr. De Vos and I both flew to Barbados for a face-to-face meeting with the Barclays workout specialists to discuss restructuring Pusser's Ltd's debt.  A March 6, 2002 letter I sent to Mark Young of Barclays referenced the occasion "[w]hen Lloyd and I flew down to Barbados to meet with Andy Gardiner and Charles Middleton [workout specialists] on June 25, 2001 . . . ."  A true and accurate copy of the March 6, 2002 letter is attached hereto as Exhibit A.

26.    Again, on August 8, 2001, Mr. De Vos was in Tortola, BVI, for the annual meeting of the shareholders of a subsidiary of Pusser's Ltd incorporated in Delaware  As the minutes of that meeting reflect, Mr. De Vos acted as secretary and was elected to the

board of directors at this meeting.  A true and accurate copy of the Minutes of the Annual

Meeting (Aug. 8, 2001) are attached hereto as Exhibit B.

27.    Mr. De Vos attended the annual meetings of Pusser's Ltd and other

companies in November 2001.  This is reflected in a letter written and signed by

Mr. De Vos dated December 29, 2001.  A true and accurate copy of Mr. De Vos's letter

is attached hereto as Exhibit C ("When I visited Tortola for the annual meetings at the

end of November, Kert [Tennikait] was kind enough to provide me with his summary of

the invoices outstanding between Pusser's and me.")

28.    In addition, Mr. De Vos was in the BVI for negotiations with Barclays on

the restructuring of Pusser's Ltd's debt in the Spring of 2002.  The negotiations with

Barclays led to a letter agreement on April 17, 2002, the terms of which were later

incorporated into a more formal Assignment Agreement signed on May 9, 2002.  A true

and accurate copy of the April 17, 2002 Letter Agreement from Barclays Bank PLC to

Magwitch LLC, Pusser's (2001) Ltd, and Pusser's West Indies, Ltd. is attached hereto as

Exhibit D.  The letter agreement refers to "discussions earlier this week" between the

parties, is expressly "governed by British Virgin Islands law," and was signed by all

parties, including Magwitch through Mr. De Vos, in the BVI.

29.    I do not specifically recall whether Mr. De Vos was in the BVI for the

closing of the formal Assignment Agreement on May 9, 2002, but there is evidence that

he intended to be here. In an email from Mr. De Vos to Kert Tennikait sent three days

before the closing, Mr. De Vos said he was planning to come to the BVI for that event.  A

true and accurate copy of the May 6, 2002 email is attached hereto as Exhibit E.

30.     In short, Mr. De Vos and through him, Magwitch were down here in the BVI to effect the workout leading to Magwitch's purchase of the Note that is at the heart of this dispute.  By contrast, neither I nor any of the other Pusser's defendants were ever in New York for any part of this transaction.  New York had nothing to do with this transaction.

31.     The terms of the deal eventually worked out with Barclays was that the security for the cumulative debt owed by Pusser's Ltd to Barclays would be allocated between operations in two geographic regions, the Caribbean and the United States.  Thus, one portion of the debt would be secured by certain of Pusser's Ltd's assets in the Caribbean, and the balance of the debt, in the amount of $3.3 million, would be secured by certain assets of Pusser's Ltd's subsidiaries in the United States.

32.     These terms were incorporated into an Assignment Agreement executed on May 9, 2002.  A true and accurate copy of the Assignment Agreement is attached hereto as Exhibit F.  It was executed in the BVI and is expressly governed by the law of the BVI.

33.     Pursuant to the arrangement spelled out in the Assignment Agreement, Pusser's Ltd made the Note to Barclays Bank PLC on May 9, 2002.  A true and accurate copy of the Note is attached to this declaration as Exhibit G.  The Note provided that the borrower, Pusser's Ltd, would pay Barclays the amount of the note plus interest "**on demand**, at its offices at Road Town, Tortola, British Virgin Islands" or at such other place designated by the lender.  I signed the Note in the BVI on behalf of the borrower, Pusser's, Ltd, and on behalf of the United States subsidiaries of Pusser's Ltd, including Pusser's Florida, whose assets would secure the Note.

34.     The Note contains a choice-of-law clause providing that it "shall be governed as to validity, interpretation, construction, effect, and in all other respects by the laws and decisions of the British Virgin Islands."

35.     After Pusser's Ltd made the Note, Magwitch purchased it from Barclays for $1.5 million.  When the Promissory Note was sold to Magwitch, Pusser's Ltd was instructed to direct all communications to Magwitch's address in New York.  However, when Magwitch formally demanded payment under the Promissory Note in September 2006 it was via a letter to Pusser's Ltd in the BVI that showed a New Jersey address for Magwitch.

36.     In conjunction with the Note, Pusser's Ltd subsidiaries, including Pusser's Florida, were subject to security agreements with Magwitch pledging certain of their assets to secure Pusser's Ltd's indebtedness to Magwitch.  True and accurate copies of these security agreements and assignments thereof to Magwitch are attached hereto as Exhibits H and I.  I executed the security agreements in the BVI on behalf of these companies, and the assignments of the security from Barclays to Magwitch were made in the BVI and are expressly governed by the laws of the BVI.  The security agreements are governed by the laws of Florida, Maryland, South Carolina and Delaware, respectively. None of these security agreements was entered into in New York, pertained to assets in New York, or was in any way governed by New York law.

37.     By agreement of all concerned persons, including Magwitch, the accounts of all the Pusser's operations in the Caribbean and the United States, including the accounts of the restaurants in Maryland and Florida, were managed in the BVI by a single financial comptroller, Kert Tennikait.  If there were any inter-company fund transfers,

whether from Caribbean operations to United States operations or vice versa, they were effected and booked in the BVI.

38.      The Pusser's entities and Magwitch, with Mr. De Vos in attendance as Pusser's lawyer, officer, director, and creditor, and as Magwitch's representative, met often in the BVI and transfers of funds between Pusser's companies was a frequent topic of discussion. As a result, Mr. De Vos was fully aware of any intra-company movement of funds. Any agreements or promises with respect to transfers were made in the BVI, not in New York.

39.      When Magwitch bought the Note it was secured by the assets of Pusser's Ltd's operating subsidiaries in the United States, which were ultimately merged into Pusser's Florida. (Mr. De Vos, as lawyer, engineered this merger.) These businesses had assets valued in excess of the $3.3 million face value of the Note, including a Pusser's Landing restaurant and retail store in the Marriott Hotel on the waterfront in Annapolis, Maryland, and two restaurants -- Pusser's at the Beach and Pusser's Down Under -- in Fort Lauderdale, Florida.

40.      In September 2003, the Pusser's Landing restaurant in Annapolis, in which Pusser's had invested more than $2 million, was devastated by Hurricane Isabel. This unforeseen natural disaster jeopardized Magwitch's security for the Note. If Pusser's was unable to rebuild quickly in Annapolis, the hotel owner where the Pusser's Landing was located could have terminated Pussers' right to operate at that location, destroying any value the restaurant had. The insurance money for this loss was tied up in litigation with the hotel owner, who was trying to force a default so that it could terminate the Pusser's Landing Operating Agreement, which it had a right to do if

-10-

Pusser's failed to re-start operations in a specified timeframe.  Therefore, Mr. De Vos, on behalf of Magwitch, and while still purporting to act as Pussers' lawyer, asked for substantial cash advances from PWI and another Pusser's company in the BVI, Pusser's Rum, Ltd ("Rumco") to repair and rebuild the Pusser's Landing operations.  Rumco is not a party to this action.

41.     In response to Mr. De Vos's request, PWI and Rumco advanced hundreds of thousands of dollars to repair and rebuild the Pusser's Landing restaurant and related store operations in Annapolis to avoid a default.

42.     As part of the consideration for the cash advances from PWI and Rumco, Mr. De Vos agreed on behalf of Magwitch that "funds that are moved from Rum/PWI to Pusser's Inc to cover the cash shortfall will be repaid from the first available cash proceeds in the United States, and specifically ahead of any payments of legal fees to my firm or cash distribution to Magwitch or others."  *See* Lloyd De Vos's February 11, 2004 email, attached hereto as Ex. J.  Magwitch thus agreed to subordinate its security interest in Pusser's Florida's assets to PWI and Rumco.

43.     Contrary to its agreement to subordinate, Magwitch now complains that insurance funds for the damage done by Hurricane Isabel should have been paid to Magwitch when they finally became available.  *See* Complaint ¶¶ 53-54.

44.     There was no improper transfer of funds, as Magwitch contends.  Any transfers that may have occurred were done with Magwitch's express agreement as reflected in Mr. De Vos's February 11, 2004 email and in other communications.  In any case, any transfer would have had no relationship to New York.  Pusser's Florida's cash and accounting were handled by Pusser's accounting operations in the BVI.

45.     Neither I nor the Pusser's entities could ever have reasonably expected to be called into the courts of New York for resolution of the disputes that are the subject of the complaint filed by Magwitch.  I never supposed that I or the Pusser's entities could be subject to the personal jurisdiction of courts in New York.  None of the written agreements at issue in this case were governed by New York law or chose New York as the place for dispute resolution.  Indeed, any time there is an express choice-of-law clause or choice-of-venue provision in an agreement pertaining to the debt or security at issue, the choice is invariably for some state or jurisdiction other than New York.  If Mr. De Vos had advised me that these agreements related to Magwitch made me or my companies subject to jurisdiction in New York, I would not have entered into them.  I was relying on Mr. De Vos to protect the Pusser's companies and secure appropriate legal protections.

46.     I would welcome the opportunity to disprove Magwitch's claims in a court of law, but it would be a substantial hardship for me and the Pusser's entities to litigate this case in New York.  Many of the people familiar with the events out of which Magwitch's claims arise are here in the BVI, including myself, Kert Tennikait (Comptroller of the Pusser's entities), Barclays Bank personnel, Barclays Bank and Pusser's accounting firms, Barclays Bank attorneys (BVI firm of Harney, Westwood and Riegels), Paul Webster (a lawyer in the BVI who is familiar with the Barclays workout and, in addition to Mr. De Vos, was a lawyer for Pusser's), and others.  Other than Mr. De Vos, I can think of no other people in or near New York who have relevant information about this case.

47.     So long as I have known Mr. De Vos, he has been a regular visitor to the BVI and other places in the Caribbean, where he has a number of clients whom he advises on legal matters.  There would be little hardship to Mr. De Vos if he were required to bring his claims in the BVI.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


_____
Charles S. Tobias

Dated: __3/10/2008_____

# Exhibit A



March 6, 2002


Mr. Mark Young
General Manager
Barclays Bank PLC
Road Town, Tortola


Dear Mark,

First, I apologize for the delay in getting this to you. Mr. Lloyd DeVos has been so occupied with other matters, that he was unable to complete this in the time frame that we wanted you to have it. Thus I am completing this so we might move forward without delay.

When Lloyd and I flew down to Barbados to meet with Andy Gardiner and Charles Middleton on June 25, 2001, we believed that Pusser's had an excellent chance of recovery from the financial position it was in. Pusser's had sold off its money-losing units, reduced its employee head count, more than halved its operating overhead and was operating units that were profitable within their four walls. It was beginning to make money. Based on the projections extrapolating those results, we thought that Pusser's would be able to raise the $8 million equity it was seeking. Likewise, based on that plan, we thought that there was a good chance that the bank would eventually come out whole.

For the period from June 25 through September 11, the financial results of Pusser's bore this out. Through the end of its Period 3 (September 16, 2001), the Company's EBITDA and earnings were about $200,000 ahead of budget. Unfortunately, as you and almost everyone else in any way related to the hospitality industry in the Caribbean knows, September 11th changed all this.

At present, Pusser's has fallen significantly behind on both its projected EBITDA and its income. From being ahead by about $200,000 at the end of its Period 3 in September, it is now about $400,000 behind as shown in its numbers for Period 8. It expects to fall another $600,000 behind for the balance of the fiscal year (which ends June 30, 2002) with a real cash loss for the year in the range of $400,000 to $600,000. The principal reason that we see for this is the inability of the Company to purchase inventory for its retail stores. While food & beverage sales are running about 90% of budget since September 11th, retail sales have been running at only 53% of budget. Simply, Pusser's does not have the goods to sell.

Since then and until recently, I have been trying to sell or refinance the company as an integral unit, that is with the U.S. and the Caribbean units combined with the view to the Company's continuing as an ongoing enterprise in both the U.S. and the Caribbean as it has been. However, final interest in this possibility died several weeks ago. Fortunately or unfortunately, a lot of time has been spent writing business plans and exploring only those arrangements which would have had the bank being fully repaid, and the shareholders retaining a part of their equity. I have come to realize that this approach, after September 11th, required that an unrealistic valuation be placed on the business in a market that presently discounts heavily, especially in circumstances like Pusser's: heavy losses, a huge debt, a negative net worth and an offshore location.

We have now concluded that the best course at this time is to break the Company into its two geographical components, that is, the U.S. and the Caribbean – and to sell them independently for a realistic valuation. In effect, we are proposing a planned liquidation. Of course, the shareholders would lose their equity and their notes. In the interim, we believe that the best way to maximize value is to keep the business running while it is sold, which also protects the trade creditors and employees that Pusser's has in the British Virgin Islands while maximizing the possible recovery amount for the bank in its capacity as the secured creditor of Pusser's.

Several months ago, an outside group, headed by Mr. Jim Jackson, a Pusser's shareholder, requested that I assist them in negotiations with the Jim Beam Brands Company's parent, Fortune Brands, with the purchase of the business of British Navy Pusser's Rum from Fortune Brands who have decided to sell Pusser's and numerous other small brands. The parties have agreed in principle to a final closing date between June 1 and August 1 of this year. The first draft of the Purchase Agreement has just been received. The purchase price for the rum is to be $4 million for which the funds have been raised.

I have agreed tentatively to run this new company. Recently, I persuaded the investment group that maintaining the Pusser's units in the British Virgin Islands would be greatly advantageous to the promotion and future sales of Pusser's Rum. As a condition of me agreeing to run the new company, the rum company agreed to approach the bank on a best effort basis to purchase the bank's notes for cash. The rum company has also agreed that if a successful transaction is concluded, that the it will assume responsibility for severance pay for Pusser's BVI employees, and payment of Pusser's BVI vendors in order to maintain the local goodwill necessary for the ongoing operation of the business. This would take care of these potential problems in the British Virgin Islands.

In the U.S., because of U.S. law, the rum company would be prohibited from operating any bars in the U.S. and would thus be forced to sell the best cash generating unit it would acquire under the proposed transaction, Pusser's Annapolis, as well as the second unit in Ft. Lauderdale. In a normal business climate, one would expect to receive approximately $2,500,000 from the sale of these units based on a factor of 2.5 times the cash flow generated by the units at the unit contribution level before G & A, depreciation, etc. Given the present climate for food and beverage operations in the U.S., and the



Company's distressed position as to time and cash, we would be pleased to receive $1,000,000 for these units. Gary Rogalski and I have been in discussions with a series of possible purchasers for these assets, and $1,000,000 is what's being offered for the two units combined. Of course, if Pusser's ceases operations, both of these units will simply fall into the hands of Thayer Properties, the owners of the hotels in which the units operate, and their value will essentially evaporate.

In attempting to arrive at a value of what the assets might be worth to the rum company, various scenarios were examined, finally coming down to EBITDA and asset valuations. From the rum company's perspective, a single, inexpensive Pusser's unit in the BVI would probably suffice for its needs as related to the promotion of the rum at a cost substantially less than what it would expect to pay the bank under the proposed transaction.

Thus valuing the Company on its expected EBITDA for this year at five times EBITDA, which is generous in today's market, one comes up with a valuation in the range of $2 - $2.5 . Similarly, we have tried to develop a liquidation value of what the rum company might reasonably expect to recover if it had to place the same assets into liquidation. Valuing the assets realistically, one arrives at a net liquidation value of about $2.5 million (see attached valuation sheet). Much of the asset value on the various units, particularly Annapolis, Ft. Lauderdale and Marina Cay, is in the leasehold improvements, which provides no liquidity excepting to the landlord.

Assuming a successful transaction with the bank, the rum company would liquidate the existing company, Pusser's Ltd., so as to be free of contingent liabilities. This course of action presents four other factors that a buyer must take into account, some of which were noted earlier.

The first factor is that all of Pusser's units operate on licensed premises - which are cancelable by the landlord on 60 days written notice if the company is put into receivership, which is what would happen if the rum company and the bank conclude the proposed transaction, and the rum company follows through with its plan of liquidation. It would therefore be incumbent upon me to obtain their agreement that they not cancel in the event that the current company is liquidated, and resurfaces operating under the new.

A second factor is severance pay. The liquidation of any company in the BVI requires that severance pay be offered to all employees wishing to accept it in lieu of ongoing employment in the new enterprise. It is believed that many will accept it since they have been in the employ of the Company for more than 20 years, and thus the amount to be paid represents a significant bonus as many of them draw close to the age where they wish to quit working. The exposure here is about $250,000.

The third factor is the payables of the BVI company. In order for the rum company to be able to continue to operate the Caribbean units it would be purchasing, all Caribbean payables of Pusser's Ltd. would need to be paid. This amount presently is about $1 million.

③

The fourth factor is working capital for the BVI company. In order that it be able to operate profitably and efficiently, it will need a working capital infusion of not less than $1 million. This is to increase inventory levels by about $750,000 where retail operations can again become profitable, and to repair, replace and upgrade equipment and facilities that are in dire need.

Thus in addition to what it is proposing to pay to the bank, the rum company must be prepared to put up an additional $2.25 million cash on top. Thus the rum company's initial cash outlay would be about $6 million.

Taking all factors into account, it has been concluded that the rum company cannot pay more than $3.5 million cash for purchase of the bank's notes. The proposed transaction would be a two-step process.

Step 1: Within thirty days of the conclusion of an agreement with the bank, the bank will receive $1 million cash, and temporarily a deed in lieu of foreclosure for the Pusser's DownUnder property in Ft. Lauderdale valued at the $1.8 million that is to come from it. Thus at this point the bank will have received value of $2.8 million. Concurrently, the bank will release the U.S. assets and all claims against the U.S. companies so that the U.S. will be free to go forward.

The BVI company, Pusser's Ltd., needs a cash infusion as soon as possible so that it can purchase a limited amount of inventory necessary for it to remain financially viable pending the conclusion of the transaction with the bank. Thus as part of Step 1, $250,000 would be advanced to the Pusser's Ltd. concurrently with the bank's release of the U.S. assets.

Step 2: Understandably, the Rum Co. does not wish to close on the agreement with the bank, which effectively entails the purchase of the Caribbean units which it contemplates purchasing to promote the Pusser's Rum brand it is buying, until it closes on the purchase of the rum business from Fortune Brands which can be no sooner than June 1, 2002 or later than August 1, 2002. On or before August 1st, or on the same day as the closing of the rum purchase from Beam, the rum company will pay the bank $2.5 million cash at which time:

> (i)    The deed to the Pusser's Down Under goes back to the rum company, and
> (ii)   The balance of the bank's Pusser's Ltd. notes are transferred from the bank to the rum company.
> (iii)  The rum company assumes responsibility for severance payments to employees and for Caribbean payables.

Presently, the rum company has commitments for the cash it requires to purchase the Pusser's Rum business from Fortune Brands. If the bank is amenable to an agreement as proposed, then the rum company will undertake to raise the additional funds which the

proposed transaction will require. While the rum company is reasonably certain that this can be done, it cannot undertake to do so until an agreement is in place between itself and the bank.

As we stated in June, we have tried to be as forthcoming as possible in the circumstances that we find ourselves. We very much appreciate the manner in which the bank has worked with us. While the present situation is not what we would wish, until now we have endeavored to conduct ourselves in a way that provides the creditors and shareholders of Pusser's with the best possible chance of recovery. Perhaps we spent too long trying to achieve refinancing goals that, under the circumstances, were not realistic. What's proposed here is both realistic and, we believe, achievable within a reasonable time frame.

We would welcome any further discussion of these matters at your convenience.

Yours sincerely,

Charles Tobias

copy:    James Jackson
         Charles Tobias
         Kert Tennikait
         Lloyd DeVos



# Exhibit B

## MINUTES OF THE ANNUAL MEETING
## OF THE SHAREHOLDERS OF
## PUSSER'S INC.

The annual meeting of the shareholders of Pusser's Inc., a Delaware corporation (the "Corporation"), was held on August 8, 2001 at 10:15 a.m., at Fort Burt Hotel, Road Town, Tortola, British Virgin Islands. The following, being the sole shareholder of the corporation, was present:

Mr. Charles S. Tobias

Also present was Mr. Lloyd De Vos.

The meeting was called to order by Mr. Tobias. It was moved, seconded, and unanimously carried that Mr. Tobias act as Chairman of the meeting, and that Mr. De Vos act as Secretary of the meeting and record the minutes thereof. The Secretary then presented a Waiver of Notice of the Meeting signed by the sole shareholder. The Chairman directed that the Waiver be annexed to the minutes of the meeting.

The Chairman next presented the financial report of the Corporation which was accepted and ordered filed with the Secretary.

The Chairman stated that the next item of business at the meeting was to elect the directors of the Corporation. Upon motion duly made, seconded and unanimously adopted, it was

> **RESOLVED,** that the following persons are elected as the directors of the Corporation, to serve for the ensuing year or until their successor(s) are elected and qualify:
>
> Mr. Charles S. Tobias
> Mr. Lloyd De Vos
> Mr. Jim Jackson
> Mr. Jim Flynn

NWK_100437_1/LDEVOS

On motion duly made, seconded and unanimously adopted, it was

> **RESOLVED**, that the shareholder hereby ratifies, adopts and approves all acts of any officer or director of the Corporation made during the preceding year.

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, it was adjourned.

Mr. Lloyd De Vos
Secretary of the Meeting

# Exhibit C

# HILL, BETTS & NASH LLP

99 PARK AVENUE
20TH FLOOR
NEW YORK, NEW YORK 10016

(212) 839-7000
Fax: (212) 466-0514

Lloyd De Vos
Direct Telephone: 212-786-1000
Direct Facsimile: 212-786-1015
E-mail: Ldevos@hillbetts.com

December 29, 2001

Mr. Charles S. Tobias
Pusser's Ltd.
P. O. Box 626
Road Town, Tortola
British Virgin Islands

Re:    Our file 80227

Dear Charles:

As we continue our recovery efforts, I have just reached the point where I have begun to think about how to handle billing for services for periods prior to September 11, 2001.

Part of my agreement with Edwards & Angell is that I have arranged for De Vos & Co. PLLC to purchase all of the outstanding accounts receivable and time inventories for my clients. You should not be hearing from Edwards & Angell concerning any amounts owed, and if you do, please let me know at once. All amounts owed by Pusser's for my services or the services of anyone at Edwards & Angell are owned by and payable to De Vos & Co. PLLC. Frankly, I did this because I did not want you to be hassled by either a collection agency or a law firm at this time. We have other and more important matters to occupy our time.

When I visited Tortola for the annual meetings at the end of November, Kert was kind enough to provide me with his summary of the invoices outstanding between Pusser's and me. According to Kert's reconciliation, there was a balance of $112,395.11 due from Pusser's Ltd. to De Vos & Co. PLLC, a balance of $32,089.48 due from Pusser's Ltd. to Edwards & Angell and a balance of $32,807.51 due from Pusser's Inc. to Edwards & Angell. Now that I have purchased the Edwards & Angell account receivable, all of these amounts are due to De Vos & Co. PLLC. Since for our purposes, it really does not matter whether the amounts are owed by Pusser's Ltd. or Pusser's Inc., there was just a balance of $177,292.10.

Since that time, of course, you were kind enough to permit me retain $5,000 of the Delaware franchise tax refund. This reduced the balance to $172,292.10.

{NY001972 1 }

'2126

Mr. Charles S. Tobias
December 29, 2001
Page 2

I have now reconstructed much of what was done in August and the beginning of September, 2001 for Pusser's. Frankly, there were only the clean-up matters involved, ironically as it appears now, with cleaning up all of the corporate and finance matters so that we would have everything in order for due diligence for a next round of financing. There were, however, the disbursements incurred in connection with our visit to Morgan Keegan in Tennessee and some old expenses relating to attendance at annual meetings in Florida. The total of the time and disbursements came to approximately $3,000.

All things being considered, the best estimate that I can come to is that a statement for $2,750 would cover everything that was done. In the interest of being overly fair, I would ask that you accept $2,750 as the bill in settlement of all Pusser's matters for periods up to September 11, 2001.

While I could design some De Vos & Co. letterhead and type up a formal bill for that amount, I would ask that under the present circumstances, you accept this letter as an invoice for $2,750. This will bring the balance between us up to $175,042.

I continue to have great faith and hope for Pusser's and us, and with a little bit of luck, I look forward to 2002 as the year when we turn the corner, get financed properly again and begin to have some fun as well as make money. More on that in the days to come ...

With thanks and kind regards,

                    Yours sincerely,

                    Lloyd De Vos

LDV/ss

[NY001972.1]

# Exhibit D

$\textcircled{J}$

P.O. Box No. 70
Road Town
Tortola
British Virgin Islands

U.S. Mailing Address
P.O. Box 8309
Cruz Bay
St. John
USVI 00831

Tel 284 494 2171/3
Fax 284 494 4315

Magwitch LLC
c/o Hill, Betts & Nash, LLP
99 Park Avenue
New York, New York 10016

Pussers (2001) Ltd.
Charles Town, Nevis
British West Indies

Pusser's West Indies Ltd.
Road Town, Tortola
British Virgin Islands



# BARCLAYS

17 April 2002

Dear Sirs,

We refer to the discussions earlier this week between Barclays Bank PLC (the "**Bank**") and yourselves (the "**Purchasers**") in relation to the purchase of debt owed by Pusser's Ltd. (the "**Company**") and its subsidiaries to the Bank. The Company and its subsidiaries are referred to in the remainder of this letter as the "**Group**".

We write to record our understanding of the oral agreement which the Purchasers and the Bank have reached. The Bank and the Purchasers agree that they will proceed in good faith to document formally in a manner reasonably acceptable to both parties the agreement set out in this letter, each understanding that a legally binding agreement will only come into force upon the execution of further, formal legal documents. This agreement is conditional upon the execution of such formal legal documents not later than 8 May 2002.

1.    **Purchase of Group Debt**

On or before 8 May 2002 Magwitch LLC will purchase $3.3 million of the indebtedness of the Group at a purchase price of US$1,500,000. On receipt of the aforesaid purchase price the Bank will take all steps within its control to execute and deliver to the Purchaser such documents as it has in its possession or is reasonably requested to execute to give the purchaser title to the indebtedness and all security then held by the Bank over assets located in the United States.

L4v0016

On or before 31 May 2002 Pusser's (2001) Ltd. will purchase $2.2 million of the indebtedness of the Group at a purchase price of US$1,000,000. On receipt of the aforesaid purchase price the Bank will take all steps within its control to execute and deliver to the Purchaser such documents as it has in its possession or is reasonably requested to execute to give the purchaser title to the indebtedness.

On or before the earlier of: i) the closing of a subscription to shares of Pusser's West Indies Ltd. at which at least $5,000,000 is paid in, or ii) 1 September 2002, Pusser's West Indies Ltd. will purchase all remaining indebtedness of the Group at a purchase price of US$2,000,000. On receipt of the aforesaid purchase price the Bank will take all steps within its control to execute and deliver to the Purchaser such documents as it has in its possession or is reasonably requested to execute to give: a) the purchaser title to the indebtedness; b) Pusser's (2001) Ltd. its mortgage interest in warehouse premises owned by the Company and located in Road Town, Tortola, British Virgin Islands; and c) Pusser's West Indies Ltd. all other security from the Group then held by the Bank.

2,    **General**

The sale of the indebtedness is made as one transaction and on the understanding that each of the Purchasers will complete the undertakings that they have made and that the Bank shall not be under an obligation to complete this transaction only in part. In the event that any Purchaser shall not meet its obligation, the amount of indebtedness owed by the Group to the Bank shall only be reduced by the amount of cash received by the Bank and each Purchaser shall restore to the Bank any debt purchased in excess of that amount.

The Bank does not and will not make any representation or warranty and has no responsibility to any Purchaser as to the effectiveness, genuineness, validity, enforceability or sufficiency of documents evidencing the debt being sold or the security for the debt being sold or as to the collectability of amounts outstanding or payable thereunder.

Each of the Purchasers represent to the Bank that it is not a creditor of the Group, a trustee for a creditor of the Group or managed or controlled by any current director of the Company, and that it has adequate sources of cash other than from the Group or related to the Group from which it is making this purchase.

All payments to be made to the Bank shall be made to its account at such office or bank as it may notify to the Purchasers for this purpose and for value on the due date.

The agreement of the Bank to enter into this transaction is conditioned upon the Company continuing to make monthly payments of interest and principal as were being kept current at 31 March 2002 until sale of the relevant debt hereunder.

Ldv0016

The agreement of the Bank to enter into this transaction is conditioned upon the Company holding of an EGM as soon as reasonably practicable but in any event prior to 8 May 2002 to disclose to shareholders and material Group creditors the agreement that the Purchasers have reached with the Bank.

The formal documents shall provide that in the event that the Bank is forced to disgorge any proceeds of sale of the debt of the Group, the Purchasers shall retransfer to the Bank the relevant indebtedness and any security for the relevant indebtedness that it holds.

This letter is governed by British Virgin Islands law.

Yours faithfully

Senior BVI Manager
Barclays Bank PLC

We agree to the above,

For and on behalf of
Magwitch LLC

For and on behalf of
Pusser's (2001) Ltd.

For and on behalf of
Pusser's West Indies Ltd.

L4v0016

Exhibit E

Subj:     **RE: Accounts payable; intercompany loans**
Date:     5/6/2002 4:11:16 PM Central Daylight Time
From:     ldevos@hillbetts.com
To:       Klt456@aol.com
CC:       ctobias@pussers.com
*Sent from the Internet (Details)*

Jim Derr has taken a sabbatical from the practice of law in the Virgin Islands for the next six months. In order to permit him to do this, I have advanced him the $12,409.00 that is due to him from Pusser's.

Could you please change the accounts payable schedule to show that the $12,409 owing to Jim Derr is owed to De Vos & Co. This amount, of course, is in addition to the amounts owed to De Vos & Co./Hill, Betts & Nash and is in addition to the $250,000 amount to which Charles, Jim Jackson and I agreed through September 1.

Sorry I am not down there yet, but there is way too much to do to get everything organized for the Barclays transaction.

One small aspect of that on which you can help me immediately - would I be correct in assuming that the intercompany account numbers that you send me have not changed prior to last Friday, May 3. If they have changed, could you please let me know soonest so that I can change the minutes of the meetings that I am bringing down with me.

Best regards,

Lloyd De Vos

# Exhibit F

ASSIGNMENT AGREEMENT


DATED 9th May 2002


BETWEEN


BARCLAYS BANK PLC

MAGWITCH L.L.C.

PUSSERS (2001) LTD.

AND

PUSSER'S WEST INDIES LTD.


# HARNEY WESTWOOD & RIEGELS

385172_5

THIS AGREEMENT is dated 9th May 2002 and made BETWEEN:

(1)    BARCLAYS BANK PLC (the "Assignor");

(2)    MAGWITCH L.L.C. c/o Hill, Betts & Nash LLP 99 Park Avenue, 20th Floor, New York, New York 10016 ("Magwitch");

(3)    PUSSER'S (2001) LTD. of Charlestown, Nevis, British West Indies ("2001"); and

(4)    PUSSER'S WEST INDIES LTD. of Road Town, Tortola, British Virgin Islands ("West Indies").

IT IS AGREED as follows:

1.    INTERPRETATION

1.1    Definitions

In this Agreement:

"Assigned Amounts"

means the Tranche A Assigned Amount, the Tranche B Assigned Amount and the Tranche C Assigned Amount (each an "Assigned Amount").

"Assignees"

means each of Magwitch, 2001 and West Indies (each an "Assignee").

"Business Day"

means a day on which banks in Tortola and New York are open for business.

"Effective Date"

means each date on which the assignment of an Assigned Amount is to take place under this Agreement.

"Finance Documents"

means the Tranche A Finance Documents, the Tranche B Finance Documents and the Tranche C Finance Documents (each a "Finance Document").

"Obligors"

means in relation to each of the Assigned Amounts the persons liable to the Assignor under the Finance Documents relating to those Assigned Amounts whether as borrower or guarantor or by virtue of having granted the Assignor a Security Interest and identified as such in the Schedule relating to those Assigned Amounts.

"Party"

means a party to this Agreement.

"Retained Fees and Interest"

has the meaning given to it in Clause 6 (Excluded Rights).

"Receiving Account"

means subject to Clause 7.1 (Place), the account of a Party designated as its Receiving Account in Schedule 1, Schedule 2 or Schedule 3.

"Security Interest"

means any mortgage, pledge, lien, charge, assignment, hypothecation or security interest or any other agreement or arrangement having the effect of conferring security.

"Tranche A Assigned Amount"

means the principal amount of the borrowing identified as such in Schedule 1 and for which the Obligors are liable to the Assignor under the Tranche A Finance Documents or the principal amount outstanding of that borrowing.

"Tranche A Effective Date"

means 9 May 2002 or such earlier date agreed between the Assignor and Magwitch.

"Tranche A Finance Documents"

means

(a)    any agreement or instrument evidencing or providing for the Tranche A Assigned Amount;

(b)    any guarantee, indemnity or other assurance against loss given in respect of the Tranche A Assigned Amount;

4

(c)    any document evidencing or creating any Security Interest over any asset of any person to secure any obligations of any Obligor in respect of the Tranche A Assigned Amount;

(d)    any other agreement (including any rescheduling or restructuring agreement) relating to the Tranche A Assigned Amount,

but does not include a document or agreement creating a Security Interest unless specifically identified in Schedule 1

**"Tranche A Purchase Price"**

means US$1,500,000.

**"Tranche B Assigned Amount"**

means the principal amount of the borrowing identified as such in Schedule 2 and for which the Obligors are liable to the Assignor under the Tranche B Finance Documents or the principal amount outstanding of that borrowing.

**"Tranche B Effective Date"**

means 31 May 2002 or such earlier date agreed between the Assignor and Magwitch.

**"Tranche B Finance Documents"**

means

(a)    any agreement or instrument evidencing or providing for the Tranche B Assigned Amount;

(b)    any guarantee, indemnity or other assurance against loss given in respect of the Tranche B Assigned Amount;

(c)    any document evidencing or creating any Security Interest over any asset of any person to secure any obligations of any Obligor in respect of the Tranche B Assigned Amount;

(d)    any other agreement (including any rescheduling or restructuring agreement) relating to the Tranche B Assigned Amount,

but does not include a document or agreement creating a Security Interest unless specifically identified in Schedule 2

**"Tranche B Purchase Price"**

means US$1,000,000.

## Index

**Clause**

**Page**

1.    Interpretation ................................................................................................... 3
2.    Assignment ........................................................................................................ 7
3.    Undertaking and payment ............................................................................... 8
4.    Notices of assignment ...................................................................................... 8
5.    Further assurance ............................................................................................. 9
6.    Excluded rights ................................................................................................. 9
7.    Payments administration ................................................................................ 10
8.    Representations and warranties ..................................................................... 10
9.    Assignor's responsibility ................................................................................ 12
10.   New money ....................................................................................................... 12
11.   Provision for re-transfer ................................................................................. 12
12.   Assignor's obligations ..................................................................................... 12
13.   Changes to the parties ..................................................................................... 13
14.   Waivers and remedies cumulative ................................................................. 13
15.   Severability ....................................................................................................... 13
16.   Counterparts ..................................................................................................... 14
17.   Notices ............................................................................................................... 14
18.   Expenses ............................................................................................................ 15
19.   Stamp duty ........................................................................................................ 15
20.   Jurisdiction and service of process ............................................................... 15
21.   Governing law ................................................................................................... 16

**Schedules**

1.    Details of the Tranche A Assignment ............................................................ 17
2.    Details of the Tranche B Assignment ............................................................ 20
3.    Details of the Tranche C Assignment ............................................................ 22

Signatories ................................................................................................................. 24

.... ... ...... ... ... ...

**"Tranche C Assigned Amount"**

means the principal amount of the borrowing identified as such in Schedule 3 and for which the Obligors are liable to the Assignor under the Tranche C Finance Documents or the principal amount outstanding of that borrowing.

**"Tranche C Effective Date"**

means the earlier of

(i)     1 September 2002; or

(ii)    the closing of an issue of shares in the equity capital of West Indies or any disposal by West Indies of any right to subscribe for or to be allotted shares in its equity capital the proceeds of which (or the proceeds or which when aggregated with the proceeds of any prior subscription) exceed US$5,000,000; or

(iii)   such earlier dated agreed between the Assignor and West Indies.

**"Tranche C Finance Documents"**

means

(a)     any agreement or instrument evidencing or providing for the Tranche C Assigned Amount;

(b)     any guarantee, indemnity or other assurance against loss given in respect of the Tranche C Assigned Amount;

(c)     any document evidencing or creating any Security Interest over any asset of any person to secure any obligations of any Obligor in respect of the Tranche C Assigned Amount;

(d)     any other agreement (including any rescheduling or restructuring agreement) relating to the Tranche C Assigned Amount.

**"Tranche C Purchase Price"**

means US$2,000,000.

**1.2     Construction**

(a)     In this Agreement, unless the contrary intention appears, a reference to:

(i)     an "amendment" includes a supplement, novation or re-enactment and "amended" is to be construed accordingly;

6

     (ii)    an "authorisation" includes an authorisation, consent, approval, resolution, licence, exemption, filing and registration;

     (iii)   a Clause or a Schedule is a reference to a clause of or a schedule to this Agreement;

     (iv)   a person includes its successors and assigns;

     (v)   a Finance Document or another document is a reference to that Finance Document or other document as amended;

     (vi)   a time of day is a reference to British Virgin Islands time; and

     (vii)   words importing the singular include the plural and vice versa.

(b)    The index to and the headings in this Agreement are for convenience only and are to be ignored in construing this Agreement.

## 2. ASSIGNMENT

### 2.1 Assignment

Subject to the terms and conditions of this Agreement, the Assignor:

     (a)   with effect from the Tranche A Effective Date assigns to Magwitch the Tranche A Assigned Amount;

     (b)   with effect from the Tranche B Effective Date assigns to 2001 the Tranche B Assigned Amount; and

     (c)   with effect from the Tranche C Effective Date assigns to West Indies the Tranche C Assigned Amount.

together with all (subject as otherwise provided in this Agreement) rights and benefits accruing to the Assignor in relation to that Assigned Amount (including the benefit of any guarantee of that Assignor Amount and any other Security Interest in relation to that Assigned Amount under the relevant Finance Documents).

### 2.2 Notice

The Assignor notifies the Assignees, and the Assignees acknowledges, that the Assignor shall not:

     (a)   be required to reimburse the Assignees for, or otherwise be responsible for or assure the Assignees against, any loss suffered by the Assignees in consequence of the matters provided for in this Agreement (other than loss

caused by the wilful failure of the Assignor to perform or observe the terms of this Agreement); or

(b)     have any obligation to repurchase the Assigned Amounts or any part of the Assigned Amounts.

3.     **UNDERTAKING AND PAYMENT**

In consideration of the assignment by the Assignor to the Assignees of the Assigned Amounts:

(a)     Magwitch agrees with effect from the Tranche A Effective Date to accept the assignment of the Tranche A Assigned Amount without recourse, to be bound by the Tranche A Finance Documents as if originally named as an original lender in the Tranche A Finance Documents and to assume and perform all the obligations of the Assignor under the Tranche A Finance Documents in respect of the Tranche A Assigned Amount arising on or after the Tranche A Effective Date and that it shall on the Tranche A Effective Date pay to the Assignor without set-off, deduction or withholding the Tranche A Purchase Price and procure the release by the Obligors of any obligations owed by the Assignor to the Obligors in respect of the Tranche A Assigned Amount;

(b)     2001 agrees with effect from the Tranche B Effective Date to accept the assignment of the Tranche B Assigned Amount without recourse, to be bound by the Tranche B Finance Documents as if originally named as an original lender in the Tranche B Finance Documents and to assume and perform all the obligations of the Assignor under the Tranche B Finance Documents in respect of all the Tranche B Assigned Amounts arising on or after the Tranche B Effective Date and that it shall on the Tranche B Effective Date pay to the Assignor without set-off, deduction or withholding the Tranche B Purchase Price and procure the release by the Obligors of any obligations owed by the Assignor to the Obligors in respect of the Tranche B Assigned Amount; and

(c)     West Indies agrees with effect from the Tranche C Effective Date to accept the assignment of the Tranche C Assigned Amount without recourse, to be bound by the Tranche C Finance Documents as if originally named as an original lender in the Tranche C Finance Documents and to assume and perform all the obligations of the Assignor under the Tranche C Finance Documents in respect of all the Tranche C Assigned Amounts arising on or after the Tranche C Effective Date and that it shall on the Tranche C Effective Date pay to the Assignor without set-off, deduction or withholding the Tranche C Purchase Price and procure the release by the Obligors of any obligations owed by the Assignor to the Obligors in respect of the Tranche C Assigned Amount.

4.     **NOTICES OF ASSIGNMENT**

Forthwith on or after the relevant Effective Date the Assignees shall notify the Obligors, under the relevant Finance Documents as required, and in the form required

by, those Finance Documents, of the assignment to the Assignee under this Agreement of that Assigned Amount and of the Assignees' agreement to be bound by those Finance Documents as fully and to the same extent as if that Assignee were an original lender.

5.    **FURTHER ASSURANCE**

The Assignor and the Assignees shall each take whatever action may be necessary:

(a)    so that the relevant Assignee may assume, to the fullest extent permitted by the Finance Documents and in accordance with the provisions of this Agreement, all the rights and obligations of the Assignor with respect to the relevant Assigned Amount on the relevant Effective Date (other than those rights expressly excepted from this Agreement);

(b)    for the Assignor to be released from all obligations arising after the relevant Effective Date under the relevant Finance Documents in relation to the relevant Assigned Amount; and

(c)    otherwise to implement the terms of this Agreement,

including the execution of any further documents and the giving of any notice, order or direction and the making of any registration which in each case may be required.

6.    **EXCLUDED RIGHTS**

(a)    No Assignee shall, in relation to an Assigned Amount, be entitled:

(i)    to any fees paid or accrued due under the Finance Documents prior to the relevant Effective Date; or

(ii)    to any interest payable under the relevant Finance Documents in respect of an Assigned Amount on or prior to, or in respect of any period ending prior to, the relevant Effective Date (whether paid before, on or after the relevant Effective Date),

and all those amounts (together "Retained Fees and Interest") shall belong to and be retained by the Assignor.

(b)    If any amount (other than any Retained Fees and Interest) is received or recovered by the Assignor in respect of the Assigned Amount on or after the Effective Date relating to that Assigned Amount, the Assignor shall forthwith pay to the Assignee that amount.

(c)    If any amount of any Retained Fees and Interest is received or recovered by the Assignee, the Assignee shall forthwith pay to the Assignor that amount.

7.    **PAYMENTS ADMINISTRATION**

7.1    **Place**

All payments or deposits by a Party to, or with, another Party under this Agreement shall be made to the Receiving Account of that other Party. Each Party may designate a different account as its Receiving Account by giving the other not less than five Business Days' notice before the due date for payment.

7.2    **Funds**

(a)    Subject to paragraph (b) below, payments under this Agreement in relation to an Assigned Amount shall be made in the currency in which that Assigned Amount is denominated in for value on the due date at such times and in such funds as are customary at the time for settlement of transactions in that currency.

(b)    Where the Assignor's obligation to make a payment under this Agreement arises from receipt or recovery of an amount pursuant to the Finance Documents the Assignor shall make the payment in the currency and funds in which those monies were received or recovered and, if that currency is not the currency of the country in which that Assigned Amount is denominated, it shall be made to the account of the Assignee in the principal financial centre of the country of that currency specified by the Assignee.

7.3    **Confirmation of receipts**

Where the obligation of a Party (the "payer") to make a payment arises as a result of its having received an amount from another person, the payer is not obliged to pay that sum to another Party (the "payee") until it has established that it has actually received that sum. However, the payer may assume that the sum has been paid to it in accordance with the applicable Finance Documents, and, in reliance on that assumption, make available to the payee a corresponding amount. If the sum has not been made available but the payer has paid a corresponding amount to the payee, the payee shall forthwith on demand by the payer refund the corresponding amount, together with interest on that amount from the date of payment to the date of receipt, calculated at a rate determined by the payer to reflect its cost of funds.

8.    **REPRESENTATIONS AND WARRANTIES**

8.1    **Assignor and Assignee**

Each of the Assignor and the Assignees makes the representations and warranties set out in this Clause 8.1:

(a)    **Powers and authority:** It has the power to enter into and perform and has taken all necessary action to authorise the entry into, performance and delivery of this Agreement and the transactions contemplated by this Agreement.

9.    **ASSIGNOR'S RESPONSIBILITY**

Save as expressly provided in Clauses 8.1 (Assignor and Assignee) the Assignor has not made and does not by this Agreement make, and no Assignee has relied upon, any representation, warranty or condition (expressed or implied) about, and the Assignor will have no responsibility to any Assignee for, the effectiveness, validity or enforceability of, any Finance Document or other documentation delivered by the Assignor to the Assignee or any of the terms, covenants or conditions contained in the Finance Documents or other documentation or any non-performance by any party to it or the financial condition of any Obligor or any other person liable with respect to the Assigned Amount.

10.    **NEW MONEY**

If an Assigned Amount is rescheduled or renegotiated the relevant Assignee and not the Assignor will be subject to the rescheduled or renegotiated terms to the extent that those terms relate to that Assigned Amount.

11.    **PROVISION FOR RE-TRANSFER**

The Assignees jointly and severally agree that if the Assignor is required by any court or government authority or any liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator, sequestrator or the like to make any payment or suffer any diminution of return on account of its receipt of the Tranche A Purchase Price, the Tranche B Purchase Price or the Tranche C Purchase Price (the "reduction") then each Assignee will at its own expense take all such action to re-transfer to the Assignor all its right title and interest in the Assigned Amounts (less only an amount which is the sum of the Purchase Price paid by that Assignee less the reduction (and for these purposes the reduction shall be allocated between the Assignees in the proportion which it bears to the aggregate Purchase Price paid by the Assignees under this Agreement)) together with all such rights and benefits accruing to the Assignees in relation to the Assigned Amounts (including but not limited to the benefit of any proceeds of sale or the benefit (whether realised or not) of any guarantee and any other security in relation to the Assigned Amounts under the Finance Documents) as it holds.

12.    **ASSIGNOR'S OBLIGATIONS**

(a)    The obligations of the Assignor under this Agreement are conditional on each Assignee performing its obligations under this Agreement and each Assignee agrees that in the event of a failure by another Assignee to perform its obligations:

(i)    the Assignor will have no further obligations under this Agreement; and

(ii)    an Assignee to which an assignment has been made under this Agreement (a "performing assignee") will at its own expense take all such action to re-transfer to the Assignor all that performing assignee's right title and interest in the Assigned Amounts which have been assigned to it (less only an amount of

12

the Assigned Amount represented by the Purchase Price paid by that performing assignee) together with all such rights and benefits accruing to it in relation to those Assigned Amounts (including but not limited to the benefit of any proceeds of sale or the benefit (whether realised or not) of any guarantee and any other security in relation to those Assigned Amounts under the Finance Documents) as it holds.

(b)   The obligations of the Assignor under this Agreement are conditional on the Obligors continuing to make such payments under the Finance Documents as were being made at 31 March 2002 up to and including the Effective Date for the assignment of that Assigned Amount.

(c)   The obligations of the Assignor under this Agreement are subject to the condition that it shall first have received in form and substance satisfactory to it a guarantee of the obligations of the Assignees under this Agreement and of losses suffered by the Assignor as a result of the reversal of transactions with the Obligors from Mr. Charles Tobias.

13.   **CHANGES TO THE PARTIES**

No Party may assign, transfer, novate, encumber or dispose of any of its interest in, its rights and/or obligation's under this Agreement without the prior written consent of the other Parties. However, after an Assignee has performed its payment obligations in Clause 3 (Undertaking and payment) in respect of the Assigned Amount, this Clause 11 shall not restrict an Assignee from assigning, charging or pledging the whole or any part of its rights, title and interest in the relevant Assigned Amount to any third party.

14.   **WAIVERS AND REMEDIES CUMULATIVE**

The rights of each Party under this Agreement:

(a)   may be exercised as often as necessary;

(b)   are cumulative and not exclusive of its rights under the general law; and

(c)   may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

15.   **SEVERABILITY**

Subject to Clause 12 (Assignor's obligations) if a provision of this Agreement is or becomes illegal invalid or unenforceable in any jurisdiction, that shall not affect:

(a)   the validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b)    the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

### 16.    COUNTERPARTS

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

### 17.    NOTICES

#### 17.1    Giving of notices

Subject to Clause 4 (Notices of Assignment), all notices or other communications under or in connection with this Agreement shall be given in writing and, unless otherwise stated may be made by facsimile. Any such notice will be deemed to be given as follows:

(a)    if by letter, when delivered personally or on actual receipt;

(b)    if by facsimile, when received in legible form.

However, a notice given in accordance with the above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

#### 17.2    Addresses for notices

The address, telex number and facsimile number of each Party for all notices under or in connection with this Agreement are:

(a)    in relation to the Assignor:

Barclays Bank Plc
P O Box 70
Road Town, Tortola
British Virgin Islands

Attention:    Mark Young
Fax No.:    #1 284 494 4487

(b)    in relation to Magwitch:

c/o Hill, Betts & Nash LLP 99 Park Avenue
20th Floor
New York, NY 10016

Attention.:    Lloyd De Vos

Fax No.:        # 1 212 786 1015

(c)    in relation to 2001:

PO Box 626
Road Town
Tortola
British Virgin Islands

Attention:    Joanna Tobias
Fax No.:      # 1 284 494 4267

(d)    in relation to West Indies:

South West Associates
522A Main Avenue
Dorango
Colorado 81301

Attention:    James Jackson
Fax No.:      # 1 970 259 0536

or any other notified by that Party for this purpose to the other Parties by not less than
five Business Days' notice.

## 18.    EXPENSES

Each Party shall pay its own costs and expenses in connection with the preparation,
negotiation and execution of this Agreement.

## 19.    STAMP DUTY

The Assignee shall pay, and forthwith on demand indemnify the Assignor against any
liability it incurs in respect of, any stamp, registration and similar tax which is or
becomes payable in connection with the entry into and performance of this
Agreement.

## 20.    JURISDICTION AND SERVICE OF PROCESS

### 20.1    Submission

Each Party to this Agreement agrees, for the benefit of the Assignor, that the courts of
the British Virgin Islands shall have jurisdiction to settle any disputes in connection
with this Agreement and, accordingly, submits to the jurisdiction of the British Virgin
Islands courts.

### 20.2    Service of process

15

Without prejudice to any other mode of service, the Assignees:

(a)     irrevocably appoint as their agent for service of process Coverdale Trust Services Limited, 30 De Castro Street, Simmonds Building, P.O. Box 961, Road Town in relation to any proceedings before the British Virgin Islands courts in connection with this Agreement;

(b)     agrees that failure by a process agent to notify the Assignee of the process will not invalidate the proceedings concerned;

(c)     consents to the service of process relating to any such proceedings by prepaid posting of a copy of the process to its address for the time being applying under Clause 20.2 (Addresses for notices); and

(d)     agrees that if the appointment of any person mentioned in paragraph (a) above ceases to be effective, each Assignee shall immediately appoint a further person in the British Virgin Islands to accept service of process on its behalf in the British Virgin Islands and, failing such appointment within 15 days, the Assignor is entitled to appoint such a person by notice to the Assignees.

20.3    **Forum convenience and enforcement abroad**

Each Party:

(a)     waives objection to the British Virgin Islands courts on grounds of inconvenient forum or otherwise as regards proceedings in connection with this Agreement; and

(b)     agrees that a judgment or order of the British Virgin Islands court in connection with this Agreement is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction.

20.4    **Non-exclusivity**

Nothing in this Clause 20 limits the right of the Assignor to bring proceedings in connection with this Agreement:

(a)     in any other court of competent jurisdiction; or

(b)     concurrently in more than one jurisdiction.

21.     **GOVERNING LAW**

This Agreement is governed by British Virgin Islands law.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

## SCHEDULE 1

### DETAILS OF TRANCHE A ASSIGNMENT

1.    **PARTIES AND DOCUMENTATION**

| (a) Obligors | *Pusser's Ltd., a British Virgin Islands company, number 2389* |
|---|---|
| | *Pusser's Inc. ,a South Carolina corporation,* |
| | *Pusser's Inc., a Florida corporation ,* |
| | *Pusser's Inc., a Delaware corporation,* |
| | *Pusser's Inc., a Maryland corporation  and* |
| | *Pusser's Retail Inc., a Delaware corporation* |
| (b) Credit Agreements (title, date and parties): | *(1) Facility Letter dated 29 February 1996 between Barclays Bank PLC and Pusser's Ltd. as it relates to a bridging loan of up to $1,500,000 booked in Barclays account 215650774 of which an amount (including interest accrued to close of business on 8 May 2002) of $1,346,012.55 is outstanding.* |
| | *(as amended by a letter dated 10 May 2000 from Barclays Bank PLC to Pusser's Ltd.)* |
| | *(2) Facility Letter dated 25th November 1996 between Barclays Bank PLC and Pusser's Ltd. and its subsidiaries as it relates to a  loan of up to $1.6m loan to Pusser's Inc. (Florida) (formerly Pusser's Down Under Inc.) for which the booking office is the Miami branch of Barclays Bank PLC of which an amount (including interest accrued to close of business on 8 May 2002) of $1,517,955.83 is outstanding* |
| | *(as amended by a letter dated 16 April 1997 from Barclays PLC to Pusser's Inc. (Florida) (formerly Pusser's Down UnderInc.))* |
| | *(3) Facility Letter dated 26 January 2000 between Barclays Bank PLC and Pusser's Ltd. as it relates* |

| | |
|---|---|
| | *to $436,031.62 of a loan booked in Barclays account 215650138*<br><br>*(as amended by a letter dated 31 March 2000 From Barclays Bank PLC to Pusser's Ltd.)* |
| (c) Other Finance Documents: | *(1)A promissory note dated 9 May 2002 in favour of Barclays Bank PLC for a principal amount of $3,300,000 relating to the credit agreements and signed by Pusser's Ltd., Pusser's Inc. (Florida), Pusser's Inc. (Delaware), Pusser's Inc. (Maryland) and Pusser's Retail Inc.*<br><br>*(2) a security agreement dated 1 September 1995 between Pusser's Inc. (Maryland) and Barclays Bank PLC*<br><br>*(3) a mortgage, security agreement and assignment of rents and leases dated 30 June 1997 between Pusser's Inc. (Florida) and Barclays Bank PLC*<br><br>*(4) a security agreement dated 2 April 2000 between Pusser's Retail Inc and Barclays Bank PLC*<br><br>*(5) a security agreement dated 29 March 1996 between Pusser's Inc. (South Carolina) and Barclays Bank PLC* |

## 2.    ASSIGNMENT

| | |
|---|---|
| (a)  Tranche A Assigned Amount: | **$3,300,000** |
| (b)  Currency of Tranche A Assigned Amount: | **UNITED STATES DOLLARS** |

## 3.    ADMINISTRATION DETAILS

| (a)      Assignor's Receiving Account: | *Instructions to:*<br><br>*Barclays Bank PLC*<br>*75 Wall Street*<br>*New York, N.Y. 10265*<br>*U.S.A*<br><br>*For credit to:* | *swift    code    or    routing number/account*<br><br>*BARCUS33  or  ABA#026 002 574* |
|---|---|---|

|  | Barclays Bank PLC<br>P.O. Box 70<br>Road Town, Tortola<br>British Virgin Islands<br><br>For Further Credit:<br><br>Barclays Bank re Pussers Debt Sale | BARCVGVG<br><br>280 715 290<br><br><br><br><br>Account 215065324 |
|---|---|---|
| (b)     Assignee's     Paying Account: | United States Trust Company of New York | ABA 021001318<br>Magwitch LLC<br><br>Account 21-4605-3 |

**SCHEDULE 2**

**DETAILS OF TRANCHE B ASSIGNMENT**

1.    **PARTIES AND DOCUMENTATION**

| (a) Obligors | Pusser's Ltd., a British Virgin Islands company, number 2389 |
|---|---|
| (b) Credit Agreement (title, date and parties): | (1) Facility Letter dated 29 February 1996 between Barclays Bank PLC and Pusser's Ltd. as it relates to a construction finance loan of up to $800,000 booked in Barclays account 215640256 of which an amount (including interest accrued to close of business on 8 May 2002) of $484,355.44 is outstanding.<br><br>(2) Facility Letter dated 26th January between Barclays Bank PLC and Pusser's Ltd. as it relates to an amount of $2,200,000 less the amount outstanding under the loan referred to in (1) above as at the Tranche B Effective Date of a loan booked in Barclays account 215650138<br><br>(as amended by a letter dated 31 March 2000 from Barclays Bank PLC to Pusser's Ltd.) |
| (c) Other Finance Documents: | A promissory note dated 9 May 2002 in favour of Barclays Bank PLC for a principal amount of $2,200,000 relating to the credit agreements and signed by Pusser's Ltd. |

2.    **ASSIGNMENT**

| (a) Tranche B Assigned Amount: | $2,200,000 |
|---|---|
| (b) Currency of Tranche B Assigned Amount: | UNITED STATES DOLLARS |

3.    ADMINISTRATION DETAILS

| (a)    Assignor's Receiving Account: | *Instructions to:* | *swift    code    or    routing number/account* |
|---|---|---|
| | *Barclays Bank PLC*<br>*75 Wall Street*<br>*New York, N.Y. 10265*<br>*U.S.A* | *BARCUS33 or ABA#026 002 574* |
| | *For credit to:* | |
| | *Barclays Bank PLC*<br>*P.O. Box 70*<br>*Road Town, Tortola*<br>*British Virgin Islands* | *BARCVGVG*<br><br>*280 715 290* |
| | *For Further Credit:* | |
| | *Barclays Bank re Pussers Debt Sale* | *Account 215065324* |
| (b)    Assignee's    Paying Account: | *To be notified* | *To be notified* |

21

## SCHEDULE 3

### DETAILS OF TRANCHE C ASSIGNMENT

**1.     PARTIES AND DOCUMENTATION**

| (a) Obligors: | *Pusser's Ltd., a British Virgin Islands company, number 2389* |
|---|---|
| (b) Credit Agreement (title, date and parties): | *Facility Letter dated 26th January between Barclays Bank PLC and Pusser's Ltd. as it relates to any amounts not assigned in Tranche A or Tranche B of a loan booked in Barclays account 215650138*<br><br>*(as amended by a letter dated 31 March 2000 From Barclays Bank PLC to Pusser's Limited)* |
| (c) Other Finance Documents: | *(1)     A promissory note to be executed before the Tranche C Effective Date in favour of Barclays Bank PLC for a principal amount of the remaining outstanding indebtedness relating to the credit agreements and signed by Pusser's Ltd.*<br><br>*(2)     A charge dated 14 April 1981 from Pusser's Ltd. in favour of Barclays Bank PLC*<br><br>*(as amended on 1 September 1982, 16 May 1983, 25 September 1985, 7 March 1988 and 6 December 1988)*<br><br>*(3) Debenture dated 15 May 1980 from Pusser's Ltd. in favour of Barclays Bank PLC* |

**2.     ASSIGNMENT**

| (a) Tranche C Assigned Amount: | *$ remaining indebtedness* |
|---|---|
| (b) Currency of Tranche C Assigned Amount: | **UNITED STATES DOLLARS** |

3.    ADMINISTRATION DETAILS

| (a)    Assignor's Receiving Account: | *Instructions to:* | *swift    code    or    routing number/account* |
|---|---|---|
| | *Barclays Bank PLC* <br> *75 Wall Street* <br> *New York, N.Y. 10265* <br> *U.S.A* | *BARCUS33  or  ABA#026  002 574* |
| | *For credit to:* | |
| | *Barclays Bank PLC* <br> *P.O. Box 70* <br> *Road Town, Tortola* <br> *British Virgin Islands* | *BARCVGVG* <br><br> *280 715 290* |
| | *For Further Credit:* | |
| | *Barclays Bank re Pussers Debt Sale* | *Account 215065324* |
| (b)    Assignee's    Paying Account: | *To be notified* | *To be notified* |

SIGNATORIES

Assignor

BARCLAYS BANK PLC

By:

Assignees

MAGWITCH L.L.C.

By:

PUSSERS (2001) LTD.

By:

PUSSERS WEST INDIES LTD.

By:

24

# Exhibit G

## PROMISSORY NOTE

$3,300,000                                                    May 9, 2002

FOR VALUE RECEIVED, PUSSER'S LTD. (the "Borrower"), promises to pay to the order of BARCLAYS BANK PLC., (the "Lender"), on demand, at its offices at Road Town, Tortola, British Virgin Islands, or at such other place or to such other party or parties as Lender may from time to time designate, the principal sum of Three Million Three Hundred Thousand and no/100 ($3,300,000.00) Dollars together with interest thereon computed from the date hereof at the rate of one and one-half (1.5%) percent per annum over the Barclays Bank New York Prime Rate (as hereinafter defined).  The amount payable hereunder shall be paid without any set-off or counterclaim whatsoever.

The interest rate hereunder shall adjust accordingly on each date the Prime Rate changes.  The term "Prime Rate" shall mean the rate of interest quoted by Barclays Bank New York, or any successor thereto, as the prime rate (which rate may not be the rate charged by Lender to its preferred customers), as the same may be changed from time to time by it.  If for any reason Barclays Bank New York shall at any time no longer quote a prime rate in the manner set forth above, Lender shall, in the exercise of its reasonable judgment, substitute another means of determining the annual lending rate of interest and the rate of interest as thus determined shall thereafter be the Prime Rate as that term is used herein.  Interest shall be computed on the actual number of days elapsed divided by a 360-day year.

All installments of principal and all interest are payable in lawful money of the United States of America, which shall be legal tender in payment of all debts and dues, public and private, at the time of payment; and in the event of (a) failure to pay this Note in full on demand, or (b) default in the payment of any other installment of interest or principal or any other sum payable pursuant to the terms of this Note or any lien document securing this Note, not cured within thirty (30) days after written notice from Lender, or (c) an "Event of Default" as such term is defined in the Security Agreements, (as hereinafter defined) not cured within the cure period (if any) provided therein, then or at any time thereafter, at the option of Lender, the whole of the principal sum then remaining unpaid hereunder together with all interest accrued thereon, shall immediately become due and payable without further notice, and the lien given to secure the payment of this Note may be foreclosed.  From and after the maturity of this Note either according to its terms or as the result of a declaration of maturity, the entire principal remaining unpaid hereunder shall bear interest at a rate of four (4%) percent per annum above the rate otherwise in effect hereunder (the "Default Rate"), or the highest applicable lawful rate, whichever is the lesser; provided that there shall be no automatic reduction to the highest lawful rate if Borrower or any endorser or guarantor is barred by law from availing itself in any action or proceeding of the defense of usury, or if Borrower or any endorser or guarantor barred or exempted from the operation of any law limiting the

[NY0049982.1]

amount of interest that may be paid for the loan or use of money, or in the event this transaction, because of its amount or purpose or for any other reason is exempt from the operation of any statute limiting the amount of interest that may be paid for the loan of use of money. Failure to exercise such option or any other rights Lender may in the event of any such default be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent default, whether of the same of different nature.

If this Note is placed in the hands of an attorney for collection or is collected through any legal proceedings, Borrower promises to pay all expenses of collection and reasonable attorney's fees incurred by Lender.

In the event the interest provisions hereof or any exactions provided for herein or in the lien documents or any other instruments securing Note shall result, because of the monthly reduction of principal or any other reason related or unrelated to the interest provisions, at any time during the life of the loan, in an effective rate of interest which, for any period of time, transcends the limit of the usury or any other law applicable to the loan evidenced hereby, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied to principal immediately upon receipt of such monies by Lender with the same force and effect as though the payer had specifically designated such and agreed to accept such extra payment(s) as a premium free payment. Notwithstanding the foregoing, however, Lender may at any time and from time to time elect, by notice in writing to the owners of the property affected by the lien document securing this Note, to reduce or limit the collection of any interest to such sums, which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirement of the preceding sentence. In no event shall any agreed to or actual exaction as consideration for this loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

This Note evidences amounts owed pursuant to a facility letter dated 29 February 1996, a facility letter dated 25th November 1996 and a facility letter dated 26 January 2000 (in each case as amended from time to time).

This Note is secured by the Security Agreements over assets located in the United States of America entered into by Barclays Bank PLC with each of the undersigned and mortgage documents entered into by Barclays Bank with Pusser's Inc., a Florida corporation, and such further security documents as may be requested from time to time by Lender ("Security Agreements"), to which reference is made from the terms thereof.

Lender may collect a late charge of five (5%) per cent of any installment of principal or interest which is not paid within fifteen (15) days of the due date thereof to cover the extra time and expense involved in handling delinquent payments. Such late charge shall apply to late payments prior to maturity or acceleration. Upon maturity or acceleration, no further late charges shall be assessed, but Borrower shall pay the Default

Rate of interest on all amounts due from the date of maturity or acceleration until the Note is paid in full. The collection of the late charge shall not be deemed a waiver by Lender of interest accruing after the due date of any installment or of any of Lender's other rights under this Note.

Borrower agrees that the late charge provided above is fair and reasonable compensation to Lender for the additional administrative time and effort incurred in collecting and processing delinquent payments. Borrower further agrees that the Default Rate is a fair and reasonable rate of interest to be charged after maturity or acceleration of this Note in light of the increased risks to Lender inherent in a past due loan and the administrative time and effort incurred in collecting a past due loan.

Borrower and all endorsers, guarantors and all persons liable or to become liable on this Note waive presentment, protest and demand, notice of protest; demand and dishonor and nonpayment of this Note, and consent to any and all renewals and extensions of the time of payment hereof, and agree, further, that at any time and from time to time without notice, the terms of payment herein may be modified or the security described in the lien document securing the Note released in whole or in part, or increased, change or exchange by agreement between Lender and any owner of premises affected by said lien document securing this Note without in anywise affecting the liability of any party to this instrument or any person liable with respect to any indebtedness evidenced hereby.

Lender is not required to rely on the collateral for the payment of the Note in the event of default by the maker, but may proceed directly against the maker, endorsers, or guarantors, if any, in such manner as it deems desirable. None of the rights and remedies of Lender hereunder are to be waived or affected by failure or delay to exercise them. All remedies conferred on Lender by this Note or any other instrument or agreement shall be cumulative, and none is exclusive. Such remedies may be exercised concurrently or consecutively at Lender's option.

This Note may be prepaid in whole or in part at any time without penalty.

This Note shall be governed as to validity, interpretation, construction, effect, and in all other respects by the laws and decisions of the British Virgin Islands.

Wherever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note or portion thereof shall be prohibited by or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

This note may be assigned by Lender with or without recourse.

BORROWER AND LENDER WAIVE, TO THE FULL EXTENT PERMITTED BY LAW, THE RIGHT TO A JURY TRIAL IN ANY LITIGATION CONCERNING THIS PROMISSORY NOTE OR ANY AGREEMENT SECURING THIS PROMISSORY NOTE AND IN ANY LITIGATION CONCERNING ANY DEFENSE, CLAIM, COUNTERCLAIM, CLAIM OF SET-OFF OR SIMILAR CLAIM OF ANY NATURE THAT BORROWER MAY ASSERT AGAINST LENDER.

PUSSER'S LTD., a British Virgin Islands Company

By: _____
        Charles S. Tobias, Director

PUSSER'S INC., a South Carolina Corporation

By: _____
        Charles S. Tobias, President

PUSSER'S INC., a Florida Corporation

By: _____
        Charles S. Tobias, President

PUSSER'S INC., a Delaware Corporation

By: _____
        Charles S. Tobias, President

PUSSER'S INC., a Maryland Corporation

By: _____
        Charles S. Tobias, President

PUSSER'S RETAIL INC., a Delaware Corporation

By: _____
        Charles S. Tobias, President

[NY004978.2 ]                    4