Gregory W. Gilliam (GG 2857)
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
|  | : | Case No. 08cv2144 (LTS)(GWG) |
MAGWITCH L.L.C.,

                            Plaintiff,        :   ECF Case

                  -against-

PUSSER'S INC., PUSSER'S LTD., PUSSER'S WEST
INDIES LTD and CHARLES S. TOBIAS,

                        Defendants.
-----------------------------------------------------------------------x


# EXHIBIT H

# TO THE DECLARATION OF

# CHARLES S. TOBIAS [Docket Entry #6]

# ATTACHED HERETO

Exhibit H

## SECURITY AGREEMENT

This **SECURITY AGREEMENT**, made on the dates set forth on the signature page hereof, between **MAGWITCH LLC.**, c/o Hill, Betts & Nash LLP, 99 Park Avenue, 20th Floor, New York, NY 10016 (herein called the "Secured Party") and the undersigned.

(1)(a)    As security for any and all of the Obligations (as defined in Paragraph 1(b)) the undersigned pledges to the Secured Party and creates a lien and security interest in favor of the Secured Party in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

(i)    all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

(ii)    all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

(iii)    all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

(iv)    all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

(v)    all claims of the undersigned against the Secured Party, and all moneys at any time in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

(vi)    all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but no limited to securities issued (as stock splits, stock dividends or otherwise) relative to any securities constituting Collateral.

{PYV005191.2 }

#19

(b)  The term "Obligations" means all obligations an liabilities of the undersigned to the Secured Party, now existing or hereafter arising (including but not limited to obligations and liabilities of the undersigned arising under this Security Agreement), whether matured or not matured, whether absolute or contingent and whether directly created or acquired by assignment or otherwise (including but not limited to liabilities, contingent and otherwise, direct or indirect, of the undersigned to the Secured Party as indorser, guarantor, acceptor, surety or otherwise with respect to any obligation or liability of any third party to the Secured Party and liabilities, contingent or otherwise, of the undersigned by way of any express or implied contract with or for the benefit of the Secured Party, to purchase or provide funds for the payment of any obligation or liability of any third party to the Secured Party, or to supply funds to or to invest in such third party, or otherwise to insure the Secured Party against loss on any obligation or liability of such third party).

(2)    Until the occurrence of an Event of Default (as defined in Paragraph 9), the undersigned may use the Collateral in any lawful manner not inconsistent with this Security Agreement and with the terms of any insurance thereon; may sell its inventory and goods in the ordinary course of business; and may use or consume any raw materials or supplies, the use or consumption of which is necessary in order to carry on the undersigned's business.  The undersigned will at all times keep the collateral separate and distinct from any of its other property and keep accurate and complete records of the same.

(3)    The Secured Party shall have no duty of care with respect to the Collateral, except to exercise reasonable care in the custody and preservation of Collateral in its actual possession.  The Secured Party shall be deemed to have exercised reasonable care with respect to Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property or if the Secured Party takes such action with respect to such collateral as the undersigned shall request in writing, but the Secured Party's failure to comply with any such request or to take steps to preserve rights against any person or property shall not be deemed a failure to exercise reasonable care with respect to such Collateral.  The Secured Party shall have no responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the collateral, nor for informing the undersigned with respect to any thereof (whether or not the Secured Party shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the Secured Party, whether or not an Event of Default shall have occurred, the undersigned will promptly: (i) deliver, transfer, assign or indorse to the Secured Party upon receipt by the undersigned, in the exact form in which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Secured Party, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Secured Party; (iii) deliver to the Secured Party, at the time and place and in the manner specified by the Secured Party, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Secured Party has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Secured Party detailed lists of and all

QNY00510123)

2

writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Secured Party; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and make payment on account of any or all of the Obligations, in each case to the satisfaction of the Secured Party, if the security afforded by this Security Agreement shall be unsatisfactory to the Secured Party in its sole judgment; and (vi) pay or reimburse the Secured Party for all expenses, including attorney's fees and disbursements, incurred by the Secured Party pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Secured Party's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Secured Party may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Secured Party's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Secured Party may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b)  The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c)  The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Secured Party may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Secured Party. All policies of insurance shall provide that (i) such insurance shall be payable to the Secured Party and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Secured Party for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Secured Party by the insurer. At the request of the Secured Party all such policies shall be delivered to and held by it. The Secured Party may act as attorney for the undersigned in obtaining, adjusting, settling and cancelling such insurance and indorsing any drafts.

(5)   The Secured Party may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Secured Party in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of

(NY0051012 )

3

insurance as required by Paragraph 4(a)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v) to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Secured Party, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the collateral; and (i) transfer to or register in the name of the Secured Party or of the Secured Party's nominee any or all of the Collateral which may be in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf.

(6)    At any time and from time to time, the Secured Party may at its  option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral.  The undersigned agrees to join with the Secured Party at the Secured Party's request in executing any such statements and amendments.  The undersigned represents to the Secured Party that no lien or security interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Secured Party, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item. The undersigned will not create or suffer to exist, without the prior written consent of the Secured Party, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)    This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Secured Party of the undersigned's signed notice to such effect, or upon the Secured Party's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.

(8)    In the event of the happening of any one or more of the following events (each being herein called an "Event of Default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing for or securing or evidencing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the undersigned or of any indorser, guarantor, acceptor, surety or other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Secured

[NY005191L2]

4

Party, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Secured Party against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Secured Party in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Secured Party's option become immediately due and payable, without demand or notice, and any obligation of the Secured Party to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

(9)     Upon the occurrence of an Event of Default the Secured Party shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Secured Party may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees, legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Secured Party may sell at its

[NY005901.2 ]

5

option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Secured Party may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Secured Party at a place to be designated by the Secured Party which is reasonable convenient to both parties and at a time designated by the Secured Party, all at the expense of the undersigned.

(10)    The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, indorsements and powers of attorney, which in the Secured Party's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(11)(a)    For purposes of perfection of the Secured Party's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Secured Party's possession if such Collateral is in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Secured Party or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Secured Party as collateral security or for safekeeping or for any other or different purpose.

(b)    No failure or delay on the Secured Party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The Secured Party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance. None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Secured Party. No provision of any Agreement or other contract or writing between the undersigned and the Secured Party shall be construed as a waiver, modification or amendment of any of the Secured Party's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement. The Secured Party may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or invalidating its rights as to any other Collateral.

(c)    In litigation in which the Secured Party and the undersigned may be adverse parties, the Secured Party and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Secured Party.

[NYY0351012]

6

(d)  The undersigned assents to any contract the Secured Party may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e)  This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Secured Party the Secured Party's successors, transferees and assigns.  The Secured Party may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f)  Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Florida.  All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of Florida shall have the same meaning herein as in said Code.  If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

(g)  The undersigned represents to the Secured Party that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h)  If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties.  Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation.  Neither this Security Agreement nor any of the Secured Party's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any Collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Secured Party as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor. Each party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

(12)     This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Secured Party shall not be required as a condition to the effectiveness of this Security Agreement. Any execution of this Security Agreement by the Secured Party is only for purposes of filing this Security Agreement as a financing statement, if the Secured Party deems the execution hereof by it to be necessary or desirable for purposes of such filing.

(13)     This Security Agreement is being executed as part of a sale of debt and associated security by Barclays Bank PLC to the Secured Party. Barclays Bank PLC cannot locate the original Security Agreement. Copies of an original Security Agreement were held by both the Barclays Bank PLC and the undersigned. The undersigned held its copy of the original Security Agreement at the office of its Secretary, which was located at 1 World Trade Center, 52nd Floor, New York, New York. As a result of terrorist attack that occurred on September 11, 2001, the original Security Agreement was destroyed. This Security Agreement is intended to supersede and assign the rights granted by the undersigned to Barclays Bank to the Secured Party.

Dated: May 6, 2002
          as of October 3, 1997

PUSSER'S INC.,
a Florida corporation

By: _____

Charles S. Tobias, President

04/22/2002 12:39 FAX 284 494 8214      HW&R ROAD TOWN                    @012



## SECURITY AGREEMENT

This **SECURITY AGREEMENT**, made on the dates set forth on the signature page hereof, between BARCLAYS BANK PLC, having its Head Office in the city of London, England, acting through its branch office in Road Town, Tortola, British Virgin Islands (herein called the "Bank") and the undersigned.

(1)(a)  As security for any and all of the Obligations (as defined in Paragraph 1(b) the undersigned pledges to the Bank and creates a lien and security interest in favor of the Bank in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

(i)  all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

(ii)  all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

(iii)  all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

(iv)  all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

(v)  all claims of the undersigned against the Bank, and all moneys at any time in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

(vi)  all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all

04/22/2002 12:39 FAX 264 494 8214    HW&R ROAD TOWN    ⌀013



proceeds thereof, including but not limited to securities
issued (as stock splits, stock dividends or otherwise)
relative to any securities constituting Collateral.

(b)  The term "Obligations" means all obligations and liabilities
of the undersigned to the Bank, now existing or hereafter arising
(including but not limited to obligations and liabilities of the
undersigned arising under this Security Agreement), whether matured
or not matured, whether absolute or contingent and whether directly
created or acquired by assignment or otherwise (including but not
limited to liabilities, contingent and otherwise, direct or
indirect, of the undersigned to the Bank as indorser, guarantor,
acceptor, surety or otherwise with respect to any obligation or
liability of any third party to the Bank and liabilities,
contingent or otherwise, of the undersigned by way of any express
or implied contract with or for the benefit of the Bank, to
purchase or provide funds for the payment of any obligation or
liability of any third party to the Bank, or to supply funds to or
to invest in such third party, or otherwise to insure the Bank
against loss on any obligation or liability of such third party).

(2) Until the occurrence of an Event of Default (as defined in
Paragraph 9), the undersigned may use the Collateral in any lawful
manner not inconsistent with this Security Agreement and with the
terms of any insurance thereon; may sell its inventory and goods in
the ordinary course of business; and may use or consume any raw
materials or supplies, the use or consumption of which is necessary
in order to carry on the undersigned's business.  The undersigned
will at all times keep the collateral separate and distinct from
any of its other property and keep accurate and complete records of
the same.

(3) The Bank shall have no duty of care with respect to the
Collateral, except to exercise reasonable care in the custody and
preservation of Collateral in its actual possession.  The Bank
shall be deemed to have exercised reasonable care with respect to
Collateral in its possession if such Collateral is accorded
treatment substantially equal to that which the Bank accords its
own property or if the Bank takes such action with respect to such
collateral as the undersigned shall request in writing, but the
Bank's failure to comply with any such request or to take steps to
preserve rights against any person or property shall not be deemed
a failure to exercise reasonable care with respect to such
Collateral.  The Bank shall have no responsibility for ascertaining
any maturities, calls, conversions, exchanges, offers, tenders or
similar matters relating to any of the collateral, nor for
informing the undersigned with respect to any thereof (whether or
not the Bank shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the
Bank, whether or not an Event of Default shall have occurred, the
undersigned will promptly: (i) deliver, transfer, assign or indorse

2



to the Bank upon receipt by the undersigned, in the exact form in which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Bank, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Bank; (iii) deliver to the Bank, at the time and place and in the manner specified by the Bank, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Bank has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Bank detailed lists of and all writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Bank; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and make payment on account of any or all of the Obligations, in each case to the satisfaction of the Bank, if the security afforded by this Security Agreement shall be unsatisfactory to the Bank in its sole judgment; and (vi) pay or reimburse the Bank for all expenses, including attorney's fees and disbursements, incurred by the Bank pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Bank's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral). The undersigned hereby indemnifies and holds harmless the Bank from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Bank may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Bank's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Bank from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Bank may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b)  The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c)  The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Bank may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Bank. All policies of insurance

04/22/2002 12:40 FAX 284 494 8214        HW&R ROAD TOWN    ___                    ☐015



shall provide that (i) such insurance shall be payable to the Bank and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Bank for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Bank by the insurer.  At the request of the Bank all such policies shall be delivered to and held by it.  The Bank may act as attorney for the undersigned in obtaining, adjusting, settling and cancelling such insurance and indorsing any drafts.

(5)  The Bank may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Bank in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of insurance as required by Paragraph 4(a)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v) to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Bank, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the collateral; and (i) transfer to or register in the name of the Bank or of the Bank's nominee any or all of the Collateral which may be in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf.

(6)  At any time and from time to time, the Bank may at its option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral.  The undersigned agrees to join with the Bank at the Bank's request in executing any such statements and amendments.

4



The undersigned represents to the Bank that no lien or security interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Bank, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item.  The undersigned will not create or suffer to exist, without the prior written consent of the Bank, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)(a)    The undersigned represents that (i) its chief place of business is located at the address set forth on the signature page hereof, (ii) all of its other places of business are located at the addresses set forth in part I of Schedule A hereto, (iii) all Collateral (other than accounts, contract rights and general intangibles) is located at the addresses set forth in part II of said Schedule A, and (iv) all records concerning its accounts or contract rights are kept at the address set forth in part III of said Schedule A.

(b)    The undersigned will notify the Bank in writing at least thirty days in advance (i) of any discontinuance or change of address of its chief place of business, of any of its other places of business, of the place where any Collateral (other than accounts, contract rights and general intangibles) is or is to be located and of the place where any records concerning its accounts or contract rights are or are to be kept, and (ii) of the addresses of any new place of business of the undersigned, of any new place where any Collateral (other than accounts, contract rights and general intangibles) is or is to be located and of any new place where any records concerning its accounts or contract rights are or are to be kept.

(8)    This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Bank of the undersigned's signed notice to such effect, or upon the Bank's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.

(9)    In the event of the happening of any one or more of the following events (each being herein called an "Event of default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to  perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing for or securing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the

5

04/22/2002 12:41 FAX 284 494 8214          HW&R ROAD TOWN                    ☒017



undersigned or of any indorser, guarantor, acceptor, surety or other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Bank, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Bank against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Bank in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Bank's option become immediately due and payable, without demand or notice, and any obligation of the Bank to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

6

04/22/2002 12:41 FAX 284 404 8214          HW&R ROAD TOWN                                    ☒018



(10)   Upon the occurrence of an Event of Default the Bank shall
have all of the rights and remedies available to a secured party
under applicable law and, in addition thereto, the undersigned
agrees that (a) in the event that notice is required by applicable
law, written notice given by mail to the undersigned, at the
address set forth on the signature page hereof, three business days
prior to the date of public sale of any Collateral or prior to the
date after which private sale of any other disposition of any
Collateral will be made shall constitute reasonable notice, but
notice, given in any other reasonable manner or at any other
reasonable time shall be sufficient; (b) in the event of sale or
other disposition of any Collateral, the Bank may apply the
proceeds of any such sale or disposition to the satisfaction of its
reasonable attorneys' fees, legal expenses and other costs and
expenses incurred in connection with its taking, retaking, holding,
preparing for sale or other disposition, and selling or other
disposition of such Collateral; (c) without precluding any other
methods of sale or other disposition, the sale or other disposition
of any collateral shall have been made in a commercially reasonable
manner if conducted in conformity with reasonable commercial
practices of banks disposing of similar property, but in any event
the Bank may sell at its option on such terms as it may choose,
without assuming any credit risk and (to the extent permitted by
applicable law) without any obligation to advertise; and (d) the
Bank may require the undersigned to assemble the Collateral and to
take all necessary or appropriate action to preserve and keep it in
good condition and to make it available to the Bank at a place to
be designated by the Bank which is reasonable convenient to both
parties and at a time designated by the Bank, all at the expense of
the undersigned.

(11)   The undersigned agrees, at its own expense, to do all further
acts and things and to execute and deliver all writings and
contracts, including security agreements, assignments, indorsements
and powers of attorney, which in the Bank's opinion may be
necessary or appropriate to create, perfect, preserve, validate or
otherwise protect in any jurisdiction any lien or security interest
granted pursuant hereto or in any additional collateral security
referred to in Paragraph 4(a)(v) or to enable the Bank to exercise
and enforce its rights and remedies hereunder or with respect to
such liens or security interests.

(12)(a)  For purposes of perfection of the Bank's security interest
in any Collateral in which a security interest may be perfected by
possession, such Collateral shall be deemed to be in the Bank's
possession if such Collateral is in the possession or control of
the Bank, of any of its correspondents or of any other third party
acting on the Bank's behalf, or if such Collateral is put in
transit by mail or by carrier to or from the Bank or any such
correspondent or third party, in all cases irrespective of whether
for the express purpose of being used by the Bank as collateral
security or for safekeeping or for any other or different purpose.

7

04/22/2002 12:42 FAX 284 494 8214        HW&R ROAD TOWN                        @019



(b)  No failure or delay on the Bank's part in exercising any right
or remedy hereunder shall operate as a waiver hereof; nor shall any
single or partial exercise of any such right or remedy preclude any
other or further exercise thereof or the exercise of any other
right or remedy.   The Bank's rights and remedies hereunder are
cumulative and not exclusive of any rights or remedies provided by
law or in any Agreement or other contract between the undersigned
to any other  or further notice or demand similar or other
circumstance.   None of the terms or provisions of this Security
Agreement may be waived, modified or amended except in writing duly
signed by the Bank.   No provision of any Agreement or other
contract or writing between the undersigned and the Bank shall be
construed as a waiver, modification or amendment of any of the
Bank's rights and remedies under this Security Agreement unless
such waiver, modification or amendment is made expressly and with
explicit reference to this Security Agreement.  The Bank may in its
discretion at any time relinquish its rights hereunder as a
particular Collateral without thereby affecting or invalidating its
rights as to any other Collateral.

(c)  In litigation in which the Bank and the undersigned may be
adverse parties, the Bank and the undersigned hereby waive their
respective rights to demand trial by jury and, in addition, the
undersigned waives any set-off or counterclaim of any nature or
description against the Bank.

(d)  The undersigned assents to any contract the Bank may enter
into with any other bank or other secured party of which the
undersigned is indebted providing for subordination of priorities
of claims or for sharing the Collateral or any realizations
thereon.

(e)  This Security Agreement shall be binding upon the undersigned
and  upon  its  heirs,  executors,  administrators,  successors,
transferees and assigns, and shall inure to the benefit of, and be
enforceable by, the Bank the Bank's successors, transferees and
assigns.   The Bank may assign or transfer in whole or in part this
Security Agreement, any of the obligations, any agreement and such
Collateral and from its obligations as secured party of record.

(f)  Except to the extent provided by any mandatory provisions of
applicable law, this Security Agreement shall be governed by and
construed in accordance with the laws of Maryland.  All terms used
in this Security Agreement and not defined herein which are defined
in the Uniform Commercial Code as in effect from time to time in
the State of Maryland shall have the same meaning herein as in said
Code.   If any provision of this Security Agreement or portion of
such  provision or the application thereof to any person or
circumstance shall to any extent be held invalid or enforceable,
the remainder of this Security Agreement (or the remainder of such
provision)  and  the  application  thereof  other  persons  or
circumstances shall not be affected thereby.

8

04/22/2002 12:42 FAX 264 494 8214        HW&R ROAD TOWN        ☒020



(g)   The undersigned represents to the Bank that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h)   If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties.  Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation.  Neither this Security Agreement nor any of the Bank's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any Collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Bank as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor.  Each party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

9

04/22/2002 12:43 FAX 284 494 8214    HW&R ROAD TOWN    @021



(13) This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Bank shall not be required as a condition to the effectiveness of this Security Agreement. Any execution of this Security Agreement by the Bank is only for purposes of filing this Security Agreement as a financing statement, if the Bank deems the execution hereof by it to be necessary or desirable for purposes of such filing.

Dated: September 1st, 1995          PUSSER'S (ANNAPOLIS) INC.

By: _____
    Title: President

Address of Chief Place of
Business:

301 Najoles Road, Suite 201
        (Street Address)

Millersville, Maryland 21108
        (City and State/Island)

10

(73)

## SECURITY AGREEMENT

This **SECURITY AGREEMENT**, made on the dates set forth on the signature page hereof, between **BARCLAYS BANK PLC**, having its Head Office in the city of London, England, acting through its branch office in Road Town, Tortola, British Virgin Islands (herein called the "Bank") and the undersigned.

(1)(a)  As security for any and all of the Obligations (as defined in Paragraph 1(b) the undersigned pledges to the Bank and creates a lien and security interest in favor of the Bank in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

(i)   all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

(ii)  all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

(iii) all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

(iv)  all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

(v)   all claims of the undersigned against the Bank, and all moneys at any time in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

(vi)  all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but not limited to securities



issued (as stock splits, stock dividends or otherwise)
relative to any securities  constituting Collateral,

(b)  The term "Obligations" means all obligations and liabilities
of the undersigned to the Bank, now existing or hereafter arising
(including but not limited to obligations and liabilities of the
undersigned arising under this Security Agreement), whether matured
or not matured, whether absolute or contingent and whether directly
created or acquired by assignment or otherwise (including but not
limited to liabilities, contingent and otherwise, direct or
indirect, of the undersigned to the Bank as indorser, guarantor,
acceptor, surety or otherwise with respect to any obligation or
liability of any third party to the Bank and liabilities,
contingent or otherwise, of the undersigned by way of any express
or implied contract with or for the benefit of the Bank, to
purchase or provide funds for the payment of any obligation or
liability of any third party to the Bank, or to supply funds to or
to invest in such third party, or otherwise to insure the Bank
against loss on any obligation or liability of such third party).

(2) Until the occurrence of an Event of Default (as defined in
Paragraph 9), the undersigned may use the Collateral in any lawful
manner not inconsistent with this Security Agreement and with the
terms of any insurance thereon; may sell its inventory and goods in
the ordinary course of business; and may use or consume any raw
materials or supplies, the use or consumption of which is necessary
in order to carry on the undersigned's business.  The undersigned
will at all times keep the collateral separate and distinct from
any of its other property and keep accurate and complete records of
the same.

(3) The Bank shall have no duty of care with respect to the
Collateral, except to exercise reasonable care in the custody and
preservation of Collateral in its actual possession.  The Bank
shall be deemed to have exercised reasonable care with respect to
Collateral in its possession if such Collateral is accorded
treatment substantially equal to that which the Bank accords its
own property or if the Bank takes such action with respect to such
collateral as the undersigned shall request in writing, but the
Bank's failure to comply with any such request or to take steps to
preserve rights against any person or property shall not be deemed
a failure to exercise reasonable care with respect to such
Collateral. The Bank shall have no responsibility for ascertaining
any maturities, calls, conversions, exchanges, offers, tenders or
similar matters relating to any of the collateral, nor for
informing the undersigned with respect to any thereof (whether or
not the Bank shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the
Bank, whether or not an Event of Default shall have occurred, the
undersigned will promptly: (i) deliver, transfer, assign or indorse
to the Bank upon receipt by the undersigned, in the exact form in

2



which they are received all proceeds of Collateral, including but
not limited to proceeds of contract rights, accounts, general
intangibles, chattel paper and instruments; (ii) notify account
debtors and obligors on instruments to make payments directly to
the Bank, and indicate on all invoices to such account debtors and
obligors that all payments are to be made directly to the Bank;
(iii) deliver to the Bank, at the time and place and in the manner
specified by the Bank, all Collateral in which a security interest
may be perfected by a secured party's taking possession thereof,
irrespective of whether the Bank has prior thereto perfected a
security interest in such Collateral by filing or otherwise;
(iv) deliver to the Bank detailed lists of and all writings
relating to the Collateral and evidence of the maintenance of
insurance pursuant to Paragraph 4(c), all in a form satisfactory to
the Bank; (v) furnish additional collateral security, not included
in Paragraph 1(a), as security for any and all of the Obligations
and make payment on account of any or all of the Obligations, in
each case to the satisfaction of the Bank, if the security afforded
by this Security Agreement shall be unsatisfactory to the Bank in
its sole judgment; and (vi) pay or reimburse the Bank for all
expenses, including attorney's fees and disbursements, incurred by
the Bank pursuant to any provision of this Security Agreement or in
connection with; the administration and enforcement of and the
exercise of any of the Bank's rights under this Security Agreement
(including but not limited to the custody, preservation, use and
operation of any Collateral Obligations, and the realization upon
any or all of the Collateral). The undersigned hereby indemnifies
and holds harmless the Bank from and against any claim, expense
(including attorney's fees and disbursements, loss and liability to
which the Bank may become subject in connection with this Security
Agreement (including but not limited to the custody, preservation,
use and operation of any Collateral in the Bank's possession or
control) and any Agreement (as defined in Paragraph 9(b), the
enforcement of any of the Obligations, and the realization upon any
or all Collateral. The undersigned hereby indemnifies and holds
harmless the Bank from and against any claim, expense (including
attorney's fees and disbursements), loss and liability to which the
Bank may become subject in connection with this Security Agreement,
and Agreement, any Obligation or any collateral.

(b) The undersigned will promptly pay when due all taxes relating
to this Security Agreement, any Agreement, any Obligation or any
Collateral (including its custody, preservation, use or operation).

(c) The undersigned will maintain insurance at all times with
respect to all insurable Collateral against risk of fire, theft
and all other risks customarily insured against by persons engaged
in business similar to that of the undersigned and such special
risks as the Bank may designate, in such amounts, containing such
terms, in such forms, for such periods and written by such insurers
as shall be satisfactory to the Bank. All policies of insurance
shall provide that (i) such insurance shall be payable to the Bank

3

04/22/2002 13:18 FAX 284 494 8214       HW&R ROAD TOWN                                    ☑006/031



and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Bank for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Bank by the insurer.  At the request of the Bank all such policies shall be delivered to and held by it.  The Bank may act as attorney for the undersigned in obtaining, adjusting, settling and cancelling such insurance and indorsing any drafts.

(5) The Bank may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Bank in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of insurance as required by Paragraph 4(a)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v) to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Bank, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the undersigned; and (i) transfer to or register in the name of the Bank or of the Bank's nominee any or all of the Collateral which may be in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf.

(6) At any time and from time to time, the Bank may at its option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral.  The undersigned agrees to join with the Bank at the Bank's request in executing any such statements and amendments. The undersigned represents to the Bank that no lien or security

4



interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Bank, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item. The undersigned will not create or suffer to exist, without the prior written consent of the Bank, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)(a)  The undersigned represents that (i) its chief place of business is located at the address set forth on the signature page hereof, (ii) all of its other places of business are located at the addresses set forth in part I of Schedule A hereto, (iii) all Collateral (other than accounts, contract rights and general intangibles) is located at the addresses set forth in part II of said Schedule A, and (iv) all records concerning its accounts or contract rights are kept at the address set forth in part III of said Schedule A.

(b)  The undersigned will notify the Bank in writing at least thirty days in advance (i) of any discontinuance or change of address of its chief place of business, of any of its other places of business, of the place where any Collateral (other than accounts, contract rights and general intangibles) is or is to be located and of the place where any records concerning its accounts or contract rights are or are to be kept, and (ii) of the addresses of any new place of business of the undersigned, of any new place where any Collateral (other than accounts, contract rights and general intangibles) is or is to be located and of any new place where any records concerning its accounts or contract rights are or are to be kept.

(8)  This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Bank of the undersigned's signed notice to such effect, or upon the Bank's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.

(9)  In the event of the happening of any one or more of the following events (each being herein called an "Event of default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to  perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing.. for or securing or evidencing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the undersigned or of any indorser, guarantor, acceptor, surety or

5

other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Bank, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Bank against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Bank in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Bank's option become immediately due and payable, without demand or notice, and any obligation of the Bank to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

6

Case 2:07-cv-03040-SRC-CCC    Document 9-6    Filed 08/23/2007    Page 26 of 37

04/12/2002 13:19 FAX 284 494 8214    HW&R ROAD TOWN    ☑009/031



(10) Upon the occurrence of an Event of Default the Bank shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Bank may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees. legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Bank may sell at its option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Bank may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Bank at a place to be designated by the Bank which is reasonable convenient to both parties and at a time designated by the Bank, all at the expense of the undersigned.

(11) The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, indorsements and powers of attorney, which in the Bank's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Bank to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(12)(a) For purposes of perfection of the Bank's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Bank's possession if such Collateral is in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Bank or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Bank as collateral security or for safekeeping or for any other or different purpose.

7



(b) No failure or delay on the Bank's part in exercising any right or remedy hereunder shall operate as a waiver hereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The Bank's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance. None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Bank. No provision of any Agreement or other contract or writing between the undersigned and the Bank shall be construed as a waiver, modification or amendment of any of the Bank's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement. The Bank may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or invalidating its rights as to any other Collateral.

(c) In litigation in which the Bank and the undersigned may be adverse parties, the Bank and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Bank.

(d) The undersigned assents to any contract the Bank may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e) This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Bank the Bank's successors, transferees and assigns. The Bank may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f) Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Maryland. All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of South Carolina shall have the same meaning herein as in said Code. If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

8



(g)  The undersigned represents to the Bank that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h)  If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties. Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation. Neither this Security Agreement nor any of the Bank's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Bank as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor. Each party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

9



(13)  This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Bank shall not be required as a condition to the effectiveness of this Security Agreement.  Any execution of this Security Agreement by the Bank is only for purposes of filing this Security Agreement as a financing statement, if the Bank deems the execution hereof by it to be necessary or desirable for purposes of such filing.

Dated: March 29 , 1996           PUSSER'S CHARLESTON INC.

                                  By: _____
                                      Title:

                                  Address of Principal Place of
                                  Business:

                                  __17 Lockwood Drive_____
                                         (Street Address)

                                  __Charleston, South Carolina 21402
                                      (City and State/Island)

10

08/07/2007 15:24 FAX 305 494 8217   CCC   BARCLAYS SEC   HWER ROAD TOWN   Filed 08/23/2007   Page 30 of 37   @024/031

## SECURITY AGREEMENT

This SECURITY AGREEMENT, made on the dates set forth on the signature page hereof, between BARCLAYS BANK PLC, having its Head Office in the city of London, England, acting through its agency in Miami, Florida (herein called the "Bank") and the undersigned.

(1)(a)  As security for any and all of the Obligations (as defined in Paragraph 1(b) the undersigned pledges to the Bank and creates a lien and security interest in favor of the Bank in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

(i)      all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

(ii)     all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

(iii)    all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment; .

(iv)     all fixtures, furniture and equipment from any retail stores or offices that maybe operated by the undersigned;

(v)      all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

(vi)     all claims of the undersigned against the Bank, and all moneys at any time in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

(vii)    all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but not limited to securities issued (as stock splits, stock dividends or otherwise) relative to any securities constituting Collateral,

(b)   The term "Obligations" means all obligations and liabilities of the undersigned to the Bank,



now existing or hereafter arising (including but not limited to obligations and liabilities of the undersigned arising under this Security Agreement), whether matured or not matured, whether absolute or contingent and whether directly created or acquired by assignment or otherwise (including but not limited to liabilities, contingent and otherwise, direct or indirect, of the undersigned to the Bank as indorser, guarantor, acceptor, surety or otherwise with respect to any obligation or liability of any third party to the Bank and liabilities, contingent or otherwise, of the undersigned by way of any express or implied contract with or for the benefit of the Bank, to purchase or provide funds for the payment of any obligation or liability of any third party to the Bank, or to supply funds to or to invest in such third party, or otherwise to insure the Bank against loss on any obligation or liability of such third party).

(2)    Until the occurrence of an Event of Default (as defined in Paragraph 9), the undersigned may use the Collateral in any lawful manner not inconsistent with this Security Agreement and with the terms of any insurance thereon; may sell its inventory and goods in the ordinary course of business; and may use or consume any raw materials or supplies, the use or consumption of which is necessary in order to carry on the undersigned's business. The undersigned will at all times keep the collateral separate and distinct from any of its other property and keep accurate and complete records of the same.

(3)    The Bank shall have no duty of care with respect to the Collateral, except to exercise reasonable care in the custody and preservation of Collateral in its actual possession. The Bank shall be deemed to have exercised reasonable care with respect to Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Bank accords its own property or if the Bank takes such action with respect to such collateral as the undersigned shall request in writing, but the Bank's failure to comply with any such request or to take steps to preserve rights against any person or property shall not be deemed a failure to exercise reasonable care with respect to such Collateral. The Bank shall have no responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the collateral, nor for informing the undersigned with respect to any thereof (whether or not the Bank shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the Bank, whether or not an Event of Default shall have occurred, the undersigned will promptly: (i) deliver, transfer, assign or indorse to the Bank upon receipt by the undersigned, in the exact form in which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Bank, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Bank; (iii) deliver to the Bank, at the time and place and in the manner specified by the Bank, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Bank has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Bank detailed lists of and all writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Bank; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and

2



make payment on account of any or all of the Obligations, in each case to the satisfaction of the Bank, if the security afforded by this Security Agreement shall be unsatisfactory to the Bank in its sole judgment; and (vi) pay or reimburse the Bank for all expenses, including attorney's fees and disbursements, incurred by the Bank pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Bank's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral). The undersigned hereby indemnifies and holds harmless the Bank from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Bank may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Bank's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Bank from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Bank may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b)    The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c)    The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Bank may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Bank. All policies of insurance shall provide that (i) such insurance shall be payable to the Bank and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Bank for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Bank by the insurer. At the request of the Bank all such policies shall be delivered to and held by it. The Bank may act as attorney for the undersigned in obtaining, adjusting, settling and canceling such insurance and indorsing any drafts.

(5)    The Bank may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Bank in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of insurance as required by Paragraph 4(c)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v)

3



to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Bank, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the collateral; and (i) transfer to or register in the name of the Bank or of the Bank's nominee any or all of the Collateral which may be in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf.

(6)    At any time and from time to time, the Bank may at its option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral. The undersigned agrees to join with the Bank at the Bank's request in executing any such statements and amendments. The undersigned represents to the Bank that no lien or security interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Bank, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item. The undersigned will not create or suffer to exist, without the prior written consent of the Bank, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)(a)  The undersigned represents that (i) its chief place of business is located at the address set forth on the signature page hereof, (ii) all of its other places of business are located at the addresses set forth in part I of Schedule A hereto, (iii) all Collateral (other than accounts, contract rights and general intangibles) is located at the addresses set forth in part II of said Schedule A, and (iv) all records concerning its accounts or contract rights are kept at the address set forth in part III of said Schedule A.

(b)    The undersigned will notify the Bank in writing at least thirty days in advance (i) of any discontinuance or change of address of its chief place of business, of any of its other places of business, of the place where any Collateral (other than accounts, contract rights and general intangibles) is or is to be located and of the place where any records concerning its accounts or contract rights are or are to be kept, and (ii) of the addresses of any new place of business of the undersigned, of any new place where any Collateral (other than accounts, contract rights and general intangibles) is or is to be located and of any new place where any records concerning its accounts or contract rights are or are to be kept.

(8)    This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Bank of the undersigned's signed notice to such effect, or upon the Bank's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.



(9) In the event of the happening of any one or more of the following events (each being herein called an "Event of default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing for or securing or evidencing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the undersigned or of any indorser, guarantor, acceptor, surety or other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Bank, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Bank against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Bank in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Bank's option become immediately due and payable, without demand or notice, and any obligation of the Bank to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

(10) Upon the occurrence of an Event of Default the Bank shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other

5

Case 1:07-cv-06046-GBC-GGG    Document 9-6    Filed 08/23/2007    Page 35 of 37



disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Bank may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees. legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Bank may sell at its option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Bank may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Bank at a place to be designated by the Bank which is reasonable convenient to both parties and at a time designated by the Bank, all at the expense of the undersigned.

(11)    The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, endorsements and powers of attorney, which in the Bank's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Bank to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(12)(a)    For purposes of perfection of the Bank's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Bank's possession if such Collateral is in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Bank or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Bank as collateral security or for safekeeping or for any other or different purpose.

(b)    No failure or delay on the Bank's part in exercising any right or remedy hereunder shall operate as a waiver hereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The Bank's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance. None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Bank. No provision of any Agreement or other contract or writing between the undersigned and the Bank shall be construed as a waiver, modification or amendment of any of the Bank's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement. The Bank may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or

6



invalidating its rights as to any other Collateral.

(c)    In litigation in which the Bank and the undersigned may be adverse parties, the Bank and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Bank.

(d)    The undersigned assents to any contract the Bank may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e)    This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Bank the Bank's successors, transferees and assigns. The Bank may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f)    Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Florida. All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of Florida shall have the same meaning herein as in said Code. If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

(g)    The undersigned represents to the Bank that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h)    If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties. Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation. Neither this Security Agreement nor any of the Bank's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any Collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Bank as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor. Each

7

W/1002 13:28 FAX 284 494 8214          HW&R ROAD TOWN                          ☑031/031



party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

(13)    This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Bank shall not be required as a condition to the effectiveness of this Security Agreement.  Any execution of this Security Agreement by the Bank is only for purposes of filing this Security Agreement as a financing statement, if the Bank deems the execution hereof by it to be necessary or desirable for purposes of such filing.

Dated: April 2, 2000                    PUSSER'S RETAIL, INC.


                                        By _____
                                           President

                                        Address of Principal Place of Business:


                                        264 King Street_____
                                        (Street Address)


                                        Charleston, South Carolina_____
                                        (City and State/Island)

8