Gregory W. Gilliam
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------X

| | |
|---|---|
| MAGWITCH L.L.C., : | |
| : | Case No. 08-cv-2144 |
| Plaintiff, : | |
| : | ECF Case |
| -against- : | |
| : | |
| PUSSER'S INC., PUSSER'S LTD., : | **DECLARATION OF** |
| PUSSER'S WEST INDIES LTD., and : | **CHARLES S. TOBIAS** |
| CHARLES S. TOBIAS : | |
| : | |
| Defendants. : | |

----------------------------------------------------------------------X

**Charles S. Tobias** makes this declaration pursuant to 28 U.S.C. § 1746 and in

support of the Defendants' Motion to Dismiss the above-captioned action.

1.      My name is Charles S. Tobias, one of the defendants in the above-

referenced action.  I am 73 years of age.  I am competent to testify to the matters set forth

in this declaration.

2.      In 1979, I took up residence in the British Virgin Islands ("BVI") where I

founded Pusser's Ltd.  In 1999, I became a citizen, or "belonger," of the BVI.

3.      I have never been a citizen or domiciliary of the state of New York.

4.      I have never owned, leased or otherwise occupied any real property in the

state of New York.

5.      I have never maintained any tangible or intangible personal property, kept bank accounts, or made investments in the state of New York.

6.      I derive no income from the state of New York.

7.      I have not, in or on my own behalf, done business in, or otherwise engaged in business activities or transactions in or directed at, the state of New York.

8.      I have read the complaint filed by Magwitch, LLC ("Magwitch"), in the above-captioned action against Pusser's, Inc., ("Pusser's Florida"), Pusser's, Ltd ("Pusser's Ltd") Pusser's West Indies, Ltd. ("PWI"), and me individually.  Pusser's Florida, Pusser's Ltd, and PWI are hereafter sometimes referred to collectively as "the Pusser's entities."

9.      Pusser's Florida is a corporation organized under the laws of the state of Florida.  It has had no business activity since 2005.  In 2005, Pusser's Florida's assets were liquidated and all cash received as a result of the liquidation was used to pay Pusser's Florida's debts including a $1.5 million payment to Magwitch.  After all Pusser's Florida's debts were paid, there was no money left over.  At the time when Pusser's Florida was actively engaged in business, its activities, properties, and employees were in Florida, Maryland and South Carolina.  Pusser's Florida has never had any business activity, property, or employees in the state of New York.

10.     Pusser's Ltd is a corporation organized under the laws of the BVI.  It is currently inactive.  It is the sole shareholder of Pusser's Florida.  Its operations in the United States, when they were active, were in Maryland, South Carolina and Delaware, through subsidiaries of Pusser's Ltd, which were merged into Pusser's Florida in 2003. Pusser's Ltd does no business in New York and has no assets or employees there.

BA2DOCS1/337421

11.    PWI is a corporation organized under the laws of the BVI.  I am the sole shareholder of PWI.  Since 2002 PWI has owned and operated Pusser's branded restaurants, retail outlets, and other operations in the Caribbean, as distinguished from the Pusser's branded operations in the United States.  PWI has never done business, or otherwise engaged in business transactions in, or directed at the state of New York.  It has no property or employees in the state of New York.

12.    None of the Pusser's entities has ever owned, leased, or otherwise occupied any real property in the state of New York.

13.    None of the Pusser's entities has ever maintained any tangible or intangible personal property in the state of New York, none of them has employed persons in New York, and none of them has ever kept bank accounts, made investments, or employed persons in the state of New York.

14.    None of the Pusser's entities has ever been qualified or licensed to do business in New York, and none of them has ever, until the above-captioned action was filed, been involved in any court litigation, arbitration, mediation, or other legal proceedings in New York.

15.    Some time in the early 1980s I became acquainted with a lawyer named Lloyd De Vos.  I met him through a friend who headed a bank in the BVI that was using Mr. De Vos as a lawyer.  Mr. De Vos was a business and tax lawyer who provided legal advice to persons doing business in the Caribbean, including the BVI, and he had an office in the neighboring U.S. Virgin Islands.  Mr. De Vos became an investor in Pusser's Ltd in that time frame and then became a member of its board of directors.  Mr. De Vos's role eventually expanded to becoming legal advisor to Pusser's Ltd and its subsidiaries.

16.     Because Mr. De Vos was the lawyer for Pusser's companies, I had contact with him by letter, fax and email, and sometimes in person when I happened to be in the United States.  When I communicated by fax or email, I directed my correspondence to his law firm in New Jersey or New York depending on which law firm he happened to be affiliated with at the time.   When I called Mr. De Vos during business hours, I usually contacted him by calling his law office, which was for a period of time from 2000 until September 2001, in New Jersey, and for another period of time, after September 2001, in New York.  If I could not reach Mr. De Vos in his office, because of the hour at which I was calling or for some other reason, I typically called him on his cell phone, in which case I did not know precisely where he physically was located.  When I visited Mr. De Vos in New York, which was rare, I would typically see him at his New York office, or at a restaurant for dinner.  My records reflect that from 2000 to 2004 I was in New York less than five times.  The Complaint in this case alleges that I went to New York to give deposition testimony.  I have no recollection of such a deposition, and I do not believe I was ever in a deposition related to the matters asserted in the Complaint.

17.     When I spoke on the phone with Mr. De Vos, I did not keep track of where he was, and called him wherever he happened to be.  If I did discuss any of the matters described in the Complaint with Mr. De Vos on the phone while he was in New York (and I have no recollection of such discussion), it was only because he happened to be in New York at that time.  I have no recollection of discussing the Pusser's workout or Magwitch's becoming a Pusser's creditor while I was physically present in New York. To the contrary, my recollection, as set forth in more detail below, is that all significant discussions about the Barclays workout, and Magwitch's part in it, took place in the BVI

-4-

or, on at least one occasion, in Barbados.  Similarly, as also set forth in more detail below, any discussions about Pusser's intra-company fund transfers that I had with Mr. De Vos were typically in the BVI.

18.    During the period of time that Mr. De Vos was legal advisor to the Pusser's companies, he was affiliated with law firms based either in New York or New Jersey.  The fact that Mr. De Vos practiced law in New York as opposed to some other place was a matter of indifference to me.  I did not seek Mr. De Vos's legal advice with respect to any matter related to the state of New York.  I sought his advice on various tax and corporate governance issues, and on business issues, particularly relating to expansion of Pusser's Ltd's business into Florida, South Carolina, and Maryland.

19.    The Complaint in this case arose out of transactions in the BVI in 2002 pursuant to which Magwitch, the plaintiff in this case, became a secured creditor of Pusser's Ltd and Pusser's Florida by paying $1.5 million for a promissory note in the amount of $3.3 million Pusser's Ltd made to the BVI branch of the British bank, Barclays ("the Note").

20.    Mr. De Vos is the sole owner, member, and manager of Magwitch.  So far as I know, it has no employees or physical offices, and no assets other than the Note.

21.    Pusser's Ltd had business interests both in the Caribbean region and, through its wholly-owned subsidiaries, in the United States.  These interests included Pusser's branded restaurants and retail operations.  In the United States these operations were located in Florida, Maryland, and South Carolina.  There were no such operations in the state of New York.

BA2DOCS1/337421

22.    Pusser's Ltd financed its operations, including its United States operations, through loans provided by Barclays Bank's branch on Tortola, BVI.  To secure itself, Barclays took a security interest in Pusser's Ltd's assets in the Caribbean and the United States.  No bank in New York was involved.

23.    By 2001, Pusser's Ltd had accumulated indebtedness to Barclays in excess of $11 million.  Pusser's Ltd was incapable of paying this debt.  Rather than formally declare Pusser's Ltd in default, however, Barclays negotiated a workout.

24.    During the workout of Pusser's Ltd's debt, Mr. De Vos was a shareholder, officer, and director of Pusser's Ltd, as well as its closest legal advisor.  He was therefore fully engaged in the workout negotiations and actively participated in the workout process here in the BVI.   He came to the BVI for every key corporate meeting, and he participated in person in every important meeting with Barclays about Pusser's Ltd's attempted debt restructuring.  Most of these meetings were in the BVI, and all of them were held in the Caribbean.  None of them was in New York.

25.    For example, on June 25, 2001, Mr. De Vos and I both flew to Barbados for a face-to-face meeting with the Barclays workout specialists to discuss restructuring Pusser's Ltd's debt.  A March 6, 2002 letter I sent to Mark Young of Barclays referenced the occasion "[w]hen Lloyd and I flew down to Barbados to meet with Andy Gardiner and Charles Middleton [workout specialists] on June 25, 2001 . . . ."  A true and accurate copy of the March 6, 2002 letter is attached hereto as Exhibit A.

26.    Again, on August 8, 2001, Mr. De Vos was in Tortola, BVI, for the annual meeting of the shareholders of a subsidiary of Pusser's Ltd incorporated in Delaware  As the minutes of that meeting reflect, Mr. De Vos acted as secretary and was elected to the

-6-

board of directors at this meeting.  A true and accurate copy of the Minutes of the Annual

Meeting (Aug. 8, 2001) are attached hereto as Exhibit B.

27.    Mr. De Vos attended the annual meetings of Pusser's Ltd and other

companies in November 2001.  This is reflected in a letter written and signed by

Mr. De Vos dated December 29, 2001.  A true and accurate copy of Mr. De Vos's letter

is attached hereto as Exhibit C ("When I visited Tortola for the annual meetings at the

end of November, Kert [Tennikait] was kind enough to provide me with his summary of

the invoices outstanding between Pusser's and me.")

28.    In addition, Mr. De Vos was in the BVI for negotiations with Barclays on

the restructuring of Pusser's Ltd's debt in the Spring of 2002.  The negotiations with

Barclays led to a letter agreement on April 17, 2002, the terms of which were later

incorporated into a more formal Assignment Agreement signed on May 9, 2002.  A true

and accurate copy of the April 17, 2002 Letter Agreement from Barclays Bank PLC to

Magwitch LLC, Pusser's (2001) Ltd, and Pusser's West Indies, Ltd. is attached hereto as

Exhibit D.  The letter agreement refers to "discussions earlier this week" between the

parties, is expressly "governed by British Virgin Islands law," and was signed by all

parties, including Magwitch through Mr. De Vos, in the BVI.

29.    I do not specifically recall whether Mr. De Vos was in the BVI for the

closing of the formal Assignment Agreement on May 9, 2002, but there is evidence that

he intended to be here. In an email from Mr. De Vos to Kert Tennikait sent three days

before the closing, Mr. De Vos said he was planning to come to the BVI for that event.  A

true and accurate copy of the May 6, 2002 email is attached hereto as Exhibit E.

30.    In short, Mr. De Vos and through him, Magwitch were down here in the BVI to effect the workout leading to Magwitch's purchase of the Note that is at the heart of this dispute. By contrast, neither I nor any of the other Pusser's defendants were ever in New York for any part of this transaction. New York had nothing to do with this transaction.

31.    The terms of the deal eventually worked out with Barclays was that the security for the cumulative debt owed by Pusser's Ltd to Barclays would be allocated between operations in two geographic regions, the Caribbean and the United States. Thus, one portion of the debt would be secured by certain of Pusser's Ltd's assets in the Caribbean, and the balance of the debt, in the amount of $3.3 million, would be secured by certain assets of Pusser's Ltd's subsidiaries in the United States.

32.    These terms were incorporated into an Assignment Agreement executed on May 9, 2002. A true and accurate copy of the Assignment Agreement is attached hereto as Exhibit F. It was executed in the BVI and is expressly governed by the law of the BVI.

33.    Pursuant to the arrangement spelled out in the Assignment Agreement, Pusser's Ltd made the Note to Barclays Bank PLC on May 9, 2002. A true and accurate copy of the Note is attached to this declaration as Exhibit G. The Note provided that the borrower, Pusser's Ltd, would pay Barclays the amount of the note plus interest "**on demand**, at its offices at Road Town, Tortola, British Virgin Islands" or at such other place designated by the lender. I signed the Note in the BVI on behalf of the borrower, Pusser's, Ltd, and on behalf of the United States subsidiaries of Pusser's Ltd, including Pusser's Florida, whose assets would secure the Note.

34.    The Note contains a choice-of-law clause providing that it "shall be governed as to validity, interpretation, construction, effect, and in all other respects by the laws and decisions of the British Virgin Islands."

35.    After Pusser's Ltd made the Note, Magwitch purchased it from Barclays for $1.5 million.  When the Promissory Note was sold to Magwitch, Pusser's Ltd was instructed to direct all communications to Magwitch's address in New York.  However, when Magwitch formally demanded payment under the Promissory Note in September 2006 it was via a letter to Pusser's Ltd in the BVI that showed a New Jersey address for Magwitch.

36.    In conjunction with the Note, Pusser's Ltd subsidiaries, including Pusser's Florida, were subject to security agreements with Magwitch pledging certain of their assets to secure Pusser's Ltd's indebtedness to Magwitch.  True and accurate copies of these security agreements and assignments thereof to Magwitch are attached hereto as Exhibits H and I.  I executed the security agreements in the BVI on behalf of these companies, and the assignments of the security from Barclays to Magwitch were made in the BVI and are expressly governed by the laws of the BVI.  The security agreements are governed by the laws of Florida, Maryland, South Carolina and Delaware, respectively.  None of these security agreements was entered into in New York, pertained to assets in New York, or was in any way governed by New York law.

37.    By agreement of all concerned persons, including Magwitch, the accounts of all the Pusser's operations in the Caribbean and the United States, including the accounts of the restaurants in Maryland and Florida, were managed in the BVI by a single financial comptroller, Kert Tennikait.  If there were any inter-company fund transfers,

whether from Caribbean operations to United States operations or vice versa, they were effected and booked in the BVI.

38.    The Pusser's entities and Magwitch, with Mr. De Vos in attendance as Pusser's lawyer, officer, director, and creditor, and as Magwitch's representative, met often in the BVI and transfers of funds between Pusser's companies was a frequent topic of discussion.  As a result, Mr. De Vos was fully aware of any intra-company movement of funds.  Any agreements or promises with respect to transfers were made in the BVI, not in New York.

39.    When Magwitch bought the Note it was secured by the assets of Pusser's Ltd's operating subsidiaries in the United States, which were ultimately merged into Pusser's Florida.  (Mr. De Vos, as lawyer, engineered this merger.)  These businesses had assets valued in excess of the $3.3 million face value of the Note, including a Pusser's Landing restaurant and retail store in the Marriott Hotel on the waterfront in Annapolis, Maryland, and two restaurants -- Pusser's at the Beach and Pusser's Down Under -- in Fort Lauderdale, Florida.

40.    In September 2003, the Pusser's Landing restaurant in Annapolis, in which Pusser's had invested more than $2 million, was devastated by Hurricane Isabel. This unforeseen natural disaster jeopardized Magwitch's security for the Note.  If Pusser's was unable to rebuild quickly in Annapolis, the hotel owner where the Pusser's Landing was located could have terminated Pussers' right to operate at that location, destroying any value the restaurant had.  The insurance money for this loss was tied up in litigation with the hotel owner, who was trying to force a default so that it could terminate the Pusser's Landing Operating Agreement, which it had a right to do if

Pusser's failed to re-start operations in a specified timeframe. Therefore, Mr. De Vos, on behalf of Magwitch, and while still purporting to act as Pussers' lawyer, asked for substantial cash advances from PWI and another Pusser's company in the BVI, Pusser's Rum, Ltd ("Rumco") to repair and rebuild the Pusser's Landing operations. Rumco is not a party to this action.

41.    In response to Mr. De Vos's request, PWI and Rumco advanced hundreds of thousands of dollars to repair and rebuild the Pusser's Landing restaurant and related store operations in Annapolis to avoid a default.

42.    As part of the consideration for the cash advances from PWI and Rumco, Mr. De Vos agreed on behalf of Magwitch that "funds that are moved from Rum/PWI to Pusser's Inc to cover the cash shortfall will be repaid from the first available cash proceeds in the United States, and specifically ahead of any payments of legal fees to my firm or cash distribution to Magwitch or others." *See* Lloyd De Vos's February 11, 2004 email, attached hereto as Ex. J. Magwitch thus agreed to subordinate its security interest in Pusser's Florida's assets to PWI and Rumco.

43.    Contrary to its agreement to subordinate, Magwitch now complains that insurance funds for the damage done by Hurricane Isabel should have been paid to Magwitch when they finally became available. *See* Complaint ¶¶ 53-54.

44.    There was no improper transfer of funds, as Magwitch contends. Any transfers that may have occurred were done with Magwitch's express agreement as reflected in Mr. De Vos's February 11, 2004 email and in other communications. In any case, any transfer would have had no relationship to New York. Pusser's Florida's cash and accounting were handled by Pusser's accounting operations in the BVI.

45.     Neither I nor the Pusser's entities could ever have reasonably expected to be called into the courts of New York for resolution of the disputes that are the subject of the complaint filed by Magwitch. I never supposed that I or the Pusser's entities could be subject to the personal jurisdiction of courts in New York. None of the written agreements at issue in this case were governed by New York law or chose New York as the place for dispute resolution. Indeed, any time there is an express choice-of-law clause or choice-of-venue provision in an agreement pertaining to the debt or security at issue, the choice is invariably for some state or jurisdiction other than New York. If Mr. De Vos had advised me that these agreements related to Magwitch made me or my companies subject to jurisdiction in New York, I would not have entered into them. I was relying on Mr. De Vos to protect the Pusser's companies and secure appropriate legal protections.

46.     I would welcome the opportunity to disprove Magwitch's claims in a court of law, but it would be a substantial hardship for me and the Pusser's entities to litigate this case in New York. Many of the people familiar with the events out of which Magwitch's claims arise are here in the BVI, including myself, Kert Tennikait (Comptroller of the Pusser's entities), Barclays Bank personnel, Barclays Bank and Pusser's accounting firms, Barclays Bank attorneys (BVI firm of Harney, Westwood and Riegels), Paul Webster (a lawyer in the BVI who is familiar with the Barclays workout and, in addition to Mr. De Vos, was a lawyer for Pusser's), and others. Other than Mr. De Vos, I can think of no other people in or near New York who have relevant information about this case.

47.     So long as I have known Mr. De Vos, he has been a regular visitor to the BVI and other places in the Caribbean, where he has a number of clients whom he advises on legal matters.  There would be little hardship to Mr. De Vos if he were required to bring his claims in the BVI.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

Charles S. Tobias

Dated:  __3/10/2008_____

# Exhibit A



March 6, 2002


Mr. Mark Young
General Manager
Barclays Bank PLC
Road Town, Tortola


Dear Mark,

First, I apologize for the delay in getting this to you. Mr. Lloyd DeVos has been so occupied with other matters, that he was unable to complete this in the time frame that we wanted you to have it. Thus I am completing this so we might move forward without delay.

When Lloyd and I flew down to Barbados to meet with Andy Gardiner and Charles Middleton on June 25, 2001, we believed that Pusser's had an excellent chance of recovery from the financial position it was in. Pusser's had sold off its money-losing units, reduced its employee head count, more than halved its operating overhead and was operating units that were profitable within their four walls. It was beginning to make money. Based on the projections extrapolating those results, we thought that Pusser's would be able to raise the $8 million equity it was seeking. Likewise, based on that plan, we thought that there was a good chance that the bank would eventually come out whole.

For the period from June 25 through September 11, the financial results of Pusser's bore this out. Through the end of its Period 3 (September 16, 2001), the Company's EBITDA and earnings were about $200,000 ahead of budget. Unfortunately, as you and almost everyone else in any way related to the hospitality industry in the Caribbean knows, September 11th changed all this.

At present, Pusser's has fallen significantly behind on both its projected EBITDA and its income. From being ahead by about $200,000 at the end of its Period 3 in September, it is now about $400,000 behind as shown in its numbers for Period 8. It expects to fall another $600,000 behind for the balance of the fiscal year (which ends June 30, 2002) with a real cash loss for the year in the range of $400,000 to $600,000. The principal reason that we see for this is the inability of the Company to purchase inventory for its retail stores. While food & beverage sales are running about 90% of budget since September 11th, retail sales have been running at only 53% of budget. Simply, Pusser's does not have the goods to sell.

Since then and until recently, I have been trying to sell or refinance the company as an integral unit, that is with the U.S. and the Caribbean units combined with the view to the Company's continuing as an ongoing enterprise in both the U.S. and the Caribbean as it has been. However, final interest in this possibility died several weeks ago. Fortunately or unfortunately, a lot of time has been spent writing business plans and exploring only those arrangements which would have had the bank being fully repaid, and the shareholders retaining a part of their equity. I have come to realize that this approach, after September 11th, required that an unrealistic valuation be placed on the business in a market that presently discounts heavily, especially in circumstances like Pusser's: heavy losses, a huge debt, a negative net worth and an offshore location.

We have now concluded that the best course at this time is to break the Company into its two geographical components, that is, the U.S. and the Caribbean -- and to sell them independently for a realistic valuation. In effect, we are proposing a planned liquidation. Of course, the shareholders would lose their equity and their notes. In the interim, we believe that the best way to maximize value is to keep the business running while it is sold, which also protects the trade creditors and employees that Pusser's has in the British Virgin Islands while maximizing the possible recovery amount for the bank in its capacity as the secured creditor of Pusser's.

Several months ago, an outside group, headed by Mr. Jim Jackson, a Pusser's shareholder, requested that I assist them in negotiations with the Jim Beam Brands Company's parent, Fortune Brands, with the purchase of the business of British Navy Pusser's Rum from Fortune Brands who have decided to sell Pusser's and numerous other small brands. The parties have agreed in principle to a final closing date between June 1 and August 1 of this year. The first draft of the Purchase Agreement has just been received. The purchase price for the rum is to be $4 million for which the funds have been raised.

I have agreed tentatively to run this new company. Recently, I persuaded the investment group that maintaining the Pusser's units in the British Virgin Islands would be greatly advantageous to the promotion and future sales of Pusser's Rum. As a condition of me agreeing to run the new company, the rum company agreed to approach the bank on a best effort basis to purchase the bank's notes for cash. The rum company has also agreed that if a successful transaction is concluded, that the it will assume responsibility for severance pay for Pusser's BVI employees, and payment of Pusser's BVI vendors in order to maintain the local goodwill necessary for the ongoing operation of the business. This would take care of these potential problems in the British Virgin Islands.

In the U.S., because of U.S. law, the rum company would be prohibited from operating any bars in the U.S. and would thus be forced to sell the best cash generating unit it would acquire under the proposed transaction, Pusser's Annapolis, as well as the second unit in Ft. Lauderdale. In a normal business climate, one would expect to receive approximately $2,500,000 from the sale of these units based on a factor of 2.5 times the cash flow generated by the units at the unit contribution level before G & A, depreciation, etc. Given the present climate for food and beverage operations in the U.S., and the



Company's distressed position as to time and cash, we would be pleased to receive $1,000,000 for these units. Gary Rogalski and I have been in discussions with a series of possible purchasers for these assets, and $1,000,000 is what's being offered for the two units combined. Of course, if Pusser's ceases operations, both of these units will simply fall into the hands of Thayer Properties, the owners of the hotels in which the units operate, and their value will essentially evaporate.

In attempting to arrive at a value of what the assets might be worth to the rum company, various scenarios were examined, finally coming down to EBITDA and asset valuations. From the rum company's perspective, a single, inexpensive Pusser's unit in the BVI would probably suffice for its needs as related to the promotion of the rum at a cost substantially less than what it would expect to pay the bank under the proposed transaction.

Thus valuing the Company on its expected EBITDA for this year at five times EBITDA, which is generous in today's market, one comes up with a valuation in the range of $2 - $2.5 . Similarly, we have tried to develop a liquidation value of what the rum company might reasonably expect to recover if it had to place the same assets into liquidation. Valuing the assets realistically, one arrives at a net liquidation value of about $2.5 million (see attached valuation sheet). Much of the asset value on the various units, particularly Annapolis, Ft. Lauderdale and Marina Cay, is in the leasehold improvements, which provides no liquidity excepting to the landlord.

Assuming a successful transaction with the bank, the rum company would liquidate the existing company, Pusser's Ltd., so as to be free of contingent liabilities. This course of action presents four other factors that a buyer must take into account, some of which were noted earlier.

The first factor is that all of Pusser's units operate on licensed premises - which are cancelable by the landlord on 60 days written notice if the company is put into receivership, which is what would happen if the rum company and the bank conclude the proposed transaction, and the rum company follows through with its plan of liquidation. It would therefore be incumbent upon me to obtain their agreement that they not cancel in the event that the current company is liquidated, and resurfaces operating under the new.

A second factor is severance pay. The liquidation of any company in the BVI requires that severance pay be offered to all employees wishing to accept it in lieu of ongoing employment in the new enterprise. It is believed that many will accept it since they have been in the employ of the Company for more than 20 years, and thus the amount to be paid represents a significant bonus as many of them draw close to the age where they wish to quit working. The exposure here is about $250,000.

The third factor is the payables of the BVI company. In order for the rum company to be able to continue to operate the Caribbean units it would be purchasing, all Caribbean payables of Pusser's Ltd. would need to be paid. This amount presently is about $1 million.



The fourth factor is working capital for the BVI company. In order that it be able to operate profitability and efficiently, it will need a working capital infusion of not less than $1 million. This is to increase inventory levels by about $750,000 where retail operations can again become profitable, and to repair, replace and upgrade equipment and facilities that are in dire need.

Thus in addition to what it is proposing to pay to the bank, the rum company must be prepared to put up an additional $2.25 million cash on top. Thus the rum company's initial cash outlay would be about $6 million.

Taking all factors into account, it has been concluded that the rum company cannot pay more than $3.5 million cash for purchase of the bank's notes. The proposed transaction would be a two-step process.

Step 1: Within thirty days of the conclusion of an agreement with the bank, the bank will receive $1 million cash, and temporarily a deed in lieu of foreclosure for the Pusser's DownUnder property in Ft. Lauderdale valued at the $1.8 million that is to come from it. Thus at this point the bank will have received value of $2.8 million. Concurrently, the bank will release the U.S. assets and all claims against the U.S. companies so that the U.S. will be free to go forward.

The BVI company, Pusser's Ltd., needs a cash infusion as soon as possible so that it can purchase a limited amount of inventory necessary for it to remain financially viable pending the conclusion of the transaction with the bank. Thus as part of Step 1, $250,000 would be advanced to the Pusser's Ltd. concurrently with the bank's release of the U.S. assets.

Step 2: Understandably, the Rum Co. does not wish to close on the agreement with the bank, which effectively entails the purchase of the Caribbean units which it contemplates purchasing to promote the Pusser's Rum brand it is buying, until it closes on the purchase of the rum business from Fortune Brands which can be no sooner than June 1, 2002 or later than August 1, 2002. On or before August 1st, or on the same day as the closing of the rum purchase from Beam, the rum company will pay the bank $2.5 million cash at which time:

      (i)    The deed to the Pusser's Down Under goes back to the rum company, and

      (ii)   The balance of the bank's Pusser's Ltd. notes are transferred from the bank to the rum company.

      (iii)  The rum company assumes responsibility for severance payments to employees and for Caribbean payables.

Presently, the rum company has commitments for the cash it requires to purchase the Pusser's Rum business from Fortune Brands. If the bank is amenable to an agreement as proposed, then the rum company will undertake to raise the additional funds which the



proposed transaction will require. While the rum company is reasonably certain that this can be done, it cannot undertake to do so until an agreement is in place between itself and the bank.

As we stated in June, we have tried to be as forthcoming as possible in the circumstances that we find ourselves. We very much appreciate the manner in which the bank has worked with us. While the present situation is not what we would wish, until now we have endeavored to conduct ourselves in a way that provides the creditors and shareholders of Pusser's with the best possible chance of recovery. Perhaps we spent too long trying to achieve refinancing goals that, under the circumstances, were not realistic. What's proposed here is both realistic and, we believe, achievable within a reasonable time frame.

We would welcome any further discussion of these matters at your convenience.

Yours sincerely,

Charles Tobias

copy:   James Jackson
        Charles Tobias
        Kert Tennikait
        Lloyd DeVos



# Exhibit B

## MINUTES OF THE ANNUAL MEETING
## OF THE SHAREHOLDERS OF
## PUSSER'S INC.

The annual meeting of the shareholders of Pusser's Inc., a Delaware corporation (the "Corporation"), was held on August 8, 2001 at 10:15 a.m., at Fort Burt Hotel, Road Town, Tortola, British Virgin Islands. The following, being the sole shareholder of the corporation, was present:

Mr. Charles S. Tobias

Also present was Mr. Lloyd De Vos.

The meeting was called to order by Mr. Tobias. It was moved, seconded, and unanimously carried that Mr. Tobias act as Chairman of the meeting, and that Mr. De Vos act as Secretary of the meeting and record the minutes thereof. The Secretary then presented a Waiver of Notice of the Meeting signed by the sole shareholder. The Chairman directed that the Waiver be annexed to the minutes of the meeting.

The Chairman next presented the financial report of the Corporation which was accepted and ordered filed with the Secretary.

The Chairman stated that the next item of business at the meeting was to elect the directors of the Corporation. Upon motion duly made, seconded and unanimously adopted, it was

> **RESOLVED,** that the following persons are elected as the directors of the Corporation, to serve for the ensuing year or until their successor(s) are elected and qualify:

Mr. Charles S. Tobias<br>
Mr. Lloyd De Vos<br>
Mr. Jim Jackson<br>
Mr. Jim Flynn

NWK_100437_1/LDEVOS

On motion duly made, seconded and unanimously adopted, it was

> **RESOLVED**, that the shareholder hereby ratifies, adopts and approves all acts of any officer or director of the Corporation made during the preceding year.

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, it was adjourned.

Mr. Lloyd De Vos
Secretary of the Meeting

NWK_100437_1/LDEVOS

# Exhibit C

# HILL, BETTS & NASH LLP

99 PARK AVENUE
20TH FLOOR
NEW YORK, NEW YORK 10016

(212) 839-7000
Fax: (212) 466-0514

**Lloyd De Vos**
Direct Telephone: 212-786-1000
Direct Facsimile: 212-786-1015
E-mail: Ldevos@hillbetts.com

December 29, 2001

Mr. Charles S. Tobias
Pusser's Ltd.
P. O. Box 626
Road Town, Tortola
British Virgin Islands

Re:    Our file 80227

Dear Charles:

As we continue our recovery efforts, I have just reached the point where I have begun to think about how to handle billing for services for periods prior to September 11, 2001.

Part of my agreement with Edwards & Angell is that I have arranged for De Vos & Co. PLLC to purchase all of the outstanding accounts receivable and time inventories for my clients. You should not be hearing from Edwards & Angell concerning any amounts owed, and if you do, please let me know at once. All amounts owed by Pusser's for my services or the services of anyone at Edwards & Angell are owned by and payable to De Vos & Co. PLLC. Frankly, I did this because I did not want you to be hassled by either a collection agency or a law firm at this time. We have other and more important matters to occupy our time.

When I visited Tortola for the annual meetings at the end of November, Kert was kind enough to provide me with his summary of the invoices outstanding between Pusser's and me. According to Kert's reconciliation, there was a balance of $112,395.11 due from Pusser's Ltd. to De Vos & Co. PLLC, a balance of $32,089.48 due from Pusser's Ltd. to Edwards & Angell and a balance of $32,807.51 due from Pusser's Inc. to Edwards & Angell. Now that I have purchased the Edwards & Angell account receivable, all of these amounts are due to De Vos & Co. PLLC. Since for our purposes, it really does not matter whether the amounts are owed by Pusser's Ltd. or Pusser's Inc., there was just a balance of $177,292.10.

Since that time, of course, you were kind enough to permit me retain $5,000 of the Delaware franchise tax refund. This reduced the balance to $172,292.10.
{NY001972 1 }

Mr. Charles S. Tobias
December 29, 2001
Page 2

I have now reconstructed much of what was done in August and the beginning of September, 2001 for Pusser's. Frankly, there were only the clean-up matters involved, ironically as it appears now, with cleaning up all of the corporate and finance matters so that we would have everything in order for due diligence for a next round of financing. There were, however, the disbursements incurred in connection with our visit to Morgan Keegan in Tennessee and some old expenses relating to attendance at annual meetings in Florida. The total of the time and disbursements came to approximately $3,000.

All things being considered, the best estimate that I can come to is that a statement for $2,750 would cover everything that was done. In the interest of being overly fair, I would ask that you accept $2,750 as the bill in settlement of all Pusser's matters for periods up to September 11, 2001.

While I could design some De Vos & Co. letterhead and type up a formal bill for that amount, I would ask that under the present circumstances, you accept this letter as an invoice for $2,750. This will bring the balance between us up to $175,042.

I continue to have great faith and hope for Pusser's and us, and with a little bit of luck, I look forward to 2002 as the year when we turn the corner, get financed properly again and begin to have some fun as well as make money. More on that in the days to come ...

With thanks and kind regards,

Yours sincerely,

Lloyd De Vos

LDV/ss

[NY001972.1]

# Exhibit D

P.O. Box No. 70
Road Town
Tortola
British Virgin Islands

U.S. Mailing Address
P.O. Box 8309
Cruz Bay
St. John
USVI 00831

Magwitch LLC
c/o Hill, Betts & Nash, LLP
99 Park Avenue
New York, New York 10016

Pussers (2001) Ltd.
Charles Town, Nevis
British West Indies

Pusser's West Indies Ltd.
Road Town, Tortola
British Virgin Islands

Tel 284 494 2171/3
Fax 284 494 4315

# BARCLAYS

17 April 2002

Dear Sirs,

We refer to the discussions earlier this week between Barclays Bank PLC (the "**Bank**") and yourselves (the "**Purchasers**") in relation to the purchase of debt owed by Pusser's Ltd. (the "**Company**") and its subsidiaries to the Bank. The Company and its subsidiaries are referred to in the remainder of this letter as the "**Group**".

We write to record our understanding of the oral agreement which the Purchasers and the Bank have reached. The Bank and the Purchasers agree that they will proceed in good faith to document formally in a manner reasonably acceptable to both parties the agreement set out in this letter, each understanding that a legally binding agreement will only come into force upon the execution of further, formal legal documents. This agreement is conditional upon the execution of such formal legal documents not later than 8 May 2002.

1.      **Purchase of Group Debt**

On or before 8 May 2002 Magwitch LLC will purchase $3.3 million of the indebtedness of the Group at a purchase price of US$1,500,000. On receipt of the aforesaid purchase price the Bank will take all steps within its control to execute and deliver to the Purchaser such documents as it has in its possession or is reasonably requested to execute to give the purchaser title to the indebtedness and all security then held by the Bank over assets located in the United States.

L4v0016

On or before 31 May 2002 Pusser's (2001) Ltd. will purchase $2.2 million of the indebtedness of the Group at a purchase price of US$1,000,000. On receipt of the aforesaid purchase price the Bank will take all steps within its control to execute and deliver to the Purchaser such documents as it has in its possession or is reasonably requested to execute to give the purchaser title to the indebtedness.

On or before the earlier of: i) the closing of a subscription to shares of Pusser's West Indies Ltd. at which at least $5,000,000 is paid in, or ii) 1 September 2002, Pusser's West Indies Ltd. will purchase all remaining indebtedness of the Group at a purchase price of US$2,000,000. On receipt of the aforesaid purchase price the Bank will take all steps within its control to execute and deliver to the Purchaser such documents as it has in its possession or is reasonably requested to execute to give: a) the purchaser title to the indebtedness; b) Pusser's (2001) Ltd. its mortgage interest in warehouse premises owned by the Company and located in Road Town, Tortola, British Virgin Islands; and c) Pusser's West Indies Ltd. all other security from the Group then held by the Bank.

2,    **General**

The sale of the indebtedness is made as one transaction and on the understanding that each of the Purchasers will complete the undertakings that they have made and that the Bank shall not be under an obligation to complete this transaction only in part. In the event that any Purchaser shall not meet its obligation, the amount of indebtedness owed by the Group to the Bank shall only be reduced by the amount of cash received by the Bank and each Purchaser shall restore to the Bank any debt purchased in excess of that amount.

The Bank does not and will not make any representation or warranty and has no responsibility to any Purchaser as to the effectiveness, genuineness, validity, enforceability or sufficiency of documents evidencing the debt being sold or the security for the debt being sold or as to the collectability of amounts outstanding or payable thereunder.

Each of the Purchasers represent to the Bank that it is not a creditor of the Group, a trustee for a creditor of the Group or managed or controlled by any current director of the Company, and that it has adequate sources of cash other than from the Group or related to the Group from which it is making this purchase.

All payments to be made to the Bank shall be made to its account at such office or bank as it may notify to the Purchasers for this purpose and for value on the due date.

The agreement of the Bank to enter into this transaction is conditioned upon the Company continuing to make monthly payments of interest and principal as were being kept current at 31 March 2002 until sale of the relevant debt hereunder.

Ldv0016

The agreement of the Bank to enter into this transaction is conditioned upon the Company holding of an EGM as soon as reasonably practicable but in any event prior to 8 May 2002 to disclose to shareholders and material Group creditors the agreement that the Purchasers have reached with the Bank.

The formal documents shall provide that in the event that the Bank is forced to disgorge any proceeds of sale of the debt of the Group, the Purchasers shall retransfer to the Bank the relevant indebtedness and any security for the relevant indebtedness that it holds.

This letter is governed by British Virgin Islands law.

Yours faithfully

Senior BVI Manager
Barclays Bank PLC

We agree to the above,

For and on behalf of
Magwitch LLC

For and on behalf of
Pusser's (2001) Ltd.

For and on behalf of
Pusser's West Indies Ltd.

Ldv0016

# Exhibit E

Subj:      **RE: Accounts payable; intercompany loans**
Date:      5/6/2002 4:11:16 PM Central Daylight Time
From:      ldevos@hillbetts.com
To:        Klt456@aol.com
CC:        ctobias@pussers.com
*Sent from the Internet (Details)*

Jim Derr has taken a sabbatical from the practice of law in the Virgin
Islands for the next six months. In order to permit him to do this, I
have advanced him the $12,409.00 that is due to him from Pusser's.

Could you please change the accounts payable schedule to show that the
$12,409 owing to Jim Derr is owed to De Vos & Co. This amount, of
course, is in addition to the amounts owed to De Vos & Co./Hill, Betts &
Nash and is in addition to the $250,000 amount to which Charles, Jim
Jackson and I agreed through September 1.

Sorry I am not down there yet, but there is way too much to do to get
everything organized for the Barclays transaction.

One small aspect of that on which you can help me immediately - would I
be correct in assuming that the intercompany account numbers that you
send me have not changed prior to last Friday, May 3. If they have
changed, could you please let me know soonest so that I can change the
minutes of the meetings that I am bringing down with me.

Best regards,

Lloyd De Vos

# Exhibit F

ASSIGNMENT AGREEMENT


DATED 9th May 2002


BETWEEN


BARCLAYS BANK PLC

MAGWITCH L.L.C.

PUSSERS (2001) LTD.

AND

PUSSER'S WEST INDIES LTD.


# HARNEY WESTWOOD & RIEGELS


385178_5

THIS AGREEMENT is dated 9th May 2002 and made BETWEEN:

(1)     BARCLAYS BANK PLC (the "Assignor");

(2)     MAGWITCH L.L.C. c/o Hill, Betts & Nash LLP 99 Park Avenue, 20th Floor, New York, New York 10016 ("Magwitch");

(3)     PUSSER'S (2001) LTD. of Charlestown, Nevis, British West Indies ("2001"); and

(4)     PUSSER'S WEST INDIES LTD. of Road Town, Tortola, British Virgin Islands ("West Indies").

IT IS AGREED as follows:

1.     **INTERPRETATION**

1.1     **Definitions**

In this Agreement:

**"Assigned Amounts"**

means the Tranche A Assigned Amount, the Tranche B Assigned Amount and the Tranche C Assigned Amount (each an **"Assigned Amount"**).

**"Assignees"**

means each of Magwitch, 2001 and West Indies (each an **"Assignee"**).

**"Business Day"**

means a day on which banks in Tortola and New York are open for business.

**"Effective Date"**

means each date on which the assignment of an Assigned Amount is to take place under this Agreement.

**"Finance Documents"**

means the Tranche A Finance Documents, the Tranche B Finance Documents and the Tranche C Finance Documents (each a **"Finance Document"**).

3

**"Obligors"**

means in relation to each of the Assigned Amounts the persons liable to the Assignor under the Finance Documents relating to those Assigned Amounts whether as borrower or guarantor or by virtue of having granted the Assignor a Security Interest and identified as such in the Schedule relating to those Assigned Amounts.

**"Party"**

means a party to this Agreement.

**"Retained Fees and Interest"**

has the meaning given to it in Clause 6 (Excluded Rights).

**"Receiving Account"**

means subject to Clause 7.1 (Place), the account of a Party designated as its Receiving Account in Schedule 1, Schedule 2 or Schedule 3.

**"Security Interest"**

means any mortgage, pledge, lien, charge, assignment, hypothecation or security interest or any other agreement or arrangement having the effect of conferring security.

**"Tranche A Assigned Amount"**

means the principal amount of the borrowing identified as such in Schedule 1 and for which the Obligors are liable to the Assignor under the Tranche A Finance Documents or the principal amount outstanding of that borrowing.

**"Tranche A Effective Date"**

means 9 May 2002 or such earlier date agreed between the Assignor and Magwitch.

**"Tranche A Finance Documents"**

means

    (a)    any agreement or instrument evidencing or providing for the Tranche A Assigned Amount;

    (b)    any guarantee, indemnity or other assurance against loss given in respect of the Tranche A Assigned Amount;

(c)    any document evidencing or creating any Security Interest over any asset of any person to secure any obligations of any Obligor in respect of the Tranche A Assigned Amount;

(d)    any other agreement (including any rescheduling or restructuring agreement) relating to the Tranche A Assigned Amount,

but does not include a document or agreement creating a Security Interest unless specifically identified in Schedule 1

"Tranche A Purchase Price"

means US$1,500,000.

"Tranche B Assigned Amount"

means the principal amount of the borrowing identified as such in Schedule 2 and for which the Obligors are liable to the Assignor under the Tranche B Finance Documents or the principal amount outstanding of that borrowing.

"Tranche B Effective Date"

means 31 May 2002 or such earlier date agreed between the Assignor and Magwitch.

"Tranche B Finance Documents"

means

(a)    any agreement or instrument evidencing or providing for the Tranche B Assigned Amount;

(b)    any guarantee, indemnity or other assurance against loss given in respect of the Tranche B Assigned Amount;

(c)    any document evidencing or creating any Security Interest over any asset of any person to secure any obligations of any Obligor in respect of the Tranche B Assigned Amount;

(d)    any other agreement (including any rescheduling or restructuring agreement) relating to the Tranche B Assigned Amount,

but does not include a document or agreement creating a Security Interest unless specifically identified in Schedule 2

"Tranche B Purchase Price"

means US$1,000,000.

5

## Index

**Clause**

|  |  | **Page** |
|---|---|---|
| 1. | Interpretation | 3 |
| 2. | Assignment | 7 |
| 3. | Undertaking and payment | 8 |
| 4. | Notices of assignment | 8 |
| 5. | Further assurance | 9 |
| 6. | Excluded rights | 9 |
| 7. | Payments administration | 10 |
| 8. | Representations and warranties | 10 |
| 9. | Assignor's responsibility | 12 |
| 10. | New money | 12 |
| 11. | Provision for re-transfer | 12 |
| 12. | Assignor's obligations | 12 |
| 13. | Changes to the parties | 13 |
| 14. | Waivers and remedies cumulative | 13 |
| 15. | Severability | 13 |
| 16. | Counterparts | 14 |
| 17. | Notices | 14 |
| 18. | Expenses | 15 |
| 19. | Stamp duty | 15 |
| 20. | Jurisdiction and service of process | 15 |
| 21. | Governing law | 16 |

**Schedules**

| 1. | Details of the Tranche A Assignment | 17 |
| 2. | Details of the Tranche B Assignment | 20 |
| 3. | Details of the Tranche C Assignment | 22 |

Signatories ... 24

**"Tranche C Assigned Amount"**

means the principal amount of the borrowing identified as such in Schedule 3 and for which the Obligors are liable to the Assignor under the Tranche C Finance Documents or the principal amount outstanding of that borrowing.

**"Tranche C Effective Date"**

means the earlier of

(i)     1 September 2002; or

(ii)    the closing of an issue of shares in the equity capital of West Indies or any disposal by West Indies of any right to subscribe for or to be allotted shares in its equity capital the proceeds of which (or the proceeds or which when aggregated with the proceeds of any prior subscription) exceed US$5,000,000; or

(iii)   such earlier date agreed between the Assignor and West Indies.

**"Tranche C Finance Documents"**

means

(a)     any agreement or instrument evidencing or providing for the Tranche C Assigned Amount;

(b)     any guarantee, indemnity or other assurance against loss given in respect of the Tranche C Assigned Amount;

(c)     any document evidencing or creating any Security Interest over any asset of any person to secure any obligations of any Obligor in respect of the Tranche C Assigned Amount;

(d)     any other agreement (including any rescheduling or restructuring agreement) relating to the Tranche C Assigned Amount.

**"Tranche C Purchase Price"**

means US$2,000,000.

**1.2     Construction**

(a)     In this Agreement, unless the contrary intention appears, a reference to:

(i)     an "amendment" includes a supplement, novation or re-enactment and "amended" is to be construed accordingly;

(ii)    an "authorisation" includes an authorisation, consent, approval, resolution, licence, exemption, filing and registration;

(iii)    a Clause or a Schedule is a reference to a clause of or a schedule to this Agreement;

(iv)    a person includes its successors and assigns;

(v)    a Finance Document or another document is a reference to that Finance Document or other document as amended;

(vi)    a time of day is a reference to British Virgin Islands time; and

(vii)    words importing the singular include the plural and vice versa.

(b)    The index to and the headings in this Agreement are for convenience only and are to be ignored in construing this Agreement.

## 2.    ASSIGNMENT

### 2.1    Assignment

Subject to the terms and conditions of this Agreement, the Assignor:

(a)    with effect from the Tranche A Effective Date assigns to Magwitch the Tranche A Assigned Amount;

(b)    with effect from the Tranche B Effective Date assigns to 2001 the Tranche B Assigned Amount; and

(c)    with effect from the Tranche C Effective Date assigns to West Indies the Tranche C Assigned Amount.

together with all (subject as otherwise provided in this Agreement) rights and benefits accruing to the Assignor in relation to that Assigned Amount (including the benefit of any guarantee of that Assignor Amount and any other Security Interest in relation to that Assigned Amount under the relevant Finance Documents).

### 2.2    Notice

The Assignor notifies the Assignees, and the Assignees acknowledges, that the Assignor shall not:

(a)    be required to reimburse the Assignees for, or otherwise be responsible for or assure the Assignees against, any loss suffered by the Assignees in consequence of the matters provided for in this Agreement (other than loss

caused by the wilful failure of the Assignor to perform or observe the terms of
this Agreement); or

(b)    have any obligation to repurchase the Assigned Amounts or any part of the
Assigned Amounts.

3.    UNDERTAKING AND PAYMENT

In consideration of the assignment by the Assignor to the Assignees of the Assigned
Amounts:

(a)    Magwitch agrees with effect from the Tranche A Effective Date to accept the
assignment of the Tranche A Assigned Amount without recourse, to be bound
by the Tranche A Finance Documents as if originally named as an original
lender in the Tranche A Finance Documents and to assume and perform all the
obligations of the Assignor under the Tranche A Finance Documents in respect
of the Tranche A Assigned Amount arising on or after the Tranche A Effective
Date and that it shall on the Tranche A Effective Date pay to the Assignor
without set-off, deduction or withholding the Tranche A Purchase Price and
procure the release by the Obligors of any obligations owed by the Assignor to
the Obligors in respect of the Tranche A Assigned Amount;

(b)    2001 agrees with effect from the Tranche B Effective Date to accept the
assignment of the Tranche B Assigned Amount without recourse, to be bound
by the Tranche B Finance Documents as if originally named as an original
lender in the Tranche B Finance Documents and to assume and perform all the
obligations of the Assignor under the Tranche B Finance Documents in respect
of all the Tranche B Assigned Amounts arising on or after the Tranche B
Effective Date and that it shall on the Tranche B Effective Date pay to the
Assignor without set-off, deduction or withholding the Tranche B Purchase
Price and procure the release by the Obligors of any obligations owed by the
Assignor to the Obligors in respect of the Tranche B Assigned Amount; and

(c)    West Indies agrees with effect from the Tranche C Effective Date to accept the
assignment of the Tranche C Assigned Amount without recourse, to be bound
by the Tranche C Finance Documents as if originally named as an original
lender in the Tranche C Finance Documents and to assume and perform all the
obligations of the Assignor under the Tranche C Finance Documents in respect
of all the Tranche C Assigned Amounts arising on or after the Tranche C
Effective Date and that it shall on the Tranche C Effective Date pay to the
Assignor without set-off, deduction or withholding the Tranche C Purchase
Price and procure the release by the Obligors of any obligations owed by the
Assignor to the Obligors in respect of the Tranche C Assigned Amount.

4.    NOTICES OF ASSIGNMENT

Forthwith on or after the relevant Effective Date the Assignees shall notify the
Obligors, under the relevant Finance Documents as required, and in the form required

by, those Finance Documents, of the assignment to the Assignee under this Agreement of that Assigned Amount and of the Assignees' agreement to be bound by those Finance Documents as fully and to the same extent as if that Assignee were an original lender.

### 5.    FURTHER ASSURANCE

The Assignor and the Assignees shall each take whatever action may be necessary:

(a)    so that the relevant Assignee may assume, to the fullest extent permitted by the Finance Documents and in accordance with the provisions of this Agreement, all the rights and obligations of the Assignor with respect to the relevant Assigned Amount on the relevant Effective Date (other than those rights expressly excepted from this Agreement);

(b)    for the Assignor to be released from all obligations arising after the relevant Effective Date under the relevant Finance Documents in relation to the relevant Assigned Amount; and

(c)    otherwise to implement the terms of this Agreement,

including the execution of any further documents and the giving of any notice, order or direction and the making of any registration which in each case may be required.

### 6.    EXCLUDED RIGHTS

(a)    No Assignee shall, in relation to an Assigned Amount, be entitled:

(i)    to any fees paid or accrued due under the Finance Documents prior to the relevant Effective Date; or

(ii)    to any interest payable under the relevant Finance Documents in respect of an Assigned Amount on or prior to, or in respect of any period ending prior to, the relevant Effective Date (whether paid before, on or after the relevant Effective Date),

and all those amounts (together "Retained Fees and Interest") shall belong to and be retained by the Assignor.

(b)    If any amount (other than any Retained Fees and Interest) is received or recovered by the Assignor in respect of the Assigned Amount on or after the Effective Date relating to that Assigned Amount, the Assignor shall forthwith pay to the Assignee that amount.

(c)    If any amount of any Retained Fees and Interest is received or recovered by the Assignee, the Assignee shall forthwith pay to the Assignor that amount.

7.    **PAYMENTS ADMINISTRATION**

7.1    **Place**

All payments or deposits by a Party to, or with, another Party under this Agreement shall be made to the Receiving Account of that other Party. Each Party may designate a different account as its Receiving Account by giving the other not less than five Business Days' notice before the due date for payment.

7.2    **Funds**

(a)    Subject to paragraph (b) below, payments under this Agreement in relation to an Assigned Amount shall be made in the currency in which that Assigned Amount is denominated in for value on the due date at such times and in such funds as are customary at the time for settlement of transactions in that currency.

(b)    Where the Assignor's obligation to make a payment under this Agreement arises from receipt or recovery of an amount pursuant to the Finance Documents the Assignor shall make the payment in the currency and funds in which those monies were received or recovered and, if that currency is not the currency of the country in which that Assigned Amount is denominated, it shall be made to the account of the Assignee in the principal financial centre of the country of that currency specified by the Assignee.

7.3    **Confirmation of receipts**

Where the obligation of a Party (the "payer") to make a payment arises as a result of its having received an amount from another person, the payer is not obliged to pay that sum to another Party (the "payee") until it has established that it has actually received that sum. However, the payer may assume that the sum has been paid to it in accordance with the applicable Finance Documents, and, in reliance on that assumption, make available to the payee a corresponding amount. If the sum has not been made available but the payer has paid a corresponding amount to the payee, the payee shall forthwith on demand by the payer refund the corresponding amount, together with interest on that amount from the date of payment to the date of receipt, calculated at a rate determined by the payer to reflect its cost of funds.

8.    **REPRESENTATIONS AND WARRANTIES**

8.1    **Assignor and Assignee**

Each of the Assignor and the Assignees makes the representations and warranties set out in this Clause 8.1:

(a)    **Powers and authority:** It has the power to enter into and perform and has taken all necessary action to authorise the entry into, performance and delivery of this Agreement and the transactions contemplated by this Agreement.

9.    **ASSIGNOR'S RESPONSIBILITY**

Save as expressly provided in Clauses 8.1 (Assignor and Assignee) the Assignor has not made and does not by this Agreement make, and no Assignee has relied upon, any representation, warranty or condition (expressed or implied) about, and the Assignor will have no responsibility to any Assignee for, the effectiveness, validity or enforceability of, any Finance Document or other documentation delivered by the Assignor to the Assignee or any of the terms, covenants or conditions contained in the Finance Documents or other documentation or any non-performance by any party to it or the financial condition of any Obligor or any other person liable with respect to the Assigned Amount.

10.    **NEW MONEY**

If an Assigned Amount is rescheduled or renegotiated the relevant Assignee and not the Assignor will be subject to the rescheduled or renegotiated terms to the extent that those terms relate to that Assigned Amount.

11.    **PROVISION FOR RE-TRANSFER**

The Assignees jointly and severally agree that if the Assignor is required by any court or government authority or any liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator, sequestrator or the like to make any payment or suffer any diminution of return on account of its receipt of the Tranche A Purchase Price, the Tranche B Purchase Price or the Tranche C Purchase Price (the "reduction") then each Assignee will at its own expense take all such action to re-transfer to the Assignor all its right title and interest in the Assigned Amounts (less only an amount which is the sum of the Purchase Price paid by that Assignee less the reduction (and for these purposes the reduction shall be allocated between the Assignees in the proportion which it bears to the aggregate Purchase Price paid by the Assignees under this Agreement)) together with all such rights and benefits accruing to the Assignees in relation to the Assigned Amounts (including but not limited to the benefit of any proceeds of sale or the benefit (whether realised or not) of any guarantee and any other security in relation to the Assigned Amounts under the Finance Documents) as it holds.

12.    **ASSIGNOR'S OBLIGATIONS**

(a)    The obligations of the Assignor under this Agreement are conditional on each Assignee performing its obligations under this Agreement and each Assignee agrees that in the event of a failure by another Assignee to perform its obligations:

(i)    the Assignor will have no further obligations under this Agreement; and

(ii)    an Assignee to which an assignment has been made under this Agreement (a "performing assignee") will at its own expense take all such action to re-transfer to the Assignor all that performing assignee's right title and interest in the Assigned Amounts which have been assigned to it (less only an amount of

the Assigned Amount represented by the Purchase Price paid by that performing assignee) together with all such rights and benefits accruing to it in relation to those Assigned Amounts (including but not limited to the benefit of any proceeds of sale or the benefit (whether realised or not) of any guarantee and any other security in relation to those Assigned Amounts under the Finance Documents) as it holds.

(b)     The obligations of the Assignor under this Agreement are conditional on the Obligors continuing to make such payments under the Finance Documents as were being made at 31 March 2002 up to and including the Effective Date for the assignment of that Assigned Amount.

(c)     The obligations of the Assignor under this Agreement are subject to the condition that it shall first have received in form and substance satisfactory to it a guarantee of the obligations of the Assignees under this Agreement and of losses suffered by the Assignor as a result of the reversal of transactions with the Obligors from Mr. Charles Tobias.

13.     **CHANGES TO THE PARTIES**

No Party may assign, transfer, novate, encumber or dispose of any of its interest in, its rights and/or obligation's under this Agreement without the prior written consent of the other Parties.  However, after an Assignee has performed its payment obligations in Clause 3 (Undertaking and payment) in respect of the Assigned Amount, this Clause 11 shall not restrict an Assignee from assigning, charging or pledging the whole or any part of its rights, title and interest in the relevant Assigned Amount to any third party.

14.     **WAIVERS AND REMEDIES CUMULATIVE**

The rights of each Party under this Agreement:

(a)     may be exercised as often as necessary;

(b)     are cumulative and not exclusive of its rights under the general law; and

(c)     may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

15.     **SEVERABILITY**

Subject to Clause 12 (Assignor's obligations) if a provision of this Agreement is or becomes illegal invalid or unenforceable in any jurisdiction, that shall not affect:

(a)     the validity or enforceability in that jurisdiction of any other provision of this Agreement; or

 (b) the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

**16. COUNTERPARTS**

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

**17. NOTICES**

**17.1 Giving of notices**

Subject to Clause 4 (Notices of Assignment), all notices or other communications under or in connection with this Agreement shall be given in writing and, unless otherwise stated may be made by facsimile. Any such notice will be deemed to be given as follows:

 (a) if by letter, when delivered personally or on actual receipt;

 (b) if by facsimile, when received in legible form.

However, a notice given in accordance with the above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

**17.2 Addresses for notices**

The address, telex number and facsimile number of each Party for all notices under or in connection with this Agreement are:

 (a) in relation to the Assignor:

   Barclays Bank Plc
   P O Box 70
   Road Town, Tortola
   British Virgin Islands

   Attention: Mark Young
   Fax No.: #1 284 494 4487

 (b) in relation to Magwitch:

   c/o Hill, Betts & Nash LLP 99 Park Avenue
   20th Floor
   New York, NY 10016

   Attention.: Lloyd De Vos

Fax No.:        # 1 212 786 1015

(c)    in relation to 2001:

PO Box 626
Road Town
Tortola
British Virgin Islands

Attention:     Joanna Tobias
Fax No.:       # 1 284 494 4267

(d)    in relation to West Indies:

South West Associates
522A Main Avenue
Dorango
Colorado 81301

Attention:     James Jackson
Fax No.:       # 1 970 259 0536

or any other notified by that Party for this purpose to the other Parties by not less than
five Business Days' notice.

## 18.    EXPENSES

Each Party shall pay its own costs and expenses in connection with the preparation,
negotiation and execution of this Agreement.

## 19.    STAMP DUTY

The Assignee shall pay, and forthwith on demand indemnify the Assignor against any
liability it incurs in respect of, any stamp, registration and similar tax which is or
becomes payable in connection with the entry into and performance of this
Agreement.

## 20.    JURISDICTION AND SERVICE OF PROCESS

### 20.1    Submission

Each Party to this Agreement agrees, for the benefit of the Assignor, that the courts of
the British Virgin Islands shall have jurisdiction to settle any disputes in connection
with this Agreement and, accordingly, submits to the jurisdiction of the British Virgin
Islands courts.

### 20.2    Service of process

Without prejudice to any other mode of service, the Assignees:

    (a)    irrevocably appoint as their agent for service of process Coverdale Trust Services Limited, 30 De Castro Street, Simmonds Building, P.O. Box 961, Road Town in relation to any proceedings before the British Virgin Islands courts in connection with this Agreement;

    (b)    agrees that failure by a process agent to notify the Assignee of the process will not invalidate the proceedings concerned;

    (c)    consents to the service of process relating to any such proceedings by prepaid posting of a copy of the process to its address for the time being applying under Clause 20.2 (Addresses for notices); and

    (d)    agrees that if the appointment of any person mentioned in paragraph (a) above ceases to be effective, each Assignee shall immediately appoint a further person in the British Virgin Islands to accept service of process on its behalf in the British Virgin Islands and, failing such appointment within 15 days, the Assignor is entitled to appoint such a person by notice to the Assignees.

**20.3    Forum convenience and enforcement abroad**

Each Party:

    (a)    waives objection to the British Virgin Islands courts on grounds of inconvenient forum or otherwise as regards proceedings in connection with this Agreement; and

    (b)    agrees that a judgment or order of the British Virgin Islands court in connection with this Agreement is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction.

**20.4    Non-exclusivity**

Nothing in this Clause 20 limits the right of the Assignor to bring proceedings in connection with this Agreement:

    (a)    in any other court of competent jurisdiction; or

    (b)    concurrently in more than one jurisdiction.

**21.    GOVERNING LAW**

This Agreement is governed by British Virgin Islands law.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

## SCHEDULE 1

### DETAILS OF TRANCHE A ASSIGNMENT

1.    **PARTIES AND DOCUMENTATION**

| | |
|---|---|
| (a) Obligors | *Pusser's Ltd., a British Virgin Islands company, number 2389* <br><br> *Pusser's Inc. ,a South Carolina corporation,* <br><br> *Pusser's Inc., a Florida corporation ,* <br><br> *Pusser's Inc., a Delaware corporation,* <br><br> *Pusser's Inc., a Maryland corporation  and* <br><br> *Pusser's Retail Inc., a Delaware corporation* |
| (b) Credit Agreements (title, date and parties): | *(1) Facility Letter dated 29 February 1996 between Barclays Bank PLC and Pusser's Ltd. as it relates to a bridging loan of up to $1,500,000 booked in Barclays account 215650774 of which an amount (including interest accrued to close of business on 8 May 2002) of $1,346,012.55 is outstanding.* <br><br> *(as amended by a letter dated 10 May 2000 from Barclays Bank PLC to Pusser's Ltd.)* <br><br> *(2) Facility Letter dated 25ᵗʰ November 1996 between Barclays Bank PLC and Pusser's Ltd. and its subsidiaries as it relates to a  loan of up to $1.6m loan to Pusser's Inc. (Florida) (formerly Pusser's Down Under Inc.) for which the booking office is the Miami branch of Barclays Bank PLC of which an amount (including interest accrued to close of business on 8 May 2002) of $1,517,955.83 is outstanding* <br><br> *(as amended by a letter dated 16 April 1997 from Barclays PLC to Pusser's Inc. (Florida) (formerly Pusser's Down UnderInc.))* <br><br> *(3) Facility Letter dated 26 January 2000 between Barclays Bank PLC and Pusser's Ltd. as it relates* |

| | |
|---|---|
| | *to $436,031.62 of a loan booked in Barclays account 215650138*<br><br>*(as amended by a letter dated 31 March 2000 From Barclays Bank PLC to Pusser's Ltd.)* |
| (c) Other Finance Documents: | *(1)A promissory note dated 9 May 2002 in favour of Barclays Bank PLC for a principal amount of $3,300,000 relating to the credit agreements and signed by Pusser's Ltd., Pusser's Inc. (Florida), Pusser's Inc. (Delaware), Pusser's Inc. (Maryland) and Pusser's Retail Inc.*<br><br>*(2) a security agreement dated 1 September 1995 between Pusser's Inc. (Maryland) and Barclays Bank PLC*<br><br>*(3) a mortgage, security agreement and assignment of rents and leases dated 30 June 1997 between Pusser's Inc. (Florida) and Barclays Bank PLC*<br><br>*(4) a security agreement dated 2 April 2000 between Pusser's Retail Inc and Barclays Bank PLC*<br><br>*(5) a security agreement dated 29 March 1996 between Pusser's Inc. (South Carolina) and Barclays Bank PLC* |

**2.    ASSIGNMENT**

| (a)  Tranche A Assigned Amount: | **$3,300,000** |
|---|---|
| (b)  Currency of Tranche A Assigned Amount: | **UNITED STATES DOLLARS** |

**3.    ADMINISTRATION DETAILS**

| (a)    Assignor's Receiving Account: | *Instructions to:*<br><br>*Barclays Bank PLC*<br>*75 Wall Street*<br>*New York, N.Y. 10265*<br>*U.S.A*<br><br>*For credit to:* | *swift    code    or    routing number/account*<br><br>*BARCUS33  or  ABA#026 002 574* |
|---|---|---|

|  | Barclays Bank PLC<br>P.O. Box 70<br>Road Town, Tortola<br>British Virgin Islands<br><br>For Further Credit:<br><br>Barclays Bank re Pussers Debt Sale | BARCVGVG<br><br>280 715 290<br><br><br><br><br>Account 215065324 |
| --- | --- | --- |
| (b)   Assignee's   Paying Account: | United States Trust Company of New York | ABA 021001318<br>Magwitch LLC<br><br>Account 21-4605-3 |

**SCHEDULE 2**

**DETAILS OF TRANCHE B ASSIGNMENT**

**1.    PARTIES AND DOCUMENTATION**

| | |
|---|---|
| (a) Obligors | *Pusser's Ltd., a British Virgin Islands company, number 2389* |
| (b) Credit Agreement (title, date and parties): | *(1) Facility Letter dated 29 February 1996 between Barclays Bank PLC and Pusser's Ltd. as it relates to a construction finance loan of up to $800,000 booked in Barclays account 215640256 of which an amount (including interest accrued to close of business on 8 May 2002) of $484,355.44 is outstanding.*<br><br>*(2) Facility Letter dated 26th January between Barclays Bank PLC and Pusser's Ltd. as it relates to an amount of $2,200,000 less the amount outstanding under the loan referred to in (1) above as at the Tranche B Effective Date of a loan booked in Barclays account 215650138*<br><br>*(as amended by a letter dated 31 March 2000 from Barclays Bank PLC to Pusser's Ltd.)* |
| (c) Other Finance Documents: | *A promissory note dated 9 May 2002 in favour of Barclays Bank PLC for a principal amount of $2,200,000 relating to the credit agreements and signed by Pusser's Ltd.* |

**2.    ASSIGNMENT**

| | |
|---|---|
| (a)  Tranche B Assigned Amount: | *$2,200,000* |
| (b)  Currency of Tranche B Assigned Amount: | **UNITED STATES DOLLARS** |

3.    ADMINISTRATION DETAILS

| (a)    Assignor's Receiving Account: | *Instructions to:* | *swift    code    or    routing number/account* |
|---|---|---|
| | *Barclays Bank PLC* <br> *75 Wall Street* <br> *New York, N.Y. 10265* <br> *U.S.A* | *BARCUS33  or  ABA#026 002 574* |
| | *For credit to:* | |
| | *Barclays Bank PLC* <br> *P.O. Box 70* <br> *Road Town, Tortola* <br> *British Virgin Islands* | *BARCVGVG* <br><br> *280 715 290* |
| | *For Further Credit:* | |
| | *Barclays Bank re Pussers Debt Sale* | *Account 215065324* |
| (b)    Assignee's    Paying Account: | *To be notified* | *To be notified* |

**SCHEDULE 3**

**DETAILS OF TRANCHE C ASSIGNMENT**

1.    **PARTIES AND DOCUMENTATION**

| (a) Obligors: | *Pusser's Ltd., a British Virgin Islands company, number 2389* |
|---|---|
| (b) Credit Agreement (title, date and parties): | *Facility Letter dated 26th January between Barclays Bank PLC and Pusser's Ltd. as it relates to any amounts not assigned in Tranche A or Tranche B of a loan booked in Barclays account 215650138*<br><br>*(as amended by a letter dated 31 March 2000 From Barclays Bank PLC to Pusser's Limited)* |
| (c) Other Finance Documents: | *(1)    A promissory note to be executed before the Tranche C Effective Date in favour of Barclays Bank PLC for a principal amount of the remaining outstanding indebtedness relating to the credit agreements and signed by Pusser's Ltd.*<br><br>*(2)    A charge dated 14 April 1981 from Pusser's Ltd. in favour of Barclays Bank PLC*<br><br>*(as amended on 1 September 1982, 16 May 1983, 25 September 1985, 7 March 1988 and 6 December 1988)*<br><br>*(3) Debenture dated 15 May 1980 from Pusser's Ltd. in favour of Barclays Bank PLC* |

2.    **ASSIGNMENT**

| (a) Tranche C Assigned Amount: | *$ remaining indebtedness* |
|---|---|
| (b) Currency of Tranche C Assigned Amount: | **UNITED STATES DOLLARS** |

22

3.    ADMINISTRATION DETAILS

| (a)    Assignor's Receiving Account: | *Instructions to:* | *swift    code    or    routing number/account* |
|---|---|---|
| | *Barclays Bank PLC* *75 Wall Street* *New York, N.Y. 10265* *U.S.A* | *BARCUS33 or ABA#026 002 574* |
| | *For credit to:* | |
| | *Barclays Bank PLC* *P.O. Box 70* *Road Town, Tortola* *British Virgin Islands* | *BARCVGVG* *280 715 290* |
| | *For Further Credit:* | |
| | *Barclays Bank re Pussers Debt Sale* | *Account 215065324* |
| (b)    Assignee's Paying Account: | *To be notified* | *To be notified* |

SIGNATORIES

Assignor

BARCLAYS BANK PLC

By:

Assignees

MAGWITCH L.L.C.

By:

PUSSERS (2001) LTD.

By:

PUSSERS WEST INDIES LTD.

By:

24

# Exhibit G

## PROMISSORY NOTE

$3,300,000                                                    May 9, 2002

     FOR VALUE RECEIVED, PUSSER'S LTD. (the "Borrower"), promises to pay
to the order of BARCLAYS BANK PLC., (the "Lender"), on demand, at its offices at
Road Town, Tortola, British Virgin Islands, or at such other place or to such other party
or parties as Lender may from time to time designate, the principal sum of Three Million
Three Hundred Thousand and no/100 ($3,300,000.00) Dollars together with interest
thereon computed from the date hereof at the rate of one and one-half (1.5%) percent per
annum over the Barclays Bank New York Prime Rate (as hereinafter defined).  The
amount payable hereunder shall be paid without any set-off or counterclaim whatsoever.

     The interest rate hereunder shall adjust accordingly on each date the Prime Rate
changes.  The term "Prime Rate" shall mean the rate of interest quoted by Barclays Bank
New York, or any successor thereto, as the prime rate (which rate may not be the rate
charged by Lender to its preferred customers), as the same may be changed from time to
time by it.  If for any reason Barclays Bank New York shall at any time no longer quote a
prime rate in the manner set forth above, Lender shall, in the exercise of its reasonable
judgment, substitute another means of determining the annual lending rate of interest and
the rate of interest as thus determined shall thereafter be the Prime Rate as that term is
used herein.  Interest shall be computed on the actual number of days elapsed divided by
a 360-day year.

     All installments of principal and all interest are payable in lawful money of the
United States of America, which shall be legal tender in payment of all debts and dues,
public and private, at the time of payment; and in the event of (a) failure to pay this Note
in full on demand, or (b) default in the payment of any other installment of interest or
principal or any other sum payable pursuant to the terms of this Note or any lien
document securing this Note, not cured within thirty (30) days after written notice from
Lender, or (c) an "Event of Default" as such term is defined in the Security Agreements,
(as hereinafter defined) not cured within the cure period (if any) provided therein, then or
at any time thereafter, at the option of Lender, the whole of the principal sum then
remaining unpaid hereunder together with all interest accrued thereon, shall immediately
become due and payable without further notice, and the lien given to secure the payment
of this Note may be foreclosed.  From and after the maturity of this Note either according
to its terms or as the result of a declaration of maturity, the entire principal remaining
unpaid hereunder shall bear interest at a rate of four (4%) percent per annum above the
rate otherwise in effect hereunder (the "Default Rate"), or the highest applicable lawful
rate, whichever is the lesser; provided that there shall be no automatic reduction to the
highest lawful rate if Borrower or any endorser or guarantor is barred by law from
availing itself in any action or proceeding of the defense of usury, or if Borrower or any
endorser or guarantor barred or exempted from the operation of any law limiting the

{NY004998.2 }

amount of interest that may be paid for the loan or use of money, or in the event this transaction, because of its amount or purpose or for any other reason is exempt from the operation of any statute limiting the amount of interest that may be paid for the loan of use of money. Failure to exercise such option or any other rights Lender may in the event of any such default be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent default, whether of the same of different nature.

If this Note is placed in the hands of an attorney for collection or is collected through any legal proceedings, Borrower promises to pay all expenses of collection and reasonable attorney's fees incurred by Lender.

In the event the interest provisions hereof or any exactions provided for herein or in the lien documents or any other instruments securing Note shall result, because of the monthly reduction of principal or any other reason related or unrelated to the interest provisions, at any time during the life of the loan, in an effective rate of interest which, for any period of time, transcends the limit of the usury or any other law applicable to the loan evidenced hereby, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied to principal immediately upon receipt of such monies by Lender with the same force and effect as though the payer had specifically designated such and agreed to accept such extra payment(s) as a premium free payment. Notwithstanding the foregoing, however, Lender may at any time and from time to time elect, by notice in writing to the owners of the property affected by the lien document securing this Note, to reduce or limit the collection of any interest to such sums, which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirement of the preceding sentence. In no event shall any agreed to or actual exaction as consideration for this loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

This Note evidences amounts owed pursuant to a facility letter dated 29 February 1996, a facility letter dated 25th November 1996 and a facility letter dated 26 January 2000 (in each case as amended from time to time).

This Note is secured by the Security Agreements over assets located in the United States of America entered into by Barclays Bank PLC with each of the undersigned and mortgage documents entered into by Barclays Bank with Pusser's Inc., a Florida corporation, and such further security documents as may be requested from time to time by Lender ("Security Agreements"), to which reference is made from the terms thereof.

Lender may collect a late charge of five (5%) per cent of any installment of principal or interest which is not paid within fifteen (15) days of the due date thereof to cover the extra time and expense involved in handling delinquent payments. Such late charge shall apply to late payments prior to maturity or acceleration. Upon maturity or acceleration, no further late charges shall be assessed, but Borrower shall pay the Default

{NY004991.2}                                        2

Rate of interest on all amounts due from the date of maturity or acceleration until the Note is paid in full. The collection of the late charge shall not be deemed a waiver by Lender of interest accruing after the due date of any installment or of any of Lender's other rights under this Note.

Borrower agrees that the late charge provided above is fair and reasonable compensation to Lender for the additional administrative time and effort incurred in collecting and processing delinquent payments. Borrower further agrees that the Default Rate is a fair and reasonable rate of interest to be charged after maturity or acceleration of this Note in light of the increased risks to Lender inherent in a past due loan and the administrative time and effort incurred in collecting a past due loan.

Borrower and all endorsers, guarantors and all persons liable or to become liable on this Note waive presentment, protest and demand, notice of protest; demand and dishonor and nonpayment of this Note, and consent to any and all renewals and extensions of the time of payment hereof, and agree, further, that at any time and from time to time without notice, the terms of payment herein may be modified or the security described in the lien document securing the Note released in whole or in part, or increased, change or exchange by agreement between Lender and any owner of premises affected by said lien document securing this Note without in anywise affecting the liability of any party to this instrument or any person liable with respect to any indebtedness evidenced hereby.

Lender is not required to rely on the collateral for the payment of the Note in the event of default by the maker, but may proceed directly against the maker, endorsers, or guarantors, if any, in such manner as it deems desirable. None of the rights and remedies of Lender hereunder are to be waived or affected by failure or delay to exercise them. All remedies conferred on Lender by this Note or any other instrument or agreement shall be cumulative, and none is exclusive. Such remedies may be exercised concurrently or consecutively at Lender's option.

This Note may be prepaid in whole or in part at any time without penalty.

This Note shall be governed as to validity, interpretation, construction, effect, and in all other respects by the laws and decisions of the British Virgin Islands.

Wherever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note or portion thereof shall be prohibited by or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

This note may be assigned by Lender with or without recourse.

{NY00499&2 }                                          3

BORROWER AND LENDER WAIVE, TO THE FULL EXTENT PERMITTED BY LAW, THE RIGHT TO A JURY TRIAL IN ANY LITIGATION CONCERNING THIS PROMISSORY NOTE OR ANY AGREEMENT SECURING THIS PROMISSORY NOTE AND IN ANY LITIGATION CONCERNING ANY DEFENSE, CLAIM, COUNTERCLAIM, CLAIM OF SET-OFF OR SIMILAR CLAIM OF ANY NATURE THAT BORROWER MAY ASSERT AGAINST LENDER.

PUSSER'S LTD., a British Virgin Islands Company

By: _____
      Charles S. Tobias, Director

PUSSER'S INC., a South Carolina Corporation

By: _____
      Charles S. Tobias, President

PUSSER'S INC., a Florida Corporation

By: _____
      Charles S. Tobias, President

PUSSER'S INC., a Delaware Corporation

By: _____
      Charles S. Tobias, President

PUSSER'S INC., a Maryland Corporation

By: _____
      Charles S. Tobias, President

PUSSER'S RETAIL INC., a Delaware Corporation

By: _____
      Charles S. Tobias, President

# Exhibit H

## SECURITY AGREEMENT

This **SECURITY AGREEMENT**, made on the dates set forth on the signature page hereof, between **MAGWITCH LLC.**, c/o Hill, Betts & Nash LLP, 99 Park Avenue, 20th Floor, New York, NY 10016 (herein called the "Secured Party") and the undersigned.

(1)(a)   As security for any and all of the Obligations (as defined in Paragraph 1(b)) the undersigned pledges to the Secured Party and creates a lien and security interest in favor of the Secured Party in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

(i)   all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

(ii)   all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

(iii)   all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

(iv)   all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

(v)   all claims of the undersigned against the Secured Party, and all moneys at any time in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

(vi)   all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but no limited to securities issued (as stock splits, stock dividends or otherwise) relative to any securities constituting Collateral.

{NYDOCS1/01.2}

#19

(b)  The term "Obligations" means all obligations an liabilities of the undersigned to the Secured Party, now existing or hereafter arising (including but not limited to obligations and liabilities of the undersigned arising under this Security Agreement), whether matured or not matured, whether absolute or contingent and whether directly created or acquired by assignment or otherwise (including but not limited to liabilities, contingent and otherwise, direct or indirect, of the undersigned to the Secured Party as indorser, guarantor, acceptor, surety or otherwise with respect to any obligation or liability of any third party to the Secured Party and liabilities, contingent or otherwise, of the undersigned by way of any express or implied contract with or for the benefit of the Secured Party, to purchase or provide funds for the payment of any obligation or liability of any third party to the Secured Party, or to supply funds to or to invest in such third party, or otherwise to insure the Secured Party against loss on any obligation or liability of such third party).

(2)    Until the occurrence of an Event of Default (as defined in Paragraph 9), the undersigned may use the Collateral in any lawful manner not inconsistent with this Security Agreement and with the terms of any insurance thereon; may sell its inventory and goods in the ordinary course of business; and may use or consume any raw materials or supplies, the use or consumption of which is necessary in order to carry on the undersigned's business. The undersigned will at all times keep the collateral separate and distinct from any of its other property and keep accurate and complete records of the same.

(3)    The Secured Party shall have no duty of care with respect to the Collateral, except to exercise reasonable care in the custody and preservation of Collateral in its actual possession. The Secured Party shall be deemed to have exercised reasonable care with respect to Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property or if the Secured Party takes such action with respect to such collateral as the undersigned shall request in writing, but the Secured Party's failure to comply with any such request or to take steps to preserve rights against any person or property shall not be deemed a failure to exercise reasonable care with respect to such Collateral. The Secured Party shall have no responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the collateral, nor for informing the undersigned with respect to any thereof (whether or not the Secured Party shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the Secured Party, whether or not an Event of Default shall have occurred, the undersigned will promptly: (i) deliver, transfer, assign or indorse to the Secured Party upon receipt by the undersigned, in the exact form in which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Secured Party, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Secured Party; (iii) deliver to the Secured Party, at the time and place and in the manner specified by the Secured Party, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Secured Party has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Secured Party detailed lists of and all

(NY0051012)

2

writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Secured Party; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and make payment on account of any or all of the Obligations, in each case to the satisfaction of the Secured Party, if the security afforded by this Security Agreement shall be unsatisfactory to the Secured Party in its sole judgment; and (vi) pay or reimburse the Secured Party for all expenses, including attorney's fees and disbursements, incurred by the Secured Party pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Secured Party's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Secured Party may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Secured Party's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Secured Party may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b)  The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c)  The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Secured Party may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Secured Party. All policies of insurance shall provide that (i) such insurance shall be payable to the Secured Party and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Secured Party for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Secured Party by the insurer. At the request of the Secured Party all such policies shall be delivered to and held by it. The Secured Party may act as attorney for the undersigned in obtaining, adjusting, settling and cancelling such insurance and indorsing any drafts.

(5)    The Secured Party may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Secured Party in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of

{NY00510J.2}

3

insurance as required by Paragraph 4(a)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v) to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Secured Party, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the collateral; and (i) transfer to or register in the name of the Secured Party or of the Secured Party's nominee any or all of the Collateral which may be in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf.

(6)    At any time and from time to time, the Secured Party may at its option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral. The undersigned agrees to join with the Secured Party at the Secured Party's request in executing any such statements and amendments. The undersigned represents to the Secured Party that no lien or security interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Secured Party, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item. The undersigned will not create or suffer to exist, without the prior written consent of the Secured Party, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)    This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Secured Party of the undersigned's signed notice to such effect, or upon the Secured Party's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.

(8)    In the event of the happening of any one or more of the following events (each being herein called an "Event of Default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing for or securing or evidencing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the undersigned or of any indorser, guarantor, acceptor, surety or other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Secured

[NY00510L2]

4

Party, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Secured Party against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Secured Party in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Secured Party's option become immediately due and payable, without demand or notice, and any obligation of the Secured Party to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

(9)    Upon the occurrence of an Event of Default the Secured Party shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Secured Party may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees, legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Secured Party may sell at its

[NY005901.2]

5

option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Secured Party may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Secured Party at a place to be designated by the Secured Party which is reasonable convenient to both parties and at a time designated by the Secured Party, all at the expense of the undersigned.

(10)    The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, indorsements and powers of attorney, which in the Secured Party's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(11)(a)    For purposes of perfection of the Secured Party's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Secured Party's possession if such Collateral is in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Secured Party or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Secured Party as collateral security or for safekeeping or for any other or different purpose.

(b)    No failure or delay on the Secured Party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The Secured Party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance. None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Secured Party.    No provision of any Agreement or other contract or writing between the undersigned and the Secured Party shall be construed as a waiver, modification or amendment of any of the Secured Party's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement. The Secured Party may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or invalidating its rights as to any other Collateral.

(c)    In litigation in which the Secured Party and the undersigned may be adverse parties, the Secured Party and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Secured Party.

[NY0]5101.2]

6

(d)  The undersigned assents to any contract the Secured Party may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e)  This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Secured Party the Secured Party's successors, transferees and assigns.  The Secured Party may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f)  Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Florida.  All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of Florida shall have the same meaning herein as in said Code.  If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

(g)  The undersigned represents to the Secured Party that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h)  If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties.  Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation.  Neither this Security Agreement nor any of the Secured Party's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any Collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Secured Party as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor. Each party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

{NY005J01.2 }

7

(12)    This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Secured Party shall not be required as a condition to the effectiveness of this Security Agreement. Any execution of this Security Agreement by the Secured Party is only for purposes of filing this Security Agreement as a financing statement, if the Secured Party deems the execution hereof by it to be necessary or desirable for purposes of such filing.

(13)    This Security Agreement is being executed as part of a sale of debt and associated security by Barclays Bank PLC to the Secured Party. Barclays Bank PLC cannot locate the original Security Agreement. Copies of an original Security Agreement were held by both the Barclays Bank PLC and the undersigned. The undersigned held its copy of the original Security Agreement at the office of its Secretary, which was located at 1 World Trade Center, 52nd Floor, New York, New York. As a result of terrorist attack that occurred on September 11, 2001, the original Security Agreement was destroyed. This Security Agreement is intended to supersede and assign the rights granted by the undersigned to Barclays Bank to the Secured Party.

Dated: May 9, 2002
           as of October 3, 1997

PUSSER'S INC.,
a Florida corporation

By: _Charles S. Tobias_ _____

Charles S. Tobias, President

{NY005101.1}

8

04/22/2002 12:39 FAX 284 494 8214        HWaR ROAD TOWN                    ⌀012



## SECURITY AGREEMENT

This **SECURITY AGREEMENT**, made on the dates set forth on the signature page hereof, between BARCLAYS BANK PLC, having its Head Office in the city of London, England, acting through its branch office in Road Town, Tortola, British Virgin Islands (herein called the "Bank") and the undersigned.

(1)(a)  As security for any and all of the Obligations (as defined in Paragraph 1(b) the undersigned pledges to the Bank and creates a lien and security interest in favor of the Bank in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

    (i)    all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

    (ii)   all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

    (iii)  all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

    (iv)   all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

    (v)    all claims of the undersigned against the Bank, and all moneys at any time in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

    (vi)   all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all

04/22/2002 12:39 FAX 264 494 8214    HW&R ROAD TOWN    ☒013



proceeds thereof, including but not limited to securities issued (as stock splits, stock dividends or otherwise) relative to any securities constituting Collateral,

(b)  The term "Obligations" means all obligations and liabilities of the undersigned to the Bank, now existing or hereafter arising (including but not limited to obligations and liabilities of the undersigned arising under this Security Agreement), whether matured or not matured, whether absolute or contingent and whether directly created or acquired by assignment or otherwise (including but not limited to liabilities, contingent and otherwise, direct or indirect, of the undersigned to the Bank as indorser, guarantor, acceptor, surety or otherwise with respect to any obligation or liability of any third party to the Bank and liabilities, contingent or otherwise, of the undersigned by way of any express or implied contract with or for the benefit of the Bank, to purchase or provide funds for the payment of any obligation or liability of any third party to the Bank, or to supply funds to or to invest in such third party, or otherwise to insure the Bank against loss on any obligation or liability of such third party).

(2)  Until the occurrence of an Event of Default (as defined in Paragraph 9), the undersigned may use the Collateral in any lawful manner not inconsistent with this Security Agreement and with the terms of any insurance thereon; may sell its inventory and goods in the ordinary course of business; and may use or consume any raw materials or supplies, the use or consumption of which is necessary in order to carry on the undersigned's business.  The undersigned will at all times keep the collateral separate and distinct from any of its other property and keep accurate and complete records of the same.

(3)  The Bank shall have no duty of care with respect to the Collateral, except to exercise reasonable care in the custody and preservation of Collateral in its actual possession.  The Bank shall be deemed to have exercised reasonable care with respect to Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Bank accords its own property or if the Bank takes such action with respect to such collateral as the undersigned shall request in writing, but the Bank's failure to comply with any such request or to take steps to preserve rights against any person or property shall not be deemed a failure to exercise reasonable care with respect to such Collateral. The Bank shall have no responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the collateral, nor for informing the undersigned with respect to any thereof (whether or not the Bank shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the Bank, whether or not an Event of Default shall have occurred, the undersigned will promptly: (i) deliver, transfer, assign or indorse

2

04/22/2002 12:40 FAX 284 494 8214    HW&R ROAD TOWN    Ø014



to the Bank upon receipt by the undersigned, in the exact form in
which they are received all proceeds of Collateral, including but
not limited to proceeds of contract rights, accounts, general
intangibles, chattel paper and instruments; (ii) notify account
debtors and obligors on instruments to make payments directly to
the Bank, and indicate on all invoices to such account debtors and
obligors that all payments are to be made directly to the Bank;
(iii) deliver to the Bank, at the time and place and in the manner
specified by the Bank, all Collateral in which a security interest
may be perfected by a secured party's taking possession thereof,
irrespective of whether the Bank has prior thereto perfected a
security interest in such Collateral by filing or otherwise;
(iv) deliver to the Bank detailed lists of and all writings
relating to the Collateral and evidence of the maintenance of
insurance pursuant to Paragraph 4(c), all in a form satisfactory to
the Bank; (v) furnish additional collateral security, not included
in Paragraph 1(a), as security for any and all of the Obligations
and make payment on account of any or all of the Obligations, in
each case to the satisfaction of the Bank, if the security afforded
by this Security Agreement shall be unsatisfactory to the Bank in
its sole judgment; and (vi) pay or reimburse the Bank for all
expenses, including attorney's fees and disbursements, incurred by
the Bank pursuant to any provision of this Security Agreement or in
connection with; the administration and enforcement of and the
exercise of any of the Bank's rights under this Security Agreement
(including but not limited to the custody, preservation, use and
operation of any Collateral Obligations, and the realization upon
any or all of the Collateral). The undersigned hereby indemnifies
and holds harmless the Bank from and against any claim, expense
(including attorney's fees and disbursements, loss and liability to
which the Bank may become subject in connection with this Security
Agreement (including but not limited to the custody, preservation,
use and operation of any Collateral in the Bank's possession or
control) and any Agreement (as defined in Paragraph 9(b), the
enforcement of any of the Obligations, and the realization upon any
or all Collateral. The undersigned hereby indemnifies and holds
harmless the Bank from and against any claim, expense (including
attorney's fees and disbursements), loss and liability to which the
Bank may become subject in connection with this Security Agreement,
and Agreement, any Obligation or any collateral.

(b) The undersigned will promptly pay when due all taxes relating
to this Security Agreement, any Agreement, any Obligation or any
Collateral (including its custody, preservation, use or operation).

(c) The undersigned will maintain insurance at all times with
respect to all insurable Collateral against risk of fire, theft
and all other risks customarily insured against by persons engaged
in business similar to that of the undersigned and such special
risks as the Bank may designate, in such amounts, containing such
terms, in such forms, for such periods and written by such insurers
as shall be satisfactory to the Bank. All policies of insurance

3

04/22/2002 12:40 FAX 284 494 8214          HW&R ROAD TOWN     ___                              ☎015



shall provide that (i) such insurance shall be payable to the Bank
and the undersigned as their respective interest may appear,
(ii) there shall be no recourse against the Bank for payment of
premiums, commissions, assessments or advances and (iii) at least
ten days' prior written notice of cancellation for any reason or of
any lapse shall be given to the Bank by the insurer.    At the
request of the Bank all such policies shall be delivered to and
held by it.    The Bank may act as attorney for the undersigned in
obtaining, adjusting, settling and cancelling such insurance and
indorsing any drafts.

(5)  The Bank may at any time and from time to time, at its option,
whether or not an Event of Default shall have occurred, whether or
not the Collateral shall then be deemed by the Bank in its sole
discretion to be adequate, and without notice to the undersigned,
(a) pay any taxes referred to in Paragraph 4(b); (b) discharge any
liens, security interests and other encumbrances to which any
Collateral may be subject at any time; (c) take any action shall
deem proper with respect to, and pay for, the preservation,
maintenance and repair of any or all of the Collateral; (d) in the
event of failure by the undersigned to deliver evidence of the
maintenance of insurance as required by Paragraph 4(a)(iv), obtain
and pay for such insurance; (e) notify account debtors and obligors
on instruments to make payments directly to the bank; (f) collect,
compromise, indorse, sell or otherwise deal with obligations of
account debtors and of obligors on instruments and all proceeds of
Collateral, in its own name or that of the undersigned;
(g) notwithstanding anything contained in paragraph 4(a)(v) to the
contrary, either set off, appropriate and apply upon any or all of
the Obligations, whether or not then due, and any moneys
constituting Collateral (including but not limited to any cash
proceeds of Collateral), or hold any such moneys as security for
any or all of the Obligations until the exact amount thereof shall
have been definitely ascertained by the Bank, or release such
moneys to the undersigned for use in the operation of the
undersigned's business; (h) at all reasonable time, through any of
its representatives, examine and inspect any or all of the
Collateral and examine, inspect and make copies of or extracts from
the undersigned's books, records and any other writings relating to
the collateral; and (i) transfer to or register in the name of the
Bank or of the Bank's nominee any or all of the Collateral which
may be in the possession or control of the Bank, of any of its
correspondents or of any other third party acting on the Bank's
behalf.

(6)  At any time and from time to time, the Bank may at its option
file in any jurisdiction, at the undersigned's expenses, one or
more financing, continuation and similar statements, and any
amendments thereto, with or (to the extent permitted by applicable
law) without the undersigned's signature, covering any or all of
the collateral.    The undersigned agrees to join with the Bank at
the Bank's request in executing any such statements and amendments.

04/22/2002 12:41 FAX 284 494 8214        HW&R ROAD TOWN                        @016



The undersigned represents to the Bank that no lien or security
interest has been created or exists with respect to any of the
Collateral, except for liens and security interest in favor of the
Bank, and that no financing statement or similar document is on
file in any jurisdiction covering or describing any of the
Collateral by type or item.  The undersigned will not create or
suffer to exist, without the prior written consent of the Bank, any
such lien or security interest and will not permit any such
financing statement or similar document to be on file in any
jurisdiction.

(7)(a)   The undersigned represents that (i) its chief place of
business is located at the address set forth on the signature page
hereof, (ii) all of its other places of business are located at the
addresses set forth in part I of Schedule A hereto, (iii) all
Collateral (other than accounts, contract rights and general
intangibles) is located at the addresses set forth in part II of
said Schedule A, and (iv) all records concerning its accounts or
contract rights are kept at the address set forth in part III of
said Schedule A.

(b)   The undersigned will notify the Bank in writing at least
thirty days in advance (i) of any discontinuance or change of
address of its chief place of business, of any of its other places
of business, of the place where any Collateral (other than
accounts, contract rights and general intangibles) is or is to be
located and of the place where any records concerning its accounts
or contract rights are or are to be kept, and (ii) of the addresses
of any new place of business of the undersigned, of any new place
where any Collateral (other than accounts, contract rights and
general intangibles) is or is to be located and of any new place
where any records concerning its accounts or contract rights are or
are to be kept.

(8)   This Security Agreement is a continuing agreement and shall
remain in full force and effect until termination of this Security
Agreement upon the receipt by the Bank of the undersigned's signed
notice to such effect, or upon the Bank's giving notice to such
effect to the undersigned, and payment and discharge in full of all
of the Obligations.

(9)   In the event of the happening of any one or more of the
following events (each being herein called an "Event of default"),
to wit:  (a) the non-payment or non-performance of any of the
Obligations;  (b) the failure of the undersigned to  perform or
observe any of the terms or provisions of this Security Agreement
or of any other writing or contract of the undersigned, now
existing or hereafter made, with respect to or providing for or
securing any of the Obligations (any such other
writing or contract being held herein called an "Agreement");
(c) the insolvency, death, failure in business or suspension of
usual business, dissolution or termination of existence of the

5

04/22/2002 12:41 FAX 284 494 8214     HW&R ROAD TOWN     ☒017



undersigned or of any indorser, guarantor, acceptor, surety or
other person liable, contingently or otherwise, directly or
indirectly, with respect to any of the Obligations, including but
not limited to any such liability by way of any express or implied
contract with or for the benefit of the Bank, to purchase or
provide funds for the payment of any of the Obligations, or to
supply funds to or to invest in the undersigned, or otherwise, or
otherwise to insure the Bank against loss on any of the Obligations
(any such person being herein called an "Accommodation Party");
(with institution by or against the undersigned or any
Accommodation Party, under any bankruptcy, insolvency, debtor's or
similar law, of bankruptcy or insolvency proceedings or proceedings
seeking liquidation, reorganization, arrangement, adjustment,
composition or relief of or in respect of the undersigned or any
Accommodation Party; the appointment of a receiver, assignee,
trustee, sequestrator, liquidator or similar official for, or for
any property of, the undersigned or any Accommodation Party; the
making of an assignment for the benefit of creditors by the
undersigned or any Accommodation Party; or the admission by the
undersigned or any Accommodation Party in writing of its inability
to pay its debts as they mature; (e) the issuance of any
restraining notice, injunction, order of attachment or any other
court order or legal process with respect to any Collateral or any
other property of the undersigned or of any Accommodation Party;
(f) the issuance of an execution or the commencement of
supplementary proceedings against the undersigned or any
Accommodation Party in connection with a judgment entered against
the undersigned or such Accommodation Party; (g) the taking of
title to or possession of, or the assumption of control over all or
any substantial part of the property or management of the
undersigned or any Accommodation Party by the United States
Government, any other government (de facto or de jure) or any
agency or instrumentality of any thereof; (h) the failure of the
undersigned or any unenforceability of any writing or contract of
any Accommodation Party, now existing or hereafter made, with
respect to, directly or indirectly, any of the obligations; (k) the
making by the undersigned or any Accommodation Party of any
misrepresentation to the Bank in connection with this Security
agreement or any Agreement or for the purpose of obtaining any
loan, advance, extension of credit, other financial accommodation
or any of the Obligations; or (l) if the Default with respect to
any partner - then, or at any time after the happening of such
Event of Default, any or all of the Obligations then existing,
although otherwise unmatured or contingent, shall at the Bank's
option become immediately due and payable, without demand or
notice, and any obligation of the Bank to make further loans,
advances, extensions of credit or other financial accommodations to
the undersigned shall thereupon be terminated.

6

04/22/2002 12:41 FAX 284 494 8214         HW&R ROAD TOWN                    @018



(10)   Upon the occurrence of an Event of Default the Bank shall
have all of the rights and remedies available to a secured party
under applicable law and, in addition thereto, the undersigned
agrees that (a) in the event that notice is required by applicable
law, written notice given by mail to the undersigned, at the
address set forth on the signature page hereof, three business days
prior to the date of public sale of any Collateral or prior to the
date after which private sale of any other disposition of any
Collateral will be made shall constitute reasonable notice, but
notice, given in any other reasonable manner or at any other
reasonable time shall be sufficient; (b) in the event of sale or
other disposition of any Collateral, the Bank may apply the
proceeds of any such sale or disposition to the satisfaction of its
reasonable attorneys' fees, legal expenses and other costs and
expenses incurred in connection with its taking, retaking, holding,
preparing for sale or other disposition, and selling or other
disposition of such Collateral; (c) without precluding any other
methods of sale or other disposition, the sale or other disposition
of any collateral shall have been made in a commercially reasonable
manner if conducted in conformity with reasonable commercial
practices of banks disposing of similar property, but in any event
the Bank may sell at its option on such terms as it may choose,
without assuming any credit risk and (to the extent permitted by
applicable law) without any obligation to advertise; and (d) the
Bank may require the undersigned to assemble the Collateral and to
take all necessary or appropriate action to preserve and keep it in
good condition and to make it available to the Bank at a place to
be designated by the Bank which is reasonable convenient to both
parties and at a time designated by the Bank, all at the expense of
the undersigned.

(11)   The undersigned agrees, at its own expense, to do all further
acts and things and to execute and deliver all writings and
contracts, including security agreements, assignments, indorsements
and powers of attorney, which in the Bank's opinion may be
necessary or appropriate to create, perfect, preserve, validate or
otherwise protect in any jurisdiction any lien or security interest
granted pursuant hereto or in any additional collateral security
referred to in Paragraph 4(a)(v) or to enable the Bank to exercise
and enforce its rights and remedies hereunder or with respect to
such liens or security interests.

(12)(a)  For purposes of perfection of the Bank's security interest
in any Collateral in which a security interest may be perfected by
possession, such Collateral shall be deemed to be in the Bank's
possession if such Collateral is in the possession or control of
the Bank, of any of its correspondents or of any other third party
acting on the Bank's behalf, or if such Collateral is put in
transit by mail or by carrier to or from the Bank or any such
correspondent or third party, in all cases irrespective of whether
for the express purpose of being used by the Bank as collateral
security or for safekeeping or for any other or different purpose.

7

04/22/2002 12:42 FAX 284 494 8214        HW&R ROAD TOWN                    ☒019



(b)  No failure or delay on the Bank's part in exercising any right
or remedy hereunder shall operate as a waiver hereof; nor shall any
single or partial exercise of any such right or remedy preclude any
other or further exercise thereof or the exercise of any other
right or remedy.   The Bank's rights and remedies hereunder are
cumulative and not exclusive of any rights or remedies provided by
law or in any Agreement or other contract between the undersigned
to any other or further notice or demand similar or other
circumstance.  None of the terms or provisions of this Security
Agreement may be waived, modified or amended except in writing duly
signed by the Bank.  No provision of any Agreement or other
contract or writing between the undersigned and the Bank shall be
construed as a waiver, modification or amendment of any of the
Bank's rights and remedies under this Security Agreement unless
such waiver, modification or amendment is made expressly and with
explicit reference to this Security Agreement.  The Bank may in its
discretion at any time relinquish its rights hereunder as a
particular Collateral without thereby affecting or invalidating its
rights as to any other Collateral.

(c)  In litigation in which the Bank and the undersigned may be
adverse parties, the Bank and the undersigned hereby waive their
respective rights to demand trial by jury and, in addition, the
undersigned waives any set-off or counterclaim of any nature or
description against the Bank.

(d)  The undersigned assents to any contract the Bank may enter
into with any other bank or other secured party of which the
undersigned is indebted providing for subordination of priorities
of claims or for sharing the Collateral or any realizations
thereon.

(e)  This Security Agreement shall be binding upon the undersigned
and upon its heirs, executors, administrators, successors,
transferees and assigns, and shall inure to the benefit of, and be
enforceable by, the Bank the Bank's successors, transferees and
assigns.  The Bank may assign or transfer in whole or in part this
Security Agreement, any of the obligations, any agreement and such
Collateral and from its obligations as secured party of record.

(f)  Except to the extent provided by any mandatory provisions of
applicable law, this Security Agreement shall be governed by and
construed in accordance with the laws of Maryland.  All terms used
in this Security Agreement and not defined herein which are defined
in the Uniform Commercial Code as in effect from time to time in
the State of Maryland shall have the same meaning herein as in said
Code.   If any provision of this Security Agreement or portion of
such provision or the application thereof to any person or
circumstance shall to. any extent be held invalid or enforceable,
the remainder of this Security Agreement (or the remainder of such
provision) and the application thereof other persons or
circumstances shall not be affected thereby.

8

04/22/2002 12:42 FAX 284 494 8214          HW&R ROAD TOWN                    Ø020



(g)   The undersigned represents to the Bank that the execution,
delivery and performance by the undersigned of this Security
Agreement have been duly authorized by all necessary corporate
action on the part of the undersigned.

(h)   If this Security Agreement is executed by two or more parties,
they shall be jointly and severally liable hereunder, and the term
"undersigned" wherever used herein shall be construed to refer
separately to each of such parties and collectively to any two or
more of such parties.  Until all of the Obligations shall have been
paid in full, none of such parties shall have any right of
subrogation.  Neither this Security Agreement nor any of the Bank's
rights, remedies, liens and security interests hereunder shall be
impaired or otherwise affected as to any party hereto (i) by the
occurrence of an Event of Default relating to any other party
hereto, (ii) by the release, discharge or addition of any other
party hereto or any other person liable for any of the Obligations,
(iii) by the exchange, release, surrender or impairment of any
Collateral or of any other collateral security, by whomsoever
granted or deposited, which is now or may hereafter be granted to
or held by the Bank as security for any of the Obligations, (vi) if
the undersigned is a partnership, by any change in the membership
of such partnership is a partnership, by any change in the
membership of such partnership, whether arising from the death or
withdrawal of one or more partners or the accession of constitute
a legal or equitable discharge of or a defense available to a
surety or guarantor.  Each party hereto designates the party whose
name appears first below as agent to whom all notices and other
communications hereunder shall be given on its behalf.

9

04/22/2002 12:43 FAX 284 494 8214     HW&R ROAD TOWN                    ☒021



(13) This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Bank shall not be required as a condition to the effectiveness of this Security Agreement. Any execution of this Security Agreement by the Bank is only for purposes of filing this Security Agreement as a financing statement, if the Bank deems the execution hereof by it to be necessary or desirable for purposes of such filing.

Dated: September 1st, 1995          PUSSER'S (ANNAPOLIS) INC.

                                     By: _Charles S. Tobias_____

                                         Title: _President_____

                                     Address of Chief Place of
                                     Business:

                                     301 Najoles Road, Suite 201
                                        (Street Address)

                                     Millersville, Maryland 21108
                                        (City and State/Island)

10

04/12/2002 13:17 FAX 284 494 8214     HW&R ROAD TOWN     ☑003/031



## SECURITY AGREEMENT

This **SECURITY AGREEMENT**, made on the dates set forth on the signature page hereof, between BARCLAYS BANK PLC, having its Head Office in the city of London, England, acting through its branch office in Road Town, Tortola, British Virgin Islands (herein called the "Bank") and the undersigned.

(1)(a) As security for any and all of the Obligations (as defined in Paragraph 1(b) the undersigned pledges to the Bank and creates a lien and security interest in favor of the Bank in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

  (i)    all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

  (ii)   all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

  (iii)  all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

  (iv)   all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

  (v)    all claims of the undersigned against the Bank, and all moneys at any time in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

  (vi)   all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but not limited to securities



issued (as stock splits, stock dividends or otherwise)
relative to any securities constituting Collateral,

(b) The term "Obligations" means all obligations and liabilities
of the undersigned to the Bank, now existing or hereafter arising
(including but not limited to obligations and liabilities of the
undersigned arising under this Security Agreement), whether matured
or not matured, whether absolute or contingent and whether directly
created or acquired by assignment or otherwise (including but not
limited to liabilities, contingent and otherwise, direct or
indirect, of the undersigned to the Bank as indorser, guarantor,
acceptor, surety or otherwise with respect to any obligation or
liability of any third party to the Bank and liabilities,
contingent or otherwise, of the undersigned by way of any express
or implied contract with or for the benefit of the Bank, to
purchase or provide funds for the payment of any obligation or
liability of any third party to the Bank, or to supply funds to or
to invest in such third party, or otherwise to insure the Bank
against loss on any obligation or liability of such third party).

(2) Until the occurrence of an Event of Default (as defined in
Paragraph 9), the undersigned may use the Collateral in any lawful
manner not inconsistent with this Security Agreement and with the
terms of any insurance thereon; may sell its inventory and goods in
the ordinary course of business; and may use or consume any raw
materials or supplies, the use or consumption of which is necessary
in order to carry on the undersigned's business. The undersigned
will at all times keep the collateral separate and distinct from
any of its other property and keep accurate and complete records of
the same.

(3) The Bank shall have no duty of care with respect to the
Collateral, except to exercise reasonable care in the custody and
preservation of Collateral in its actual possession. The Bank
shall be deemed to have exercised reasonable care with respect to
Collateral in its possession if such Collateral is accorded
treatment substantially equal to that which the Bank accords its
own property or if the Bank takes such action with respect to such
collateral as the undersigned shall request in writing, but the
Bank's failure to comply with any such request or to take steps to
preserve rights against any person or property shall not be deemed
a failure to exercise reasonable care with respect to such
Collateral. The Bank shall have no responsibility for ascertaining
any maturities, calls, conversions, exchanges, offers, tenders or
similar matters relating to any of the collateral, nor for
informing the undersigned with respect to any thereof (whether or
not the Bank shall have, or be deemed to have, knowledge thereof).

(4)(a) At the request at any time and from time to time of the
Bank, whether or not an Event of Default shall have occurred, the
undersigned will promptly: (i) deliver, transfer, assign or indorse
to the Bank upon receipt by the undersigned, in the exact form in

2



which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Bank, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Bank; (iii) deliver to the Bank, at the time and place and in the manner specified by the Bank, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Bank has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Bank detailed lists of and all writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Bank; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and make payment on account of any or all of the Obligations, in each case to the satisfaction of the Bank, if the security afforded by this Security Agreement shall be unsatisfactory to the Bank in its sole judgment; and (vi) pay or reimburse the Bank for all expenses, including attorney's fees and disbursements, incurred by the Bank pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Bank's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral). The undersigned hereby indemnifies and holds harmless the Bank from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Bank may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Bank's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Bank from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Bank may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b) The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c) The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Bank may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Bank. All policies of insurance shall provide that (i) such insurance shall be payable to the Bank

3

04/22/2002 13:18 FAX 284 494 8214          HW&R ROAD TOWN                    ☑006/031



and the undersigned as their respective interest may appear,
(ii) there shall be no recourse against the Bank for payment of
premiums, commissions, assessments or advances and (iii) at least
ten days' prior written notice of cancellation for any reason or of
any lapse shall be given to the Bank by the insurer.    At the
request of the Bank all such policies shall be delivered to and
held by it.    The Bank may act as attorney for the undersigned in
obtaining, adjusting, settling and cancelling such insurance and
indorsing any drafts.

(5) The Bank may at any time and from time to time, at its option,
whether or not an Event of Default shall have occurred, whether or
not the Collateral shall then be deemed by the Bank in its sole
discretion to be adequate, and without notice to the undersigned,
(a) pay any taxes referred to in Paragraph 4(b); (b) discharge any
liens, security interests and other encumbrances to which any
Collateral may be subject at any time; (c) take any action shall
deem proper with respect to, and pay for, the preservation,
maintenance and repair of any or all of the Collateral; (d) in the
event of failure by the undersigned to deliver evidence of the
maintenance of insurance as required by Paragraph 4(a)(iv), obtain
and pay for such insurance; (e) notify account debtors and obligors
on instruments to make payments directly to the bank; (f) collect,
compromise, indorse, sell or otherwise deal with obligations of
account debtors and of obligors on instruments and all proceeds of
Collateral, in its own name or that of the undersigned;
(g) notwithstanding anything contained in paragraph 4(a)(v) to the
contrary, either set off, appropriate and apply upon any or all of
the Obligations, whether or not then due, and any moneys
constituting Collateral (including but not limited to any cash
proceeds of Collateral), or hold any such moneys as security for
any or all of the Obligations until the exact amount thereof shall
have been definitely ascertained by the Bank, or release such
moneys to the undersigned for use in the operation of the
undersigned's business; (h) at all reasonable time, through any of
its representatives, examine and inspect any or all of the
Collateral and examine, inspect and make copies of or extracts from
the undersigned's books, records and any other writings relating to
the collateral; and (i) transfer to or register in the name of the
Bank or of the Bank's nominee any or all of the Collateral which
may be in the possession or control of the Bank, of any of its
correspondents or of any other third party acting on the Bank's
behalf.

(6) At any time and from time to time, the Bank may at its option
file in any jurisdiction, at the undersigned's expenses, one or
more financing, continuation and similar statements, and any
amendments thereto, with or (to the extent permitted by applicable
law) without the undersigned's signature, covering any or all of
the collateral.    The undersigned agrees to join with the Bank at
the Bank's request in executing any such statements and amendments.
The undersigned represents to the Bank that no lien or security

4

07/22/2002 13:19 FAX 284 494 8214          HW&R ROAD TOWN     ___ .___                    ☑007/031



interest has been created or exists with respect to any of the
Collateral, except for liens and security interest in favor of the
Bank, and that no financing statement or similar document is on
file in any jurisdiction covering or describing any of the
Collateral by type or item. The undersigned will not create or
suffer to exist, without the prior written consent of the Bank, any
such lien or security interest and will not permit any such
financing statement or similar document to be on file in any
jurisdiction.

(7)(a)  The undersigned represents that (i) its chief place of
business is located at the address set forth on the signature page
hereof, (ii) all of its other places of business are located at the
addresses set forth in part I of Schedule A hereto, (iii) all
Collateral (other than accounts, contract rights and general
intangibles) is located at the addresses set forth in part II of
said Schedule A, and (iv) all records concerning its accounts or
contract rights are kept at the address set forth in part III of
said Schedule A.

(b)  The undersigned will notify the Bank in writing at least
thirty days in advance (i) of any discontinuance or change of
address of its chief place of business, of any of its other places
of business, of the place where any Collateral (other than
accounts, contract rights and general intangibles) is or is to be
located and of the place where any records concerning its accounts
or contract rights are or are to be kept, and (ii) of the addresses
of any new place of business of the undersigned, of any new place
where any Collateral (other than accounts, contract rights and
general intangibles) is or is to be located and of any new place
where any records concerning its accounts or contract rights are or
are to be kept.

(8)  This Security Agreement is a continuing agreement and shall
remain in full force and effect until termination of this Security
Agreement upon the receipt by the Bank of the undersigned's signed
notice to such effect, or upon the Bank's giving notice to such
effect to the undersigned, and payment and discharge in full of all
of the Obligations.

(9)  In the event of the happening of any one or more of the
following events (each being herein called an "Event of default"),
to wit: (a) the non-payment or non-performance of any of the
Obligations; (b) the failure of the undersigned to  perform or
observe any of the terms or provisions of this Security Agreement
or of any other writing or contract of the undersigned, now
existing or hereafter made, with respect to or providing.. for or
securing or evidencing any of the Obligations (any such other
writing or contract being held herein called an "Agreement");
(c) the insolvency, death, failure in business or suspension of
usual business, dissolution or termination of existence of the
undersigned or of any indorser, guarantor, acceptor, surety or

5

Case 2:07-cv-05040-SRC-CCC     Document 6-6     Filed 06/26/2007     Page 18 of 19

4/12/2002 13:10 FAX 284 494 8214          HW&R ROAD TOWN _____ ___ ___          ☒008/031

(78)

other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Bank, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Bank against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Bank in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Bank's option become immediately due and payable, without demand or notice, and any obligation of the Bank to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

6

Case 2:07-cv-03040-SRC-CCC     Document 9-6     Filed 08/23/2007     Page 26 of 37

04/12/2002 13:19 FAX 284 494 8214     HW&R ROAD TOWN     @009/031



(10)  Upon the occurrence of an Event of Default the Bank shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Bank may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees. legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Bank may sell at its option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Bank may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Bank at a place to be designated by the Bank which is reasonable convenient to both parties and at a time designated by the Bank, all at the expense of the undersigned.

(11)  The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, indorsements and powers of attorney, which in the Bank's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Bank to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(12)(a)  For purposes of perfection of the Bank's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Bank's possession if such Collateral is in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Bank or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Bank as collateral security or for safekeeping or for any other or different purpose.

7



(b) No failure or delay on the Bank's part in exercising any right or remedy hereunder shall operate as a waiver hereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance.  None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Bank.  No provision of any Agreement or other contract or writing between the undersigned and the Bank shall be construed as a waiver, modification or amendment of any of the Bank's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement.  The Bank may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or invalidating its rights as to any other Collateral.

(c) In litigation in which the Bank and the undersigned may be adverse parties, the Bank and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Bank.

(d) The undersigned assents to any contract the Bank may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e) This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Bank the Bank's successors, transferees and assigns. The Bank may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f) Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Maryland. All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of South Carolina shall have the same meaning herein as in said Code.  If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

8

04/22/2002 13:20 FAX 284 494 8214          HW&R ROAD TOWN                        ☎011/031



(g) The undersigned represents to the Bank that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h) If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties. Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation. Neither this Security Agreement nor any of the Bank's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Bank as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor. Each party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

9

04/22/2002 13:21 FAX 284 494 8214          HW&R ROAD TOWN                    ☒012/031



(13)  This Security Agreement shall take effect immediately upon
execution by the undersigned, and the execution hereof by the Bank
shall not be required as a condition to the effectiveness of this
Security Agreement.  Any execution of this Security Agreement by
the Bank is only for purposes of filing this Security Agreement as
a financing statement, if the Bank deems the execution hereof by it
to be necessary or desirable for purposes of such filing.

Dated: March 29 , 1996              PUSSER'S CHARLESTON INC.


                                    By: _____, Pres.
                                        Title:


                                    Address of Principal Place of
                                    Business:


                                    __17 Lockwood Drive_____
                                        (Street Address)


                                    __Charleston, South Carolina 21402
                                        (City and State/Island)


10

03/07 15:24 FAX 203 494 8214 CCC    HYER ROAD TOWN     Filed 08/23/2007    Page 30 of 37 ✎024/031



## SECURITY AGREEMENT

This SECURITY AGREEMENT, made on the dates set forth on the signature page hereof, between BARCLAYS BANK PLC, having its Head Office in the city of London, England, acting through its agency in Miami, Florida (herein called the "Bank") and the undersigned.

(1)(a)  As security for any and all of the Obligations (as defined in Paragraph 1(b) the undersigned pledges to the Bank and creates a lien and security interest in favor of the Bank in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

(i)     all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

(ii)    all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

(iii)   all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment; .

(iv)    all fixtures, furniture and equipment from any retail stores or offices that maybe operated by the undersigned;

(v)     all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

(vi)    all claims of the undersigned against the Bank, and all moneys at any time in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

(vii)   all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but not limited to securities issued (as stock splits, stock dividends or otherwise) relative to any securities constituting Collateral,

(b)   The term "Obligations" means all obligations and liabilities of the undersigned to the Bank,



now existing or hereafter arising (including but not limited to obligations and liabilities of the undersigned arising under this Security Agreement), whether matured or not matured, whether absolute or contingent and whether directly created or acquired by assignment or otherwise (including but not limited to liabilities, contingent and otherwise, direct or indirect, of the undersigned to the Bank as indorser, guarantor, acceptor, surety or otherwise with respect to any obligation or liability of any third party to the Bank and liabilities, contingent or otherwise, of the undersigned by way of any express or implied contract with or for the benefit of the Bank, to purchase or provide funds for the payment of any obligation or liability of any third party to the Bank, or to supply funds to or to invest in such third party, or otherwise to insure the Bank against loss on any obligation or liability of such third party).

(2)    Until the occurrence of an Event of Default (as defined in Paragraph 9), the undersigned may use the Collateral in any lawful manner not inconsistent with this Security Agreement and with the terms of any insurance thereon; may sell its inventory and goods in the ordinary course of business; and may use or consume any raw materials or supplies, the use or consumption of which is necessary in order to carry on the undersigned's business.  The undersigned will at all times keep the collateral separate and distinct from any of its other property and keep accurate and complete records of the same.

(3)    The Bank shall have no duty of care with respect to the Collateral, except to exercise reasonable care in the custody and preservation of Collateral in its actual possession.  The Bank shall be deemed to have exercised reasonable care with respect to Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Bank accords its own property or if the Bank takes such action with respect to such collateral as the undersigned shall request in writing, but the Bank's failure to comply with any such request or to take steps to preserve rights against any person or property shall not be deemed a failure to exercise reasonable care with respect to such Collateral.  The Bank shall have no responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the collateral, nor for informing the undersigned with respect to any thereof (whether or not the Bank shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the Bank, whether or not an Event of Default shall have occurred, the undersigned will promptly: (i) deliver, transfer, assign or indorse to the Bank upon receipt by the undersigned, in the exact form in which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Bank, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Bank; (iii) deliver to the Bank, at the time and place and in the manner specified by the Bank, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Bank has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Bank detailed lists of and all writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Bank; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and

2

96

make payment on account of any or all of the Obligations, in each case to the satisfaction of the Bank, if the security afforded by this Security Agreement shall be unsatisfactory to the Bank in its sole judgment; and (vi) pay or reimburse the Bank for all expenses, including attorney's fees and disbursements, incurred by the Bank pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Bank's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral). The undersigned hereby indemnifies and holds harmless the Bank from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Bank may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Bank's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Bank from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Bank may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b)   The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c)   The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Bank may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Bank. All policies of insurance shall provide that (i) such insurance shall be payable to the Bank and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Bank for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Bank by the insurer. At the request of the Bank all such policies shall be delivered to and held by it. The Bank may act as attorney for the undersigned in obtaining, adjusting, settling and canceling such insurance and indorsing any drafts.

(5)   The Bank may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Bank in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of insurance as required by Paragraph 4(e)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v)

3

FAX 284 494 8214    HW&R ROAD TOWN    027/031



to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Bank, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the collateral; and (i) transfer to or register in the name of the Bank or of the Bank's nominee any or all of the Collateral which may be in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf.

(6)    At any time and from time to time, the Bank may at its option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral. The undersigned agrees to join with the Bank at the Bank's request in executing any such statements and amendments. The undersigned represents to the Bank that no lien or security interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Bank, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item. The undersigned will not create or suffer to exist, without the prior written consent of the Bank, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)(a) The undersigned represents that (i) its chief place of business is located at the address set forth on the signature page hereof, (ii) all of its other places of business are located at the addresses set forth in part I of Schedule A hereto, (iii) all Collateral (other than accounts, contract rights and general intangibles) is located at the addresses set forth in part II of said Schedule A, and (iv) all records concerning its accounts or contract rights are kept at the address set forth in part III of said Schedule A.

(b)    The undersigned will notify the Bank in writing at least thirty days in advance (i) of any discontinuance or change of address of its chief place of business, of any of its other places of business, of the place where any Collateral (other than accounts, contract rights and general intangibles) is or is to be located and of the place where any records concerning its accounts or contract rights are or are to be kept, and (ii) of the addresses of any new place of business of the undersigned, of any new place where any Collateral (other than accounts, contract rights and general intangibles) is or is to be located and of any new place where any records concerning its accounts or contract rights are or are to be kept.

(8)    This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Bank of the undersigned's signed notice to such effect, or upon the Bank's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.

4

Case 7:07-cv-03041-RJC-CCC    Document 179-6    Filed 08/23/2007    Page 34 of 61



(9) In the event of the happening of any one or more of the following events (each being herein called an "Event of default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing for or securing or evidencing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the undersigned or of any indorser, guarantor, acceptor, surety or other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Bank, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Bank against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Bank in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Bank's option become immediately due and payable, without demand or notice, and any obligation of the Bank to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

(10) Upon the occurrence of an Event of Default the Bank shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other

5

HWAR ROAD TOWN
@029/031



disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Bank may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees, legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Bank may sell at its option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Bank may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Bank at a place to be designated by the Bank which is reasonable convenient to both parties and at a time designated by the Bank, all at the expense of the undersigned.

(11)    The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, endorsements and powers of attorney, which in the Bank's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Bank to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(12)(a)    For purposes of perfection of the Bank's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Bank's possession if such Collateral is in the possession or control of the Bank, of any of its correspondents or of any other third party acting on the Bank's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Bank or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Bank as collateral security or for safekeeping or for any other or different purpose.

(b)    No failure or delay on the Bank's part in exercising any right or remedy hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The Bank's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance. None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Bank. No provision of any Agreement or other contract or writing between the undersigned and the Bank shall be construed as a waiver, modification or amendment of any of the Bank's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement. The Bank may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or

6

03/17/2002 13:27 FAX 284 494 8214 _____ HW&R ROAD TOWN                      @030/031



invalidating its rights as to any other Collateral.

(c)     In litigation in which the Bank and the undersigned may be adverse parties, the Bank and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Bank.

(d)     The undersigned assents to any contract the Bank may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e)     This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Bank the Bank's successors, transferees and assigns.  The Bank may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f)     Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Florida.  All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of Florida shall have the same meaning herein as in said Code.  If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

(g)     The undersigned represents to the Bank that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h)     If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties.  Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation.  Neither this Security Agreement nor any of the Bank's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any Collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Bank as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor.  Each

7

10/1002 13:28 FAX 284 494 8214          HW&R ROAD TOWN                                    ☑031/031



party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

(13)   This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Bank shall not be required as a condition to the effectiveness of this Security Agreement.  Any execution of this Security Agreement by the Bank is only for purposes of filing this Security Agreement as a financing statement, if the Bank deems the execution hereof by it to be necessary or desirable for purposes of such filing.

Dated: April 2, 2000                         PUSSER'S RETAIL, INC.


By: _Drews S Tobin_____
       President


Address of Principal Place of Business:


264 King Street_____
(Street Address)


Charleston, South Carolina____
(City and State/Island)

8

# Exhibit I

# ASSIGNMENT OF SECURITY AGREEMENT

AGREEMENT, made this ___9___ day of May, 2002, by and between Barclays Bank PLC, a bank organized and existing under the laws of the United Kingdom, having its head office in the City of London, England, acting through its branch office in Road Town, Tortola, British Virgin Islands (the "Assignor"), and Magwitch LLC, a New York limited liability company (the "Assignee").

WHEREAS, Assignor has entered into a security agreement with Pusser's Inc., formerly known as Pusser's Retail Inc., a Delaware corporation ("Pusser's"), dated April 2, 2000, (the "Security Agreement") providing the Assignor with a security interest in the property of Pusser's more fully described in the Security Agreement (the "Collateral") to secure all of the obligations of Pusser's to the Assignor;

WHEREAS, the Assignor and the Assignee have agreed that all of the Assignor's right, title and interest existing under and pursuant to the Security Agreement will be transferred and assigned to the Assignee.

NOW THEREFORE, in exchange for good and valuable consideration the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.  <u>Assignment</u>. For value received, Assignor herewith assigns, transfers and conveys to Assignee:

    (i)    all of its right, title and interest as secured party under and pursuant to the Security Agreement and with respect to the Collateral and other obligations of third parties to Assignor which are now or hereafter included in the Collateral covered by that Security Agreement;

    (ii)   all agreements and instruments pursuant to which any security or collateral is now or hereafter granted to Assignor with respect to such Collateral or other third party obligations, and all rights and powers of Assignor thereunder;

    (iii)  all financing statements and other filed documents at any time existing in connection with any of the foregoing; and

    (iv)   all collateral located in the United States of America delivered to Assignor by any such third parties in connection with any of the foregoing.

2.  <u>Documentation</u>. Assignor agrees to execute and deliver such additional documents or instruments (including, without limitation, UCC-1 and UCC-3 forms) as Assignee may from time to time request in furtherance hereof at no cost to Assignee.

{NY005182.2}

Case 2:07-cv-03040-SRC-CCC    Document 9-7    Filed 06/25/2007    Page 3 of 13

3.    Obligations of Secured Party. It is agreed between the Assignor and the Assignee and Pusser's that the Assignee shall perform all obligations of the Assignor under the Security Agreement, shall be entitled to all rights of the Assignor thereunder, and that the Assignor shall not be liable in any way to the Pusser's or the Assignee for the performance or non-performance of the Security Agreement by the Assignee.

4.    Attorney-in-Fact. Assignor hereby designates and appoints Assignee as Assignor's attorney-in-fact, with full power of substitution, to exercise and enforce, in the name of Assignor or Assignee, at Assignee's option, all rights and powers granted to Assignor under any of the documents and instruments or other collateral arrangements covered by the Security Agreement or this Assignment, hereby ratifies and confirms in all respects all actions taken by Assignee pursuant hereto. This power, being coupled with an interest, shall be irrevocable until termination of the Security Agreement.

5.    Amendment. No provision hereof shall be modified, altered or limited except by a written instrument expressly referring to this Assignment and to such provision, and executed by the party to be charged.

6.    Waiver. Wavier of or acquiescence in any default by the Assignor, or failure of the Assignee to insist upon strict performance by the Assignor of any provision of this Assignment, shall not constitute a waiver of any subsequent or other default or failure.

7.    Notices. Notices to either party shall be in writing and shall be delivered personally, by certified mail, return receipt requested or by facsimile at such address or telephone number set forth herein or otherwise designated in writing by such party.

If to the Assignor:          Barclays Bank PLC
                             Road Town, Tortola
                             British Virgin Islands

                             Facsimile:  (284) 494-4315
                             Telephone: (284) 494-2171/3

Case 2:07-cv-03040-SRC-CCC    Document 9-1    Filed 06/25/2007    Page 4 of 13

If to the Assignee:        Magwitch LLC
                           c/o Hill, Betts & Nash LLP
                           99 Park Avenue
                           20th Floor
                           New York, NY  10016
                           Attn: Lloyd DeVos

      Facsimile:          (212) 786-1015
      Telephone:          (212) 786-1000

8.   <u>Law</u>. This Assignment shall be governed in all respects by the laws of the British Virgin Islands applicable to contracts executed and to be performed in such jurisdiction except with regard the perfection of the Security Interest transferred under this Assignment which shall be governed by the laws of the State of Delaware but excluding its law of conflicts. If any term'of this Assignment shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.

9.   <u>Jurisdiction</u>. Each Party to this Assignment agrees, for the benefit of the Assignor, that the courts of the British Virgin Islands shall have jurisdiction to settle any disputes in connection with this Assignment and, accordingly, submits to the jurisdiction of the British Virgin Islands courts.

10.  <u>Successors and Assigns</u>. This Assignment shall be binding upon the successors and assigns of parties and shall, inure to the benefit of the parties' successors, endorses and assigns.

11.  <u>Terms</u>. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Security Agreement.

12.  <u>Counterparts</u>. This Agreement may be executed in one or more counterparts which together shall constitute one and the same instrument.

[NY985102.2 ]

3

IN WITNESS WHEREOF, the undersigned have duly executed this Assignment as of the date hereinabove written.

ASSIGNOR:

BARCLAYS BANK PLC

By: _____
Name: MARK YOUNG
Title: HEAD OF CORPORATE BANKING

ASSIGNEE:

MAGWITCH LLC

By: _____
Name: Lloyd De Vos
Title: Manager

AGREED AND ACKNOWLEDGED:

PUSSER'S RETAIL, INC., a Delaware Corporation

By: _____
Name: Charles S. Tobias
Title:  President

{NY205102.2}

4

Case 2:07-cv-05040-SRC-CCC    Document 5-7    Filed 08/25/2007    Page 6 of 13

## ASSIGNMENT OF SECURITY AGREEMENT

AGREEMENT, made this ___9___ day of May, 2002, by and between Barclays Bank PLC, a bank organized and existing under the laws of the United Kingdom, having its head office in the City of London, England, acting through its branch office in Road Town, Tortola, British Virgin Islands (the "Assignor"), and Magwitch LLC, a New York limited liability company (the "Assignee").

WHEREAS, Assignor has entered into a security agreement with Pusser's Inc., formerly known as Pusser's Charleston Inc., a South Carolina corporation ("Pusser's"), dated March 29, 1996, (the "Security Agreement") providing the Assignor with a security interest in the property of Pusser's more fully described in the Security Agreement (the "Collateral") to secure all of the obligations of Pusser's to the Assignor;

WHEREAS, the Assignor and the Assignee have agreed that all of the Assignor's right, title and interest existing under and pursuant to the Security Agreement will be transferred and assigned to the Assignee.

NOW THEREFORE, in exchange for good and valuable consideration the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.  Assignment. For value received, Assignor herewith assigns, transfers and conveys to Assignee:

    (i)   all of its right, title and interest as secured party under and pursuant to the Security Agreement and with respect to the Collateral and other obligations of third parties to Assignor which are now or hereafter included in the Collateral covered by that Security Agreement;

    (ii)  all agreements and instruments pursuant to which any security or collateral is now or hereafter granted to Assignor with respect to such Collateral or other third party obligations, and all rights and powers of Assignor thereunder;

    (iii) all financing statements and other filed documents at any time existing in connection with any of the foregoing; and

    (iv)  all collateral located in the United States of America delivered to Assignor by any such third parties in connection with any of the foregoing.

2.  Documentation. Assignor agrees to execute and deliver such additional documents or instruments (including, without limitation, UCC-1 and UCC-3

Case 2:07-cv-03040-SRC-CCC    Document 9-7    Filed 06/25/2007    Page 7 of 13

forms) as Assignee may from time to time request in furtherance hereof at no cost to Assignee.

3.   **Obligations of Secured Party**. It is agreed between the Assignor and the Assignee and Pusser's that the Assignee shall perform all obligations of the Assignor under the Security Agreement, shall be entitled to all rights of the Assignor thereunder, and that the Assignor shall not be liable in any way to the Pusser's or the Assignee for the performance or non-performance of the Security Agreement by the Assignee.

4.   **Attorney-in-Fact**. Assignor hereby designates and appoints Assignee as Assignor's attorney-in-fact, with full power of substitution, to exercise and enforce, in the name of Assignor or Assignee, at Assignee's option, all rights and powers granted to Assignor under any of the documents and instruments or other collateral arrangements covered by the Security Agreement or this Assignment, hereby ratifies and confirms in all respects all actions taken by Assignee pursuant hereto. This power, being coupled with an interest, shall be irrevocable until termination of the Security Agreement.

5.   **Amendment.** No provision hereof shall be modified, altered or limited except by a written instrument expressly referring to this Assignment and to such provision, and executed by the party to be charged.

6.   **Waiver**. Wavier of or acquiescence in any default by the Assignor, or failure of the Assignee to insist upon strict performance by the Assignor of any provision of this Assignment, shall not constitute a waiver of any subsequent or other default or failure.

7.   **Notices**. Notices to either party shall be in writing and shall be delivered personally, by certified mail, return receipt requested or by facsimile at such address or telephone number set forth herein or otherwise designated in writing by such party.

If to the Assignor:              Barclays Bank PLC
                                 Road Town, Tortola
                                 British Virgin Islands

                                 Facsimile:  (284) 494-4315
                                 Telephone: (284) 494-2171/3

Case 2:07-cv-03040-SRC-CCC    Document 5-7    Filed 06/26/2007    Page 8 of 13

If to the Assignee:          Magwitch LLC
c/o Hill, Betts & Nash LLP
99 Park Avenue
20th Floor
New York, NY 10016
Attn: Lloyd DeVos

Facsimile:       (212) 786-1015
Telephone:     (212) 786-1000

8. **Law**. This Assignment shall be governed in all respects by the laws of the British Virgin Islands applicable to contracts executed and to be performed in such jurisdiction except with regard the perfection of the Security Interest transferred under this Assignment which shall be governed by the laws of the State of South Carolina but excluding its law of conflicts. If any term of this Assignment shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.

9. **Jurisdiction**. Each Party to this Assignment agrees, for the benefit of the Assignor, that the courts of the British Virgin Islands shall have jurisdiction to settle any disputes in connection with this Assignment and, accordingly, submits to the jurisdiction of the British Virgin Islands courts.

10. **Successors and Assigns**. This Assignment shall be binding upon the successors and assigns of parties and shall, inure to the benefit of the parties' successors, endorses and assigns.

11. **Terms**. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Security Agreement.

12. **Counterparts**. This Agreement may be executed in one or more counterparts which together shall constitute one and the same instrument.

{NY0081031.2}

3

Case 2:07-cv-05040-SRC-CCC    Document 9-7    Filed 06/25/2007    Page 9 of 13

IN WITNESS WHEREOF, the undersigned have duly executed this Assignment as of the date hereinabove written.

ASSIGNOR:

BARCLAYS BANK PLC

By: _____

Name: _MARK YOUNG_

Title: _HEAD OF CORPORATE BANKING_

ASSIGNEE:

MAGWITCH LLC

By: _____

Name: _Wayne de Vos_

Title: _Manager_

AGREED AND ACKNOWLEDGED:

PUSSER'S, INC., a South Carolina Corporation

By: _____

Name: Charles S. Tobias

Title:  President

## ASSIGNMENT OF SECURITY AGREEMENT

AGREEMENT, made this __9__ day of May, 2002, by and between Barclays Bank PLC, a bank organized and existing under the laws of the United Kingdom, having its head office in the City of London, England, acting through its branch office in Road Town, Tortola, British Virgin Islands (the "Assignor"), and Magwitch LLC, a New York limited liability company (the "Assignee").

WHEREAS, Assignor has entered into a security agreement with Pusser's Inc., formerly known as Pusser's (Annapolis) Inc., a Maryland corporation ("Pusser's"), dated September 1, 1995, (the "Security Agreement") providing the Assignor with a security interest in the property of Pusser's more fully described in the Security Agreement (the "Collateral") to secure all of the obligations of Pusser's to the Assignor;

WHEREAS, the Assignor and the Assignee have agreed that all of the Assignor's right, title and interest existing under and pursuant to the Security Agreement will be transferred and assigned to the Assignee.

NOW THEREFORE, in exchange for good and valuable consideration the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.  <u>Assignment</u>. For value received, Assignor herewith assigns, transfers and conveys to Assignee:

    (i)   all of its right, title and interest as secured party under and pursuant to the Security Agreement and with respect to the Collateral and other obligations of third parties to Assignor which are now or hereafter included in the Collateral covered by that Security Agreement;

    (ii)  all agreements and instruments pursuant to which any security or collateral is now or hereafter granted to Assignor with respect to such Collateral or other third party obligations, and all rights and powers of Assignor thereunder;

    (iii) all financing statements and other filed documents at any time existing in connection with any of the foregoing; and

    (iv)  all collateral located in the United States of America delivered to Assignor by any such third parties in connection with any of the foregoing.

2.  <u>Documentation</u>. Assignor agrees to execute and deliver such additional documents or instruments (including, without limitation, UCC-1 and UCC-3

forms) as Assignee may from time to time request in furtherance hereof at no cost to Assignee.

3. <u>Obligations of Secured Party</u>. It is agreed between the Assignor and the Assignee and Pusser's that the Assignee shall perform all obligations of the Assignor under the Security Agreement, shall be entitled to all rights of the Assignor thereunder, and that the Assignor shall not be liable in any way to the Pusser's or the Assignee for the performance or non-performance of the Security Agreement by the Assignee.

4. <u>Attorney-in-Fact</u>. Assignor hereby designates and appoints Assignee as Assignor's attorney-in-fact, with full power of substitution, to exercise and enforce, in the name of Assignor or Assignee, at Assignee's option, all rights and powers granted to Assignor under any of the documents and instruments or other collateral arrangements covered by the Security Agreement or this Assignment, hereby ratifies and confirms in all respects all actions taken by Assignee pursuant hereto. This power, being coupled with an interest, shall be irrevocable until termination of the Security Agreement.

5. <u>Amendment.</u> No provision hereof shall be modified, altered or limited except by a written instrument expressly referring to this Assignment and to such provision, and executed by the party to be charged.

6. <u>Waiver</u>. Wavier of or acquiescence in any default by the Assignor, or failure of the Assignee to insist upon strict performance by the Assignor of any provision of this Assignment, shall not constitute a waiver of any subsequent or other default or failure.

7. <u>Notices</u>. Notices to either party shall be in writing and shall be delivered personally, by certified mail, return receipt requested or by facsimile at such address or telephone number set forth herein or otherwise designated in writing by such party.

|  |  |
|---|---|
| If to the Assignor: | Barclays Bank PLC<br>Road Town, Tortola<br>British Virgin Islands |
|  | Facsimile: (284) 494-4315<br>Telephone: (284) 494-2171/3 |

{NY004873.2 }

2

If to the Assignee:               Magwitch LLC
c/o Hill, Betts & Nash LLP
99 Park Avenue
20th Floor
New York, NY 10016
Attn: Lloyd DeVos

         Facsimile:         (212) 786-1015
         Telephone:       (212) 786-1000

8.    Law. This Assignment shall be governed in all respects by the laws of the British Virgin Islands applicable to contracts executed and to be performed in such jurisdiction except with regard the perfection of the Security Interest transferred under this Assignment which shall be governed by the laws of the State of Maryland but excluding its law of conflicts. If any term of this Assignment shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.

9.    Jurisdiction. Each Party to this Assignment agrees, for the benefit of the Assignor, that the courts of the British Virgin Islands shall have jurisdiction to settle any disputes in connection with this Assignment and, accordingly, submits to the jurisdiction of the British Virgin Islands courts.

10.    Successors and Assigns. This Assignment shall be binding upon the successors and assigns of parties and shall, inure to the benefit of the parties' successors, endorses and assigns.

11.    Terms. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Security Agreement.

12.    Counterparts. This Agreement may be executed in one or more counterparts which together shall constitute one and the same instrument.

[NY004873.2 ]

IN WITNESS WHEREOF, the undersigned have duly executed this Assignment as of the date hereinabove written.

ASSIGNOR:

BARCLAYS BANK PLC

By: _MM jun_
Name: _MARK YOUNG_
Title: _HEAD OF CORPORATE BANKING_

ASSIGNEE:

MAGWITCH LLC

By: _Lloyd DeVos_
Name: _Lloyd DeVos_
Title: _Manager_

AGREED AND ACKNOWLEDGED:

PUSSER'S, INC., a Maryland Corporation

By: _Charles S. Tobias_
Name: Charles S. Tobias
Title:   President

[NY004873.2]                                    4

# Exhibit J

## Charles Tobias

| | |
|---|---|
| **From:** | Lloyd De Vos [ldevos@hillbetts.com] |
| **Sent:** | Wednesday, February 11, 2004 5:15 PM |
| **To:** | jjcksn33@aol.com |
| **Cc:** | ctobias@pussers.com |

**Subject:** Advances from Pusser's Rum Limited/Pusser's West Indies Limited to Pusser's Inc.

Dear Jim:

I wanted to drop you a note and thank you for your agreement with Charles to increase the short term liquidity loans to Pusser's Inc.

Candidly, as Charles told you, we should not be in this position.  Unfortunately, as a result of Thayer under-insuring the Annapolis hotel and our agreement with them under the Operating Agreement that they would provide our insurance, we find ourselves in the situation where they are manipulating the payment of insurance proceeds under the policy that covers both of us to their advantage and to the significant disadvantage of Pusser's.  However, by not agreeing with them, it means that on the one side, we have to rebuild the unit and on the other side, we do not have the insurance proceeds from which to rebuild.  What you are doing enables us to bridge this problem, I sincerely want to thank you for this.

Pusser's Rum/PWI had originally advanced $250,000 to cover this problem.  Of that amount, $150,000 was returned when the first insurance proceeds were received and you were kind enough to carry $100,000 over to the next funding tranche.  Charles tells me that we may need to move between $60,000 and $100,000 up in addition, and possibly more for construction.

I confirm that the $100,000 plus any other funds that are moved from Rum/PWI to Pusser's Inc. to cover the cash shortfall will be repaid from the first available cash proceeds in the United States, and specifically ahead of any payments of legal fees to my firm or cash distributions to Magwitch or others.  It's the least I can do to say thanks.  Believe me, we will get it all back and then some from the proper settlement of the loss that we suffered as a result of Hurricane Isabel.

Talk with you soon,

All the best

Lloyd

2/12/2004