Andrew W. Heymann
SOLOMON, PEARL, BLUM, HEYMANN & STICH LLP
Attorneys for Plaintiff
40 Wall Street
35th Floor
New York, New York 10005
(212) 267-7600

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MAGWITCH L.L.C., | : | |
| Plaintiff, | : | 08 Civ. 2144 (LTS) |
| v. | : | |
| | : | **AFFIDAVIT** |
| PUSSER'S INC., PUSSER'S LTD., PUSSER'S WEST INDIES LIMITED and CHARLES S. TOBIAS, | : | |
| Defendants. | : | |

STATE OF NEW YORK    )
                                          )    ss.:
COUNTY OF NEW YORK  )

ANDREW W. HEYMANN, ESQ., being duly sworn, deposes and says:

1.      I am an attorney duly admitted to practice law before the courts of the State of New York and in the United States District Court for the Southern District of New York, and a partner in Solomon Pearl Blum Heymann & Stich LLP, attorneys for the Plaintiff Magwitch L.L.C. ("Magwitch").

2.      I make this affidavit in support of the motion by Magwich for an order, pursuant to 28 U.S.C. §1447(c), remanding this action to the Supreme Court of the State of New York,

County of New York (the "State Court"), for lack of subject matter jurisdiction in this Court; awarding Magwitch its costs, actual expenses and attorneys' fees incurred as a result of the Defendants' removal of this action; and for such other and further relief as this Court deems just and proper.

3.     The purpose of this Affidavit is to place before the Court copies of the following documents:

-     The Verified Complaint filed in the State Court on January 25, 2008, annexed hereto as Exhibit A;

-     The Notice of Removal (Diversity) in this Court filed on March 3, 2008, annexed hereto as Exhibit B;

-     The Supplement to the Notice of Removal (Diversity) dated March 20, 2008, annexed hereto as Exhibit C;  and

-     The Transcript of Opinion from the United States District Court for the District of New Jersey dated December 10, 2007 in the action encaptioned Magwitch, L.L.C. v. Pusser's Inc., et al, bearing Civil Action No. 07-cv-3040 (SRC), annexed hereto as Exhibit D.

4.    For all of the reasons set forth in the accompanying memorandum of law, it is respectfully requested that this Court grant the Plaintiff's motion and deny the Defendants' motion to dismiss for lack of personal jurisdiction.

_____
ANDREW W. HEYMANN

Sworn to before me this
3rd day of April, 2008

_____
Notary Public

DAVID P. STICH
Notary Public, State Of New York
No. 02ST4981028
Qualified In New York County
Commission Expires May 6, 20

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

MAGWITCH L.L.C.,                                    :

               Plaintiff,                       :

                                 :   Index No. 600733/08

    v.                                             :

PUSSER'S INC., a Florida corporation,              :
PUSSER'S LTD., a British Virgin Islands
corporation, PUSSER'S WEST INDIES                   :   VERIFIED COMPLAINT
LIMITED, a British Virgin Islands corporation,     :
and CHARLES S. TOBIAS,                              :

               Defendants.                       :

---

      Plaintiff, Magwitch L.L.C. ("Plaintiff" or "Magwitch"), by its undersigned attorneys, as and for its Complaint herein, alleges as follows:

THE PARTIES

      1.     Plaintiff is a limited liability company organized under the laws of the State of New York .

      2.     Defendant Pusser's Inc. ("Pusser's USA") is a corporation organized under the laws of the State of Florida.  At all relevant times, the principal place of business of Pusser's USA was at 80 Compromise Street, Annapolis, Maryland.

      3.     Defendant Pusser's Ltd. ("Pusser's Ltd.") is a corporation organized under the laws of the British Virgin Islands.

      4.     Defendant Pusser's West Indies Limited ("Pusser's West Indies") is a corporation organized under the laws of the British Virgin Islands.

NEW YORK
COUNTY CLERK'S OFFICE
JAN 25 2008
NOT COMPARED
WITH COPY FILE

5.    Defendant Charles S. Tobias ("Tobias") is an individual resident at "Kingston," Tortola, British Virgin Islands.

6.    At all relevant times, Tobias was the sole director and President of Pusser's USA.

7.    At all relevant times, Tobias was the controlling person of Pusser's USA.

8.    At all relevant times, Tobias was the sole director and controlling person of Pusser's Ltd.

9.    At all relevant times, Tobias was, and continues to be, the sole shareholder of Pusser's West Indies.

10.    At all relevant times, Tobias was a director and the controlling person of Pusser's West Indies.

## JURISDICTION

11.    Defendant Tobias regularly came to New York for the purpose of conducting the business of defendant Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

12.    Defendant Tobias regularly attended business meetings in New York at which the matters which are the subject of the complaint were discussed during the times relevant to the transactions described in this Complaint.

13.    Defendant Tobias came to New York to give deposition testimony in connection with the business of defendant Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

14.    Defendant Tobias maintained regular and continuous telephone, facsimile and electronic communications with representatives of the Plaintiff in New York during the times relevant to the transactions described in this Complaint.

15.     Defendant Tobias regularly employed legal counsel in New York personally and on behalf of defendants Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

16.     Defendant Tobias caused payments to be made under the promissory note that is the subject of this Complaint to the bank account of plaintiff in New York.

17.     Defendant committed tortious acts on behalf of defendant Pusser's USA outside of New York causing injury to the plaintiff within New York.

18.     Defendant Tobias committed tortious acts on behalf of defendant Pusser's Ltd. outside of New York causing injury to the plaintiff within New York.

19.     Defendant Tobias committed tortious acts on behalf of defendant Pusser's West Indies outside of New York causing injury to the plaintiff within New York.

20.     Defendant Tobias, acting on behalf of defendant Pusser's USA as more fully described in this Complaint, caused funds belonging to Pusser's USA to be transferred and diverted to defendants Pusser's Ltd. and Pusser's West Indies, causing injury to Plaintiff in New York when funds were unavailable to pay Plaintiff in New York amounts due on the promissory note that is the subject of this Complaint.

21.     Defendant Tobias, acting on behalf of defendants Pusser's USA, Pusser's Ltd., Pusser's West Indies and personally, expected and should have reasonably expected the acts complained of herein to have consequences in New York.

22.     Defendant Tobias, acting on behalf of defendants Pusser's USA, Pusser's Ltd., Pusser's West Indies and personally, derive substantial revenue from interstate or international commerce.

## FACTS

23.    At all relevant times, the Pusser's group of companies (collectively, "Pusser's") was engaged in the businesses of operating restaurants and retail stores in the United States, the U.S. Virgin Islands and the British Virgin Islands.

24.    At all relevant times, the restaurant and retail businesses of Pusser's in the United States was conducted by companies incorporated in Florida, Maryland and South Carolina (the "Predecessor Pusser's Companies"), all of which were subsequently amalgamated into Pusser's USA.

25.    The restaurant and retail business of Pusser's in the Caribbean historically was conducted by Pusser's Ltd.

26.    Pusser's was historically financed by loans from Barclays Bank PLC ("Barclays") through its office in Tortola, British Virgin Islands.

27.    By mid 2002, Pusser's had accumulated debt owing to Barclays in excess of ten million dollars.

28.    By mid 2001, Barclays had notified Pusser's that it no longer wished to be the bankers to Pusser's and would demand payment of the debt if arrangements were not made to compromise or sell the debt.

29.    During 2001 and early 2002, Pusser's attempted to arrange for financing from other sources to replace Barclays.  Pusser's was unable to obtain financing.

30.    To avoid the placing of Pusser's into liquidation, Tobias, the Chairman and controlling shareholder of Pusser's, Lloyd De Vos ("De Vos") and James Jackson ("Jackson") agreed to lead a group of shareholders in a purchase of the debt owed by Pusser's to Barclays at a negotiated discount.

31.     The offer to purchase debt from Barclays was extended to all shareholders of Pusser's. No shareholders other than Tobias, De Vos and Jackson agreed to participate.

32.     On May 9, 2002, Pusser's (2001) Ltd., a company owned by Johanna Rowan Tobias, wife of Charles Tobias, and controlled by Charles Tobias ("Pusser's 2001"), Magwitch and Pusser's West Indies (at the time controlled by Jackson) entered into an agreement with Barclays (the "Barclays Agreement") under which Magwitch would purchase $3,300,000 in face amount of the debt owed by Pusser's to Barclays in exchange for a payment of $1,500,000 on May 9, 2002, Pusser's 2001 would purchase $2,200,000 in face amount of the debt owed by Pusser's to Barclays in exchange for a payment of $1,000,000 on May 31, 2002, and Pusser's West Indies would purchase approximately $4,400,000 in face amount of the debt remaining owed by Pusser's to Barclays in exchange for a payment of $2,000,000 on September 30, 2002.

33.     Under the Barclay Agreement, all security held by Barclays in assets of Pusser's USA was to be assigned to Magwitch.

34.     As a condition of entering into the Barclays Agreement, Magwitch required that either Barclays assign and deliver to it security agreements that created a first security interest in all of the assets of Pusser's USA and the Predecessor Pusser's Companies or that Pusser's USA and the Predecessor Pusser's Companies execute security agreements that created a first security interest in the assets of Pusser's USA and its predecessors. A copy of the Pusser's USA security agreement is attached to this complaint as Exhibit A.

35.     Under the provisions of the security agreements covering the assets of Pusser's USA and the Predecessor Pusser's Companies, the secured party had the right to require that proceeds from the sale of inventories and other assets be paid to the secured party, either before or after the occurrence of an event of default.

36.    On behalf of Pusser's Ltd., Pusser's West Indies, Pusser's USA and the Predecessor Pusser's Companies, Tobias represented to, warranted, covenanted and agreed with Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001, until such time as the debt owed to Magwitch had been repaid.

37.    Magwitch specifically required this representation, warranty and covenant because it knew that Tobias had been transferring funds from Pusser's USA and the Predecessor Pusser's Companies to support the loss-making operations of Pusser's Ltd.

38.    Magwitch specifically relied upon this representation, warranty and covenant in entering into the Barclays Agreement.

39.    Under the provisions of the security agreements covering Pusser's USA and the Predecessor Pusser's Companies, all proceeds of any insurance policies were assigned to the secured party and payable to the secured party.

40.    On May 9, 2002, Magwitch paid $1,500,000 to Barclays in exchange for the demand promissory note made by Pusser's USA and others in favor of Barclays, dated April 5, 2002, in the face amount of $3,300,000 (the "Promissory Note"). A copy of the promissory note, as assigned to Magwitch, is attached to this Complaint as Exhibit B.

41.    At the time he caused Pusser's 2001 to enter into the Barclays Agreement, Tobias had no intention to honor his representations, warranty and covenant not to transfer funds from Pusser's USA and the Predecessor Pusser's Companies to other Pusser's companies.

42.    Pusser's 2001 breached the Barclays Agreement by failing to pay the required $1,000,000 to Barclays on May 31, 2002.

43.     Pusser's West Indies breached the Barclays Agreement by failing to pay the required $2,000,000 to Barclays on September 30, 2002.

44.     Following the breaches of the Barclays Agreement by Pusser's 2001 and Pusser's West Indies, Barclays threatened to reclaim the security over the Pusser's USA assets and treat the $1,500,000 paid by Magwitch as payment of the outstanding Pusser's Ltd. loans, as it was entitled to do under the terms of the Barclays Agreement.

45.     On July 9, 2003, the Barclays Agreement was amended to provide that instead of $3,000,000 being paid to Barclays by Pusser's 2001 and Pusser's West Indies for the remaining debt of Pusser's Ltd., Pusser's West Indies would purchase the remaining $7,031,124.77 in debt for $2,000,000.

46.     Magwitch consented to the amendment in order to avoid loss of its investment and the security for the Promissory Note, as had been threatened by Barclays.

47.     Pusser's West Indies subsequently purchased the debt of $7,031,124.77 owed by Pusser's Ltd. to Barclays for $2,000,000.

48.     Pusser's West Indies subsequently acquired all of the Caribbean assets of Pusser's Ltd.

49.     Subsequent to the purchase by Magwitch of the Promissory Note, neither Pusser's Ltd. nor Pusser's West Indies were able to generate sufficient cash to meet their obligations.

50.     Starting as early as September 2002, Tobias caused Pusser's USA and the Predecessor Pusser's Companies to transfer funds from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies, in breach of his commitment on behalf of Pusser's Ltd. Pusser's West Indies, Pusser's USA and the Predecessor Pusser's Companies.

51.    By June 30, 2004, Tobias had caused Pusser's USA and the Predecessor Pusser's Companies to transfer $2,470,386 to Pusser's West Indies and Pusser's Ltd., in breach of his commitment.

52.    In October 2004, Tobias caused Pusser's USA to transfer $14,000 to Pusser's West Indies.

53.    On April 4, 2005, Pusser's USA received a payment in settlement of insurance claims from damages to premises at Annapolis, Maryland in the amount of $753,227 that had been assigned to Magwitch under the terms of the security agreement between Pusser's USA and Magwitch.

54.    Notwithstanding prior demand for direct payment of these funds to Magwitch, and immediate transfer of these funds to Magwitch should they have been received by Pusser's USA, Pusser's USA refused to notify the insurance company to pay the funds directly to Magwitch, refused to pay the insurance proceeds to Magwitch upon receipt and converted them for its own purposes.

55.    On April 4, 2005, Tobias caused Pusser's USA to transfer $374,227 to Pusser's West Indies.

56.    On April 5, 2005, Tobias caused Pusser's USA to pay $11,533 in bank charges on the wrongful transfers to Pusser's West Indies.

57.    On April 14, 2005, Tobias caused Pusser's USA to transfer $10,000 to Pusser's West Indies.

58.    Upon information and belief, after April 14, 2005, Tobias caused Pusser's USA to transfer approximately $219,000 to Pusser's West Indies.

59.    All of the transfers from Pusser's USA or the Predecessor Pusser's Companies to Pusser's Ltd. or Pusser's West Indies were in breach of the agreement between Tobias, Pusser's Ltd. and Magwitch that no such transfers would be made while amounts were outstanding under the Promissory Note.

60.    On September 14, 2006, Magwitch demanded payment from Pusser's USA of all amounts due and owing on the Promissory Note.   A copy of the demand letter is attached as Exhibit C.

61.    Despite demand, the amount due on the Promissory Note has not been paid.

62.    The amount outstanding on the Promissory Note for principal and accrued interest at December 31, 2007 totals $2,123,140.

## FIRST COUNT
### (Default Under Promissory Note by Pusser's USA)

63.    Plaintiff repeats and restates the allegations of Paragraphs 1-62 of the Complaint and incorporates the same herein as if set forth at length.

64.    The failure of Pusser's USA to respond to Plaintiff's demand for payment of all amounts due and owing on the Promissory Note constitutes an act of default under the terms of the Promissory Note.

65.    By reason of the default by Pusser's USA, the principal amount of the Promissory Note, together with all interest thereon, is immediately due and owing.

## SECOND COUNT
### (Breach of Security Agreements by Pusser's USA)

66.    Plaintiff repeats and restates the allegations of Paragraphs 1-65 of the Complaint and incorporates the same herein as if set forth at length.

67.    The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies constitute breaches of the security agreements and assignments thereof that conferred upon Magwitch a first security interest in the assets of Pusser's USA and the Predecessor Pusser's Companies.

68.    By reason of the aforesaid breaches of contract, Pusser's USA is without assets sufficient to satisfy its obligations to Magwitch under the terms of the Promissory Note.

69.    As a direct and proximate result of the breaches of contract by Pusser's USA, Magwitch has sustained damage.

## THIRD COUNT
### (Tortious Interference With Contract by Tobias, Pusser's Ltd. and Pusser's West Indies)

70.    Plaintiff repeats and restates the allegations of Paragraphs 1-69 of the Complaint and incorporates the same herein as if set forth at length.

71.    Tobias, acting on behalf of Pusser's Ltd. and Pusser's West Indies as well as in his own self-interest, caused Pusser's USA to effect the aforesaid transfers of assets.

72.    In so doing, Tobias, Pusser's Ltd. and Pusser's West Indies intentionally and tortiously interfered with the security agreements pursuant to which Magwitch had a first security interest in all the assets of Pusser's USA and the Predecessor Pusser's Companies.

73.    As a direct and proximate result of the wrongful conduct of Tobias, Pusser's Ltd. and Pusser's West Indies, Magwitch has sustained damage.

## FOURTH COUNT
### (Breach of Contract by Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA)

74.    Plaintiff repeats and restates the allegations of Paragraphs 1-73 of the Complaint and incorporates the same herein as if set forth at length.

75.     The transfers of assets from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made without first obtaining the express written consent of Magwitch.

76.     By effecting the transfer of assets from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies, as set forth herein, Tobias, Pusser's USA, Pusser's West Indies and Pusser's Ltd. breached the warranties given by them to Magwitch and breached the covenants and agreements they made with Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001, until such time as the debt owed to Magwitch had been repaid.

77.     By reason of the aforesaid breaches of warranty and contract, Pusser's USA is without assets sufficient to satisfy its obligations to Magwitch under the terms of the Promissory Note.

78.     As a direct and proximate result of the breaches of warranty and contract by Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, Magwitch has sustained damage.

## FIFTH COUNT
### (Fraudulent Misrepresentation by All Defendants)

79.     Plaintiff repeats and restates the allegations of Paragraphs 1-78 of the Complaint and incorporates the same herein as if set forth at length.

80.     Tobias, acting on behalf of Pusser's USA, the Predecessor Pusser's Companies, Pusser's Ltd. and Pusser's West Indies, as well as in his own self-interest, induced Magwitch to enter into the Barclays Agreement by representing and warranting to Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not

transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001, until such time as the debt owed to Magwitch had been repaid.

81.    On the basis of these representations and warranties, and in good faith reliance thereon, Magwitch agreed to enter into the Barclays Agreement and, pursuant thereto, paid $1,500,000 to Barclays in exchange for the Promissory Note.

82.    The representations and warranties made by Tobias were false when made.

83.    Defendants made the foregoing representations and gave the foregoing warranties to Magwitch with the expectation that Magwitch would rely on them and Magwitch did, in fact, rely on them to its detriment.

SIXTH COUNT
(Fraudulent Transfers by All Defendants)

84.    Plaintiff repeats and restates the allegations of Paragraphs 1-83 of the Complaint and incorporates the same herein as if set forth at length.

85.    The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made with actual intent to hinder, delay or defraud Magwitch as a creditor of Pusser's USA and the Predecessor Pusser's Companies, in violation of the Maryland Uniform Fraudulent Conveyance Act, Md. Code, Commercial Law, §§15-201 et seq.

86.    The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made without fair consideration.

87.    The transfers of assets by Pusser's USA to Pusser's Ltd. and Pusser's West Indies caused Pusser's USA and to become insolvent at the time of the transfers or became insolvent as a result of the transfers.

88.    All defendants participated in and benefited from the fraudulent transfers of Pusser's USA's assets, as aforesaid.

89.    As a direct and proximate result of defendants' participation in the fraudulent transfers of assets, Magwitch has sustained damage.

<u>SEVENTH COUNT</u>
(Conversion by Pusser's USA, Tobias and Pusser's West Indies)

90.    Plaintiff repeats and restates the allegations of Paragraphs 1-89 of the Complaint and incorporates the same herein as if set forth at length.

91.    Pusser's USA, Tobias and Pusser's West Indies converted to their own use and purposes the funds received by Pusser's USA in settlement of insurance claims from damages to premises at Annapolis, Maryland, in contravention of Magwitch's right to the payment of all proceeds of any insurance policies held by Pusser's USA under the terms of the security agreement between Pusser's USA and Magwitch.

92.    As a direct and proximate result of the conversion of funds by Pusser's USA, Tobias and Pusser's West Indies, Magwitch has sustained damage.

<u>EIGHTH COUNT</u>
(Negligence and Breach of Fiduciary Duty by Tobias)

93.    Plaintiff repeats and restates the allegations of Paragraphs 1-92 of the Complaint and incorporates the same herein as if set forth at length.

94.    As a director, officer and controlling person of Pusser's USA and the Predecessor Pusser's Companies, Tobias at all relevant times owed a fiduciary duty to the creditors of Pusser's USA to treat and deal with them fairly and to act in good faith when making decisions and taking actions on behalf of Pusser's USA.

95.    Tobias breached the fiduciary duty that he owed to Magwitch as a secured creditor of Pusser's USA and the Predecessor Pusser's Companies by effecting the transfers of assets from Pusser's USA and the Predecessor Pusser's Companies to other Pusser's entities in which he held a beneficial interest to benefit himself.

96.    Tobias was negligent in failing to protect the interests of Magwitch as a secured creditor of Pusser's USA and the Predecessor Pusser's Companies in connection with the decisions he made and actions he took as a director, officer and controlling person of Pusser's USA and the Predecessor Pusser's Companies.

97.    As a direct and proximate result of the aforesaid negligence and breach of fiduciary duty on the part of Tobias, Magwitch has sustained damage.

WHEREFORE, Plaintiff demands judgment in its favor against Defendants, as follows:

- On the First Count against Pusser's USA for all amounts due and owing under the Promissory Note, including all principal and interest, together with attorneys' fees and costs incurred in connection with the enforcement of the Promissory Note.

- On the Second Count against Pusser's USA for breach of the Security Agreements in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution.

- On the Third Count against Tobias, Pusser's Ltd. and Pusser's West Indies, jointly and severally, for tortuous interference with contract in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and an award of attorneys' fees and costs.

- On the Fourth Count against Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, jointly and severally, for breach of contract in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution.

- On the Fifth Count against Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, jointly and severally, for fraudulent misrepresentation in an amount to be

determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and an award of attorneys' fees and costs;

- On the Sixth Count against all defendants, jointly and severally, for fraudulent transfers:

  (i)   An Order voiding the transfers of assets to the extent necessary to satisfy Magwitch's claims under the Promissory Note;

  (ii)  A Writ of Attachment with respect to the assets transferred or other property of Pusser's Ltd. and Pusser's West Indies having equivalent value;

  (iii) Preliminary and permanent injunctions against all defendants, jointly and severally, prohibiting any further use or disposition of the assets transferred;

  (iv)  An Order appointing a receiver to take charge of the subject assets;

  (v)   An Order authorizing Magwitch to levy execution on the subject assets, their proceeds or property of an equivalent worth in the hands of any or all of the defendants;

  (vi)  Judgment against Pusser's Ltd. and Pusser's West Indies for the value of the subject assets transferred;

  (vii) Judgment imposing a constructive trust on the proceeds received by Pusser's Ltd. and Pusser's West Indies; and

  (viii) Punitive damages, and attorneys' fees and costs.

- On the Seventh Count against Pusser's USA, Tobias and Pusser's West Indies for conversion in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and attorneys' fees and costs.

- On the Eighth Count against Tobias for breach of fiduciary duty in an amount to be determined to compensate Plaintiff and make it whole through an award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and attorneys' fees and costs.

- Awarding Plaintiff the reasonable costs of the action;

- Awarding Plaintiff reasonable attorneys' fees;

- Awarding Plaintiff punitive damages;

- Granting such other and further relief as this Court deems appropriate.

Dated:  New York, New York
        January 22, 2008

                                    Yours, etc.

                                    Solomon Pearl Blum Heymann & Stich LLP.

                        By: _____
                                    Andrew W. Heymann, Esq.
                                    Attorneys for Plaintiff
                                    40 Wall Street, 35th Floor
                                    New York, New York 10004
                                    (212) 267-7600

<u>VERIFICATION</u>

STATE OF NEW YORK    )
                                        )    ss.:
COUNTY OF NEW YORK  )

Lloyd De Vos, being duly sworn, deposes and says:

I am the Manager of plaintiff Magwitch LLC, a limited liability company created under, and by virtue of the laws of the State of New York.  I have read the foregoing Verified Complaint and know the contents thereof and the same are true to my knowledge, except those matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

_____
LLOYD DE VOS

Sworn to before me this
22nd day of January, 2008

_____
Notary Public

ANDREW W. HEYMANN
Notary Public, State of New York
No. 31-4897745
Qualified in New York County
My Commission Expires May 11, 2011

**EXHIBIT A**

# SECURITY AGREEMENT

This **SECURITY AGREEMENT,** made on the dates set forth on the signature page hereof, between **MAGWITCH LLC.,** c/o Hill, Betts & Nash LLP, 99 Park Avenue, 20th Floor, New York, NY 10016 (herein called the "Secured Party") and the undersigned.

(1)(a)   As security for any and all of the Obligations (as defined in Paragraph 1(b)) the undersigned pledges to the Secured Party and creates a lien and security interest in favor of the Secured Party in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

> (i)   all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

> (ii)   all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

> (iii)   all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

> (iv)   all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

> (v)   all claims of the undersigned against the Secured Party, and all moneys at any time in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

> (vi)   all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but no limited to securities issued (as stock splits, stock dividends or otherwise) relative to any securities constituting Collateral.

{NY005101.2 }

(b)  The term "Obligations" means all obligations an liabilities of the undersigned to the Secured Party, now existing or hereafter arising (including but not limited to obligations and liabilities of the undersigned arising under this Security Agreement), whether matured or not matured, whether absolute or contingent and whether directly created or acquired by assignment or otherwise (including but not limited to liabilities, contingent and otherwise, direct or indirect, of the undersigned to the Secured Party as indorser, guarantor, acceptor, surety or otherwise with respect to any obligation or liability of any third party to the Secured Party and liabilities, contingent or otherwise, of the undersigned by way of any express or implied contract with or for the benefit of the Secured Party, to purchase or provide funds for the payment of any obligation or liability of any third party to the Secured Party, or to supply funds to or to invest in such third party, or otherwise to insure the Secured Party against loss on any obligation or liability of such third party).

(2)    Until the occurrence of an Event of Default (as defined in Paragraph 9), the undersigned may use the Collateral in any lawful manner not inconsistent with this Security Agreement and with the terms of any insurance thereon; may sell its inventory and goods in the ordinary course of business; and may use or consume any raw materials or supplies, the use or consumption of which is necessary in order to carry on the undersigned's business.  The undersigned will at all times keep the collateral separate and distinct from any of its other property and keep accurate and complete records of the same.

(3)    The Secured Party shall have no duty of care with respect to the Collateral, except to exercise reasonable care in the custody and preservation of Collateral in its actual possession.  The Secured Party shall be deemed to have exercised reasonable care with respect to Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property or if the Secured Party takes such action with respect to such collateral as the undersigned shall request in writing, but the Secured Party's failure to comply with any such request or to take steps to preserve rights against any person or property shall not be deemed a failure to exercise reasonable care with respect to such Collateral.  The Secured Party shall have no responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the collateral, nor for informing the undersigned with respect to any thereof (whether or not the Secured Party shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the Secured Party, whether or not an Event of Default shall have occurred, the undersigned will promptly: (i) deliver, transfer, assign or indorse to the Secured Party upon receipt by the undersigned, in the exact form in which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Secured Party, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Secured Party; (iii) deliver to the Secured Party, at the time and place and in the manner specified by the Secured Party, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Secured Party has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Secured Party detailed lists of and all

{NY005101.2 }

2

writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Secured Party; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and make payment on account of any or all of the Obligations, in each case to the satisfaction of the Secured Party, if the security afforded by this Security Agreement shall be unsatisfactory to the Secured Party in its sole judgment; and (vi) pay or reimburse the Secured Party for all expenses, including attorney's fees and disbursements, incurred by the Secured Party pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Secured Party's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Secured Party may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Secured Party's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Secured Party may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b)  The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c)  The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Secured Party may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Secured Party. All policies of insurance shall provide that (i) such insurance shall be payable to the Secured Party and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Secured Party for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Secured Party by the insurer. At the request of the Secured Party all such policies shall be delivered to and held by it. The Secured Party may act as attorney for the undersigned in obtaining, adjusting, settling and cancelling such insurance and indorsing any drafts.

(5)    The Secured Party may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Secured Party in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of

{NY005101.2 }

3

insurance as required by Paragraph 4(a)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v) to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Secured Party, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the collateral; and (i) transfer to or register in the name of the Secured Party or of the Secured Party's nominee any or all of the Collateral which may be in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf.

(6)    At any time and from time to time, the Secured Party may at its option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral. The undersigned agrees to join with the Secured Party at the Secured Party's request in executing any such statements and amendments. The undersigned represents to the Secured Party that no lien or security interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Secured Party, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item. The undersigned will not create or suffer to exist, without the prior written consent of the Secured Party, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)    This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Secured Party of the undersigned's signed notice to such effect, or upon the Secured Party's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.

(8)    In the event of the happening of any one or more of the following events (each being herein called an "Event of Default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing for or securing or evidencing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the undersigned or of any indorser, guarantor, acceptor, surety or other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Secured

{NY005101.2}

4

Party, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Secured Party against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Secured Party in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Secured Party's option become immediately due and payable, without demand or notice, and any obligation of the Secured Party to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

(9)    Upon the occurrence of an Event of Default the Secured Party shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Secured Party may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees. legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Secured Party may sell at its

{NY005101.2 }

option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Secured Party may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Secured Party at a place to be designated by the Secured Party which is reasonable convenient to both parties and at a time designated by the Secured Party, all at the expense of the undersigned.

(10)    The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, indorsements and powers of attorney, which in the Secured Party's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(11)(a)    For purposes of perfection of the Secured Party's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Secured Party's possession if such Collateral is in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Secured Party or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Secured Party as collateral security or for safekeeping or for any other or different purpose.

(b)    No failure or delay on the Secured Party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  The Secured Party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance.  None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Secured Party.    No provision of any Agreement or other contract or writing between the undersigned and the Secured Party shall be construed as a waiver, modification or amendment of any of the Secured Party's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement. The Secured Party may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or invalidating its rights as to any other Collateral.

(c)    In litigation in which the Secured Party and the undersigned may be adverse parties, the Secured Party and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Secured Party.

(d)  The undersigned assents to any contract the Secured Party may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e)  This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Secured Party the Secured Party's successors, transferees and assigns.  The Secured Party may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f)  Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Florida.  All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of Florida shall have the same meaning herein as in said Code.  If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

(g)  The undersigned represents to the Secured Party that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h)  If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties.  Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation.  Neither this Security Agreement nor any of the Secured Party's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any Collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Secured Party as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor.  Each party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

(12)    This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Secured Party shall not be required as a condition to the effectiveness of this Security Agreement.  Any execution of this Security Agreement by the Secured Party is only for purposes of filing this Security Agreement as a financing statement, if the Secured Party deems the execution hereof by it to be necessary or desirable for purposes of such filing.

(13)    This Security Agreement is being executed as part of a sale of debt and associated security by Barclays Bank PLC to the Secured Party. Barclays Bank PLC cannot locate the original Security Agreement.  Copies of an original Security Agreement were held by both the Barclays Bank PLC and the undersigned. The undersigned held its copy of the original Security Agreement at the office of its Secretary, which was located at 1 World Trade Center, 52nd Floor, New York, New York.  As a result of terrorist attack that occurred on September 11, 2001, the original Security Agreement was destroyed. This Security Agreement is intended to supersede and assign the rights granted by the undersigned to Barclays Bank to the Secured Party.

Dated: May 8, 2002
       as of October 3, 1997

PUSSER'S INC.,
a Florida corporation

By: _____
      Charles S. Tobias, President

{NY005101.2 }

8

**EXHIBIT B**

# PROMISSORY NOTE

$3,300,000                                                                May 9, 2002

      FOR VALUE RECEIVED, PUSSER'S LTD. (the "Borrower"), promises to pay to the order of BARCLAYS BANK PLC., (the "Lender"), **on demand**, at its offices at Road Town, Tortola, British Virgin Islands, or at such other place or to such other party or parties as Lender may from time to time designate, the principal sum of Three Million Three Hundred Thousand and no/100 ($3,300,000.00) Dollars together with interest thereon computed from the date hereof at the rate of one and one-half (1.5%) percent per annum over the Barclays Bank New York Prime Rate (as hereinafter defined). The amount payable hereunder shall be paid without any set-off or counterclaim whatsoever.

      The interest rate hereunder shall adjust accordingly on each date the Prime Rate changes. The term "Prime Rate" shall mean the rate of interest quoted by Barclays Bank New York, or any successor thereto, as the prime rate (which rate may not be the rate charged by Lender to its preferred customers), as the same may be changed from time to time by it. If for any reason Barclays Bank New York shall at any time no longer quote a prime rate in the manner set forth above, Lender shall, in the exercise of its reasonable judgment, substitute another means of determining the annual lending rate of interest and the rate of interest as thus determined shall thereafter be the Prime Rate as that term is used herein. Interest shall be computed on the actual number of days elapsed divided by a 360-day year.

      All installments of principal and all interest are payable in lawful money of the United States of America, which shall be legal tender in payment of all debts and dues, public and private, at the time of payment; and in the event of (a) failure to pay this Note in full on demand, or (b) default in the payment of any other installment of interest or principal or any other sum payable pursuant to the terms of this Note or any lien document securing this Note, not cured within thirty (30) days after written notice from Lender, or (c) an "Event of Default" as such term is defined in the Security Agreements, (as hereinafter defined) not cured within the cure period (if any) provided therein, then or at any time thereafter, at the option of Lender, the whole of the principal sum then remaining unpaid hereunder together with all interest accrued thereon, shall immediately become due and payable without further notice, and the lien given to secure the payment of this Note may be foreclosed. From and after the maturity of this Note either according to its terms or as the result of a declaration of maturity, the entire principal remaining unpaid hereunder shall bear interest at a rate of four (4%) percent per annum above the rate otherwise in effect hereunder (the "Default Rate"), or the highest applicable lawful rate, whichever is the lesser; provided that there shall be no automatic reduction to the highest lawful rate if Borrower or any endorser or guarantor is barred by law from availing itself in any action or proceeding of the defense of usury, or if Borrower or any endorser or guarantor barred or exempted from the operation of any law limiting the

{NY004998.2}

amount of interest that may be paid for the loan or use of money, or in the event this transaction, because of its amount or purpose or for any other reason is exempt from the operation of any statute limiting the amount of interest that may be paid for the loan of use of money. Failure to exercise such option or any other rights Lender may in the event of any such default be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent default, whether of the same of different nature.

If this Note is placed in the hands of an attorney for collection or is collected through any legal proceedings, Borrower promises to pay all expenses of collection and reasonable attorney's fees incurred by Lender.

In the event the interest provisions hereof or any exactions provided for herein or in the lien documents or any other instruments securing Note shall result, because of the monthly reduction of principal or any other reason related or unrelated to the interest provisions, at any time during the life of the loan, in an effective rate of interest which, for any period of time, transcends the limit of the usury or any other law applicable to the loan evidenced hereby, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied to principal immediately upon receipt of such monies by Lender with the same force and effect as though the payer had specifically designated such and agreed to accept such extra payment(s) as a premium free payment. Notwithstanding the foregoing, however, Lender may at any time and from time to time elect, by notice in writing to the owners of the property affected by the lien document securing this Note, to reduce or limit the collection of any interest to such sums, which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirement of the preceding sentence. In no event shall any agreed to or actual exaction as consideration for this loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

This Note evidences amounts owed pursuant to a facility letter dated 29 February 1996, a facility letter dated 25th November 1996 and a facility letter dated 26 January 2000 (in each case as amended from time to time).

This Note is secured by the Security Agreements over assets located in the United States of America entered into by Barclays Bank PLC with each of the undersigned and mortgage documents entered into by Barclays Bank with Pusser's Inc., a Florida corporation, and such further security documents as may be requested from time to time by Lender ("Security Agreements"), to which reference is made from the terms thereof.

Lender may collect a late charge of five (5%) per cent of any installment of principal or interest which is not paid within fifteen (15) days of the due date thereof to cover the extra time and expense involved in handling delinquent payments. Such late charge shall apply to late payments prior to maturity or acceleration. Upon maturity or acceleration, no further late charges shall be assessed, but Borrower shall pay the Default

Rate of interest on all amounts due from the date of maturity or acceleration until the Note is paid in full. The collection of the late charge shall not be deemed a waiver by Lender of interest accruing after the due date of any installment or of any of Lender's other rights under this Note.

Borrower agrees that the late charge provided above is fair and reasonable compensation to Lender for the additional administrative time and effort incurred in collecting and processing delinquent payments. Borrower further agrees that the Default Rate is a fair and reasonable rate of interest to be charged after maturity or acceleration of this Note in light of the increased risks to Lender inherent in a past due loan and the administrative time and effort incurred in collecting a past due loan.

Borrower and all endorsers, guarantors and all persons liable or to become liable on this Note waive presentment, protest and demand, notice of protest; demand and dishonor and nonpayment of this Note, and consent to any and all renewals and extensions of the time of payment hereof, and agree, further, that at any time and from time to time without notice, the terms of payment herein may be modified or the security described in the lien document securing the Note released in whole or in part, or increased, change or exchange by agreement between Lender and any owner of premises affected by said lien document securing this Note without in anywise affecting the liability of any party to this instrument or any person liable with respect to any indebtedness evidenced hereby.

Lender is not required to rely on the collateral for the payment of the Note in the event of default by the maker, but may proceed directly against the maker, endorsers, or guarantors, if any, in such manner as it deems desirable. None of the rights and remedies of Lender hereunder are to be waived or affected by failure or delay to exercise them. All remedies conferred on Lender by this Note or any other instrument or agreement shall be cumulative, and none is exclusive. Such remedies may be exercised concurrently or consecutively at Lender's option.

This Note may be prepaid in whole or in part at any time without penalty.

This Note shall be governed as to validity, interpretation, construction, effect, and in all other respects by the laws and decisions of the British Virgin Islands.

Wherever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note or portion thereof shall be prohibited by or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

This note may be assigned by Lender with or without recourse.

BORROWER AND LENDER WAIVE, TO THE FULL EXTENT PERMITTED BY LAW, THE RIGHT TO A JURY TRIAL IN ANY LITIGATION CONCERNING THIS PROMISSORY NOTE OR ANY AGREEMENT SECURING THIS PROMISSORY NOTE AND IN ANY LITIGATION CONCERNING ANY DEFENSE, CLAIM, COUNTERCLAIM, CLAIM OF SET-OFF OR SIMILAR CLAIM OF ANY NATURE THAT BORROWER MAY ASSERT AGAINST LENDER.

PUSSER'S LTD., a British Virgin Islands Company

By: _____
     Charles S. Tobias, Director

PUSSER'S INC., a South Carolina Corporation

By: _____
     Charles S. Tobias, President

PUSSER'S INC., a Florida Corporation

By: _____
     Charles S. Tobias, President

PUSSER'S INC., a Delaware Corporation

By: _____
     Charles S. Tobias, President

PUSSER'S INC., a Maryland Corporation

By: _____
     Charles S. Tobias, President

PUSSER'S RETAIL INC., a Delaware Corporation

By: _____
     Charles S. Tobias, President

## ASSIGNMENT OF PROMISSORY NOTE

For value received, Barclays Bank PLC hereby sells, assigns, transfers and conveys the certain promissory note dated May 9 , 2002 made by Pusser's Ltd., Pusser's Inc. (a Delaware corporation), Pusser's Inc. (a Maryland corporation), Pusser's Inc. (a South Carolina corporation), Pusser's Retail Inc. (a South Carolina corporation) and Pusser's Inc. (a Florida corporation) to Magwitch LLC, a New York limited liability company without recourse.

Dated: May 9, 2002  
       Road Town, Tortola  
       British Virgin Islands

Barclays Bank PLC

By: _____  
    Mark Young  
    Senior Manager and Authorized  
    Signatory

**EXHIBIT C**

# MAGWITCH LLC

1445 Forest Court
Mountainside, New Jersey 07092

(908) 789-2400

E-mail: Ldevos@devos-law.com

September 13, 2006

**BY FEDERAL EXPRESS**

Mr. Charles S. Tobias
Chairman
Pusser's Ltd.
"Kingston"
Tortola, British Virgin Islands

Dear Charles:

We refer to the promissory note in the amount of $3,300,000 made by Pusser's Ltd. on May 9, 2002 and the other companies listed thereon to Barclays Bank PLC and assigned by Barclays Bank PLC to us on the same date.

We hereby demand payment in full of all amounts outstanding under this promissory note. The amount outstanding at present is **$1,905,679**, plus $264.68 for each additional day that the note remains unpaid.

Kindly make payment to our account at The United States Trust Company, N. A., ABA number 021001318 for credit to account 21-4605-3.

Yours sincerely,

Lloyd De Vos

LDV/ss

{D0006256.1 }

# Exhibit B



Gregory W. Gilliam
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York 10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**08 CV 02144**

RECEIVED
MAR 03 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

MAGWITCH L.L.C.,

                              Plaintiff,

          -against-

PUSSER'S INC., PUSSER'S LTD.,
PUSSER'S WEST INDIES LTD., and
CHARLES S. TOBIAS

                           Defendants.

------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:

NOTICE OF REMOVAL
(DIVERSITY)

Civil Action No.

(Removed from Supreme
Court, County of New York,
Index No. 600233/08)

**TO THE CLERK OF COURT:**

     **PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446,

Defendants Pusser's Inc., Pusser's Ltd., Pusser's West Indies Ltd., and Charles S. Tobias

(collectively, "Defendants"), by and through their attorneys, remove to this Court the action

described below:

     1.     On January 25, 2008, plaintiff Magwitch L.L.C. ("Magwitch") filed a complaint

in the Supreme Court of New York, County of New York, entitled *Magwitch L.L.C. v. Pusser's*

*Inc., et al.*, Index No. 600233/08. Copies of all papers filed thus far in this action are attached

hereto at Exhibit A, and are provided to this Court pursuant to Local Rule 81.1(b).

2.      Plaintiff's complaint alleges eight causes of action sounding in contract and tort and arising out of an unpaid promissory note, and seeks damages in an amount in excess of $2,000,000.00, plus unspecified other compensatory damages and punitive damages.

3.      The removal statute, 28 U.S.C. § 1441, provides several bases for the removal of a state court action to federal court. Among other things, section 1441(a) states that "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

4.      28 U.S.C. § 1332(a) states in relevant part that "[t]he district courts shall have original jurisdiction of all civil actions where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different States...."

5.      Diversity jurisdiction exists over this action, as the matter in controversy exceeds $75,000 and complete diversity of citizenship exists between the parties. Plaintiff Magwitch seeks judgment in an amount exceeding $1.9 million, exclusive of interest and costs, a total in controversy far exceeding the minimum statutory requirement.

6.      Magwitch is a limited liability company organized under the laws of the State of New York. Its principal place of business is in Mountainside, New Jersey. Thus, Magwitch is a citizen of New York and New Jersey. Defendant Pusser's Inc. is a foreign corporation organized and existing under the laws of the State of Florida, with its principal place of business in Tortola, British Virgin Islands ("BVI"). Pusser's Inc. is, and was at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, a citizen of Florida and the

BVI. Defendant Pusser's Ltd. is a foreign corporation organized and existing under the laws of the BVI, with its principal place of business in the BVI. Defendant Pusser's West Indies Ltd. also is a foreign corporation organized and existing under the laws of the BVI, with its principal place of business in the BVI. Pusser's Ltd. and Pusser's West Indies, Ltd. are, and were at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, citizens of the BVI. Finally, Defendant Charles S. Tobias is, and was at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, a domiciliary and citizen of the BVI who resides at Road Town, Tortola, BVI. None of the Defendants are, or were at the time of the filing of the Complaint or at any time relevant to the matters in the Complaint, citizens of any state in which Magwitch is a citizen. This Court has jurisdiction under 28 U.S.C. § 1332 because both elements of diversity jurisdiction—diversity of citizenship and amount in controversy—are present.

7.    This Notice of Removal is timely filed. 28 U.S.C. § 1446(b) requires that a notice of removal be filed within 30 days after receipt of the initial pleading setting forth the claim. Defendant Pusser's Inc. received the summons and complaint on February 1, 2008. The remaining Defendants received the summons and complaint on February 13, 2008. This action is therefore timely removed under 28 U.S.C. § 1446 because the first of the Defendants to receive Magwitch's initial pleadings received them within 30 days of removal.

8.    Upon the filing of this Notice of Removal, Defendants will serve this Notice on Magwitch's counsel and will cause this Notice of Removal to be filed with the Supreme Court of the State of New York, County of New York, under Index No. 600233/08. A copy of the Notice of Filing of Notice of Removal to the Supreme Court is attached hereto as Exhibit B.

Dated: New York, New York
       March 3, 2008

Gregory W. Gilliam (GG 2857)
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York 10020
Tel: (212) 307-5500
*Attorneys for Defendants Pusser's Inc.,*
*Pusser's Ltd., Pusser's West Indies Ltd., and*
*Charles S. Tobias*

TO:    Clerk of Court
       United States District Court
       Southern District of New York
       Daniel Patrick Moynihan
       United States Courthouse
       500 Pearl Street
       New York, New York 10007-1312

       Andrew W. Heymann, Esq.
       SOLOMON PEARL BLUM HEYMANN & STITCH LLP
       40 Wall Street, 35th Floor
       New York, New York 10004
       *Attorneys for Plaintiff Magwitch L.L.C.*

BA2/336484

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MAGWITCH L.L.C.,                              :       Index No. 600233/08
                                                      Date Purchased: 1-25-08
                          Plaintiff,           :

                                               :       System, INC
          -against-        c/o The Prentice Hall Corporation
                                                       Plaintiff Designates
                                                       New York County as
PUSSER'S INC., a Florida corporation;         :        The Place of Trial
PUSSER'S LTD., a British Virgin Islands
corporation; PUSSER'S WEST INDIES             :        **SUMMONS**
LIMITED, a British Virgin Islands
Corporation; and CHARLES S. TOBIAS           :        The basis of venue
                                                       is the residence of Plaintiff
                          Defendants.          :       Plaintiff resides in
                                                       New York County
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO THE ABOVE NAMED DEFENDANTS:

          YOU ARE HEREBY SUMMONED, to answer the complaint in this

action and serve a copy of your answer, or, if the complaint is not served with this

summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within twenty

(20) days after the service of this summons, exclusive of the day of service (or within 30

days after service is complete if this summons is not personally delivered to you within

the State of New York); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

Thomas N. Vause
Certified Process Server ID#145
Second Judicial Circuit Florida
Date 2-1-08 Time 3:15pm

NEW YORK
COUNTY CLERK'S OFFICE
JAN 25 2008
NOT COMPARED
WITH COPY FILE

Dated: New York, New York
        January 22, 2008

SOLOMON PEARL BLUM HEYMANN & STICH LLP

By: _____
        Andrew W. Heymann
        Attorneys for Plaintiff
        40 Wall Street
        35th Floor
        New York, New York 10005
        (212) 267-7600

To:     Pusser's Inc.
        80 Compromise Street
        Annapolis, Maryland
                and
        c/o Secretary of State, Florida
        c/o Secretary of State, Maryland
        c/o Secretary of State, New York

        Pusser's Ltd.
        Lower Estate
        Road Town
        British Virgin Islands
                and
        c/o Secretary of State, New York

        Pusser's West Indies Limited
        Lower Estate
        Road Town
        British Virgin Islands

        Charles S. Tobias
        Kingston
        Tortola
        British Virgin Islands

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

MAGWITCH L.L.C.,

      Plaintiff,

  v.

PUSSER'S INC., a Florida corporation,
PUSSER'S LTD., a British Virgin Islands
corporation, PUSSER'S WEST INDIES
LIMITED, a British Virgin Islands corporation,
and CHARLES S. TOBIAS,

      Defendants.

---

Index No. 600233/08

VERIFIED COMPLAINT

Plaintiff, Magwitch L.L.C. ("Plaintiff" or "Magwitch"), by its undersigned attorneys, as and for its Complaint herein, alleges as follows:

<u>THE PARTIES</u>

1.  Plaintiff is a limited liability company organized under the laws of the State of New York.

2.  Defendant Pusser's Inc. ("Pusser's USA") is a corporation organized under the laws of the State of Florida. At all relevant times, the principal place of business of Pusser's USA was at 80 Compromise Street, Annapolis, Maryland.

3.  Defendant Pusser's Ltd. ("Pusser's Ltd.") is a corporation organized under the laws of the British Virgin Islands.

4.  Defendant Pusser's West Indies Limited ("Pusser's West Indies") is a corporation organized under the laws of the British Virgin Islands.

NEW YORK
COUNTY CLERK'S OFFICE
JAN 25 2008
NOT COMPARED
WITH COPY FILE

5.    Defendant Charles S. Tobias ("Tobias") is an individual resident at "Kingston," Tortola, British Virgin Islands.

6.    At all relevant times, Tobias was the sole director and President of Pusser's USA.

7.    At all relevant times, Tobias was the controlling person of Pusser's USA.

8.    At all relevant times, Tobias was the sole director and controlling person of Pusser's Ltd.

9.    At all relevant times, Tobias was, and continues to be, the sole shareholder of Pusser's West Indies.

10.    At all relevant times, Tobias was a director and the controlling person of Pusser's West Indies.

## JURISDICTION

11.    Defendant Tobias regularly came to New York for the purpose of conducting the business of defendant Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

12.    Defendant Tobias regularly attended business meetings in New York at which the matters which are the subject of the complaint were discussed during the times relevant to the transactions described in this Complaint.

13.    Defendant Tobias came to New York to give deposition testimony in connection with the business of defendant Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

14.    Defendant Tobias maintained regular and continuous telephone, facsimile and electronic communications with representatives of the Plaintiff in New York during the times relevant to the transactions described in this Complaint.

15.    Defendant Tobias regularly employed legal counsel in New York personally and on behalf of defendants Pusser's USA, defendant Pusser's Ltd. and defendant Pusser's West Indies during the times relevant to the transactions described in this Complaint.

16.    Defendant Tobias caused payments to be made under the promissory note that is the subject of this Complaint to the bank account of plaintiff in New York.

17.    Defendant committed tortious acts on behalf of defendant Pusser's USA outside of New York causing injury to the plaintiff within New York.

18.    Defendant Tobias committed tortious acts on behalf of defendant Pusser's Ltd. outside of New York causing injury to the plaintiff within New York.

19.    Defendant Tobias committed tortious acts on behalf of defendant Pusser's West Indies outside of New York causing injury to the plaintiff within New York.

20.    Defendant Tobias, acting on behalf of defendant Pusser's USA as more fully described in this Complaint, caused funds belonging to Pusser's USA to be transferred and diverted to defendants Pusser's Ltd. and Pusser's West Indies, causing injury to Plaintiff in New York when funds were unavailable to pay Plaintiff in New York amounts due on the promissory note that is the subject of this Complaint.

21.    Defendant Tobias, acting on behalf of defendants Pusser's USA, Pusser's Ltd., Pusser's West Indies and personally, expected and should have reasonably expected the acts complained of herein to have consequences in New York.

22.    Defendant Tobias, acting on behalf of defendants Pusser's USA, Pusser's Ltd., Pusser's West Indies and personally, derive substantial revenue from interstate or international commerce.

<u>FACTS</u>

23.     At all relevant times, the Pusser's group of companies (collectively, "Pusser's") was engaged in the businesses of operating restaurants and retail stores in the United States, the U.S. Virgin Islands and the British Virgin Islands.

24.     At all relevant times, the restaurant and retail businesses of Pusser's in the United States was conducted by companies incorporated in Florida, Maryland and South Carolina (the "Predecessor Pusser's Companies"), all of which were subsequently amalgamated into Pusser's USA.

25.     The restaurant and retail business of Pusser's in the Caribbean historically was conducted by Pusser's Ltd.

26.     Pusser's was historically financed by loans from Barclays Bank PLC ("Barclays") through its office in Tortola, British Virgin Islands.

27.     By mid 2002, Pusser's had accumulated debt owing to Barclays in excess of ten million dollars.

28.     By mid 2001, Barclays had notified Pusser's that it no longer wished to be the bankers to Pusser's and would demand payment of the debt if arrangements were not made to compromise or sell the debt.

29.     During 2001 and early 2002, Pusser's attempted to arrange for financing from other sources to replace Barclays.  Pusser's was unable to obtain financing.

30.     To avoid the placing of Pusser's into liquidation, Tobias, the Chairman and controlling shareholder of Pusser's, Lloyd De Vos ("De Vos") and James Jackson ("Jackson") agreed to lead a group of shareholders in a purchase of the debt owed by Pusser's to Barclays at a negotiated discount.

31.    The offer to purchase debt from Barclays was extended to all shareholders of Pusser's. No shareholders other than Tobias, De Vos and Jackson agreed to participate.

32.    On May 9, 2002, Pusser's (2001) Ltd., a company owned by Johanna Rowan Tobias, wife of Charles Tobias, and controlled by Charles Tobias ("Pusser's 2001"), Magwitch and Pusser's West Indies (at the time controlled by Jackson) entered into an agreement with Barclays (the "Barclays Agreement") under which Magwitch would purchase $3,300,000 in face amount of the debt owed by Pusser's to Barclays in exchange for a payment of $1,500,000 on May 9, 2002, Pusser's 2001 would purchase $2,200,000 in face amount of the debt owed by Pusser's to Barclays in exchange for a payment of $1,000,000 on May 31, 2002, and Pusser's West Indies would purchase approximately $4,400,000 in face amount of the debt remaining owed by Pusser's to Barclays in exchange for a payment of $2,000,000 on September 30, 2002.

33.    Under the Barclay Agreement, all security held by Barclays in assets of Pusser's USA was to be assigned to Magwitch.

34.    As a condition of entering into the Barclays Agreement, Magwitch required that either Barclays assign and deliver to it security agreements that created a first security interest in all of the assets of Pusser's USA and the Predecessor Pusser's Companies or that Pusser's USA and the Predecessor Pusser's Companies execute security agreements that created a first security interest in the assets of Pusser's USA and its predecessors. A copy of the Pusser's USA security agreement is attached to this complaint as Exhibit A.

35.    Under the provisions of the security agreements covering the assets of Pusser's USA and the Predecessor Pusser's Companies, the secured party had the right to require that proceeds from the sale of inventories and other assets be paid to the secured party, either before or after the occurrence of an event of default.

36.    On behalf of Pusser's Ltd., Pusser's West Indies, Pusser's USA and the Predecessor Pusser's Companies, Tobias represented to, warranted, covenanted and agreed with Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001, until such time as the debt owed to Magwitch had been repaid.

37.    Magwitch specifically required this representation, warranty and covenant because it knew that Tobias had been transferring funds from Pusser's USA and the Predecessor Pusser's Companies to support the loss-making operations of Pusser's Ltd.

38.    Magwitch specifically relied upon this representation, warranty and covenant in entering into the Barclays Agreement.

39.    Under the provisions of the security agreements covering Pusser's USA and the Predecessor Pusser's Companies, all proceeds of any insurance policies were assigned to the secured party and payable to the secured party.

40.    On May 9, 2002, Magwitch paid $1,500,000 to Barclays in exchange for the demand promissory note made by Pusser's USA and others in favor of Barclays, dated April 5, 2002, in the face amount of $3,300,000 (the "Promissory Note"). A copy of the promissory note, as assigned to Magwitch, is attached to this Complaint as Exhibit B.

41.    At the time he caused Pusser's 2001 to enter into the Barclays Agreement, Tobias had no intention to honor his representations, warranty and covenant not to transfer funds from Pusser's USA and the Predecessor Pusser's Companies to other Pusser's companies.

42.    Pusser's 2001 breached the Barclays Agreement by failing to pay the required $1,000,000 to Barclays on May 31, 2002.

43.    Pusser's West Indies breached the Barclays Agreement by failing to pay the required $2,000,000 to Barclays on September 30, 2002.

44.    Following the breaches of the Barclays Agreement by Pusser's 2001 and Pusser's West Indies, Barclays threatened to reclaim the security over the Pusser's USA assets and treat the $1,500,000 paid by Magwitch as payment of the outstanding Pusser's Ltd. loans, as it was entitled to do under the terms of the Barclays Agreement.

45.    On July 9, 2003, the Barclays Agreement was amended to provide that instead of $3,000,000 being paid to Barclays by Pusser's 2001 and Pusser's West Indies for the remaining debt of Pusser's Ltd., Pusser's West Indies would purchase the remaining $7,031,124.77 in debt for $2,000,000.

46.    Magwitch consented to the amendment in order to avoid loss of its investment and the security for the Promissory Note, as had been threatened by Barclays.

47.    Pusser's West Indies subsequently purchased the debt of $7,031,124.77 owed by Pusser's Ltd. to Barclays for $2,000,000.

48.    Pusser's West Indies subsequently acquired all of the Caribbean assets of Pusser's Ltd.

49.    Subsequent to the purchase by Magwitch of the Promissory Note, neither Pusser's Ltd. nor Pusser's West Indies were able to generate sufficient cash to meet their obligations.

50.    Starting as early as September 2002, Tobias caused Pusser's USA and the Predecessor Pusser's Companies to transfer funds from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies, in breach of his commitment on behalf of Pusser's Ltd. Pusser's West Indies, Pusser's USA and the Predecessor Pusser's Companies.

51.    By June 30, 2004, Tobias had caused Pusser's USA and the Predecessor Pusser's Companies to transfer $2,470,386 to Pusser's West Indies and Pusser's Ltd., in breach of his commitment.

52.    In October 2004, Tobias caused Pusser's USA to transfer $14,000 to Pusser's West Indies.

53.    On April 4, 2005, Pusser's USA received a payment in settlement of insurance claims from damages to premises at Annapolis, Maryland in the amount of $753,227 that had been assigned to Magwitch under the terms of the security agreement between Pusser's USA and Magwitch.

54.    Notwithstanding prior demand for direct payment of these funds to Magwitch, and immediate transfer of these funds to Magwitch should they have been received by Pusser's USA, Pusser's USA refused to notify the insurance company to pay the funds directly to Magwitch, refused to pay the insurance proceeds to Magwitch upon receipt and converted them for its own purposes.

55.    On April 4, 2005, Tobias caused Pusser's USA to transfer $374,227 to Pusser's West Indies.

56.    On April 5, 2005, Tobias caused Pusser's USA to pay $11,533 in bank charges on the wrongful transfers to Pusser's West Indies.

57.    On April 14, 2005, Tobias caused Pusser's USA to transfer $10,000 to Pusser's West Indies.

58.    Upon information and belief, after April 14, 2005, Tobias caused Pusser's USA to transfer approximately $219,000 to Pusser's West Indies.

59. All of the transfers from Pusser's USA or the Predecessor Pusser's Companies to Pusser's Ltd. or Pusser's West Indies were in breach of the agreement between Tobias, Pusser's Ltd. and Magwitch that no such transfers would be made while amounts were outstanding under the Promissory Note.

60. On September 14, 2006, Magwitch demanded payment from Pusser's USA of all amounts due and owing on the Promissory Note. A copy of the demand letter is attached as Exhibit C.

61. Despite demand, the amount due on the Promissory Note has not been paid.

62. The amount outstanding on the Promissory Note for principal and accrued interest at December 31, 2007 totals $2,123,140.

## FIRST COUNT
### (Default Under Promissory Note by Pusser's USA)

63. Plaintiff repeats and restates the allegations of Paragraphs 1-62 of the Complaint and incorporates the same herein as if set forth at length.

64. The failure of Pusser's USA to respond to Plaintiff's demand for payment of all amounts due and owing on the Promissory Note constitutes an act of default under the terms of the Promissory Note.

65. By reason of the default by Pusser's USA, the principal amount of the Promissory Note, together with all interest thereon, is immediately due and owing.

## SECOND COUNT
### (Breach of Security Agreements by Pusser's USA)

66. Plaintiff repeats and restates the allegations of Paragraphs 1-65 of the Complaint and incorporates the same herein as if set forth at length.

67.    The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies constitute breaches of the security agreements and assignments thereof that conferred upon Magwitch a first security interest in the assets of Pusser's USA and the Predecessor Pusser's Companies.

68.    By reason of the aforesaid breaches of contract, Pusser's USA is without assets sufficient to satisfy its obligations to Magwitch under the terms of the Promissory Note.

69.    As a direct and proximate result of the breaches of contract by Pusser's USA, Magwitch has sustained damage.

### THIRD COUNT
### (Tortious Interference With Contract by Tobias, Pusser's Ltd. and Pusser's West Indies)

70.    Plaintiff repeats and restates the allegations of Paragraphs 1-69 of the Complaint and incorporates the same herein as if set forth at length.

71.    Tobias, acting on behalf of Pusser's Ltd. and Pusser's West Indies as well as in his own self-interest, caused Pusser's USA to effect the aforesaid transfers of assets.

72.    In so doing, Tobias, Pusser's Ltd. and Pusser's West Indies intentionally and tortiously interfered with the security agreements pursuant to which Magwitch had a first security interest in all the assets of Pusser's USA and the Predecessor Pusser's Companies.

73.    As a direct and proximate result of the wrongful conduct of Tobias, Pusser's Ltd. and Pusser's West Indies, Magwitch has sustained damage.

### FOURTH COUNT
### (Breach of Contract by Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA)

74.    Plaintiff repeats and restates the allegations of Paragraphs 1-73 of the Complaint and incorporates the same herein as if set forth at length.

75.    The transfers of assets from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made without first obtaining the express written consent of Magwitch.

76.    By effecting the transfer of assets from Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies, as set forth herein, Tobias, Pusser's USA, Pusser's West Indies and Pusser's Ltd. breached the warranties given by them to Magwitch and breached the covenants and agreements they made with Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001, until such time as the debt owed to Magwitch had been repaid.

77.    By reason of the aforesaid breaches of warranty and contract, Pusser's USA is without assets sufficient to satisfy its obligations to Magwitch under the terms of the Promissory Note.

78.    As a direct and proximate result of the breaches of warranty and contract by Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, Magwitch has sustained damage.

## FIFTH COUNT
(Fraudulent Misrepresentation by All Defendants)

79.    Plaintiff repeats and restates the allegations of Paragraphs 1-78 of the Complaint and incorporates the same herein as if set forth at length.

80.    Tobias, acting on behalf of Pusser's USA, the Predecessor Pusser's Companies, Pusser's Ltd. and Pusser's West Indies, as well as in his own self-interest, induced Magwitch to enter into the Barclays Agreement by representing and warranting to Magwitch that without the express written consent of Magwitch, Pusser's USA and the Predecessor Pusser's Companies would not

- 11 -

transfer assets of Pusser's USA or the Predecessor Pusser's Companies to any other Pusser's company, including specifically Pusser's Ltd., Pusser's West Indies or Pusser's 2001, until such time as the debt owed to Magwitch had been repaid.

81.     On the basis of these representations and warranties, and in good faith reliance thereon, Magwitch agreed to enter into the Barclays Agreement and, pursuant thereto, paid $1,500,000 to Barclays in exchange for the Promissory Note.

82.     The representations and warranties made by Tobias were false when made.

83.     Defendants made the foregoing representations and gave the foregoing warranties to Magwitch with the expectation that Magwitch would rely on them and Magwitch did, in fact, rely on them to its detriment.

## SIXTH COUNT
### (Fraudulent Transfers by All Defendants)

84.     Plaintiff repeats and restates the allegations of Paragraphs 1-83 of the Complaint and incorporates the same herein as if set forth at length.

85.     The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made with actual intent to hinder, delay or defraud Magwitch as a creditor of Pusser's USA and the Predecessor Pusser's Companies, in violation of the Maryland Uniform Fraudulent Conveyance Act, Md. Code, Commercial Law, §§15-201 et seq.

86.     The transfers of assets by Pusser's USA and the Predecessor Pusser's Companies to Pusser's Ltd. and Pusser's West Indies were made without fair consideration.

87.     The transfers of assets by Pusser's USA to Pusser's Ltd. and Pusser's West Indies caused Pusser's USA and to become insolvent at the time of the transfers or became insolvent as a result of the transfers.

88.    All defendants participated in and benefited from the fraudulent transfers of Pusser's USA's assets, as aforesaid.

89.    As a direct and proximate result of defendants' participation in the fraudulent transfers of assets, Magwitch has sustained damage.

<u>SEVENTH COUNT</u>
(Conversion by Pusser's USA, Tobias and Pusser's West Indies)

90.    Plaintiff repeats and restates the allegations of Paragraphs 1-89 of the Complaint and incorporates the same herein as if set forth at length.

91.    Pusser's USA, Tobias and Pusser's West Indies converted to their own use and purposes the funds received by Pusser's USA in settlement of insurance claims from damages to premises at Annapolis, Maryland, in contravention of Magwitch's right to the payment of all proceeds of any insurance policies held by Pusser's USA under the terms of the security agreement between Pusser's USA and Magwitch.

92.    As a direct and proximate result of the conversion of funds by Pusser's USA, Tobias and Pusser's West Indies, Magwitch has sustained damage.

<u>EIGHTH COUNT</u>
(Negligence and Breach of Fiduciary Duty by Tobias)

93.    Plaintiff repeats and restates the allegations of Paragraphs 1-92 of the Complaint and incorporates the same herein as if set forth at length.

94.    As a director, officer and controlling person of Pusser's USA and the Predecessor Pusser's Companies, Tobias at all relevant times owed a fiduciary duty to the creditors of Pusser's USA to treat and deal with them fairly and to act in good faith when making decisions and taking actions on behalf of Pusser's USA.

- 13 -

95.    Tobias breached the fiduciary duty that he owed to Magwitch as a secured creditor of Pusser's USA and the Predecessor Pusser's Companies by effecting the transfers of assets from Pusser's USA and the Predecessor Pusser's Companies to other Pusser's entities in which he held a beneficial interest to benefit himself.

96.    Tobias was negligent in failing to protect the interests of Magwitch as a secured creditor of Pusser's USA and the Predecessor Pusser's Companies in connection with the decisions he made and actions he took as a director, officer and controlling person of Pusser's USA and the Predecessor Pusser's Companies.

97.    As a direct and proximate result of the aforesaid negligence and breach of fiduciary duty on the part of Tobias, Magwitch has sustained damage.

WHEREFORE, Plaintiff demands judgment in its favor against Defendants, as follows:

- On the First Count against Pusser's USA for all amounts due and owing under the Promissory Note, including all principal and interest, together with attorneys' fees and costs incurred in connection with the enforcement of the Promissory Note.

- On the Second Count against Pusser's USA for breach of the Security Agreements in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution.

- On the Third Count against Tobias, Pusser's Ltd. and Pusser's West Indies, jointly and severally, for tortuous interference with contract in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and an award of attorneys' fees and costs.

- On the Fourth Count against Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, jointly and severally, for breach of contract in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution.

- On the Fifth Count against Tobias, Pusser's Ltd., Pusser's West Indies and Pusser's USA, jointly and severally, for fraudulent misrepresentation in an amount to be

determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and an award of attorneys' fees and costs;

- On the Sixth Count against all defendants, jointly and severally, for fraudulent transfers:

  (i)   An Order voiding the transfers of assets to the extent necessary to satisfy Magwitch's claims under the Promissory Note;

  (ii)  A Writ of Attachment with respect to the assets transferred or other property of Pusser's Ltd. and Pusser's West Indies having equivalent value;

  (iii) Preliminary and permanent injunctions against all defendants, jointly and severally, prohibiting any further use or disposition of the assets transferred;

  (iv)  An Order appointing a receiver to take charge of the subject assets;

  (v)   An Order authorizing Magwitch to levy execution on the subject assets, their proceeds or property of an equivalent worth in the hands of any or all of the defendants;

  (vi)  Judgment against Pusser's Ltd. and Pusser's West Indies for the value of the subject assets transferred;

  (vii) Judgment imposing a constructive trust on the proceeds received by Pusser's Ltd. and Pusser's West Indies; and

  (viii) Punitive damages, and attorneys' fees and costs.

- On the Seventh Count against Pusser's USA, Tobias and Pusser's West Indies for conversion in an amount to be determined to compensate Plaintiff and to make it whole through the award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and attorneys' fees and costs.

- On the Eighth Count against Tobias for breach of fiduciary duty in an amount to be determined to compensate Plaintiff and make it whole through an award of compensatory, consequential and incidental damages, and interest, including restitution, and for punitive damages and attorneys' fees and costs.

- Awarding Plaintiff the reasonable costs of the action;

- Awarding Plaintiff reasonable attorneys' fees;

- Awarding Plaintiff punitive damages;

- Granting such other and further relief as this Court deems appropriate.

Dated: New York, New York
       January 22, 2008

Yours, etc.

Solomon Pearl Blum Heymann & Stich LLP.

By: _____
    Andrew W. Heymann, Esq.
    Attorneys for Plaintiff
    40 Wall Street, 35th Floor
    New York, New York 10004
    (212) 267-7600

<u>VERIFICATION</u>

STATE OF NEW YORK    )
                     )    ss.:
COUNTY OF NEW YORK  )

Lloyd De Vos, being duly sworn, deposes and says:

I am the Manager of plaintiff Magwitch LLC, a limited liability company created under, and by virtue of the laws of the State of New York. I have read the foregoing Verified Complaint and know the contents thereof and the same are true to my knowledge, except those matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

_____
LLOYD DE VOS

Sworn to before me this
22ᵈ day of January, 2008

_____
Notary Public

ANDREW W. HEYMANN
Notary Public, State of New York
No. 31-4897745
Qualified in New York County
My Commission Expires May 11, 2011

# EXHIBIT  A

## SECURITY AGREEMENT

This **SECURITY AGREEMENT**, made on the dates set forth on the signature page hereof, between **MAGWITCH LLC.**, c/o Hill, Betts & Nash LLP, 99 Park Avenue, 20th Floor, New York, NY 10016 (herein called the "Secured Party") and the undersigned.

(1)(a)  As security for any and all of the Obligations (as defined in Paragraph 1(b)) the undersigned pledges to the Secured Party and creates a lien and security interest in favor of the Secured Party in all of the Undersigned's present and future right, title and interest in or to the following property, in each case whether now existing or hereafter arising, whether now owned or hereafter acquired, and wherever located (the following property being herein called collectively the "Collateral"):

(i)  all inventory and all goods, including goods in transit, which are held for sale or lease or to be furnished under contracts of service or are so furnished by the undersigned, or which are raw materials, work in process or materials used or consumed in the undersigned's business, and all documents of title covering any such inventory or goods;

(ii)  all contract rights, all rights to payments under contracts not yet earned by performance, and all instruments and chattel paper evidencing any such rights to payment;

(iii)  all accounts, all rights to payment for goods sold or leased or for services rendered, and all instruments and chattel paper evidencing any such rights to payment;

(iv)  all other goods (including but not limited to consumer goods, equipment, farm products and motor vehicles), all letters of credit, advices of credit, documents, instruments, securities, general intangibles and chattel paper, all other tangible or intangible personal property (including things in action) and all fixtures;

(v)  all claims of the undersigned against the Secured Party, and all moneys at any time in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf either deposited by or otherwise to the credit of or due to or belonging to the undersigned; and

(vi)  all proceeds of (including but not limited to inventory returned or repossessed), products of and accessions to all of the foregoing Collateral and all proceeds thereof, including but no limited to securities issued (as stock splits, stock dividends or otherwise) relative to any securities constituting Collateral.

{NY005101.2 }

(b) The term "Obligations" means all obligations an liabilities of the undersigned to the Secured Party, now existing or hereafter arising (including but not limited to obligations and liabilities of the undersigned arising under this Security Agreement), whether matured or not matured, whether absolute or contingent and whether directly created or acquired by assignment or otherwise (including but not limited to liabilities, contingent and otherwise, direct or indirect, of the undersigned to the Secured Party as indorser, guarantor, acceptor, surety or otherwise with respect to any obligation or liability of any third party to the Secured Party and liabilities, contingent or otherwise, of the undersigned by way of any express or implied contract with or for the benefit of the Secured Party, to purchase or provide funds for the payment of any obligation or liability of any third party to the Secured Party, or to supply funds to or to invest in such third party, or otherwise to insure the Secured Party against loss on any obligation or liability of such third party).

(2)     Until the occurrence of an Event of Default (as defined in Paragraph 9), the undersigned may use the Collateral in any lawful manner not inconsistent with this Security Agreement and with the terms of any insurance thereon; may sell its inventory and goods in the ordinary course of business; and may use or consume any raw materials or supplies, the use or consumption of which is necessary in order to carry on the undersigned's business. The undersigned will at all times keep the collateral separate and distinct from any of its other property and keep accurate and complete records of the same.

(3)     The Secured Party shall have no duty of care with respect to the Collateral, except to exercise reasonable care in the custody and preservation of Collateral in its actual possession. The Secured Party shall be deemed to have exercised reasonable care with respect to Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property or if the Secured Party takes such action with respect to such collateral as the undersigned shall request in writing, but the Secured Party's failure to comply with any such request or to take steps to preserve rights against any person or property shall not be deemed a failure to exercise reasonable care with respect to such Collateral. The Secured Party shall have no responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the collateral, nor for informing the undersigned with respect to any thereof (whether or not the Secured Party shall have, or be deemed to have, knowledge thereof).

(4)(a)  At the request at any time and from time to time of the Secured Party, whether or not an Event of Default shall have occurred, the undersigned will promptly: (i) deliver, transfer, assign or indorse to the Secured Party upon receipt by the undersigned, in the exact form in which they are received all proceeds of Collateral, including but not limited to proceeds of contract rights, accounts, general intangibles, chattel paper and instruments; (ii) notify account debtors and obligors on instruments to make payments directly to the Secured Party, and indicate on all invoices to such account debtors and obligors that all payments are to be made directly to the Secured Party; (iii) deliver to the Secured Party, at the time and place and in the manner specified by the Secured Party, all Collateral in which a security interest may be perfected by a secured party's taking possession thereof, irrespective of whether the Secured Party has prior thereto perfected a security interest in such Collateral by filing or otherwise; (iv) deliver to the Secured Party detailed lists of and all

[NYV003101.2 ]

writings relating to the Collateral and evidence of the maintenance of insurance pursuant to Paragraph 4(c), all in a form satisfactory to the Secured Party; (v) furnish additional collateral security, not included in Paragraph 1(a), as security for any and all of the Obligations and make payment on account of any or all of the Obligations, in each case to the satisfaction of the Secured Party, if the security afforded by this Security Agreement shall be unsatisfactory to the Secured Party in its sole judgment; and (vi) pay or reimburse the Secured Party for all expenses, including attorney's fees and disbursements, incurred by the Secured Party pursuant to any provision of this Security Agreement or in connection with; the administration and enforcement of and the exercise of any of the Secured Party's rights under this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral Obligations, and the realization upon any or all of the Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements, loss and liability to which the Secured Party may become subject in connection with this Security Agreement (including but not limited to the custody, preservation, use and operation of any Collateral in the Secured Party's possession or control) and any Agreement (as defined in Paragraph 9(b), the enforcement of any of the Obligations, and the realization upon any or all Collateral. The undersigned hereby indemnifies and holds harmless the Secured Party from and against any claim, expense (including attorney's fees and disbursements), loss and liability to which the Secured Party may become subject in connection with this Security Agreement, and Agreement, any Obligation or any collateral.

(b) The undersigned will promptly pay when due all taxes relating to this Security Agreement, any Agreement, any Obligation or any Collateral (including its custody, preservation, use or operation).

(c) The undersigned will maintain insurance at all times with respect to all insurable Collateral against risk of fire, theft and all other risks customarily insured against by persons engaged in business similar to that of the undersigned and such special risks as the Secured Party may designate, in such amounts, containing such terms, in such forms, for such periods and written by such insurers as shall be satisfactory to the Secured Party. All policies of insurance shall provide that (i) such insurance shall be payable to the Secured Party and the undersigned as their respective interest may appear, (ii) there shall be no recourse against the Secured Party for payment of premiums, commissions, assessments or advances and (iii) at least ten days' prior written notice of cancellation for any reason or of any lapse shall be given to the Secured Party by the insurer. At the request of the Secured Party all such policies shall be delivered to and held by it. The Secured Party may act as attorney for the undersigned in obtaining, adjusting, settling and cancelling such insurance and indorsing any drafts.

(5)     The Secured Party may at any time and from time to time, at its option, whether or not an Event of Default shall have occurred, whether or not the Collateral shall then be deemed by the Secured Party in its sole discretion to be adequate, and without notice to the undersigned, (a) pay any taxes referred to in Paragraph 4(b); (b) discharge any liens, security interests and other encumbrances to which any Collateral may be subject at any time; (c) take any action shall deem proper with respect to, and pay for, the preservation, maintenance and repair of any or all of the Collateral; (d) in the event of failure by the undersigned to deliver evidence of the maintenance of

{NY005101.2 }

3

insurance as required by Paragraph 4(a)(iv), obtain and pay for such insurance; (e) notify account debtors and obligors on instruments to make payments directly to the bank; (f) collect, compromise, indorse, sell or otherwise deal with obligations of account debtors and of obligors on instruments and all proceeds of Collateral, in its own name or that of the undersigned; (g) notwithstanding anything contained in paragraph 4(a)(v) to the contrary, either set off, appropriate and apply upon any or all of the Obligations, whether or not then due, and any moneys constituting Collateral (including but not limited to any cash proceeds of Collateral), or hold any such moneys as security for any or all of the Obligations until the exact amount thereof shall have been definitely ascertained by the Secured Party, or release such moneys to the undersigned for use in the operation of the undersigned's business; (h) at all reasonable time, through any of its representatives, examine and inspect any or all of the Collateral and examine, inspect and make copies of or extracts from the undersigned's books, records and any other writings relating to the collateral; and (i) transfer to or register in the name of the Secured Party or of the Secured Party's nominee any or all of the Collateral which may be in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf.

(6)    At any time and from time to time, the Secured Party may at its  option file in any jurisdiction, at the undersigned's expenses, one or more financing, continuation and similar statements, and any amendments thereto, with or (to the extent permitted by applicable law) without the undersigned's signature, covering any or all of the collateral.  The undersigned agrees to join with the Secured Party at the Secured Party's request in executing any such statements and amendments.  The undersigned represents to the Secured Party that no lien or security interest has been created or exists with respect to any of the Collateral, except for liens and security interest in favor of the Secured Party, and that no financing statement or similar document is on file in any jurisdiction covering or describing any of the Collateral by type or item.  The undersigned will not create or suffer to exist, without the prior written consent of the Secured Party, any such lien or security interest and will not permit any such financing statement or similar document to be on file in any jurisdiction.

(7)    This Security Agreement is a continuing agreement and shall remain in full force and effect until termination of this Security Agreement upon the receipt by the Secured Party of the undersigned's signed notice to such effect, or upon the Secured Party's giving notice to such effect to the undersigned, and payment and discharge in full of all of the Obligations.

(8)    In the event of the happening of any one or more of the following events (each being herein called an "Event of Default"), to wit: (a) the non-payment or non-performance of any of the Obligations; (b) the failure of the undersigned to  perform or observe any of the terms or provisions of this Security Agreement or of any other writing or contract of the undersigned, now existing or hereafter made, with respect to or providing for or securing or evidencing any of the Obligations (any such other writing or contract being held herein called an "Agreement"); (c) the insolvency, death, failure in business or suspension of usual business, dissolution or termination of existence of the undersigned or of any indorser, guarantor, acceptor, surety or other person liable, contingently or otherwise, directly or indirectly, with respect to any of the Obligations, including but not limited to any such liability by way of any express or implied contract with or for the benefit of the Secured

[NY005101.2]

4

Party, to purchase or provide funds for the payment of any of the Obligations, or to supply funds to or to invest in the undersigned, or otherwise, or otherwise to insure the Secured Party against loss on any of the Obligations (any such person being herein called an "Accommodation Party"); (with institution by or against the undersigned or any Accommodation Party, under any bankruptcy, insolvency, debtor's or similar law, of bankruptcy or insolvency proceedings or proceedings seeking liquidation, reorganization, arrangement, adjustment, composition or relief of or in respect of the undersigned or any Accommodation Party; the appointment of a receiver, assignee, trustee, sequestrator, liquidator or similar official for, or for any property of, the undersigned or any Accommodation Party; the making of an assignment for the benefit of creditors by the undersigned or any Accommodation Party; or the admission by the undersigned or any Accommodation Party in writing of its inability to pay its debts as they mature; (e) the issuance of any restraining notice, injunction, order of attachment or any other court order or legal process with respect to any Collateral or any other property of the undersigned or of any Accommodation Party; (f) the issuance of an execution or the commencement of supplementary proceedings against the undersigned or any Accommodation Party in connection with a judgment entered against the undersigned or such Accommodation Party; (g) the taking of title to or possession of, or the assumption of control over all or any substantial part of the property or management of the undersigned or any Accommodation Party by the United States Government, any other government (de facto or de jure) or any agency or instrumentality of any thereof; (h) the failure of the undersigned or any unenforceability of any writing or contract of any Accommodation Party, now existing or hereafter made, with respect to, directly or indirectly, any of the obligations; (k) the making by the undersigned or any Accommodation Party of any misrepresentation to the Secured Party in connection with this Security agreement or any Agreement or for the purpose of obtaining any loan, advance, extension of credit, other financial accommodation or any of the Obligations; or (l) if the Default with respect to any partner - then, or at any time after the happening of such Event of Default, any or all of the Obligations then existing, although otherwise unmatured or contingent, shall at the Secured Party's option become immediately due and payable, without demand or notice, and any obligation of the Secured Party to make further loans, advances, extensions of credit or other financial accommodations to the undersigned shall thereupon be terminated.

(9)    Upon the occurrence of an Event of Default the Secured Party shall have all of the rights and remedies available to a secured party under applicable law and, in addition thereto, the undersigned agrees that (a) in the event that notice is required by applicable law, written notice given by mail to the undersigned, at the address set forth on the signature page hereof, three business days prior to the date of public sale of any Collateral or prior to the date after which private sale of any other disposition of any Collateral will be made shall constitute reasonable notice, but notice, given in any other reasonable manner or at any other reasonable time shall be sufficient; (b) in the event of sale or other disposition of any Collateral, the Secured Party may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees, legal expenses and other costs and expenses incurred in connection with its taking, retaking, holding, preparing for sale or other disposition, and selling or other disposition of such Collateral; (c) without precluding any other methods of sale or other disposition, the sale or other disposition of any collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event the Secured Party may sell at its

{NY005101.2}

option on such terms as it may choose, without assuming any credit risk and (to the extent permitted by applicable law) without any obligation to advertise; and (d) the Secured Party may require the undersigned to assemble the Collateral and to take all necessary or appropriate action to preserve and keep it in good condition and to make it available to the Secured Party at a place to be designated by the Secured Party which is reasonable convenient to both parties and at a time designated by the Secured Party, all at the expense of the undersigned.

(10)    The undersigned agrees, at its own expense, to do all further acts and things and to execute and deliver all writings and contracts, including security agreements, assignments, indorsements and powers of attorney, which in the Secured Party's opinion may be necessary or appropriate to create, perfect, preserve, validate or otherwise protect in any jurisdiction any lien or security interest granted pursuant hereto or in any additional collateral security referred to in Paragraph 4(a)(v) or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or with respect to such liens or security interests.

(11)(a)    For purposes of perfection of the Secured Party's security interest in any Collateral in which a security interest may be perfected by possession, such Collateral shall be deemed to be in the Secured Party's possession if such Collateral is in the possession or control of the Secured Party, of any of its correspondents or of any other third party acting on the Secured Party's behalf, or if such Collateral is put in transit by mail or by carrier to or from the Secured Party or any such correspondent or third party, in all cases irrespective of whether for the express purpose of being used by the Secured Party as collateral security or for safekeeping or for any other or different purpose.

(b)  No failure or delay on the Secured Party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The Secured Party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law or in any Agreement or other contract between the undersigned to any other or further notice or demand similar or other circumstance. None of the terms or provisions of this Security Agreement may be waived, modified or amended except in writing duly signed by the Secured Party. No provision of any Agreement or other contract or writing between the undersigned and the Secured Party shall be construed as a waiver, modification or amendment of any of the Secured Party's rights and remedies under this Security Agreement unless such waiver, modification or amendment is made expressly and with explicit reference to this Security Agreement. The Secured Party may in its discretion at any time relinquish its rights hereunder as a particular Collateral without thereby affecting or invalidating its rights as to any other Collateral.

(c)  In litigation in which the Secured Party and the undersigned may be adverse parties, the Secured Party and the undersigned hereby waive their respective rights to demand trial by jury and, in addition, the undersigned waives any set-off or counterclaim of any nature or description against the Secured Party.

[NY6005101.2]

6

(d) The undersigned assents to any contract the Secured Party may enter into with any other bank or other secured party of which the undersigned is indebted providing for subordination of priorities of claims or for sharing the Collateral or any realizations thereon.

(e) This Security Agreement shall be binding upon the undersigned and upon its heirs, executors, administrators, successors, transferees and assigns, and shall inure to the benefit of, and be enforceable by, the Secured Party the Secured Party's successors, transferees and assigns. The Secured Party may assign or transfer in whole or in part this Security Agreement, any of the obligations, any agreement and such Collateral and from its obligations as secured party of record.

(f) Except to the extent provided by any mandatory provisions of applicable law, this Security Agreement shall be governed by and construed in accordance with the laws of Florida. All terms used in this Security Agreement and not defined herein which are defined in the Uniform Commercial Code as in effect from time to time in the State of Florida shall have the same meaning herein as in said Code. If any provision of this Security Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or enforceable, the remainder of this Security Agreement (or the remainder of such provision) and the application thereof other persons or circumstances shall not be affected thereby.

(g) The undersigned represents to the Secured Party that the execution, delivery and performance by the undersigned of this Security Agreement have been duly authorized by all necessary corporate action on the part of the undersigned.

(h) If this Security Agreement is executed by two or more parties, they shall be jointly and severally liable hereunder, and the term "undersigned" wherever used herein shall be construed to refer separately to each of such parties and collectively to any two or more of such parties. Until all of the Obligations shall have been paid in full, none of such parties shall have any right of subrogation. Neither this Security Agreement nor any of the Secured Party's rights, remedies, liens and security interests hereunder shall be impaired or otherwise affected as to any party hereto (i) by the occurrence of an Event of Default relating to any other party hereto, (ii) by the release, discharge or addition of any other party hereto or any other person liable for any of the Obligations, (iii) by the exchange, release, surrender or impairment of any Collateral or of any other collateral security, by whomsoever granted or deposited, which is now or may hereafter be granted to or held by the Secured Party as security for any of the Obligations, (vi) if the undersigned is a partnership, by any change in the membership of such partnership is a partnership, by any change in the membership of such partnership, whether arising from the death or withdrawal of one or more partners or the accession of constitute a legal or equitable discharge of or a defense available to a surety or guarantor. Each party hereto designates the party whose name appears first below as agent to whom all notices and other communications hereunder shall be given on its behalf.

(12)    This Security Agreement shall take effect immediately upon execution by the undersigned, and the execution hereof by the Secured Party shall not be required as a condition to the effectiveness of this Security Agreement. Any execution of this Security Agreement by the Secured Party is only for purposes of filing this Security Agreement as a financing statement, if the Secured Party deems the execution hereof by it to be necessary or desirable for purposes of such filing.

(13)    This Security Agreement is being executed as part of a sale of debt and associated security by Barclays Bank PLC to the Secured Party. Barclays Bank PLC cannot locate the original Security Agreement. Copies of an original Security Agreement were held by both the Barclays Bank PLC and the undersigned. The undersigned held its copy of the original Security Agreement at the office of its Secretary, which was located at 1 World Trade Center, 52nd Floor, New York, New York. As a result of terrorist attack that occurred on September 11, 2001, the original Security Agreement was destroyed. This Security Agreement is intended to supersede and assign the rights granted by the undersigned to Barclays Bank to the Secured Party.

Dated: May 9, 2002
as of October 3, 1997

PUSSER'S INC.,
a Florida corporation


By: _____
Charles S. Tobias, President

{NY005101.2}

8

# EXHIBIT  B

<u>**PROMISSORY NOTE**</u>

$3,300,000                                                                    May 9, 2002

     FOR VALUE RECEIVED, PUSSER'S LTD. (the "Borrower"), promises to pay to the order of BARCLAYS BANK PLC., (the "Lender"), on demand, at its offices at Road Town, Tortola, British Virgin Islands, or at such other place or to such other party or parties as Lender may from time to time designate, the principal sum of Three Million Three Hundred Thousand and no/100 ($3,300,000.00) Dollars together with interest thereon computed from the date hereof at the rate of one and one-half (1.5%) percent per annum over the Barclays Bank New York Prime Rate (as hereinafter defined). The amount payable hereunder shall be paid without any set-off or counterclaim whatsoever.

     The interest rate hereunder shall adjust accordingly on each date the Prime Rate changes. The term "Prime Rate" shall mean the rate of interest quoted by Barclays Bank New York, or any successor thereto, as the prime rate (which rate may not be the rate charged by Lender to its preferred customers), as the same may be changed from time to time by it. If for any reason Barclays Bank New York shall at any time no longer quote a prime rate in the manner set forth above, Lender shall, in the exercise of its reasonable judgment, substitute another means of determining the annual lending rate of interest and the rate of interest as thus determined shall thereafter be the Prime Rate as that term is used herein. Interest shall be computed on the actual number of days elapsed divided by a 360-day year.

     All installments of principal and all interest are payable in lawful money of the United States of America, which shall be legal tender in payment of all debts and dues, public and private, at the time of payment; and in the event of (a) failure to pay this Note in full on demand, or (b) default in the payment of any other installment of interest or principal or any other sum payable pursuant to the terms of this Note or any lien document securing this Note, not cured within thirty (30) days after written notice from Lender, or (c) an "Event of Default" as such term is defined in the Security Agreements, (as hereinafter defined) not cured within the cure period (if any) provided therein, then or at any time thereafter, at the option of Lender, the whole of the principal sum then remaining unpaid hereunder together with all interest accrued thereon, shall immediately become due and payable without further notice, and the lien given to secure the payment of this Note may be foreclosed. From and after the maturity of this Note either according to its terms or as the result of a declaration of maturity, the entire principal remaining unpaid hereunder shall bear interest at a rate of four (4%) percent per annum above the rate otherwise in effect hereunder (the "Default Rate"), or the highest applicable lawful rate, whichever is the lesser; provided that there shall be no automatic reduction to the highest lawful rate if Borrower or any endorser or guarantor is barred by law from availing itself in any action or proceeding of the defense of usury, or if Borrower or any endorser or guarantor barred or exempted from the operation of any law limiting the

amount of interest that may be paid for the loan or use of money, or in the event this transaction, because of its amount or purpose or for any other reason is exempt from the operation of any statute limiting the amount of interest that may be paid for the loan of use of money. Failure to exercise such option or any other rights Lender may in the event of any such default be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent default, whether of the same of different nature.

If this Note is placed in the hands of an attorney for collection or is collected through any legal proceedings, Borrower promises to pay all expenses of collection and reasonable attorney's fees incurred by Lender.

In the event the interest provisions hereof or any exactions provided for herein or in the lien documents or any other instruments securing Note shall result, because of the monthly reduction of principal or any other reason related or unrelated to the interest provisions, at any time during the life of the loan, in an effective rate of interest which, for any period of time, transcends the limit of the usury or any other law applicable to the loan evidenced hereby, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied to principal immediately upon receipt of such monies by Lender with the same force and effect as though the payer had specifically designated such and agreed to accept such extra payment(s) as a premium free payment. Notwithstanding the foregoing, however, Lender may at any time and from time to time elect, by notice in writing to the owners of the property affected by the lien document securing this Note, to reduce or limit the collection of any interest to such sums, which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirement of the preceding sentence. In no event shall any agreed to or actual exaction as consideration for this loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

This Note evidences amounts owed pursuant to a facility letter dated 29 February 1996, a facility letter dated 25th November 1996 and a facility letter dated 26 January 2000 (in each case as amended from time to time).

This Note is secured by the Security Agreements over assets located in the United States of America entered into by Barclays Bank PLC with each of the undersigned and mortgage documents entered into by Barclays Bank with Pusser's Inc., a Florida corporation, and such further security documents as may be requested from time to time by Lender ("Security Agreements"), to which reference is made from the terms thereof.

Lender may collect a late charge of five (5%) per cent of any installment of principal or interest which is not paid within fifteen (15) days of the due date thereof to cover the extra time and expense involved in handling delinquent payments. Such late charge shall apply to late payments prior to maturity or acceleration. Upon maturity or acceleration, no further late charges shall be assessed, but Borrower shall pay the Default

Rate of interest on all amounts due from the date of maturity or acceleration until the Note is paid in full. The collection of the late charge shall not be deemed a waiver by Lender of interest accruing after the due date of any installment or of any of Lender's other rights under this Note.

Borrower agrees that the late charge provided above is fair and reasonable compensation to Lender for the additional administrative time and effort incurred in collecting and processing delinquent payments. Borrower further agrees that the Default Rate is a fair and reasonable rate of interest to be charged after maturity or acceleration of this Note in light of the increased risks to Lender inherent in a past due loan and the administrative time and effort incurred in collecting a past due loan.

Borrower and all endorsers, guarantors and all persons liable or to become liable on this Note waive presentment, protest and demand, notice of protest; demand and dishonor and nonpayment of this Note, and consent to any and all renewals and extensions of the time of payment hereof, and agree, further, that at any time and from time to time without notice, the terms of payment herein may be modified or the security described in the lien document securing the Note released in whole or in part, or increased, change or exchange by agreement between Lender and any owner of premises affected by said lien document securing this Note without in anywise affecting the liability of any party to this instrument or any person liable with respect to any indebtedness evidenced hereby.

Lender is not required to rely on the collateral for the payment of the Note in the event of default by the maker, but may proceed directly against the maker, endorsers, or guarantors, if any, in such manner as it deems desirable. None of the rights and remedies of Lender hereunder are to be waived or affected by failure or delay to exercise them. All remedies conferred on Lender by this Note or any other instrument or agreement shall be cumulative, and none is exclusive. Such remedies may be exercised concurrently or consecutively at Lender's option.

This Note may be prepaid in whole or in part at any time without penalty.

This Note shall be governed as to validity, interpretation, construction, effect, and in all other respects by the laws and decisions of the British Virgin Islands.

Wherever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note or portion thereof shall be prohibited by or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

This note may be assigned by Lender with or without recourse.

BORROWER AND LENDER WAIVE, TO THE FULL EXTENT PERMITTED BY LAW, THE RIGHT TO A JURY TRIAL IN ANY LITIGATION CONCERNING THIS PROMISSORY NOTE OR ANY AGREEMENT SECURING THIS PROMISSORY NOTE AND IN ANY LITIGATION CONCERNING ANY DEFENSE, CLAIM, COUNTERCLAIM, CLAIM OF SET-OFF OR SIMILAR CLAIM OF ANY NATURE THAT BORROWER MAY ASSERT AGAINST LENDER.

PUSSER'S LTD., a British Virgin Islands Company

By: _____
     Charles S. Tobias, Director

PUSSER'S INC., a South Carolina Corporation

By: _____
     Charles S. Tobias, President

PUSSER'S INC., a Florida Corporation

By: _____
     Charles S. Tobias, President

PUSSER'S INC., a Delaware Corporation

By: _____
     Charles S. Tobias, President

PUSSER'S INC., a Maryland Corporation

By: _____
     Charles S. Tobias, President

PUSSER'S RETAIL INC., a Delaware Corporation

By: _____
     Charles S. Tobias, President

## ASSIGNMENT OF PROMISSORY NOTE

For value received, Barclays Bank PLC hereby sells, assigns, transfers and conveys the certain promissory note dated May 9 , 2002 made by Pusser's Ltd., Pusser's Inc. (a Delaware corporation), Pusser's Inc. (a Maryland corporation), Pusser's Inc. (a South Carolina corporation), Pusser's Retail Inc. (a South Carolina corporation) and Pusser's Inc. (a Florida corporation) to Magwitch LLC, a New York limited liability company without recourse.

Dated: May 9, 2002
      Road Town, Tortola
      British Virgin Islands

Barclays Bank PLC

By: _____
    Mark Young
    Senior Manager and Authorized
    Signatory

[NY00512.1]

# MAGWITCH LLC

1445 Forest Court
Mountainside, New Jersey 07092

(908) 789-2400

E-mail: Ldevos@devos-law.com

September 13, 2006

**BY FEDERAL EXPRESS**

Mr. Charles S. Tobias
Chairman
Pusser's Ltd.
"Kingston"
Tortola, British Virgin Islands

Dear Charles:

We refer to the promissory note in the amount of $3,300,000 made by Pusser's Ltd. on May 9, 2002 and the other companies listed thereon to Barclays Bank PLC and assigned by Barclays Bank PLC to us on the same date.

We hereby demand payment in full of all amounts outstanding under this promissory note. The amount outstanding at present is **$1,905,679**, plus $264.68 for each additional day that the note remains unpaid.

Kindly make payment to our account at The United States Trust Company, N. A., ABA number 021001318 for credit to account 21-4605-3.

Yours sincerely,

Lloyd De Vos

LDV/ss

{D0006216.1 }

SUPREME COURT OF THE STATE OF
NEW YORK
COUNTY OF NEW YORK

Index No. 600233/08

MAGWITCH L.L.C.,

Plaintiff,

-against-

PUSSER'S INC., a Florida corporation;
PUSSER'S LTD., a British Virgin Islands
corporation; PUSSER'S WEST INDIES
LIMITED, a British Virgin Islands
Corporation; and CHARLES S. TOBIAS,

Defendants.

SUMMONS AND COMPLAINT

SOLOMON PEARL BLUM HEYMANN & STICH LLP
ATTORNEYS FOR    Plaintiff

40 WALL STREET, 35th FLOOR
NEW YORK, N.Y. 10005
(212) 267-7600

**Exhibit B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
MAGWITCH L.L.C.,                                   :
                                                   :        NOTICE OF FILING
                            Plaintiff,             :        OF NOTICE OF REMOVAL
                                                   :
         -against-                                 :        Index No. 600233/08
                                                   :
PUSSER'S INC., PUSSER'S LTD.,                       :
PUSSER'S WEST INDIES LTD., and                     :
CHARLES S. TOBIAS                                  :
                                                   :
                            Defendants.            :
------------------------------------------------------------X

**TO THE CLERK OF COURT:**

        **PLEASE TAKE NOTICE THAT,** pursuant to 28 U.S.C. §§ 1332(a) and 1441(a),

Defendants Pusser's Inc., Pusser's Ltd., Pusser's West Indies Ltd., and Charles S. Tobias filed

on this 3rd day of March 2008, a Notice of Removal of the above-captioned matter in the

United States District Court, Southern District of New York.  A true and correct copy of the

Notice of Removal is attached hereto as Exhibit A.  Pursuant to 28 U.S.C. § 1446(d), this

Court shall proceed no further unless and until the case is remanded.

Dated: New York, New York
       March 3, 2008


                                        _____
                                        Gregory W. Gilliam
                                        VENABLE LLP
                                        Rockefeller Center
                                        1270 Avenue of the Americas
                                        25th Floor
                                        New York, New York  10020
                                        Tel: (212) 307-5500
                                        *Attorneys for Defendants Pusser's Inc.,*
                                        *Pusser's Ltd., Pusser's West Indies Ltd., and*
                                        *Charles S. Tobias*

TO:   Clerk of Court
       United States District Court
       Southern District of New York
       Daniel Patrick Moynihan
       United States Courthouse
       500 Pearl Street
       New York, New York  10007-1312

       Andrew W. Heymann, Esq.
       SOLOMON PEARL BLUM HEYMANN & STITCH LLP
       40 Wall Street, 35th Floor
       New York, New York  10004
       *Attorneys for Plaintiff Magwitch L.L.C.*

BA2/336487

2

# Exhibit C

Gregory W. Gilliam (GG 2857)
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

| | | |
|---|---|---|
| MAGWITCH L.L.C., | : | **SUPPLEMENT TO THE** |
| | : | **NOTICE OF REMOVAL** |
| Plaintiff, | : | **(DIVERSITY)** |
| | : | |
| -against- | : | Case No.: 08cv2144 (LTS) |
| | : | |
| PUSSER'S INC., PUSSER'S LTD., | : | ECF Case |
| PUSSER'S WEST INDIES LTD., and | : | |
| CHARLES S. TOBIAS | : | (Removed from Supreme |
| | : | Court, County of New York, |
| Defendants. | : | Index No. 600238/08) |

-------------------------------------------------------------------X

**TO THE CLERK OF COURT:**

Pursuant to the Court's Order dated March 12, 2008, Defendants Pusser's Inc., Pusser's

Ltd., Pusser's West Indies Ltd., and Charles S. Tobias (collectively, "Defendants"), by and

through their attorneys, submit the following Supplement to the Notice of Removal, which

original Notice of Removal was filed with the Court on March 3, 2008:

1.     Defendants' Notice of Removal asserted that this Court has jurisdiction based on

diversity of citizenship under 28 U.S.C. § 1332(a) because Plaintiff Magwitch L.L.C. ("Plaintiff"

or "Magwitch") is a limited liability corporation incorporated in New York with its principal

place of business in New Jersey and none of the Defendants are, or were at the time of the filing

of the Complaint or at any time relevant to the matters in the Complaint, citizens of either New

York or New Jersey.  The Court observed in the March 12, 2008 Order that for purposes of

diversity jurisdiction the citizenship of an artificial business entity other than a corporation is determined by the citizenship of its members. As a result, the Court ordered Defendants to supplement the Notice of Removal.

2.    In response to the Court's Order, Defendants state that Mr. Lloyd De Vos is the sole and managing member and sole owner of Magwitch. *See* Ex. B to the Declaration of Gregory W. Gilliam in Support of Defendants' Motion to Dismiss the Complaint, Lloyd De Vos's New Jersey Declaration ¶ 1. Mr. De Vos is and was at the time of the filing of the Complaint and at any time relevant to the matters in the Complaint a domiciliary of New Jersey. *See id.* ¶¶ 2 – 3. As set forth more fully in the Notice of Removal, Defendant Pusser's Inc. is, and was at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, a citizen of Florida and the BVI. Defendants Pusser's Ltd. and Pusser's West Indies Ltd. are, and were at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, citizens of the BVI. Finally, Defendant Charles S. Tobias is, and was at the time of the filing of the Complaint and at all times relevant to the matters in the Complaint, a domiciliary and citizen of the BVI who resides at Road Town, Tortola, BVI. Thus, at all relevant times for the purposes of diversity, Mr. Tobias was a citizen of a foreign state and none of the other Defendants were citizens of any state in which Mr. De Vos or Magwitch is a citizen.

3.    After Defendants filed the Notice of Removal, Plaintiff's counsel contacted Defendants' counsel and inquired whether Mr. Tobias is a citizen of the United States, in addition to being a citizen of the BVI. Plaintiff's counsel suggested that if Mr. Tobias is a citizen of the United States and BVI, his United States citizenship is relevant for diversity purposes and could destroy diversity jurisdiction if Mr. Tobias has no domicile in the United States. In response to this inquiry, Defendants' counsel confirmed that Mr. Tobias is a citizen of the United

States, the BVI and the United Kingdom.  The history of Mr. Tobias's citizenship is as follows.

Mr. Tobias was born in Canada, and was thus a Canadian citizen by birth.  He migrated to the

United States and served in the United States Marine Corps, which made him eligible to become

a naturalized U.S. citizen, which he did.  After being honorably discharged from the Marine

Corps, Mr. Tobias was domiciled in California for a period of time, and then left the United

States to travel.  Mr. Tobias never resumed residence in the United States and ultimately settled

in the BVI in 1979.  He has been domiciled in the BVI since that time.  Mr. Tobias became a

BVI citizen in 1999 and a citizen of the United Kingdom in 2002.  He has not, however,

relinquished his U.S. citizenship.

       4.      Defendants do not agree that Mr. Tobias's U.S. citizenship precludes diversity

jurisdiction because his dominant nationality is where he has been exclusively domiciled for the

past 30 years, in the BVI.  Nevertheless, Defendants acknowledge that the existing case law

presents a close and complex question as to this Court's subject-matter jurisdiction.  Despite the

plain language of 28 U.S.C. § 1332, which provides for diversity jurisdiction in cases of civil

actions between "citizens of a State and citizens or subjects of a foreign state," some courts have

found that only the United States citizenship of a dual citizen is considered for purposes of

diversity and that, where the person is not domiciled in the United States, he/she is not a citizen

of any State.  *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 507 (2d Cir. 1991).  An

exception exists, however, where the dual citizen's "dominant nationality" is the foreign

nationality.  *See Sadat v. Mertes*, 615 F.2d 1176, 1188 (7th Cir. 1980).  Here, Defendants would

argue that the dominant nationality exception is applicable insofar as Mr. Tobias, a naturalized

citizen of the United States, has resided in the BVI for nearly the past 30 years and has been a

citizen for 9 years. *See* Declaration of Charles S. Tobias in Support of Defendants' Motion to Dismiss the Complaint ¶ 2.

5.      Defendants filed a motion to dismiss this action on the grounds of lack of personal jurisdiction. Regardless whether Plaintiff pursues a motion to remand based on the subject matter jurisdiction issue it raised with Defendants' counsel, precedent from the Supreme Court and the Second Circuit dictates that the Court may first decide the motion to dismiss that Defendants filed on personal jurisdiction grounds, rather than decide the more difficult subject matter jurisdiction issue. Depending upon the Court's decision on the personal jurisdiction issue, the question of diversity of citizenship may become moot. Where Defendants' motion to dismiss is pending and no motion to remand has been filed, judicial economy further weighs in favor of first deciding the personal jurisdiction issues in Defendants' motion to dismiss.

6.      The Supreme Court has concluded that there is "no unyielding jurisdictional hierarchy" and it is appropriate in some cases for a district court to give priority to a personal jurisdictional inquiry before a subject matter jurisdiction inquiry. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999). In *Ruhrgas*, the district court was confronted with a straightforward personal jurisdiction issue presenting no complex question of state law, while the alleged defect in subject matter jurisdiction based on a removal pursuant to 28 U.S.C. § 1332 raised a difficult and novel question. The Supreme Court held that the district court did not abuse its discretion by turning directly to personal jurisdiction. *See Ruhrgas*, 526 U.S. at 588. This Court has favorably recognized the judicial economy concerns endorsed by the Supreme Court in *Ruhrgas* and the flexibility in the order in which a court may assess jurisdictional issues. *See Turedi v. Coca-Cola Co.*, 460 F. Supp.2d 507, 515, 521 (2006) (J. Marrero) (citing the holding in *Ruhrgas* and concluding that the court had jurisdiction to dismiss a suit on the basis of

4

forum non conveniens before determining whether subject matter jurisdiction or personal jurisdiction existed).

7.       Even before *Ruhrgas*, the Second Circuit recognized that "considerations of judicial economy and restraint may persuade the court to avoid a difficult question of subject-matter jurisdiction when the case may be disposed of on a simpler ground." *Cantor Fitzgerald, L.P, v. Peaslee*, 88 F.3d 152 (2nd Cir. 1996). In *Cantor Fitzgerald*, the Second Circuit found that it would have been a waste of judicial resources to entertain further proceedings regarding the district court's subject matter jurisdiction, including authorizing additional discovery and hearing argument, as well as having to consider the legal theories regarding the preservation of diversity jurisdiction. *See Cantor Fitzgerald*, 88 F.3d at 155. If diversity was lacking, the parties also would have had to re-litigate personal jurisdiction in state court. *See id.* at 155-56.

8.       The same judicial economy concerns hold true in this case. The issue of dual citizenship and the application of the dominant nationality exception has not been widely addressed by federal courts and has not yet been briefed to the Court in this case. On the other hand, the issue of whether personal jurisdiction exists over Defendants under New York's long-arm statute and due process principles are straightforward. In addition, Defendants' motion to dismiss already has been filed with the Court while a motion to remand, if Plaintiff intends to pursue such a motion, has not been filed. As a result, and given the less difficult legal issues involved in the motion to dismiss, concerns of judicial economy weigh in favor of the Court's adjudicating the Defendants' motion to dismiss before the issue of diversity of citizenship.

9.       Defendants therefore request that the question of personal jurisdiction raised by their motion to dismiss before the Court takes on the more difficult legal question concerning its subject-matter jurisdiction.

Dated: New York, New York
       March 20, 2008

                                        _____s/ Gregory W. Gilliam_____
                                        Gregory W. Gilliam (GG 2857)
                                        VENABLE LLP
                                        Rockefeller Center
                                        1270 Avenue of the Americas
                                        25th Floor
                                        New York, New York  10020
                                        Tel: (212) 307-5500
                                        *Attorneys for Defendants Pusser's Inc.,*
                                        *Pusser's Ltd., Pusser's West Indies Ltd., and*
                                        *Charles S. Tobias*

BA2/338789

# Exhibit D

Transcript of opinion in New Jersey  (D0017224).TXT

1

```
 1                 UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
 2             CIVIL ACTION NO. 07-cv-3040 (SRC)

 3

 4    MAGWITCH, L.L.C.,

 5         Plaintiff,

 6    vs.

 7    PUSSER'S INC., a Florida
      Corporation,
 8
         Defendant
 9    _____

10
                           December 10, 2007
11                         Newark, New Jersey

12

13    B E F O R E:    HONORABLE STANLEY R. CHESLER, USDJ

14

15
      Pursuant to Section 753 Title 28 United States Code, the
16    following transcript is certified to be an accurate
      record as taken stenographically in the above-entitled
17    proceedings.

18
      JACQUELINE KASHMER
19    Official Court Reporter

20

21

22
                        JACQUELINE KASHMER, C.S.R.
23                      OFFICIAL COURT REPORTER
                            P. O. Box 12
24                      Pittstown, NJ 08867
                          (908) 229-6496
25
```

2

```
 1    A P P E A R A N C E S:

 2

 3        GRAHAM CURTIN, PA
          Four Headquarters Plaza
          P.O. Box 1991
 4        Morristown, NJ 07962-1991
```

Page 1

Transcript of opinion in New Jersey  (D0017224).TXT

BY:  THOMAS R. CURTIN, ESQ.
5        For the Plaintiff

6

7        SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC
         One Gateway Center - 13th Floor
8        Newark, NJ 07102-5311
         BY:  ARNOLD B. CALMANN, ESQ.
9
                    and
10
         VENABLE, LLP
11       211 Hopkins Plaza
         Suite 1800
12       Baltimore, MD 21201
         BY:  JOHN A. MC CAULEY, ESQ.
13       For the Defendant

14

15

16

17

18

19

20

21

22

23

24

25

                                                    3


1            THE COURT:  Be seated.  Good morning,

2    everybody.  All right.  Can I have appearances by

3    counsel in this matter.

4            MR. CURTIN:  Good morning.  Thomas R.

5    Curtin, Graham Curtin for the plaintiff.

6            MR. CALMANN:  Arnold Calmann for the

7    defendants and with me is John McCauley from the Venable

8    firm in Washington whose admission pro hac we've already

9    moved, as your Honor may be aware.

10           THE COURT:  Okay.  And as I understand it,
                            Page 2

Transcript of opinion in New Jersey  (D0017224).TXT

11    you are opposing that pro hac vice admission?

12              MR. CURTIN:  I am, your Honor, but not for

13    purposes of this argument.  If Mr. McCauley wants to

14    argue --

15              THE COURT:  Fine.  Then let me put it this

16    way.  I think quite frankly that if there is a basis for

17    disqualification, as I gather your position is, that

18    he'd be disqualified because he is likely to be a

19    witness in the ultimate proceeding in this matter, that

20    frankly, that's a matter which can be taken up at a

21    later point and at this point the Court will admit

22    counsel pro hac vice subject to an application to

23    disqualify him if appropriate.  All right?

24              MR. MC CAULEY:   Thank you very much, your

25    Honor.

                                                          4


1               MR. CALMANN:   Thank you, your Honor.

2               THE COURT:  All right.  At this point then I

3     will hear from the moving party.

4               MR. MC CAULEY:   Your Honor, would you like

5     me to speak from the podium?

6               THE COURT:  Wherever you are comfortable.

7               MR. MC CAULEY:   All right.  Well, since I

8     have some papers I'll stand here.  If my voice doesn't

9     carry, just let me know.

10              THE COURT:  It's a very small courtroom.  It

11    has the advantage of being very practical, if not being

12    particularly elegant.  Please proceed.

13              MR. MC CAULEY:   Frankly, your Honor, it's

14    as good as they come.  I think it's a wonderful court

15    house.

16              Your Honor, I represent, as you know, the

Transcript of opinion in New Jersey   (D0017224).TXT

17   four defendants who are Pusser's, Inc., which is a
18   Florida corporation, Pusser's Ltd., which is a
19   corporation incorporated in the British Virgin Islands,
20   Pusser's West Indies, which is also a British Virgin
21   Islands corporation, and Charles Tobias, who is a
22   resident and citizen of the British Virgin Islands.
23              This is an action that was brought by
24   Magwitch, LLC, which is a New York LLC, which has always
25   been known to the parties as a New York LLC.  I think

5

1    it's appropriate in this motion to dismiss which, as
2    your Honor knows, turn on so crucially on the facts to
3    start with the parties, and I think the place to start
4    is with the plaintiff, Magwitch.
5              The documents submitted in the surreply of
6    the plaintiff, Magwitch, included a supplemental
7    declaration of Mr. De Vos, which included as an exhibit
8    the articles of incorporation or articles of
9    organization of Magwitch LLC, and I think it's worth
10   noting, your Honor, that in addition to being a company
11   that was formed under the limited liability company law
12   of the state of New York, the articles of organization
13   specifically state that the county within the state of
14   New York in which the office of the company is to be
15   located is the county of New York, and then in the
16   fourth recitation under the articles of organization,
17   the secretary of state of the state of New York is
18   designated as agent of the company for service of
19   process and then it says that the secretary of state
20   shall mail a copy of any process against the company to
21   One World Financial Center in New York, the City of New
22   York.  Your Honor --

Transcript of opinion in New Jersey (D0017224).TXT

23          THE COURT:  One moment.  Go ahead, I'm

24    sorry.

25          MR. MC CAULEY:  Yes, your Honor.  Your

6

1    Honor, I've already identified the state or the

2    jurisdiction of citizenship of the defendants so now I

3    think it is appropriate to look at the key transactional

4    documents that are at issue in this case.

5          This is a case in which plaintiff, Magwitch,

6    is suing on a promissory note.  That promissory note was

7    made in the Virgin Islands by Pusser's Ltd., a British

8    Virgin Islands company, and it was also signed by a

9    number of other subsidiaries of Pusser's Ltd., who were

10    ultimately merged into Pusser's, Inc., the Florida

11    corporation.

12          That promissory note was made in the BVI,

13    it's payable in the BVI or at such other place as the

14    lender designates, and the choice of law under the

15    promissory note is British Virgin Islands law.

16          THE COURT:  Well, it's payable to Barclay's,

17    if I recall correctly, is it not?

18          MR. MC CAULEY:  Yes, your Honor, that's

19    correct.  It's payable to Barclay's PLC at its offices

20    in Road Town, Tortola, British Virgin Islands.

21          THE COURT:  Okay.  But this transaction to a

22    certain degree -- I mean, that's the note.

23          MR. MC CAULEY:  Yes.

24          THE COURT:  The transaction is the

25    relationship between Pusser's and Magwitch in I guess

7

1    purchasing that note at a discounted price.

Page 5

Transcript of opinion in New Jersey  (D0017224).TXT

2          MR. MC CAULEY:   Yes, your Honor.

3          THE COURT:  All right.  And I gather that is

4    where the rubber meets the road in this case, either at

5    least in terms of a specific jurisdiction analysis.

6          MR. MC CAULEY:   Yes, your Honor.  In terms

7    of specific jurisdictional analysis, the conduct

8    complained of is failure to pay the note.  It's also

9    improper transfer of funds from Pusser's, Inc., Florida

10   corporation, to Pusser's West Indies, and also

11   representations and warranties and fraud statements,

12   allegedly fraudulent statements made to Magwitch to

13   induce Magwitch to buy the note.

14          Well, what we know is that the idea of

15   Magwitch's purchasing the note arose and was conceived

16   in the British Virgin Islands during face-to-face

17   discussions between the relevant parties which were

18   Barclay's and Pusser's, Inc. and Pusser's Ltd. and

19   Pusser's West Indies, and Magwitch, which was

20   represented there by Lloyd De Vos, and what we know by

21   Mr. De Vos's deposition testimony in February of 2005,

22   when he was being asked about this idea of Magwitch

23   becoming a secured creditor of Pusser's Ltd., he

24   acknowledged that this was in face-to-face meetings in

25   the Virgin Islands, and that the question pressed him,

                                                        8

1    How did it come about, somebody must have had this idea,

2    that is, the idea -- your Honor, just for the record,

3    I'm looking at an exhibit to Charles Tobias's

4    supplemental declaration, it's exhibit C to Mr. Tobias's

5    supplemental declaration and it's an excerpt from the

6    deposition of Mr. De Vos given on February 22nd, 2005 in

7    an unrelated case.  The question was posed to Mr. De

Transcript of opinion in New Jersey  (D0017224).TXT

8     Vos, How did it come about, somebody must have had this

9     idea.  It's your money so you must have been in on the

10    idea at some point.

11          Mr. De Vos's answer was, There came a point

12    in the discussions with Barclay's where Barclay's made

13    it clear, Barclay's in the person of Mr. Nobbs, made it

14    clear that they would step in and liquidate Pusser's if

15    an agreement was not reached to their satisfaction.  And

16    he's already testified moments earlier in the deposition

17    that these were face-to-face discussions in the British

18    Virgin Islands, your Honor.

19          THE COURT:  What page is that again?

20          MR. MC CAULEY:   It's exhibit C of -- it's

21    in the reply memorandum, your Honor.  It's the exhibit C

22    to Charles Tobias's supplemental declaration.

23          THE COURT:  And what page of the deposition?

24          MR. MC CAULEY:   Page 81, your Honor.

25          THE COURT:  All right.  I have it.  Thank

                                                         9

1     you.

2          MR. MC CAULEY:   So, he says there came a

3     point in the discussions with Barclay's in the person of

4     Mr. Nobbs made it clear they would step in and liquidate

5     Pusser's if an agreement was not reached to their

6     satisfaction.

7          At that time Charles Tobias and Jim

8     Jackson -- Jim Jackson is the owner of Pusser's Rum

9     Ltd., not a defendant in this case, also a British

10    Virgin Islands corporation -- at that time Charles

11    Tobias and Jim Jackson and I met separately and Mr.

12    Jackson offered to either purchase or finance the

13    Caribbean assets of Pusser's but did not want to be

                          Page 7

Transcript of opinion in New Jersey  (D0017224).TXT

14   involved with the United States assets of Pusser's.

15          Mr. Tobias said he did not have the funds in

16   order to do this.  I thought about it for a day and

17   suggested that Mr. Tobias contact all other shareholders

18   of Pusser's or creditors of Pusser's just to see if any

19   of them would be interested in doing this, failing which

20   I would as a limited last resort.

21          So, this idea that Magwitch would purchase

22   this debt of Pusser's which was secured by assets in the

23   United States was conceived in April of 2002 at a

24   meeting in the Virgin Islands, British Virgin Islands,

25   and it was Mr. De Vos's idea.  There's no indication in

10

1    this testimony that anyone solicited Mr. De Vos or

2    Magwitch to come in and do this.  He was down there as

3    an officer of the company, as a director of the company,

4    and as the legal counsel for the company and this was

5    his idea.  He was also a shareholder of the company.

6           So, that's where that idea arose, that's

7    where any representations about what the conditions

8    would be of his coming in were agreed to, and that is

9    where he signed the assignment agreement pursuant to

10   which Barclay's agreed to assign to Magwitch the $3.3

11   million note that would be secured by the U.S. assets.

12          The letter agreement that was the precursor

13   to the final agreement, the final assignment agreement,

14   what Magwitch in its papers calls the Barclay's

15   agreement, which we call the assignment agreement, that

16   agreement was formed in the Virgin Islands.  The letter

17   agreement, that was essentially the letter of intent or

18   the memorandum of agreement that preceded the formal

19   papers, that was signed by Mr. De Vos on behalf of

Page 8

Transcript of opinion in New Jersey  (D0017224).TXT

20    Magwitch in the British Virgin Islands.

21             Now, Mr. De Vos says, well, I signed the

22    formal, in his declaration, I signed the formal

23    assignment agreement in New Jersey, but he also says it

24    was sent to him in New Jersey by Barclay's' counsel.  It

25    wasn't sent to him by Pusser's.  And so, there was no --

                                                          11


1     there's no, in all of this, no purposeful activity by

2     any of the Pusser's defendants that was directed at New

3     Jersey.

4             Indeed, Mr. De Vos said in his first

5     declaration submitted in conjunction with the opposition

6     that he got involved with Pusser's not because someone

7     solicited him but because he purchased some shares back

8     in the mid '80s and then Mr. Tobias asked him to join

9     the board, and then he did that, and then thereafter in

10    the '90s he began providing legal representation.  So,

11    it wasn't anyone from Pusser's reaching out to a

12    resident of New Jersey for this investment.  Indeed, if

13    they were reaching out at all to Magwitch, it was to a

14    New York limited liability company.

15            Now, Mr. De Vos says in his declaration

16    everyone understood that payments would be made to

17    Magwitch in New Jersey.  That's what the understanding

18    of all the parties were.  Well, I'd submit that Mr. De

19    Vos, he can make such a statement but I'm not sure he's

20    competent to make a statement as to someone else's

21    intention without more than that, without that broad

22    sweeping conclusory statement and, in fact, what the

23    documents show and what we showed through the affidavit

24    of Mr. Kert Tennikait in the reply memorandum was that,

25    indeed, Mr. De Vos gave explicit instructions on behalf

                          Page 9

Transcript of opinion in New Jersey  (D0017224).TXT

12

1    of Magwitch that payments should be made to New York, to
2    New York City.  The e-mail which we attached as Exhibit
3    A to the declaration of Mr. Kert Tennikait, who is the
4    controller of Pusser's, who's resident in the British
5    Virgin Islands and does all of the accounting for these
6    companies, it says repayment of loans to Magwitch should
7    be made to the account of Magwitch, LLC, and then he
8    gives an account number, at United States Trust Company
9    of New York, New York, New York, and he gives the ABA
10   number.  And as Mr. Tennikait confirmed, completely
11   unrebutted and unaddressed in the surreply submitted by
12   Magwitch, Mr. Tennikait confirmed in his declaration
13   that no payment was ever wired or made to New Jersey.
14   Any payments that were wired were wired to New York.
15   Those were always Mr. De Vos's instructions.
16          Indeed, when the Pusser's, Inc. assets in
17   the United States were liquidated, it consisted of a
18   restaurant in Annapolis.  When those assets were
19   liquidated, Mr. De Vos, as a result of an agreement
20   surrounding that liquidation, was to get $1.5 million.
21   His instructions then, which was in April of 2005, were
22   to send his money, his Magwitch money, to the very same
23   account in New York City.  So, even if it could be said
24   that someone reached out to Magwitch for this money,
25   which is not borne out by Mr. De Vos's testimony in

13

1    2005, they weren't reaching out to a resident of New
2    Jersey.  They were reaching out to a New York limited
3    liability company with offices in New York.
4          Indeed, every document that we see in the
Page 10

Transcript of opinion in New Jersey  (D0017224).TXT

5   case that mentions Magwitch gives -- except for the
6   final demand for payment that Mr. De Vos sent on behalf
7   of Magwitch in September 2006, with that exception there
8   is no other address given for Magwitch in the security
9   agreement, in the assignment of the security agreement,
10  in the note itself, in the notice to Pusser's that it
11  would be making its payments to Magwitch, notice from
12  Barclay's to Pusser's saying your note has been
13  assigned, please make all payments to Magwitch.  It was
14  always direct all correspondence to Magwitch, care of
15  Mr. De Vos in New York.  So, there was no purposeful
16  activity in any sense of the word directed toward anyone
17  in New Jersey.
18          Mr. De Vos in his supplemental declaration
19  that he submitted with his surreply now agrees, contrary
20  to what he said in his initial deposition, he said
21  between September 2001 and April 2002 -- this is a
22  direct quote from his first declaration -- between
23  September 2001 and April 2002, the time when the
24  negotiations were taking place between Pusser's and
25  Barclay's Bank, I was not physically in the British

14

1   Virgin Islands.  That's paragraph 74 of his declaration.
2           Well, in our reply, your Honor, we rebutted
3   that with his testimony from 2005 in which he expressly
4   stated he was in the British Virgin Islands and that
5   there were face-to-face meetings down there.  He now
6   says in paragraph 17 of his supplemental declaration, I
7   agree with Tobias that I was physically present in the
8   British Virgin Islands in April 2002.
9           So, we have a case here where there's
10  failure to pay a note, there are allegations of
Page 11

Transcript of opinion in New Jersey (D0017224).TXT

11    movements of money between Pusser's, Inc. and Pusser's
12    West Indies in the Virgin Islands, none of which -- no
13    movement of which had anything to do with New Jersey
14    because all the assets of Pusser's were either in -- the
15    U.S. assets were either in Maryland or South Carolina or
16    Florida, none in New Jersey.  So, if there were
17    movements of cash, cash was moved from Maryland or
18    Florida to the Pusser's West Indies.  In fact, all the
19    books and records, all the financial records of Pusser's
20    were kept in the Virgin Islands by Kert Tennikait, the
21    controller of Pusser's, who submitted his declaration in
22    conjunction with our reply.
23             So, when you look at the transfer of funds
24    and you look at the question of specific jurisdiction,
25    none of those events or occurrences relate to the claims

                                                        15


 1    or arise out of any activity in New Jersey, and that's
 2    the same with the representations and warranties because
 3    this idea was Mr. De Vos's idea based on discussions he
 4    had down in the Virgin Islands.  And even if it wasn't
 5    Mr. De Vos's idea, it was Magwitch, the New York
 6    company, which always directed payments to New York.
 7    That was the company that supplied the funds and became
 8    the creditor and in fact is the party in this case.
 9             So, your Honor, given that none of the
10    parties in this case are resident in or formed in New
11    Jersey, given that not one of the documents in this case
12    chooses New Jersey law to govern the interpretation and,
13    in fact, most of the key documents choose British Virgin
14    Islands law, and in light of the fact that none of the
15    conduct arose -- that forms the basis for the complaint
16    arose out of conduct in New Jersey, all of that, your

Transcript of opinion in New Jersey  (D0017224).TXT

17    Honor, dooms this case from the point of view of

18    specific jurisdiction.

19              Now, there's one other argument that Mr. De

20    Vos makes and this is that under the Calder vs. Jones

21    doctrine, that the Court should take special notice that

22    there was an intentional tort and that it was directed

23    at Magwitch in New Jersey.

24              Well, first, it wasn't directed at Magwitch

25    in New Jersey because Magwitch, to the knowledge of

16

1    Pusser's, has always been a New York limited liability

2    company and always had a New York address so far as

3    Pusser's ever knew and that's undisputed in the record.

4              But furthermore, your Honor, the Calder vs.

5    Jones doctrine as interpreted by the court in the case

6    of, I believe it's IMO, your Honor, the IMO case, said

7    they reject a very expansive reading of Calder vs. Jones

8    which was espoused by the Seventh Circuit and instead

9    they adopted the rationale and the reasoning of every

10    other circuit that had decided the issue about the scope

11    of Calder vs. Jones in a business tort context and said

12    you've got to really focus on that third prong.  The

13    third prong is you have to purposefully direct your

14    activity and aim your conduct at New Jersey, and they in

15    their opposition they did not address that at all.  In

16    the surreply they addressed it not at all.  They ignored

17    the third prong because the third prong here doesn't

18    fit.  There's no evidence, no fact in the record that

19    would suggest that this intentional tort, the fraud that

20    they allege or the conversion that they allege were

21    aimed at New Jersey.  It is simply not the case.

22              I don't know whether they're still

Page 13

Transcript of opinion in New Jersey  (D0017224).TXT

23    maintaining general jurisdiction, your Honor.  They seem
24    to back away from it somewhat but not completely in
25    their surreply but, in any event, the law on general

17

1    jurisdiction is strict.  There have to be continuous and
2    systematic contacts.  It has to be shown by extensive
3    and persuasive facts.  In fact, the Court, Judge Lechner
4    of this court in the Telesis case noted that in
5    Helicopteros, which is the seminal Supreme Court case on
6    general jurisdiction, they noted that in that case the
7    defendant had solicited helicopter services in Texas,
8    had purchased 80 percent of its helicopters in Texas,
9    regularly sent employees to Texas for training, spent
10    four million dollars over an eight-year stretch of time
11    on parts and accessories from the Texas company, and
12    with all of those contacts in Texas, the court said
13    there's still no basis for general jurisdiction.  So,
14    it's a very demanding standard.
15            What Magwitch offers the court for general
16    jurisdiction is that Mr. De Vos and Mr. Tobias had
17    telephone conversations over the years during the course
18    of Mr. De Vos's representation of the Pusser's entities.
19            Well, what you note is that there was only
20    one small period of time from 2000 to 2001 when Mr. De
21    Vos had a law office in New Jersey.  The rest of the
22    time he was in New York.  Before the execution of the
23    promissory note he was in New York.  At the time that he
24    negotiated and brought the idea to the table of
25    Magwitch's purchasing that note, Mr. De Vos was in New

18

1    York.  And there was a period of time in the horrible
Page 14

Transcript of opinion in New Jersey  (D0017224).TXT

2   aftermath of September 11 when he was in New Jersey

3   because the office building where he practiced law had

4   been destroyed, but that is the very definition of

5   happenstance.

6          The fact is Pusser's entities were not

7   consulting with Mr. De Vos on New Jersey law or New

8   Jersey issues or even coming to him because of his

9   status as a New Jersey lawyer.  They knew him through a

10  different channel.  They knew him because he was an

11  investor in the company.  He had purchased shares in the

12  mid 1980s.  Then he sat on the board and then he began

13  providing legal representation.  And so, your Honor,

14  there was no -- again, and this is key -- no purposeful

15  activity directed at New Jersey.

16         To the extent that Mr. Tobias and Mr. De Vos

17  talked on the telephone when Mr. De Vos happened to be

18  in New Jersey because it was after hours or because he

19  was at home, that's happenstance.  That's not purposeful

20  activity directed at New Jersey.

21         Your Honor, with that, I believe our papers

22  are pretty thorough but if the Court does have any

23  additional questions, I'd be happy to try to answer them

24  at this time.

25         THE COURT:  Let me hear from Mr. Curtin.

                                                    19


1          MR. CURTIN:  Interesting, Judge, that

2   there's no dispute as to the fact that Mr. De Vos and

3   his company Magwitch are owed the funds here.  The

4   question is whether or not this is the proper place for

5   them to collect those funds.

6          I don't know much more to say to you, Judge,

7   or to say to my adversary other than what Mr. De Vos has

                        Page 15

Transcript of opinion in New Jersey  (D0017224).TXT

8   set forth in these papers.  I know that the burden at

9   this stage of the case is mine.  I also know that I'm

10  entitled to all the inferences that I'm entitled to

11  under the allegations of the complaint as well as the

12  disputed facts which are set forth in the various

13  documents that have been submitted to the Court.

14          Mr. De Vos, as the principal sole owner of

15  Magwitch, has laid out a factual basis upon which the

16  Court can determine that this is the proper jurisdiction

17  for this dispute to be resolved.  He has set forth in

18  particularity both as to specific jurisdiction and

19  general jurisdiction the basis and his belief and our

20  belief as his counsel that this is the proper forum for

21  the resolution of the dispute.  He is a member of the

22  bar of this state.  He has laid out facts which are not

23  disputed or at best are in dispute with regard to the

24  role that he played in New Jersey, his company played in

25  New Jersey, where the note was made, where the note was

20

1   to be paid, why the promissory note contained a general

2   provision as to how it might be assigned or not be

3   assigned.  Those facts seem to me are sufficient to be

4   able to permit the Court to permit us to move forward

5   and to litigate this matter in New Jersey.

6          There is no suggestion that Pusser's, a

7   worldwide international company, did business in New

8   Jersey.  It's not as if they don't know about the Garden

9   State.  There's no suggestion that they haven't sold

10  here, advertised here, marketed here.  Mr. Tobias, as I

11  understand at least the pleadings, is to a large degree

12  or is Pusser's for all practical and legal purposes.

13  Mr. Tobias and Mr. De Vos had a long-standing friendship

Page 16

Transcript of opinion in New Jersey  (D0017224).TXT

14    which has been fractured as a result of Mr. De Vos's
15    assistance to the company in lending them money when
16    they were going down the shute.  In this instance the
17    dispute that Mr. De Vos has with the company is had the
18    money been maintained in the United States, the
19    insurance proceeds, we wouldn't be here.
20            Mr. De Vos, during the time that the dispute
21    arose over the assignment or the transfer of these
22    insurance proceeds, was in fact always living in New
23    Jersey, always practicing as a member of the bar in New
24    Jersey, maintained his offices in New Jersey for part of
25    that time.

                                                    21

1             I'm not sure what else I can tell you that I
2    haven't told you before.  If that doesn't make it, then
3    we'll see Pusser's and Mr. Tobias in some other
4    jurisdiction.
5            THE COURT:  Thank you, Mr. Curtin.  Anything
6    further?
7            MR. MC CAULEY:  Your Honor, I would just
8    point out very quickly that the entitlement to deference
9    that a party has in jurisdiction, on a jurisdictional
10   issue only lasts so long as the defendant -- until the
11   defendant shows those facts to be incorrect and then
12   Carteret itself, the case that espouses that deference
13   principle, talks about the need to go further when the
14   court has more information.  And I would also say
15   simply, your Honor, that Mr. De Vos is not the party
16   here.  It is Magwitch, a New York company.
17           THE COURT:  Thank you.  The Court is
18   satisfied based upon the submissions by the parties that
19   plaintiff has failed to demonstrate that there are
                          Page 17

Transcript of opinion in New Jersey  (D0017224).TXT

20    sufficient contacts with the District of New Jersey to

21    support a finding of either specific jurisdiction or

22    general jurisdiction.

23            With regard to specific jurisdiction, the

24    starting point for the Court's analysis must be the

25    Supreme Court's decision in Burger King Corporation vs.

22

1    Rudzewicz, 471 U.S. 462, 1985.  In that seminal case the

2    Supreme Court set forth the standard by which a court

3    should consider whether or not a cause of action arising

4    out of a contractual relationship gives rise to a

5    finding of specific jurisdiction.  The Supreme Court

6    held that in order to make that determination, the court

7    must look at the course of negotiation between the

8    parties, the place where the contract was reached and

9    the anticipated course of future behavior under the

10    contract.

11            The Court went on to say that once those

12    factors were sufficient to cause the court to conclude

13    that there was sufficient minimal contacts to support

14    jurisdiction, the court nevertheless was also required

15    to do an analysis as to whether or not in the overall

16    evaluation of the relationship of the parties, fairness

17    and due process warranted exercising jurisdiction based

18    upon those minimal contacts.

19            The Court is satisfied that the minimal

20    contacts have not been demonstrated in this case.  There

21    may be some dispute about where the actual document that

22    constitutes the, quote, assignment was executed in that

23    plaintiff asserts its execution was in New Jersey

24    through Mr. De Vos, the owner of all the outstanding

25    shares in plaintiff, Magwitch LLC.  That may very well

Page 18

Transcript of opinion in New Jersey  (D0017224).TXT

23

1    be the case, although it is certainly not conceded by

2    defendants.  But of equal, if not more, import is the

3    memoranda of understanding between the parties and what

4    that memoranda of understanding contemplates.

5    Unfortunately, it becomes somewhat difficult for me to

6    locate that particular document since my version is not

7    fully tabbed, but --

8              MR. MC CAULEY:   Your Honor, I could hand it

9    up to the Court if you like, your Honor.  I believe it's

10   exhibit D to Mr. Tobias's supplemental declaration --

11             THE COURT:  Thank you.  It is indeed.

12             MR. MC CAULEY:   It is actually exhibit G,

13   your Honor, and if you want, I could hand it up to the

14   Court.

15             THE COURT:  Exhibit G, let's find exhibit G.

16             MR. MC CAULEY:   To the supplemental

17   declaration of Mr. Tobias, your Honor.

18             THE COURT:  I see.

19             MR. MC CAULEY:   Submitted with the reply

20   brief, your Honor.

21             THE COURT:  That particular document,

22   indeed, exhibit G, indicates that it is a letter of

23   intent in which the parties agree in good faith to

24   formally document the assignment agreement.

25   Significantly, that letter of intent signed by Mr.

24

1    De Vos on behalf of Magwitch LLC is addressed to

2    Magwitch LLC, CO Hill, Betts & Nash in New York, New

3    York, thus indicating that at least at that point in

4    time the understanding of the parties was that that

Page 19

Transcript of opinion in New Jersey  (D0017224).TXT

5    indeed was where Magwitch was located.

6            The evidence further indicates that Mr. De

7    Vos had a long and substantial relationship with

8    Pusser's Inc., was counsel to the corporation, was

9    apparently friends with Mr. Tobias, who was one of the

10   major shareholders in certain of the Pusser's entities,

11   and that he indeed did travel to Tortola and the Virgin

12   Islands in connection with his relationship with

13   Pusser's.

14           With regard to the assignment, if the Court

15   understands the assignment documents correctly, and

16   there appears to be a number of them attached to the

17   original affidavit of Mr. Tobias, it appears among other

18   things that the security agreement involved in this and

19   the assignment of the security agreement in particular,

20   which was dated May 9 of 2002, provides for notices to

21   the assignee at Magwitch LLC, care of Hill, Betts &

22   Nash, 99 Park Avenue, New York, New York, and I believe

23   that's exhibit D to Mr. Tobias's original certification.

24           It also does appear that it was indeed

25   contemplated that payments were going to be made to

                                                    25


1    Magwitch's account in New York and the Court has in

2    front of it exhibit F to Mr. Tobias's original

3    certification which indicates as of May 9, 2002, all

4    future correspondence and future payments be made

5    pursuant to the mortgage should be directed to Magwitch

6    LLC, care of Hill, Betts & Nash, LLP, 99 Park Avenue,

7    New York, New York.

8            In short, the record seems to unequivocally

9    indicate that Mr. De Vos's relationship with Pusser's

10   over many, many years was centered in his New York legal

Transcript of opinion in New Jersey   (D0017224).TXT

11    practices offices at Hill, Betts & Nash and that the
12    documents which executed the agreement between these
13    parties contemplated that, indeed, those offices would
14    still be the contact point for Magwitch which was wholly
15    owned by Mr. De Vos.
16              The record further clearly indicates based
17    upon the deposition testimony of Mr. De Vos that the
18    basic discussions concerning this relationship appear to
19    have occurred in the British Virgin Islands, as Mr. De
20    Vos indicated in his deposition of February 22nd, 2005,
21    attached as exhibit C to the supplemental declaration of
22    Mr. Tobias, particularly at pages 80 through 82.
23              In contrast to this Mr. De Vos says that
24    following the tragic events of the World Trade Center,
25    his law firm was dislocated and he was contacted by Mr.

                                                         26

1     Tobias at his home in New Jersey.  Significantly,
2     however, there is not a single indication in Mr. De
3     Vos's certifications where he points to a particular
4     conversation which he had which resulted or furthered
5     the arrangement which is at the core of this case.
6               In short, there is virtually nothing in
7     terms of evidence from Mr. De Vos that this transaction
8     resulted from negotiations between Mr. Tobias,
9     presumably in the Virgin Islands, and Mr. De Vos,
10    presumably in New Jersey.  His reference to multiple
11    conversations with Mr. Tobias in his certification is
12    insufficient to do the job, particularly because Mr.
13    De Vos wore multiple hats with regard to his
14    relationship with Pusser's during this period of time,
15    both as an attorney and an investor.
16              As the Court indicated then, the course of
                         Page 21

Transcript of opinion in New Jersey  (D0017224).TXT

17   negotiations does not point to New Jersey under the
18   Burger King decision.  The point of expected performance
19   under the contract does not point to New Jersey since
20   the records would indicate that expected payments would
21   be made to New York.  The record indicates that at least
22   some discussions concerning this transaction occurred in
23   the British Virgin Islands and, all told, the Court is
24   unpersuaded that under Burger King the minimal contacts
25   that were demonstrated are sufficient to make out a case

27

1    of specific jurisdiction.
2            The Court further is satisfied that given
3    the clear record that Magwitch LLC was headquartered in
4    New York City, that an argument under Calder vs. Jones
5    is simply untenable.
6            Counsel for defendant has correctly
7    indicated that Third Circuit law requires that the
8    conduct be specifically targeted towards a jurisdiction
9    before Calder vs. Jones will permit jurisdiction to be
10   found.  In this case there is no evidence of specific
11   targeting anywhere, but even if such were the case, the
12   evidence certainly would not support a finding of
13   specific targeting at New Jersey.
14           With regard to plaintiff's general
15   jurisdiction argument, the Court is satisfied that there
16   has simply been an insufficient demonstration that there
17   are substantial and continuous contacts between the
18   defendants and New Jersey.  The best that plaintiff has
19   demonstrated is that a company with the name Pusser's in
20   it, and if I recall correctly, it's Pusser's Rum.  Is
21   that correct?
22           MR. MC CAULEY:   Pusser's Rum Limited, your
             Page 22

Transcript of opinion in New Jersey  (D0017224).TXT

23    Honor.  Yes, your Honor.

24            THE COURT:  Thank you -- - that Pusser's Rum

25    Limited has an independent distributor in the United

28

1    States which sells Pusser's rum.  The evidence before

2    the Court indicates that a Mr. Jackson is the majority

3    shareholder in that corporation.

4            Plaintiff contends that Mr. Tobias controls

5    Pusser's Rum Limited.  However, there is no evidence, A,

6    to support that assertion except for Mr. De Vos's

7    statement and, secondly, even if there was sufficient

8    evidence to indicate that Mr. Tobias indeed did, quote,

9    control Pusser's Rum Limited, that would still leave

10    hanging the question of how jurisdiction over -- let me

11    take that back -- how Pusser's Rum's activities in the

12    U.S. through a distributor where Pusser's Rum was,

13    quote, controlled by Mr. Tobias would equate to general

14    jurisdiction over Mr. Tobias or, alternatively,

15    jurisdiction over the other Pusser's entities that are

16    defendants in this case, since Pusser's Rum Limited is

17    not a defendant in this case.

18            There is no demonstration that Pusser's Rum

19    Limited is an alter ego of the defendant corporations

20    and, furthermore, no evidence that Mr. Tobias in

21    anything other than potentially the capacity of a

22    corporate representative engaged in any substantial and

23    continuous contacts with the United States sufficient to

24    support a finding of jurisdiction.  And finally, the

25    extent to which those contacts would support a finding

29

1    in the District of New Jersey is further attenuated.
                          Page 23

Transcript of opinion in New Jersey  (D0017224).TXT

2                    In short, the Court is satisfied that
3    plaintiff has failed to make out a case for general
4    jurisdiction over any of the defendants.  Therefore, the
5    Court will issue an order in conformance with this oral
6    decision dismissing all the claims against the
7    defendants in this matter without prejudice for lack of
8    in personam jurisdiction.  Thank you, counsel.
9                    MR. MC CAULEY:   Thank you, your Honor.
10                   MR. CURTIN:  Thank you your Honor.
11                   (Whereupon the proceedings are adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25