Gregory W. Gilliam (GG 2857)
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
MAGWITCH L.L.C.,                                    :    **ORAL ARGUMENT**
                                                    :    **REQUESTED**
                            Plaintiff,              :
                                                    :
            -against-                               :    Case No.: 08cv2144 (LTS)
                                                    :
PUSSER'S INC., PUSSER'S LTD.,                       :    ECF Case
PUSSER'S WEST INDIES LTD., and                      :
CHARLES S. TOBIAS                                   :    (Removed from Supreme
                                                    :    Court, County of New York,
                            Defendants.             :    Index No. 600238/08)
-----------------------------------------------------------------------X

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>PLAINTIFF'S MOTION TO REMAND</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ........................................................................................1

FACTS ........................................................................................................3

ARGUMENT ...............................................................................................5

     A.     Jurisdiction exists under 28 U.S.C. § 1332(a)(3)
             because the BVI, not the United States, is the
             dominant nationality of Defendant Charles Tobias .....................................5

     B.     Alternatively, the Court should exercise its discretion
             to decide defendants' Motion to Dismiss Based on Lack of
             Personal Jurisdiction before deciding the subject matter
             jurisdiction issue raised by plaintiff's Motion to Remand ........................11

     C.     If the Court remands the case, it is possible under
             New York practice that defendants could be barred
             from any opportunity to contest the existence of
             personal jurisdiction ...................................................................................16

CONCLUSION ............................................................................................18

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Action S.A. v. Marc Rich & Co.,*
   951 F.2d 504 (2d Cir. 1991)..............................................................................9, 12

*Bellido-Sullivan v. Amer. Int'l Group, Inc.,*
   123 F. Supp. 2d 161 (S.D.N.Y. 2000)....................................................................11

*Caggiano v. Pfizer, Inc.,*
   384 F. Supp.2d 689 (S.D.N.Y. 2005)....................................................................11

*Cantor Fitzgerald, L.P, v. Peaslee,*
   88 F.3d 152 (2nd Cir. 1996)..............................................................1, 12, 13, 17

*Curley v. Brignoli, Curley & Roberts Assocs.,*
   915 F.2d 81, 85 (2d Cir. 1990)..............................................................................13

*Farmer v. National Life Ass'n of Hartford,*
   93 Sickels 265, 33 N.E. 1075 (1893) ..............................................................2, 17

*First City Fed. Sav. Bank v. Dennis,*
   680 F.Supp. 579, 584 (S.D.N.Y. 1988)…………………………………………...16

*Kery v. American Airlines,*
   962 F. Supp.2d 264 (D. Puerto Rico 1997)............................................................10

*Lehman Government Securities v. Pickholz,*
   1996 WL 447995, *2 (S.D.N.Y. 1996)..................................................................11

*Lemos v. Pateras,*
   5 F. Supp.2d 164 (S.D.N.Y. 1998).........................................................................11

*Newman-Green, Inc. v. Alfonzo-Larvain,*
   490 U.S. 826 (1989)..................................................................................................6

*Quinn v. Booth Memorial Hosp.,*
   239 A.D. 266, 657 N.Y.S. 2d 680 (1st Dep't 1997) ...........................................2, 17

*Ruhrgas AG v. Marathon Oil Co.,*
   526 U.S. 574 (1999)..................................................................................1, 12, 13

*Sadat v. Mertes,*
   615 F.2d 1176 (7th Cir. 1980) ..........................................................6, 7, 8, 9, 11, 12

*Sung v. Wasserstein*,
    415 F. Supp.2d 393 (S.D.N.Y. 2006)...................................................................11

*Turedi v. Coca-Cola Co.*,
    460 F. Supp.2d 507 (2006) ..............................................................................12

*United Mutual Houses, L.P. v. Andujar*,
    230 F. Supp.2d 349 (S.D.N.Y. 2002)...................................................................10

*Weinberg v. Colonial Williamsburg, Inc.*,
    215 F. Supp. 633 (E.D.N.Y.1963) .......................................................................17

## **Statutes**

28 U.S.C. § 1147(c) .........................................................................................10

28 U.S.C. § 1332(a)(2).............................................................................2, 5, 7, 8

28 U.S.C. § 1332(a)(3)............................................................................5, 6, 10

Defendants Pusser's Inc., Pusser's Ltd., Pusser's West Indies Ltd., and Charles S. Tobias (collectively, "Defendants"), by and through their attorneys, submit the following memorandum of law in opposition to motion for remand filed by the plaintiff, Magwitch L.L.C. ("Magwitch") of the State of New York.

## **<u>INTRODUCTION</u>**

The Magwitch gambit is not to offer any meaningful opposition to the Defendants' motion to dismiss for lack of personal jurisdiction, but rather to challenge this Court's subject-matter jurisdiction in a motion to remand. Magwitch is apparently betting that the Court will give automatic primacy to a remand motion, and never reach the merits of Defendants' personal jurisdiction defense. To do this, the Court would have to ignore the cases holding that there is no jurisdictional hierarchy that requires a court to consider a motion to remand before deciding a motion to dismiss based on lack of personal jurisdiction. Notably, in remarkably similar circumstances to the ones here, the Second Circuit affirmed this Court's exercise of its discretion to decide a pending motion to dismiss for lack of personal jurisdiction before considering a motion to remand. *See Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152 (2d Cir. 1996). This sensible approach was later upheld by the United States Supreme Court in *Ruhrgas RG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999).

Magwitch cannot credibly argue that its attack on the Court's subject matter jurisdiction is so simple and compelling that the Court has to decide the remand motion before considering the Defendants' personal jurisdiction defenses. Magwitch itself invoked federal jurisdiction based on the citizenship of the identical parties when it brought the same claims against the same Defendants in New Jersey federal court in June 2007. Its new position on subject matter jurisdiction is not well-founded because it is based on the misapplication of an obscure and

poorly developed judicial doctrine concerning the effect of dual citizenship on alienage jurisdiction under 28 U.S.C. § 1332(a)(2).

Because of the lack of any substantial contacts between the Defendants and New York, and the lack of any significant relationship between Magwitch's claims and New York, Magwitch apparently has decided that its best hope is its remand motion.  If the Court remands, Magwitch would likely seek to avoid any decision on the Defendants' personal jurisdiction defenses by arguing waiver.  There is some support for this position.  A 115-year-old New York case holds that the act of removing a case to federal court constituted a "general appearance" in the state court, and that if the case is remanded back to the state court, a defendant, having generally appeared through the removal petition, could no longer challenge service of process. *See Farmer v. National Life Ass'n of Hartford*, 93 Sickels 265, 33 N.E. 1075 (1893) (filing of a removal petition constituted a general appearance that waived any defect in service of process). This case's holding seemed for many years to be a dead letter until New York's Appellate Division revived it, without analysis, in *Quinn v. Booth Memorial Hosp.*, 239 A.D. 266, 657 N.Y.S. 2d 680 (1st Dep't 1997) (filing a notice of removal in federal court precluded objection to defective service after the case was remanded).

Magwitch has thus plainly calculated that filing an opposition to the Defendants' personal jurisdiction motion in this Court is too risky, as it would only highlight its glaring and considerable weaknesses on this issue.  Rather, it has gambled on putting all of its eggs in the remand basket, and the possibility that the *Farmer* and *Quinn* cases will spell procedural defeat for the Defendants' personal jurisdiction defenses without regard to their substantive merit.

There is no question that the Court's subject matter jurisdiction presents novel and knotty questions about the consequences of the dual nationality of one of the four defendants.  While

Defendants believe this Court has subject matter jurisdiction, they also candidly recognize that fairly resolving that issue will require an intense and careful inquiry into and determination of facts, motives and intentions, as discussed more fully below.  Simpler by far is the Defendants' challenge to personal jurisdiction, to which for obvious tactical reasons Magwitch has offered only token opposition.  Under these circumstances, the Court should consider the Defendants' motion to dismiss before resolving the trickier question of subject matter jurisdiction.

If the Court nevertheless chooses to tackle the question of subject matter jurisdiction first, it should conclude that, by any measure, the dominant nationality of Mr. Tobias is his British nationality as a citizen of the British Virgin Islands ("BVI"), and it is his BVI citizenship, not his U.S. citizenship, that should apply for purposes of diversity jurisdiction.

<u>FACTS</u>

Mr. Tobias was born in Canada and was thus a citizen of Canada and member of the British Commonwealth by birth.  He came to the United States to attend university, after which he enlisted in and served in the United States Marine Corps from approximately 1957 to 1964. *See* Tobias Suppl. Decl. ¶ 2.  As an incident of his military service, Mr. Tobias was given the opportunity to become a naturalized United States citizen, which he accepted.  *See id.*  After being honorably discharged, Mr. Tobias had a brief and successful business career in California. In 1971, he essentially pulled up stakes and left the United States, never to return other than for short visits.  *See id.*  From December 1971 until 1979, Mr. Tobias pursued a dream of sailing around the world.  *See id.*   In 1979, Mr. Tobias founded Pusser's Ltd. in the BVI, and applied for permanent resident status in that British colony.  *See id.* ¶ 3.  From that point in time, Mr. Tobias became domiciled in and established a life for himself in the BVI.

-3-

In 1980, the government of the BVI granted Mr. Tobias permanent resident status, which is roughly equivalent to that of a "green card" in the United States. *See id.* Even though he could have continued to live and work in the BVI without becoming a citizen, Mr. Tobias sought to become a BVI citizen because the BVI became his home during his many years of exclusive residence there. *See id.* ¶ 4. In 1999, after 19 years as a legal permanent resident, Mr. Tobias became a BVI citizen. *See id.* The Certificate granting Mr. Tobias citizenship stated that he "has been ordinarily resident in the Virgin Islands for a period of nineteen (19) years prior to his application and has declared his intention of making his permanent home in the Virgin Islands." *See* Ex. B to the Tobias Decl.

Mr. Tobias also obtained a British Dependent Territories Passport, which is issued to Dependent Territory British citizens, later in 1999. *See* Tobias Suppl. Decl. ¶ 4. In 2002, Mr. Tobias became a citizen of the United Kingdom on the basis of his BVI citizenship and his birth in Canada, a member of the British Commonwealth. *See id.* ¶ 5. He thus has a UK passport in addition to his BVI passport. Mr. Tobias still possesses the United States passport he had before he became a BVI citizen but he has not renewed it since becoming a citizen of the BVI. *See id.* He has no genuine need for his United States passport, as he can travel freely using his British passports. *See id.*

Mr. Tobias did everything required to obtain permanent residency and citizenship status in the BVI and for the past twenty-nine years has considered, and continues to consider, his foremost, dominant nationality to be that of the BVI. *See* Tobias Suppl. Decl. ¶ 6. Indeed, all aspects of Mr. Tobias's life indicate that the BVI is his dominant nationality:

- He was married in the BVI and his wife is also a naturalized BVI citizen. *See* Tobias Suppl. Decl. ¶ 4.

- He made a will in the BVI, with advice from a BVI lawyer, and the executor of his will is a BVI lawyer.  Mr. Tobias expects that he will die and be buried in the BVI. *See id.*

- He is an eligible and active voter in the BVI.  By contrast, he is not registered to vote in the United States and has never registered to vote or voted in any election in the United States.  *See id.* ¶ 7.

- He is a Director on the BVI Tourist Board and Chair of the Marketing Committee. *See id.*

- He has resided in the BVI for the past 29 years and owns real property in the BVI. By contrast, he owns no real property in the United States and has not had a permanent residence in the United States since 1971.  *See id.*

- He maintains a BVI driver's license.  By contrast, he has no driver's license in the United States.  *See id.*

- His boat is berthed in the BVI and registered as a British vessel.  *See id.*

- He holds medical insurance in the BVI.  *See id.*

## ARGUMENT

### A.  Jurisdiction exists under 28 U.S.C. § 1332(a)(3) because the BVI, not the United States, is the dominant nationality of Defendant Charles Tobias.

According to 28 U.S.C. § 1332(a)(3), the district courts have original jurisdiction over an action where the amount in controversy exceeds $75,000 and is one between "citizens of different States and in which citizens or subjects of a foreign state are additional parties."[1]  This case easily satisfies the literal requirements of this statute.  It is undisputed that Magwitch is a citizen of New Jersey for purposes of the application of 28 U.S.C. § 1332(a)(3).  Pusser's, Inc. is a citizen of Florida.  Pusser's Ltd., Pusser's West Indies, Ltd., and Mr. Tobias are all citizens of the BVI.  Magwitch's argument is that because Mr. Tobias has not formally renounced his U.S.

---

[1] Similarly, 28 U.S.C. § 1332(a)(2) provides that the district courts have original jurisdiction over actions between is between "citizens of different States and citizens or subjects of a foreign state."  Although 1332(a)(3) is applicable here because Magwitch and one of the defendants, Pusser's, Inc., are citizens of different states, and the other defendants are citizens or subjects of a foreign state, the analysis of whether Mr. Tobias is a citizen of a foreign state, the BVI, is the same under 1332(a)(2) and 1332(a)(3).

citizenship, only his U.S. citizenship should be considered for purposes of diversity jurisdiction, notwithstanding the undisputed history of his leaving the United States 37 years ago, and becoming domiciled in the BVI in 1979. Magwitch argues that Mr. Tobias's vestigial U.S. citizenship trumps his BVI citizenship and destroys diversity because he is domiciled abroad and considered to be "stateless." *See* Memo. in Support of Remand at 2 – 5.

The crux of the matter is one that has received minimal treatment in U.S. federal courts— whether Mr. Tobias's dominant nationality is that of the BVI such that his BVI citizenship, not his United States citizenship, should be considered for diversity purposes and application of 28 U.S.C. § 1332(a)(3).[2] As explained below, the circumstances establish that Mr. Tobias's BVI citizenship is his dominant citizenship, and that he should be considered a subject of a foreign state for purposes of 28 U.S.C. § 1332(a)(3).

The seminal case about dominant nationality and alienage jurisdiction is the Seventh Circuit's decision in *Sadat v. Mertes,* 615 F.2d 1176 (7th Cir. 1980). In *Sadat,* the plaintiff was born in Egypt and moved to the United States as an adult, where he attended school and worked for several corporations. In 1973, he became a naturalized U.S. citizen, obtaining the consent of his country of birth to this change in his status. That same year, he accepted employment with an American company that required him to relocate to Lebanon. He registered with the U.S. Embassy in Lebanon. He stayed in Lebanon for two years until political unrest and other issues led to the termination of his employment. The plaintiff intended to return to the United States. In 1975, amidst growing political unrest and civil strife in Lebanon, and without sufficient

---

[2] Plaintiff's apparent reliance on the Supreme Court's decision in *Newman-Green, Inc. v. Alfonzo-Larvain*, 490 U.S. 826 (1989), is misplaced. That case analyzed whether a United States citizen domiciled abroad could be a "citizen" of a State under 28 U.S.C. § 1332(a)(1) for purposes of diversity jurisdiction. Unlike *Newman-Green, Inc.*, the question before this Court involves alienage jurisdiction and dual citizenship under 28 U.S.C. § 1332(a)(3). Specifically, the issue is whether the Court should consider a dual BVI / United States citizen who is domiciled in the BVI to be a citizen of a foreign state.

finances to return to the United States, plaintiff fled with his family to the nearest safe place he could—Egypt. Plaintiff remained in Egypt for three years and registered with the U.S. Embassy there.

The complaint in *Sadat* was filed in federal district court in Wisconsin while the plaintiff was in Egypt in 1976, and arose from an automobile accident that plaintiff suffered while on his way to an airport in the U.S. to leave for his employment in Lebanon in 1973. The plaintiff returned to the U.S. in 1978. When plaintiff filed his complaint in *Sadat*, he originally alleged for diversity purposes that he was an American citizen residing in Egypt. It was not until defendants moved to dismiss the complaint on the basis that diversity was absent because plaintiff was domiciled in Egypt and, thus, not a citizen of any U.S. state, that plaintiff changed his view of his own domicile. In response to defendants' challenge, the Plaintiff alternatively argued that diversity jurisdiction was proper because he was a citizen of the United States and resident of Pennsylvania, where he had lived at the time of the accident in 1973 prior to moving to Lebanon. However, the Seventh Circuit concluded that at the time the action was commenced in 1976, the plaintiff was domiciled in Egypt and, thus, could not be considered a citizen of any U.S. state. *See Sadat*, 615 F.2d at 1180.

As a matter of first impression among the circuit courts of appeal, the Seventh Circuit further analyzed whether plaintiff was a citizen of a foreign state by virtue of his dual American-Egyptian citizenship and, therefore, diversity jurisdiction existed under 28 U.S.C. § 1332(a)(2). *Sadat*, 615 F.2d at 1185. The court observed that ordinarily the American citizenship of a dual national should be considered for diversity purposes, which would destroy diversity jurisdiction, but that no single rule could be controlling because of the variety of situations in which dual citizenship could arise. *See id.* at 1187. One such exception to the general rule is the dominant

nationality exception.  According to that exception, the rationale for alienage jurisdiction --

assuring foreign nations that their citizens will have access to and protection of federal courts --

is applicable where a dual citizen's dominant nationality is that of the foreign state and his or her

relationship to the United States is remote and attenuated.  *See i.d.* at 1187.  If the dual citizen

had manifested intent to be a national of the other state and taken "reasonably practicable" steps

to avoid or terminate his status as a U.S. citizen he should be treated as a foreign citizen for

purposes of alienage jurisdiction.  *See id.*

   In *Sadat*, unlike in Mr. Tobias's case, the plaintiff's actions subsequent to his U.S.

naturalization established his resolve to remain a U.S. citizen despite his extended stay abroad.

*See id.* at 1188.  Plaintiff in *Sadat* registered with the U.S. Embassy during his stays in Lebanon

and Egypt, only went to Egypt in 1976 because he could not afford to return to the United States,

voted by absentee ballot in the 1976 U.S. presidential election, and insisted that throughout his

foreign travels he retain his U.S. citizenship, bypassing employment opportunities that may have

been available in Egypt because they might have jeopardized his status as a U.S. citizen.  *See id.*

Even his complaint alleged that he was a citizen of the United States.  It was only as a means of

thwarting the challenge to subject-matter jurisdiction by seeking to establish alienage jurisdiction

under 28 U.S.C. § 1332(a)(2) that the plaintiff sought to assert his Egyptian citizenship.  As a

result, the Seventh Circuit concluded that the plaintiff's actions manifested his continued,

voluntary association with the United States and his intent to remain an American.  *See id.*  Thus,

the Court determined that diversity jurisdiction did not exist under the dominant nationality

exception because the plaintiff's United States citizenship, not his Egyptian citizenship, was the

one to be considered for diversity purposes.

In *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504 (2d Cir. 1991), the Second Circuit relied on *Sadat* and, while it did not expressly adopt *Sadat's* dominant nationality exception, the Second Circuit's analysis in *Rich* is entirely consistent with that exception. In *Rich,* a U.S. citizen, Marc Rich, fled to Europe one step ahead of a criminal investigation and became a naturalized Spanish citizen, apparently to avoid extradition. The Court, in analyzing a federal expatriation statute to determine whether subject matter jurisdiction existed after a default judgment was entered in the U.S., found that Mr. Rich had no intent to relinquish his U.S. citizenship and took actions contrary to any such intent:

- He listed himself in a European commercial register as an American citizen living in Madrid. His American citizenship in the register did not change until after the suit at issue commenced, despite a number of corrections made to other parts of his entry.

- The U.S. Consul in Madrid informed Mr. Rich that he might have lost his United States citizenship by swearing allegiance to Spain and requested that he clarify his intent within 30 days. However, he did not respond for nearly two years.

- Fearing that he might be held in contempt as an American citizen for his company's failure to comply with a subpoena issued by a federal grand jury, Mr. Rich brought an action in a Swiss court, arguing that he was a private individual with American citizenship who was subject to American jurisdiction, and therefore risked sanctions for the company's failure.

Like the plaintiff in *Sadat*, but unlike Mr. Tobias, the U.S. citizen in *Rich* plainly considered his American citizenship paramount, and his relationship with Spain only secondary.

No such actions or intent are present in Mr. Tobias's case. Mr. Tobias was born in Canada and became a naturalized United States citizen. After becoming naturalized and living in the United States for a period, he left the United States in 1971, never to return except for short visits. Unlike the plaintiff in *Sadat*, Mr. Tobias never *intended* to return to the United States, having started a business in the BVI nearly 30 years ago and dropping his anchor there, so to speak, permanently. Indeed, Mr. Tobias has not taken any affirmative steps to maintain his

United States citizenship since becoming a citizen of the BVI in 1999.  To the contrary, all of Mr. Tobias's actions have manifested his intent to remain a citizen of the BVI.  It is hard to imagine what other "reasonably practicable steps" Mr. Tobias could have or should have taken to avoid his United States citizenship, or why he would have done so.  It is on this issue of intent where the limited number of cases addressing dual citizenship and alienage jurisdiction become murky.

Plaintiff alleges that the dominant nationality exception is inapplicable because Mr. Tobias has not taken any steps to terminate his status as a United States national, see Memo. in Support of Remand at 5, and cites to the decision in *Kery v. American Airlines*, 962 F. Supp.2d 264 (D. Puerto Rico 1997).  Reliance on *Kery*, however, is unconvincing.  There, the plaintiff did not present any evidence to show that she had reasonably taken steps to avoid her status as a United States citizen.  The federal court in Puerto Rico determined, without citation to any authority, that the reissuance of plaintiff's U.S. passport only two years before the Court's decision was sufficient in the absence of any contrary evidence from the plaintiff to determine that the dominant nationality exception was inapplicable.  Besides being distinguishable factually, the *Kery* decision does not hold together logically.  If one of the prerequisites to application of the dominant nationality exception is for the dual citizen to have successfully terminated his or her U.S. citizenship, then not really even a dominant nationality exception at all.  Indeed, the person no longer would even be a dual citizen.  Thus, Defendants request that the Court apply the dominant nationality exception and use Mr. Tobias's BVI citizenship for purposes of 28 U.S.C. § 1332(a)(3).  The motion for remand should be denied.[3]

---

[3] Even if the Court were to remand the action to New York state court, Magwitch's request for an award of attorneys' fees is not appropriate under the circumstances at hand.  Indeed, this Court has recognized that requests for fees under 28 U.S.C. § 1447(c) are frequently declined.  *See United Mutual Houses, L.P. v. Andujar*, 230 F. Supp.2d 349, 354-55 (S.D.N.Y. 2002). Defendants' effort to remove this action, even if ultimately unsuccessful, is

**B. Alternatively, the Court should exercise its discretion to decide defendants' Motion To Dismiss Based On Lack Of Personal Jurisdiction before deciding the subject matter jurisdiction issue raised by plaintiff's Motion To Remand.**

The Court may properly postpone a decision on the difficult and novel diversity jurisdiction issue implicated by Mr. Tobias's dual citizenship and the application of alienage jurisdiction, and instead focus first on the existence, or not, of personal jurisdiction over the Defendants.

Defendants' research discovered only two published decisions within the Second Circuit involving dual citizenship and which country's citizenship to apply for diversity purposes, and neither of those discussed the dominant nationality exception. As discussed above, in the *Rich* case the Second Circuit's analysis, while not expressly adopting *Sadat's* dominant nationality exception, was entirely consistent with that exception. In *Lemos v. Pateras*, 5 F. Supp.2d 164 (S.D.N.Y. 1998), the Court determined after a brief review that subject matter jurisdiction did not exist over a dual Greek / U.S. citizen, but there is no indication that the dominant nationality exception was raised by the parties or considered by the Court. In an unreported decision from this Court, *Lehman Government Securities v. Pickholz*, 1996 WL 447995, *2 (S.D.N.Y. 1996), the Court declined to read the Second Circuit's citation to *Sadat* in the *Rich* case as an adoption

---

objectively reasonable considering the paucity of cases on application of the dominant nationality exception set forth in *Sadat*. Considering that Magwitch was the one who originally sought to invoke the jurisdiction of the federal court in New Jersey when it filed suit against the very same defendants, including Mr. Tobias, last summer, Magwitch cannot plausibly suggest that justice requires that Defendants pay its costs and expenses. This Court has observed that the absence of bad faith, as well as the existence of a colorable question as to whether removal is proper, weighs against the award of costs and fees. *See Caggiano v. Pfizer, Inc.*, 384 F. Supp.2d 689, 692 (S.D.N.Y. 2005) (denying a request for fees where defendants' contention that federal question jurisdiction existed did not prevail, but was "far from a frivolous argument"); *see also Sung v. Wasserstein*, 415 F. Supp.2d 393, 408 (S.D.N.Y. 2006) (observing that "absent unusual circumstances, attorney's fees should not be awarded when the removing party has an objectively reasonable basis for removal"); *Bellido-Sullivan v. Amer. Int'l Group, Inc.*, 123 F. Supp. 2d 161, 169 (S.D.N.Y. 2000) (declining to award fees and stating that "removal ... is a complicated and somewhat murky issue"). Furthermore, Defendants offered to extend the time for Magwitch to file a motion for remand so the Court could first consider the personal-jurisdiction question. Magwitch chose instead to move for remand when such a motion may have been rendered unnecessary by disposition of Defendants' personal-jurisdiction defenses. As a result, Defendants respectfully request that the Court deny Magwitch's request for an award of attorneys' fees under 28 U.S.C. § 1147(c).

of the dominant nationality exception.  Therefore, it undertook no analysis of the circumstances

of the defendant's dual citizenship and left the reader to wonder whether the dual citizen was

more aligned with the plaintiffs in *Sadat* and *Rich*, or with Mr. Tobias.  Thus, there is little

available case law to guide this court in how to apply dominant nationality exception in

Mr. Tobias's case.  At the very least, *Sadat* suggests that a searching inquiry into the facts,

motives, and intentions of the dual national must be undertaken.

Based on these overarching legal and factual questions regarding dual citizenship,

Defendants urge the Court to decide their motion to dismiss based on lack of personal

jurisdiction before deciding Plaintiff's motion to remand.

The Supreme Court has concluded that there is "no unyielding jurisdictional hierarchy"

and it is appropriate in some cases for a district court to give priority to a personal-jurisdiction

inquiry before a subject matter jurisdiction inquiry.  *See Ruhrgas AG v. Marathon Oil Co.*, 526

U.S. 574, 578 (1999).  In *Ruhrgas*, the Supreme Court observed that the federal and state

systems are complementary and that cooperation, not conflict, is essential.  *See Ruhrgas*, 526

U.S. at 586.  This flexible system allows for the federal courts to make sensitive judgments, such

as deciding a personal-jurisdiction question before a subject-matter jurisdiction question where

concerns of judicial economy and restraint are overriding.  *See id.* at 586-87.

Even before *Ruhrgas*, the Second Circuit recognized that "[c]onsiderations of judicial

economy and restraint may persuade the court to avoid a difficult question of subject-matter

jurisdiction when the case may be disposed of on a simpler ground."  *Cantor Fitzgerald, L.P., v.

Peaslee*, 88 F.3d 152, 155 (2nd Cir. 1996).  This Court also has favorably recognized the judicial

economy concerns endorsed by the Supreme Court in *Ruhrgas* and the flexibility in the order in

which a court may assess jurisdictional issues.  *See Turedi v. Coca-Cola Co.*, 460 F. Supp.2d

507, 515, 521 (2006) (J. Marrero) (citing the holding in *Ruhrgas* and concluding that the court had jurisdiction to dismiss a suit on the basis of forum non conveniens before determining whether subject matter jurisdiction or personal jurisdiction existed).

In *Cantor Fitzgerald*, the defendants removed the case to federal court and then moved to dismiss because personal jurisdiction was lacking. Plaintiff Cantor Fitzgerald, a limited partnership, subsequently moved to remand because at least one of its partners was a United States citizen domiciled abroad, which plaintiff alleged destroyed diversity jurisdiction. The Second Circuit found that it would have been a waste of judicial resources to entertain further proceedings regarding the district court's subject-matter jurisdiction. *See Cantor Fitzgerald*, 88 F.3d at 155. Before deciding the motion to remand, the Court may have needed to authorize additional discovery and a hearing on whether the limited partnership had any colorable claims against a particular defendant. *See id.* In addition, the Court would have had to determine whether diversity jurisdiction could be preserved by any of the defendants' legal theories. *See id.* at 155-56 (citing *Curley v. Brignoli, Curley & Roberts Assocs.,* 915 F.2d 81, 85 (2d Cir.1990) (recognizing the court's obligation to explore any promising avenue in favor of sustaining subject-matter jurisdiction)). If diversity was lacking, the parties also would have had to re-litigate personal jurisdiction in state court. *See id.* at 156. As a result, the Court went on to review the personal jurisdiction question first.

Thus, the Second Circuit in *Cantor Fitzgerald* already determined that a diversity question relating to domicile outside of the United States was sufficiently more difficult to decide than whether the defendant "transacted business" in New York under New York's long-arm statute, such that the personal jurisdiction issue was determined first. Here, the subject-matter jurisdiction question involves an additional layer of complexity on top of what was at

issue in *Cantor Fitzgerald*—whether the United States or foreign citizenship of a dual citizen should be considered based on the application of the dominant nationality exception, which is an issue that has not been widely addressed by federal courts.  Certainly if the question of subject-matter jurisdiction were as clear as Magwitch argues, it would not have filed an identical action against these defendants, including Mr. Tobias, in federal court in New Jersey, or alleged that the court there had subject matter jurisdiction.  Instead, concerns of judicial economy weigh in favor of the Court's adjudicating the personal-jurisdiction issue before the diversity of citizenship issue.  Contrary to Magwitch's suggestion, the fact that Defendants' memorandum in support of their motion to dismiss is longer than the briefing on the motion to remand does not have any bearing on which issue should be decided first.

As explained in more detail in Defendants' memorandum supporting their motion to dismiss, none of the Defendants has sufficient contacts with New York to subject them to the personal jurisdiction of this Court.  None of the Pusser's entities has any offices, employees, assets or other contacts with New York.  The promissory note and security agreements that are the subject of the dispute were not negotiated or executed in New York, none of them contains forum-selection clauses that implicate New York, none of them involves performance by the parties in New York (except that payments on the Note were sent to a New York bank at the request of Magwitch), and all of them are expressly governed by the laws of the BVI or some jurisdiction other than New York.

Magwitch's Complaint does not contain a single fact to show that Mr. Tobias or the Pusser's entities had "permanent and continuous" contact with New York in the traditional business sense sufficient to satisfy the stringent standard for general jurisdiction.  Similarly, specific jurisdiction over the defendants is lacking because the totality of Defendants' activities

-14-

within New York leads to one inescapable conclusion—Defendants have not purposefully

conducted activities within New York such that they "transacted business" in New York or, in

other words, invoked the benefits and protections of New York law.  Even if Defendants could

be said to have transacted business in New York, specific jurisdiction is lacking because there is

no substantial relationship between Magwitch's claims and the circumstances that Magwitch

might allege suffice as Defendants' "transacting business" in New York.  In any case,

jurisdiction would not be compatible with requirements of due process under the Fourteenth

Amendment because the factors assessed under the due process analysis, including the burden on

a defendant to defend the case in New York, the interest of New York in adjudicating the matter,

and the plaintiff's interest in obtaining convenient relief, weigh heavily against a finding that the

assertion of jurisdiction over Defendants is reasonable.

    Magwitch tries to bolster the existence of personal jurisdiction in its remand motion by

referencing comments made by Defendants' counsel and a federal judge in New Jersey during a

hearing wherein the Court found personal jurisdiction lacking over these defendants in New

Jersey in connection with the same claims Magwitch is now pursuing in New York.  *See* Memo.

in Support of Remand at 6 – 7.  Plaintiff's reliance on the New Jersey hearing further shows, that

when it suited Magwitch to litigate in New Jersey, Magwitch claimed that virtually all of the

events out of which its claims arose took place in or were directed at New Jersey and that all the

alleged harm to Magwitch was felt in New Jersey; however, now that it suits Magwitch to

litigate in New York, Magwitch changed course and seeks to bolster the Defendants' relationship

with New York.

    The excerpts on which Plaintiff relies indicate only that Magwitch is a New York LLC,

Pusser's payment on the Promissory Note was wired to a bank in New York, and Mr. De Vos's

law office in New York was sometimes used as a point of contact for Magwitch. However, Mr.

Tobias recalls, consistent with Mr. De Vos's testimony cited in Defendants' motion to dismiss,

that all significant discussions about the Barclays workout, and Magwitch's part in it, took place

in the BVI or, on at least one occasion, in Barbados. Telephone calls to or meetings with Mr.

De Vos in New York that predated the discussions underlying Magwitch's claims do not suffice

to establish specific jurisdiction. Moreover, Mr. De Vos's legal services to Defendants do not

bear any relationship to Magwitch's purchase of the Note from Barclays, or to Magwitch's

causes of action arising from the purchase, much less the substantial relationship required to

satisfy the jurisdictional test under the New York long arm statute. Nor does the mere payment

on the Promissory Note to a bank account in New York confer jurisdiction over the defendants.

*See First City Fed. Sav. Bank v. Dennis*, 680 F.Supp. 579, 584 (S.D.N.Y. 1988). Thus, the

circumstances to which Plaintiff points do not establish personal jurisdiction under New York

law and merely obscure the fact that Mr. De Vos and Magwitch aimed their conduct at the BVI

and availed themselves of the benefits and protections of BVI law.

## C.     If the Court remands the case, it is possible under New York practice that defendants could be barred from any opportunity to contest the existence of personal jurisdiction.

There is an additional, equitable reason for the Court to exercise its discretion and decide

initially the personal jurisdiction issue in Defendants' motion to dismiss before deciding the

motion to remand. Magwitch acknowledges that Defendants are "free to contest personal

jurisdiction" in New York State court if the case is remanded and Defendants choose to pursue it.

*See* Memo. in Support of Remand at 8. It goes without saying that Defendants are "free to

contest" the existence of personal jurisdiction. What Magwitch fails to mention is that it may be

able to raise a waiver defense pursuant to which a New York state court could decline

consideration of Defendants' challenge to personal jurisdiction if the case is remanded. Thus, if the Court were to decide to remand before considering the personal jurisdiction argument, it could have the effect of precluding Defendants from ever contesting the basis for personal jurisdiction in New York. This possibility sheds light on Magwitch's tactic of trying to circumvent the Court's review of personal jurisdiction by seeking additional time to oppose Defendants' motion and then using that time to fashion a remand motion.

Dated New York precedent holds that once a defendant files a notice of removal, the defendant has made a general appearance and has thus waived any objections to personal jurisdiction. *Farmer v. National Life Ass'n of Hartford*, 93 Sickels 265, 33 N.E. 1075 (1893) (holding that once a notice of removal was filed, the defendant made a general appearance and could not then later contest service of process after the case was remanded). At least one New York Appellate Division decision has affirmed the 115 year-old precedent. *See Quinn v. Booth Memorial Hosp.*, 239 A.D.2d 266, 657 N.Y.S.2d 680 (1st Dep't 1997) (holding without discussion that appellants' filing of a removal petition in federal court effected a general appearance precluding their objections to defective service after the case was remanded to State court). Although those decisions address personal jurisdiction objections based on ineffective service of process, not on the sufficiency of a defendant's contacts with the jurisdiction, the law in New York opens the door for such an argument.

The Second Circuit has held that a notice of removal is not a waiver of any 12(b) defenses in federal court. *See Cantor Fitzgerald*, 88 F.3d at 157 n.4. However, the *Farmer* and *Quinn* cases have led to considerable uncertainty as to how a challenge to personal jurisdiction might play out in state court if a case is remanded. *See Weinberg v. Colonial Williamsburg, Inc.*, 215 F. Supp. 633, 637 (E.D.N.Y.1963) (observing that New York state courts have held that the

filing of a removal petition effects a general appearance, thus waiving any objections to defective service and jurisdiction over the person).

Therefore, were this Court to remand without ever examining the propriety of personal jurisdiction, it is possible that under current New York precedent defendants would be denied an opportunity to dispute personal jurisdiction.

## CONCLUSION

Defendants believe that the Court has subject matter jurisdiction but understand that determination of that issue will require careful scrutiny and the analysis of numerous facts regarding Mr. Tobias's citizenship and his intentions regarding citizenship. Accordingly, the simpler path is for the Court to decide Defendants' challenge to personal jurisdiction, which involves a more routine factual inquiry and the application of well-settled principles regarding long arm jurisdiction and due process. Indeed, the facts and law set forth fully in Defendants' motion to dismiss establish that personal jurisdiction over the Defendants is lacking. Magwitch's tactic of choosing not to confront the personal jurisdiction deficiencies in this case suggest that the Court will decide the remand motion as a matter of course instead of reaching the merits of Defendants' motion to dismiss. Defendants urge the Court not to follow the path Magwitch suggests, especially where Defendants could be precluded from contesting personal jurisdiction in state court if the Court were to remand the case. As a result, Defendants respectfully request that the Court either deny the motion to remand or, alternatively, permit Magwitch reasonable time to oppose Defendants' motion to dismiss and exercise its discretion to first decide the motion to dismiss.

Dated: New York, New York
        April 25, 2008

                            _____s/ Gregory W. Gilliam_____
                            Gregory W. Gilliam (GG 2857)
                            VENABLE LLP
                            Rockefeller Center
                            1270 Avenue of the Americas
                            25th Floor
                            New York, New York  10020
                            Tel: (212) 307-5500
                            *Attorneys for Defendants Pusser's Inc.,*
                            *Pusser's Ltd., Pusser's West Indies Ltd., and*
                            *Charles S. Tobias*

BA2/340441

-19-

Gregory W. Gilliam
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Tel: (212) 307-5500
Attorneys for Defendants Pusser's Inc., Pusser's Ltd.,
Pusser's West Indies Ltd., and Charles S. Tobias

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

MAGWITCH L.L.C.,                                          :

                                         Plaintiff,        :

                -against-                                :

PUSSER'S INC., PUSSER'S LTD.,                 :
PUSSER'S WEST INDIES LTD., and              :
CHARLES S. TOBIAS                                    :

                                   Defendants.       :
-----------------------------------------------------------------------X

Case No. 08-cv-2144

ECF Case

**SUPPLEMENTAL**
**DECLARATION OF**
**CHARLES S. TOBIAS**

      **Charles S. Tobias** makes this declaration pursuant to 28 U.S.C. § 1746, and in

support of the Defendants' Motion to Dismiss and the Defendants' opposition to

Plaintiff's Motion to Remand the above-captioned action.

      1.      My name is Charles S. Tobias, one of the defendants in the above-

referenced action.  I am 73 years of age.  I am competent to testify to the matters set forth

in this declaration.

      2.      I was born in Canada.  I later moved to the United States to attend

university, and after graduation enlisted in the United States Marine Corps, in which I

served from approximately 1957 to 1964.  My military service gave me the opportunity

to become a naturalized United States citizen, which I did while in the Marine Corps.

After being honorably discharged, I had a brief and successful business career in

California. I gave up this career in 1971 to pursue a dream of sailing around the world.

From December 1971 until 1979 I sailed my boat in various parts of the world. I spent

short periods of time in the United States during 1978 and 1979, but I lived on my boat

during these visits.

3.    In 1979, I founded Pusser's Ltd., a corporation formed under the laws of

the British Virgin Islands ("BVI"), and applied for permanent residence in the BVI

shortly thereafter. This status, equivalent to that of a "green card" in the United States, is

one that is only stingily granted. I was fortunate to have my application approved on

June 6, 1980, as evidenced by a Certificate of Residence from the government of the

BVI. A true and accurate copy of this Certificate of Residence is attached hereto as

Exhibit A.

4.    I was married in the BVI, and my wife is a BVI citizen. I could have

continued to live and work in the BVI without becoming a citizen, but I sought out

citizenship here in the BVI because this is my home, and has been my only home since

1979. I became a citizen in the BVI in 1999, after living 19 years here as a legal

permanent resident. In the BVI, a Dependent Territory (colony) of Great Britain,

citizenship is called "Belongership." The government of the BVI granted me a

Certificate attesting that I "belong" to the BVI on March 15, 1999. The Certificate states

that Charles S. Tobias "has been ordinarily resident in the Virgin Islands for a period of

nineteen (19) years prior to his application and has declared his intention of making his

permanent home in the Virgin Islands." A true and accurate copy of this Certificate is

-2-

attached hereto as Exhibit B. I also obtained a British Dependant Territories Passport, which is issued to Dependant Territory British citizens, later in 1999.

5.　　In 2002, I was granted United Kingdom citizenship and a United Kingdom passport. I was able to achieve this because I was by then a citizen of the BVI who had been born in Canada, a member of the British Commonwealth, which qualified me for UK Citizenship and thus a UK passport. I have a United States passport but I have not renewed it since becoming a citizen of the BVI. I have no need for a United States passport, and can enter freely in and out of the United States using my British passports.

6.　　I have done everything required of me to obtain Permanent Residency and "Belongership" status in the BVI and for the past twenty-nine years I have considered, and continue to consider, my foremost, dominant nationality to be that of the BVI. I sought counsel in the BVI to create a will, which I then executed in the BVI. The executor of my will is a BVI lawyer. I expect that I will die and be buried in the BVI

7.　　I am not registered to vote in the United States and I have never registered to vote or voted in any election in the United States. By contrast, I am an eligible and active voter in the BVI. I am a Director on the BVI Tourist Board and Chair of the Marketing Committee. I own real property in the BVI; I own no real property in the United States. I have a BVI driver's license. I have no driver's license in the United States. I own a boat that is berthed in the BVI and registered as a British vessel. I hold medical insurance in the BVI.

8.　　Magwitch untruthfully attempts to cast the relationship among Magwitch, the Pusser's entities and me as one that was centered on New York, much in the same way Magwitch previously and unsuccessfully tried to cast the relationship as one that

centered on New Jersey when it filed a similar action in the federal district court in New Jersey. The events in question did not transpire in New York anymore than they did in New Jersey. It is interesting that the plaintiff's first choice was New Jersey, but in light of his failure there, he is now trying New York as his second choice. All of these events occurred here in the BVI where Mr. De Vos, who was then Pusser's' lawyer and is the sole owner and member of Magwitch, negotiated and effected over many weeks the workout that led to Magwitch's purchase of the Promissory Note that is now at the heart of this dispute.

9.      During the workout of Pusser's Ltd's debt, Mr. De Vos was a shareholder, officer, and director of Pusser's Ltd, in the BVI, as well as its closest legal advisor. He was therefore fully engaged in the workout negotiations and actively participated in the workout process here in the BVI, as it turns out, both for his own account and on behalf of the company he was paid and supposed to represent. He came to the BVI for every key corporate meeting, and he participated in person in every important meeting with Barclays about Pusser's Ltd's attempted debt restructuring. All of these meetings occurred in the Caribbean, most of them in the BVI. None of them was in New York. Not one.

10.      By contrast, neither I nor any of the other Pusser's defendants were ever in New York for any part of this transaction. My records reflect that from 2000 to 2004 I was in New York fewer than five times and on none of those occasions did I go to New York for the purpose of discussing business relating to Magwitch. New York had nothing to do with the relationship between Pusser's and Magwitch, except that payment to Magwitch was made to a New York bank account and communications with Magwitch

-4-

on occasion were made by happenstance through Mr. De Vos's law office in New York, or New Jersey or to Europe by telephone.

11.    After Pusser's Ltd made the Promissory Note to Barclays Bank on May 9, 2002, Magwitch purchased it from Barclays for $1.5 million. When the Promissory Note was sold to Magwitch, Pusser's Ltd was instructed to direct all communications to Magwitch's address in New York. However, when Magwitch formally demanded payment under the Promissory Note in September 2006 it was via a letter to Pusser's Ltd in the BVI that showed a New Jersey address for Magwitch.

12.    Neither I nor the Pusser's entities could ever have reasonably expected to be called into the courts of New York for resolution of the disputes that are the subject of the complaint filed by Magwitch, which all arose out of events and transactions in the BVI. I never supposed that I or the Pusser's entities could be subject to the personal jurisdiction of courts in New York merely because Magwitch purchased a promissory note on which one of the Pusser's companies was the obligor, especially since the promissory note and the related documents were made subject to the laws of the BVI. If Mr. De Vos had advised me that this arrangement made me or my companies subject to jurisdiction in New York, I would not, on behalf of my companies, have agreed to it. I was relying on Mr. De Vos to protect the Pusser's companies and secure appropriate legal protections, for which we paid him thousands of dollars in legal fees.

13.    I would welcome the opportunity to disprove Magwitch's claims in a court of law, but it would be a substantial financial hardship for me and the Pusser's entities to litigate this case in New York and in my view could very well put justice beyond our financial capability. In addition to the added legal expenses expected with defending a

-5-

case far from home, there would be considerable expenses associated with bringing knowledgeable witnesses from the BVI to a New York courtroom. Just getting from the BVI to New York requires a full day of travel. Most of the people familiar with the events out of which Magwitch's claims arise are here in the BVI, including myself, Kert Tennikait (Comptroller of the Pusser's entities), Barclays Bank personnel, Barclays Bank and Pusser's accounting firms, Barclays Bank attorneys (BVI firm of Harney, Westwood and Riegels), Paul Webster (a lawyer in the BVI who is familiar with the Barclays workout and, in addition to Mr. De Vos, was a lawyer for Pusser's), and others. Other than Mr. De Vos, I can think of no other people in or near New York who have relevant information about this case because it all happened here.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Charles S. Tobias*

Charles S. Tobias

Dated: **22 APK 08**

# Exhibit A



VIGILATE

GOVERNMENT OF THE BRITISH VIRGIN ISLANDS

# Certificate

### Certificate of Residence

The Certificate of residence is granted

to    CHARLES S. TOBIAS

of    Toronto, Canada

in accordance with section eighteen of the Immigration Ordinance This Certificate is subject to the condition that the said

CHARLES S. TOBIAS

shall not without the prior permission in writing of the governor engaged in any gainful occupation in the Virgin Islands. Breach of this condition will entail cancellation of the certificate. For and on behalf of the Governor.Chief Immigration Officer.

Endorsements relating to wife and dependant children of holder —

DATE  6th June, 1980

Marion

IMMIGRATION DEPARTMENT
Chief Immigration Officer
BRITISH VIRGIN ISLANDS

# Exhibit B



**VIGILATE**

GOVERNMENT OF THE BRITISH VIRGIN ISLANDS

# Certificate

## that person belongs to the Virgin Islands

Whereas   CHARLES SYDNEY TOBIAS

of   CANADA

has satisfied the Board of Immigration that he is a person of good character over the age of eighteen years and has been ordinarily resident in the Virgin Islands for a period of NINETEEN (19) years prior to his application & has declared his intention of making his permanent home in the Virgin Islands. Now Therefore the Governor hereby grants to the said

CHARLES SYDNEY TOBIAS

a certificate that he belongs to the Virgin Islands for the purposes of the Immigration Ordinance.

Signed for and on behalf of the Governor

Chief Immigration Officer

DATE: 15th March, 1999

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of April, 2008, a true and correct copy

of *Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Remand* and

the *Supplemental Declaration of Charles S. Tobias,* with accompanying exhibits, was

served by electronic mail on:

      Andrew W. Heymann, Esq.
      *aheymann@solpearl.com*

                              s/Gregory W. Gilliam
                              Gregory W. Gilliam